| | |
|---|---|
| 1 | Geraldine A. Valdez (Bar No. 174305) |
| | Kendra J. Hall (Bar No. 166836) |
| 2 | PROCOPIO, CORY, HARGREAVES |
| |    & SAVITCH LLP |
| 3 | 530 B Street, Suite 2100 |
| | San Diego, California  92101 |
| 4 | Telephone: 619.238.1900 |

1 Geraldine A. Valdez (Bar No. 174305)
Kendra J. Hall (Bar No. 166836)
2 PROCOPIO, CORY, HARGREAVES
   & SAVITCH LLP
3 530 B Street, Suite 2100
San Diego, California  92101
4 Telephone: 619.238.1900

5 Attorneys for Defendants Alejandro Diaz-
Barba and Martha Margarita Barba de la Torre

6

7 Stephen B. Morris (Bar No.126192)
Mark C. Hinkley (Bar No. 138759)
MORRIS & ASSOCIATES
8 444 West C Street, Suite 300
San Diego, California  92101
9 Telephone: 619.239.1300

10 Attorneys for Defendant Alejandro Diaz-Barba

D. Anthony Gaston (Bar No. 57074)
Attorney At Law
Corporate Center
550 West C Street, Suite 700
San Diego, California 92101
Telephone: 619.234.3103

Attorneys for Appellant
Martha Margarita Barba de la Torre

11

12              UNITED STATES DISTRICT COURT

13            SOUTHERN DISTRICT OF CALIFORNIA

14 In re:                                   Case No. 3:08-CV-01446-BTM-BLM

15 JERRY LEE ICENHOWER dba Seaview          Appeal from Bankruptcy Court (S.D. Cal)
Properties, and DONNA LEE ICENHOWER,

16                                          Bkr. Case No. 03-11155-LA7
         Debtors
17                                          Adv. Proc. No.: 06-90369
                                           Adv. Proc. No.: 04-90392
18 ALEJANDRO DIAZ-BARBA;
MARTHA MARGARITA BARBA DE LA TORRE   **REQUEST FOR JUDICIAL NOTICE
19                                   IN SUPPORT OF MOTION OF
                                     DEFENDANTS/APPELLANTS
20          Appellant,               MARTHA MARGARITA BARBA DE
                                     LA TORRE AND ALEJANDRO DIAZ-
21     v.                            BARBA FOR STAY OF JUDGMENT
                                     PENDING APPEAL**
22 KISMET ACQUISITION, LLC
                                     Date:  August 28, 2008
23          Appellee.                Time:  4:00 p.m.
                                     Dept.:  15
24                                   Judge:  Honorable Barry Ted Moskowitz

25

26

27

28

Adv. Proc. No. 06-90369; 04-90392

Pursuant to Rule 9017 of the Federal Rules of Bankruptcy Procedure and Rule 201 of the Federal Rules of Evidence, Appellants Alejandro Diaz-Barba and Martha Margarita Barba de la Torre request this Court to take judicial notice of the following documents in support of their motion for stay of judgment pending appeal:

| EXHIBIT NO. | DOCUMENT NAME | FILING DATE |
|---|---|---|
| 1 | Consolidated Findings of Fact and Conclusions of Law | June 2, 2008 |
| 2 | Order Approving Trustee's Motion Authorizing Sale of Assets Outside of Ordinary Course of Business | December 7. 2006 |
| 3 | Order on Motion to Alter or Amend Consolidated Judgment | July 30, 2008 |
| 4 | Tentative Ruling | |
| 5 | Reporter's Transcript of Proceedings | January 18, 2007 |
| 6 | Letter to the Honorable Louise De Carl Adler from Joel Hernandez Garcia | December 14, 2007 |
| 7 | Memorandum of Points and Authorities in Support of Motion to Dismiss | November 28, 2006 |
| 8 | Declaration of Fletcher W. Paddison | November 28, 2006 |

DATED: August 15, 2008              PROCOPIO, CORY, HARGREAVES
                                            & SAVITCH, LLP


                                   By:  /s/ Geraldine A. Valdez
                                        Geraldine A. Valdez, Attorneys for
                                        Defendants Alejandro Diaz-Barba and
                                        Martha Margarita Barba de la Torre

2

115634/000000/954143.01

ENTERED    JUN - 2 2008

FILED

JUN - 2 2008

CLERK, U.S. BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# NOT FOR PUBLICATION

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No. 03-11155-A7 |
| JERRY L. ICENHOWER dba Seaview Properties, and DONNA L. ICENHOWER, | Adv. No. 06-90369-A7<br>Adv. No. 04-90392-A7 |
| Debtors. | |
| KISMET ACQUISITION, LLC, a Delaware limited liability company, Successor-in-Interest to Gerald H. Davis, Chapter 7 Trustee, | **CONSOLIDATED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| Plaintiff, | |
| v. | |
| JERRY L. ICENHOWER, an individual; et al. | |
| Defendants. | |

### I.

### INTRODUCTION

The matter before this Court is the trial of two related adversary proceedings. The first is an action by Kismet Acquisition, LLC ("Kismet" or "Plaintiff"), as successor to the chapter 7 trustee ("Trustee") to avoid and recover the prepetition transfer of real property called the Villa Vista Hermosa, located in the Village of

**EXHIBIT    1**

1  Chamela in the Municipality of La Huerta, State of Jalisco, Mexico (the "Villa

2  Property") pursuant to §§ 544(b), 550 and 551.[1]  The second is an action by Kismet,

3  as successor to the Trustee, to determine that defendant Howell & Gardner Investors,

4  Inc. ("H&G") is the alter ego of debtors Jerry and Donna Icenhower (collectively

5  "Debtors") and/or for substantive consolidation of Debtors and H&G *nunc pro tunc*

6  to the petition date, and to avoid and recover H&G's postpetition transfer of the Villa

7  Property to defendants, Martha Barba Diaz and her son Alejandro Diaz Barba

8  pursuant to §§ 549, 550 and 551 (collectively the "Diaz Defendants").  [2]  The

9  remaining defendants in these actions are the Debtors, H&G and the Diaz

10  Defendants.[3]

11       The Court has subject matter jurisdiction over the actions pursuant to 28 U.S.C.

12  § 1334(b).  The actions are core proceedings pursuant to 28 U.S.C. §§ 157(b)(1) and

13  (2)(B), (E), (F), (H) and (O).  Venue is proper in the Southern District of California

14  pursuant to 28 U.S.C. § 1409(a).

15  **II.**

16  **FINDINGS OF FACT**

17  **A.    Background – Debtors' Relationship with the Lonie Trust.**

18       1.    In or about January 1984, D. Donald Lonie ("Mr. Lonie") established the

19  D. Donald Lonie, Jr., Family Trust under the laws of the State of Nevada (the "Lonie

20  Trust").  Mr. Lonie died in May 1997, at which time the Lonie Trust became

21  irrevocable. The trustees of the Lonie Trust are Stephen E. Lonie, Diane C. Oney and

22  Thomas E. Lonie.

23  _____

24      [1] *Kismet v. Icenhower et al.*, Adv. Proc. No. 04-90392 (hereinafter the "Fraudulent

25  Conveyance Action").

26      [2] *Kismet v. Icenhower et al.*, Adv. Proc. No. 06-90369 (hereinafter the "Alter Ego -

Avoidance Action").

27      [3] *See* Adv. Proc. 06-90369, Doc. # 190, at Ex. 1 (listing the status of each of the defendants

28  in both actions as of trial).

1      2.     Prior to Mr. Lonie's death, Mr. Lonie and the Lonie Trust engaged

2  in business transactions with the Debtors concerning beneficial interests in a

3  *fideicomiso* bank trust which owned the Villa Property located in the restricted

4  coastal zone of Mexico.[4]

5      3.     Prior to Mr. Lonie's death, the Lonie Trust agreed to sell its interest in

6  the Villa Property to the Debtors.  The parties executed a Real Estate Purchase

7  Contract, and Mr. Icenhower executed two promissory notes, an English note and a

8  Spanish note to be recorded in Mexico, reflecting a different dollar amount to avoid

9  Mexican taxes.  Thereafter, the Lonie Trust agreed to release its lien on the Villa

10  Property to assist Mr. Icenhower in consummating a sale of the Villa Property to a

11  third party with the agreement he would re-record the lien if the sale fell through.

12  Mr. Icenhower did not consummate the sale, and he disputed his obligation to re-

13  record the lien. Additionally, a dispute arose regarding which note was the operative

14  note – the English note or the Spanish note.

15      4.     On March 24, 2000, the Lonie Trust initiated an action against the

16  Debtors in the United States District Court for the Southern District of California

17  entitled *Stephen P. Lonie, Diane C. Oney and Thomas E. Lonie, Jr., Family Trust v.*

18  *Jerry L. Icenhower, et al.*, Civ. No. 00-CV-612 (the "district court action"), seeking

19  *inter alia*, a determination of the parties' respective rights and interests in the Villa

20  Property and injunctive relief (the "district court action").

21      5.     On November 24, 2003, the district court entered judgment in favor of

22  the Lonie Trust.  The judgment directed the Debtors to either: (1) pay damages in the

23  amount of $1,356,830.32 and re-register a lien on the Villa Property as security for

24  the damages until paid by a date certain; or (2) reconvey the Villa Property to the

25

26  _____

27    [4] Under Mexican law, a foreign national may not directly hold title to coastal real property in Mexico, but may hold the beneficial interest in a *fideicomiso* bank trust formed to hold title to the real property. Hereinafter, unless otherwise specified, all references to the transfer or sale of the Villa

28  Property refer to the transfer or sale of the beneficial trust interest.

1   Lonie Trust, free of any encumbrance, claim, lien, or liabilities placed on the Property

2   as a result of the Debtors' actions or inactions.  [Pretrial Order ("PTO") entered

3   4/14/08 in Adv. Proc. 06-90369, Doc. # 191, Admitted Facts at ¶ 44]

4        6.    In response to the judgment, Debtors filed this chapter 7 bankruptcy case

5   on December 15, 2003.

6   **B.    Debtors' Relationship with H&G**.

7        7.    H&G is a Nevada Corporation created as a shell corporate entity by

8   Laughlin International, Inc. ("Laughlin") in 2001.

9        8.    On March 4, 2002, at a time when Debtors were facing a motion for

10  preliminary injunction and for summary judgment in the district court action,

11  Mr. Icenhower contacted Laughlin and purchased H&G, paying  $3,424 with his

12  personal credit card. There is no evidence that H&G had any capitalization other than

13  the $3,424 contributed by Mr. Icenhower.  There is no evidence any shares were ever

14  issued in exchange for capital contributions or anything of value.

15       9.    Mr. Icenhower arranged for Laughlin to provide a phone number,

16  physical address and mail forwarding services.  H&G had no separate physical place

17  of business, and simply utilized Laughlin's business address as a place to receive

18  mail.   Mr. Icenhower also asked Laughlin to open a bank account in the name of

19  H&G. However, H&G had no funds of substance in any bank account, or other funds

20  from any source.  Mr. Icenhower paid for Laughlin's continuing services with his

21  personal funds through and including October 22, 2003.

22       10.    Craig Kelley ("Mr. Kelley") served as the sole officer and director of

23  H&G. Mr. Kelley's testimony at trial is that he agreed to serve in these capacities in

24  name only. Mr. Kelley did not understand his duties as the officer and director of a

25  corporation; he testified that he was a president on paper only.  He took all orders

26  from Mr. Icenhower, and executed all documents because Mr. Icenhower told him to

27  sign them. Mr. Kelley testified that he never attended or called any shareholders

28  meeting.  He never met or spoke to any of H&G's purported shareholders and was

- 4 -

1  unaware if there were any shareholders. Also, he was unaware of whether H&G was
2  capitalized.

3       11.    Mr. Kelley was aware of Mr. Icenhower's financial and legal problems.
4  He agreed to help Mr. Icenhower by becoming H&G's officer and director because
5  he felt sorry for Mr. Icenhower, and because he was dating Mr. Icenhower's sister.

6       12.    Mr. Kelley's trial testimony is inconsistent with his earlier deposition
7  testimony and, indeed, a Declaration he executed to alter that testimony. [Ex. "K"]
8  He explained that he gave perjured deposition testimony at Icenhower's urging, felt
9  remorse for doing so and, after consulting his own counsel, contacted Kismet's
10 lawyers to recant the earlier testimony he had given. He executed a Declaration
11 disavowing the earlier testimony which was also, in part, inaccurate. [*Id.*] Many of
12 the inaccuracies in this Declaration appear to be the result of its having been prepared
13 by Kismet's counsel – it is full of "legalese" and Kelley, a substance abuse counselor
14 with no business training, could not explain some of its "statements" because he did
15 not understand them. Also, because he was still trying to protect Mr. Icenhower's
16 sister, he admits the description of how he first met Mr. Icenhower is not accurate.
17 The Court observed his demeanor and his remorse at giving the earlier perjured
18 testimony and finds his explanations to be genuine and his trial testimony sincere and
19 credible.

20      13.    Mr. Icenhower was the point of contact for H&G for all communications
21 from Laughlin until December 18, 2003, at which time he asked Laughlin to remove
22 his name from its records. Mr. Icenhower claims he was contacted by Mr. Diaz in his
23 capacity as the manager of the Villa Property.

24      14.    H&G had no real corporate existence apart from Mr. Icenhower. It had
25 no business purpose other than as a sham company to hold the Debtors' assets.

26      15.    H&G's corporate charter was revoked by the Nevada Secretary of State
27 on January 21, 2006.
28 / / /

C.    **The Debtors' Transfer of the Villa Property to H&G.**

16.    On March 4, 2002, prior to judgment in the district court action, Debtors entered into an agreement to transfer the Villa Property to H&G (the "H&G Purchase Agreement"). The H&G Purchase Agreement provided that H&G would pay $100,000 cash and assume Debtors' intra-family debt in the amount of approximately $140,000 in exchange for Debtors' interest in the Villa Property and another property known as the El Zafiro Property. [Ex. 53] However, there is no evidence that H&G paid any of the recited consideration in exchange for transfer of the properties.

17.    The H&G Purchase Agreement gave Mr. Icenhower absolute control over the operation of the Villa Property, the right to all rental income from the Villa, the responsibility for the payment of the expenses of the Villa, control over any sale, a 10% commission on any sale up to $1.5 million and a right to all proceeds over $1.5 million. Further, the Purchase Agreement provided that H&G was required to sell its beneficial interest in the *fideicomiso* trust if Mr. Icenhower presented it with a buyer that made an offer to purchase that would net H&G $1.35 million.

18.    One week later, the H&G Purchase Agreement was amended and through this amendment, the El Zafiro Property was released from the *fideicomiso* trust and sold to Dr. Robert Miller for $90,000. [Ex. 57] The amended agreement provided that the consideration for El Zafiro was to be paid directly to Mr. Icenhower, not H&G. The amendments further adjusted the purchase price as between the Villa Property and the El Zafiro Property; it reduced the $1.5 million number referenced in Factual Finding ("FF") ¶ 17 above to $1.4 million, and placed slightly different restrictions on H&G's right to sell the beneficial interest in the *fideicomiso* trust. All other terms of the original H&G Purchase Agreement remained the same.

19.    The timing of the Debtors' purchase of H&G from Laughlin, and the execution of the H&G Purchase Agreement transferring the Villa Property from Debtors to H&G, coincided with the Lonie Trust's filing of a motion for a preliminary injunction and for summary judgment in the district court action.

20.     The transfer of the Villa Property from Debtors to H&G was recorded in the Mexican Registry on September 2, 2002.

21.     Debtors never disclosed they had transferred the Villa Property during the district court litigation.

**D.     The Background of the Diaz Defendants.**

22.     Mr. Diaz and Ms. Barba Diaz are citizens of Mexico but residents of San Diego County, California.  Ms. Barba Diaz is Mr. Diaz' mother.

23.     Mr. Diaz has a degree in math and computer science from the University of California at San Diego, and is the officer and/or director or member of numerous limited liability companies and corporations having a principal place of business in San Diego County.  [PTO in Adv. Proc. 06-90369, Doc. # 191, Admitted Facts ¶ 9] Mr. Diaz testified that in 2002 he became chairman of the board of e.Digital Corp., a publicly held company, and was a  member of its audit committee.

24.     Ms. Barba Diaz is a member of the board and was president of XLNC1, Inc., a radio station broadcasting classical music in San Diego.  Further, it is an admitted fact that she is an officer or director of a number of other companies having a principal place of business in San Diego County.  [PTO in Adv. Proc. 06-90369, Doc. # 191, Admitted Facts ¶ 8]

25.     At the time period of the Villa Property transaction, Ms. Barba Diaz and her now-deceased husband were very ill.  She relied on her son and their attorney to handle all aspects of the transaction for her.  She never met Mr. Icenhower before this trial.  She had no personal knowledge who owned the Villa Property at the time of its transfer to the Diaz Defendants.

26.     Ms. Barba Diaz testified she has a warm emotional attachment to the Villa as it was the place where she spent many happy years visiting with their friends, the Kochergas   She also testified that since its acquisition, she was aware the Villa had been advertised as a vacation rental.  Further, she admitted that she owns five other oceanfront vacation properties in Mexico (which she does not rent).

- 7 -

1    **E.    Debtors' Relationship with the Diaz Defendants.**

2    27.    Mr. Icenhower first met Mr. Diaz at a coffee shop in Pacific Beach; they

3    met through Eugene Kocherga ("E. Kocherga"). Mr. Diaz and E. Kocherga were

4    childhood friends, having spent many summers together at the Villa Property when

5    E. Kocherga's family owned the Villa Property. In the Summer of 2003, Mr. Diaz

6    accompanied E. Kocherga on visit to the Villa Property during the planning of a

7    Kocherga family wedding. Mr. Diaz remembers learning Mr. Icenhower was the

8    "manager" of the Villa Property.

9    28.    Mr. Diaz met Mr. Icenhower again at the wedding in August 2003. At

10    this meeting, Mr. Diaz learned from Mr. Icenhower that the Villa might be for sale,

11    but he considered the price too high. In the following months, and into 2004,

12    Mr. Icenhower contacted Mr. Diaz several times concerning a possible sale of the

13    Villa Property at successively lower prices but Mr. Diaz continued to indicate the

14    price was too high.

15    29.    As a result of continuing conversations, Mr. Diaz and Mr. Icenhower

16    finally agreed to a purchase price $1.5 million USD for the Villa Property, and

17    Mr. Diaz commenced his due diligence. While Mr. Diaz was conducting his due

18    diligence, Mr. Icenhower asked Mr. Diaz for a $100,000 personal loan to invest in a

19    golf pro shop. Mr. Icenhower promised he would make monthly payments and repay

20    the balance from the fee he would earn from H&G on the sale of the Villa Property.

21    Although Mr. Diaz did not know Mr. Icenhower very well, he made the loan. The

22    loan is evidenced by a promissory note dated October 7, 2003. [Ex. 1]

23    30.    Mr. Icenhower made the first monthly payment of $750. Then he filed

24    bankruptcy on December 15, 2003. [Ex. 121].

25    31.    Mr. Icenhower did not contact Mr. Diaz to warn him about his

26    bankruptcy filing. Mr. Diaz learned about the bankruptcy when he received the

27    Notice of Commencement of Chapter 7 Bankruptcy Case. Mr. Diaz received this

28    notice because Debtors listed the $100,000 loan in their bankruptcy schedules.

32.    Mr. Diaz was shocked and concerned about the bankruptcy.    He immediately contacted Mr. Icenhower, and they met at Mr. Diaz's residence. Mr. Icenhower explained he filed bankruptcy because he had lost a big judgment to the Lonie Trust which he believed to be improper and unfair.    Additionally, at that time, they discussed the sale of the Villa Property. Mr. Icenhower assured Mr. Diaz the loan would be repaid through a $100,000 reduction of the purchase price by H&G. Mr. Diaz indicates he accepted Mr. Icenhower's explanation and did not feel he needed to separately investigate why Mr. Icenhower had authority to lower the sales price of the Villa Property to repay Mr. Icenhower's personal loan.

**F.    The Diaz Defendants' Due Diligence Efforts.**

33.    The Diaz Defendants used the services of Eduardo Sanchez ("Mr. Sanchez"), a lawyer licensed only in Mexico, to conduct due diligence on their purchase of the H&G interest in the *fideicomiso* trust. Mr. Sanchez testified he is not licensed in the U.S. and is not familiar with U.S. law.

34.    Mr. Sanchez testified that he viewed his role in conducting due diligence as follows:  to determine the legal existence of H&G; to determine that it was a corporation in good standing in the U.S.; to determine that whoever signed the documents of sale on H&G's behalf had the full power of attorney under Mexican law to sell; and to personally review the records of the title to the Villa Property to determine if previous transfers were legally correct and determine whether there were any liens against the Villa Property. To that end, Mr. Sanchez obtained the Articles of Incorporation of H&G [Ex. U-5]; obtained information from the State of Nevada confirming that H&G was a corporation in good standing [Ex. U-4]; obtained a corporate resolution authorizing Mr. Kelley, as the corporation's sole director, to consummate the sale of the beneficial rights in the *fideicomiso* trust. [Ex. 202]; and personally reviewed the property records in the property office in Autlan, Mexico, determining that previous transfers of the Villa Property were legally correct and that there were no liens or legal claims against the Villa Property.

- 9 -

35.    Mr. Sanchez testified he was unconcerned with any requirements under U.S. law for the transfer of this beneficial interest because he viewed the transaction as one solely governed by Mexican real estate law.  He did not request or obtain a shareholders' resolution authorizing the sale of substantially all of H&G's assets and he was unconcerned that the consideration for the sale was being paid to entities other than H&G. Mr. Sanchez was aware of Mr. Icenhower's personal bankruptcy; however, he was unconcerned with it because he viewed the transaction as the purchase of the interest in the *fideicomiso* trust from H&G.  He did not check either the bankruptcy court file or call the Trustee.  Mr. Sanchez testified that he was not told by Mr. Diaz or anyone else that Mr. Icenhower had warned Mr. Diaz that the Trustee was looking into the transaction by which Debtors sold the Villa Property to H&G.  However, the Court observes that Mr. Sanchez also testified that he does not keep any emails or notes from conversations with his clients.

G.    **H&G's Transfer of the Villa Property to the Diaz Defendants**

36.    On March 31, 2004, Mr. Diaz gave H&G a check in the amount of $25,000. [Ex. D] The check states in the "memo" section that it is for the "Vista Hermosa."   Although this check to H&G is purportedly endorsed by Mr. Kelley, Mr. Kelley  testified that he did not sign it.  The fact that the endorsement on the check has Mr. Kelley's name misspelled corroborates Mr. Kelley's claim it is not his signature, as it is highly unlikely he would misspell his own name.

37.    On June 7, 2004, H&G and the Diaz Defendants executed a formal purchase agreement for the Villa Property ("Agreement") [Ex. 2]  The Agreement required the Diaz Defendants to pay stated consideration of $7,508,800 Mexican pesos which is approximately equivalent to $658,071  USD for the Villa Property. However, testimony of Mr. Icenhower, the Diaz Defendants, Mr. Kelley and Mr. Sanchez, establishes that the actual agreed price was $1,500,000 USD. Mr. Diaz, Mr. Sanchez, and Mr. Icenhower acknowledge that the lower stated price in the Agreement was a commonly-used ruse to reduce the Mexican taxes imposed on the

1   sale.

2       38.    On or about June 7, 2004, the closing of the sale of the Villa Property to

3   the Diaz Defendants took place in San Diego, California. Mr. Icenhower, Mr. Kelley,

4   Mr. Sanchez, and Mr. Diaz were present at the closing which was held at the Chula

5   Vista office of Peter Thompson, a lawyer. Even though Mr. Kelley physically signed

6   the documents on behalf of H&G in his capacity as officer and director of H&G, the

7   testimony of Mr. Kelley, and, to some extent, Mr. Diaz, was that Mr. Icenhower

8   controlled the closing of the sale to the Villa Property to the Diaz Defendants .

9   Mr. Kelley was a passive participant. He did what Mr. Icenhower directed him to do.

10  Other than exchanging pleasantries at this meeting, Mr. Kelley had no interaction or

11  communication with the Diaz Defendants.

12      39.    The only consideration paid directly to H&G by the Diaz Defendants

13  was the $25,000 paid in March 2004. [*See* FF ¶ 36]  At the closing, Mr. Icenhower

14  directed the Diaz Defendants to pay the balance of the consideration to third parties

15  as follows: (i) $675,000 USD to Buckeye International Funding, Inc. [Ex. C];

16  (ii) $398,663 USD to Western Financial Assets, Inc. [Ex. A]; and (iii) $191,567 USD

17  to Icenhower Investments, to a bank account controlled by Mr. Icenhower's brother

18  [Ex. B].

19      40.    Neither Mr. Diaz nor Mr. Sanchez  thought it odd that Mr. Icenhower

20  directed them to pay most of the consideration (other than the initial $25,000 paid to

21  H&G in March 2004), to third parties and not to H&G.

22      41.    The Villa Property constituted all of the property owned by H&G.

23  However, the only authorizations for the sale of the *fideicomiso* trust interest to the

24  Diaz Defendants was the corporate resolution by Mr. Kelley as sole director.

25  [Ex. 202] There is no evidence of a shareholder resolution authorizing the transfer

26  of all of the property of the corporation as required by Nevada law and, specifically,

27  by Article TENTH of H&G's Articles of Incorporation. [Ex. U-5]

28  / / /

- 11 -

42.    The sale of the Villa Property from H&G to the Diaz Defendants was recorded in the Mexican Registry on September 8, 2004.

43.    Shortly after the sale was consummated, Mr. Kelley resigned as the officer and director of H&G; Mr. Icenhower informed Laughlin that he and Mr. Kelley were no longer involved with H&G; and Laughlin ceased to provide an address, telephone or mail forwarding services for H&G, as the annual maintenance fees were unpaid.

**H.    The Trustee's Litigation Against the Defendants**

44.    The Debtors first disclosed their transfer of the Villa Property to H&G at their § 341(a) meeting on January 12, 2004. [PTO in Adv. Proc. 06-90369, Doc. #191, Admitted Facts ¶ 35] At the continued meeting of creditors on March 22, 2004, the Trustee questioned the Debtors further regarding this transfer.

45.    On August 23, 2004, the Trustee filed the fraudulent conveyance action to avoid and recover Debtors' transfer of the Villa Property to H&G. Additionally, the Trustee obtained a temporary restraining order and preliminary injunction prohibiting the defendants from transferring or encumbering the Villa Property. [Adv. Proc. 04-90392, Doc. #14; #28; #42] The Trustee did not name the Diaz Defendants in the complaint because he was unaware that H&G had already transferred the Villa Property to the Diaz Defendants.

46.    In or about February 2005, the Trustee learned about H&G's transfer of the Villa Property to the Diaz Defendants. Accordingly, the Trustee filed an *ex parte* application to amend the complaint to include this subsequent transfer to the Diaz Defendants, and he sought and obtained additional injunctive relief restraining the newly added defendants from further transferring or encumbering the Villa Property. [*Id.*, Doc. #63, #65, #71-72]

47.    The Trustee asserted that H&G had violated the first injunction precluding transfer of the Villa Property. However, the sale to the Diaz Defendants had closed *before* entry of the first restraining order, and the Diaz Defendants

- 12 -

1  recorded their deed in the Mexican Registry *before* the Court's Amended Temporary

2  Restraining Order entered on February 5, 2005.

3      48.    On August 3, 2006, the Trustee filed the Alter Ego - Avoidance Action

4  to determine that H&G is Debtors' alter ego and/or for substantive consolidation of

5  Debtors and H&G *nunc pro tunc* to the petition date, and to avoid and recover the

6  postpetition transfer of the Villa Property pursuant to § 549 and § 550.

7      49.    H&G did not appear in either of the actions, and has made no attempt to

8  defend any of the claims alleged against it. The Court has entered the default against

9  H&G in both actions. Accordingly, it is an admitted fact that, as to H&G, the facts

10  alleged in the complaints are deemed admitted. [*See* PTO in Adv. Proc. 06-90369,

11  PTO, Admitted Facts ¶¶ 21-29; PTO in Adv. Proc. 04-90392, Admitted Facts ¶ 14.]

12  **I.    Kismet's Entry into the Bankruptcy Case.**

13      50.    Kismet was a stranger to this bankruptcy case until on or about July 5,

14  2006, when it filed a Notice of Transfer of Claim indicating it had purchased the

15  Lonie Trust's claims against the estate.[5]  [Main Case Doc. # 69]

16      51.    Thereafter, Kismet negotiated with the Trustee to purchase the estate's

17  assets, including assignment of these actions, in exchange for payment of an amount

18  sufficient to pay all creditors in full except its own claims which Kismet voluntarily

19  subordinated ("Asset Purchase Agreement"). The Asset Purchase Agreement was

20  subject to overbid.    Creditors and all interested parties, including the Diaz

21  Defendants, received notice of the motion to sell these actions.

22      52.    At the hearing held November 30, 2006, the Court approved the Asset

23  Purchase Agreement and an order was entered on December 7, 2006. [Main Case

24  Doc. # 95] Pursuant to the Asset Purchase Agreement, Kismet was substituted into

25

26      [5] The Notice of Transfer of Claim indicates Kismet purchased Proof of Claim No. 4 filed

27  in the amount of $1,385,950.65. This claim includes Kismet's claims arising from the judgment and
   from a Joint Litigation Agreement with the Trustee to advance the Trustee's legal fees to prosecute

28  these actions for the benefit of the estate.

1  these actions in place of the Trustee as the real party in interest.

2      53.    The estate remains open for administration. However, Kismet is the only

3  creditor remaining to be paid.

4

**J.**    **Expert Testimony Concerning Due Diligence Required by United**
5        **States Law and the Alter Ego Claim.**

6      54.    Professor C. Hugh Friedman of the University of San Diego Law School

7  ("Prof. Friedman"), an expert in United States corporate law, testified regarding the

8  level of due diligence exercised by the Diaz Defendants. He was asked to assume that

9  the Diaz Defendants did not obtain a copy of a corporate or shareholder resolution

10  authorizing the sale of all of H&G's property (the Villa Property); did not obtain any

11  representations or warranties regarding proper corporate authorization to complete

12  the sale; and did not obtain any written authorization from H&G to direct payment

13  of the consideration for the sale to a bank in Visalia, California to the order of third

14  parties, not H&G.    Assuming these facts, which were all proved at trial, Prof.

15  Friedman testified that the standard of care was well below the expected customary

16  standard of care and practice for a buyer or someone acting on behalf of the buyer

17  and, in his view, totally inadequate.

18      55.    Prof. Friedman was further asked to assume the following facts, all of

19  which were also proved at trial:

20  •    that Mr. Icenhower had extensive correspondence with Laughlin regarding

21      payment of their fee and payment of Nevada taxes to keep H&G in good

22      standing; that Mr. Icenhower paid these fees and taxes as requested;

23  •    that there was no evidence of transfer of assets or other capitalization of H&G

24      other than the Icenhower-owned property (the Villa Property and El Zafiro);

25  •    that the transfer of the property to H&G occurred at a time when

26      Mr. Icenhower was under the threat of issuance of an injunction;

27  •    that there was no evidence of a corporate resolution to issue stock;

28  / / /

- 14 -

1    •    that there was no evidence of shareholders whose names were recorded in the

2    corporate register;

3    •    that the only officer was a straw or "dummy" officer who exercised no

4    discretion but did what he was told by Mr. Icenhower;

5    •    that the corporation had no address or phone number other than that of

6    Laughlin, the original seller of the corporate shell;

7    •    that the Diaz Defendants were aware that Mr. Icenhower had previously owned

8    the Villa Property and had a continuing role in managing the property, and was

9    the sole person negotiating its sale on behalf of H&G; and

10    •    that the Diaz Defendants were told by Mr. Icenhower that he would reduce the

11    price of the Villa Property being purchased from H&G to repay them for the

12    $100,000 loan discharged in his personal bankruptcy.

13    Based on the foregoing facts, it was Prof. Friedman's opinion that

14 Mr. Icenhower had total control of H&G and that H&G is the alter ego of

15 Mr. Icenhower. The Court finds this opinion persuasive and adopts it as the finding

16 of the Court.

17 **K.**    **Expert Testimony Concerning Due Diligence Required by Mexican Law.**

18

19    55.    Professor Jorge Vargas of the University of San Diego Law School

20 ("Prof. Vargas"), testified on behalf of the Diaz Defendants about Mexican law

21 governing the sale of interests in *fideicomiso* trusts. Prof. Vargas' testimony

22 concerning the transaction at issue was somewhat inconsistent. First, he testified that

23 disputes involving beneficial interests in *fideicomiso* trusts holding title to real

24 property in the restricted coastal zone of Mexico are more in the nature of *in rem*,

25 rather than *in personam* actions under Mexican law because of the application of the

26 / / /

27 / / /

28

- 15 -

Calvo clause.[6] However, on cross-examination, he admitted that in an article he authored in March 2007, he opined that he considered the Calvo clause a "legal relic."

56.    Second, Prof. Vargas testified at length on direct examination about the sufficiency of the due diligence conducted by the Diaz Defendants. In his opinion, once the Diaz Defendants' counsel Mr. Sanchez determined that previous transfers of the Villa Property were regular, that the transferor corporation, H&G, was in good standing; that the notary public certified there were no liens or claims against the Villa Property, and that there was a proper corporate resolution, the transaction could close and would be a legitimate and complete transaction under Mexican law.

57.    On cross examination, Prof. Vargas testified as to what he believed was a higher duty of due diligence in a cross-border transaction. For example, he stated that some investigation into the nature of the business and the reputation of the selling (or buying) a U.S. corporation should be conducted to avoid involvement in money laundering by drug or arms dealers; that some contact with the U.S. corporation by telephone should be attempted; that some information about the capitalization of the U.S. corporation should be obtained; and, generally, that getting into the "intricacies" of the U.S. corporation was a necessary part of due diligence in a cross-border transaction. Prof. Vargas stated that in his view, it was the obligation of Mexican counsel to do this investigation or associate U.S. counsel to assist in that investigation. He opined that failure to do this was negligence in performing due diligence. Thereafter, the next day, on redirect by the Diaz Defendants' counsel, Prof. Vargas retracted this testimony and his opinion of negligence, characterizing it as excessively academic.

58.    Finally, as to questions posed by the Court, Prof. Vargas stated that Mexican corporations operate in a manner similar to U.S. corporations; that is, they

---

[6] The Calvo clause is a doctrine of Mexican law which holds that judgments rendered by foreign courts purporting to affect real property in Mexico are unenforceable as against the public interest of Mexico, and contrary to the exclusive sovereignty of Mexico over its realty.

operate through the mechanism of corporate resolutions and they require a shareholders' resolution to dispose of substantially all of the property of a Mexican corporation.

59.    Eduardo Bustamante ("Mr. Bustamante") testified on behalf of Kismet in rebuttal to Prof. Vargas' opinion of the regularity of the Villa Property transaction and the sufficiency of due diligence.  Mr. Bustamante is an attorney licensed in Mexico since 1979.  He obtained a Masters in Law from a U.S. university and then returned to private practice in Mexico, doing commerical and civil litigation and eventually specializing in cross-border business and real estate transactions.  He and his firm represent Fortune 500 companies.  He has testified in court proceedings at least five times as an expert witness, as well as been employed in that capacity at least ten times.  He is also designated as an official translator for the State Supreme Court of the Northern Baja Peninsula.

60.    Mr. Bustamante identified the following items as "red flags" that required additional enquiry by the Diaz Defendants:

- Article SIXTH of the Purchase Agreement conveys not only the *fideicomiso* trust interest but also personalty, including vehicles, but there is no warranty by the seller H&G that the personalty was legally within Mexico. [Ex. 2] Mr. Bustamante stated this is a significant omission because vehicles, for example, have to be properly imported into Mexico, otherwise they are contraband.  A carefully crafted purchase agreement would not only contain warranties of title to the personalty but also require the seller to substantiate his claim of ownership.  Mr. Bustamante says that, in his opinion, such omission indicates the parties were in a rush to close the transaction.

- The disparity between the stated purchase price ($7,508,800 Mex. Pesos or $678,071 USD), versus the actual price for the purchase of $1,500,000 USD, was irregular.  It was his opinion that where there is this sort of disparity, either the seller is misleading the buyer or there is collaboration between them in

1    understating the purchase price so that the transaction has a "discount" by way

2    of incurring less taxes.

3    ●   Payment of the consideration to entities other than H&G required additional

4        due diligence by the Diaz Defendants or their counsel because a purchaser has

5        to know where the proceeds are going to avoid violating Mexican laws about

6        money laundering.

7    ●   The 2002 H&G Purchase Agreement between Mr. Icenhower and H&G which

8        gave Mr. Icenhower total control over management and sale of the Villa

9        Property, and the right to retain all rentals, should have raised questions about

10       the relationship between Mr. Icenhower and H&G.  [FF ¶ 17]

11   61.   In completing his review of Mr. Sanchez' file, it was Mr. Bustamante's

12   opinion that the due diligence of the Diaz Defendants was lacking.  Because of

13   irregularities he identified in the transfers between the prior holders of interests in the

14   *fideicomiso* trust, he believes, at minimum, Mr. Sanchez should have tried to contact

15   the prior owners of the *fideicomiso* trust interests  *(e.g.,* the Lonie Trust or its

16   beneficiaries, or their counsel) to find out if any residual interest was being asserted.

17   That investigation would have revealed the district court litigation which precipitated

18   Mr. Icenhower's transfer to H&G.  When pressed on cross-examination,

19   Mr. Bustamante characterized the failure to do this as negligent.

20   62.   Further, Mr. Bustamante disagreed with Prof. Vargas' characterization

21   of the rights in the *fideicomiso* trust as *in rem* rights, stating that they are *in personam*

22   rights.  This point is critical to determining whether the Trustee or his predecessors,

23   the Lonie Trust and the Lonies, could have recorded a "preventative notice" of the

24   pending litigation, providing public notice of a claim against the trust beneficiary.  It

25   was Mr. Bustamante's uncontroverted testimony, based on his experience, that a final,

26   nonappealable judgment would first have had to be obtained before that order could

27   be  domesticated into a foreign judgment in Mexico to lien  *in personam* rights held

28   by a *fideicomiso* trust.   Since the Lonie Trust's judgment was prevented from

1 becoming a final, nonappealable order by Icenhower's bankruptcy, no preventative
2 notice could have been recorded against the trust interest holding the Villa. Mr.
3 Bustamante's explanation is clear, consistent and persuasive.

4      63.    The Court has weighed the testimony, experience and demeanor of
5 Mr. Sanchez, Prof. Friedman, Prof. Vargas and Mr. Bustamante and, based on the
6 findings made above, finds that the Diaz Defendants exercised insufficient due
7 diligence in determining whether the purchase from H&G was legally sufficient and
8 permitted.

9 **L.    Other Facts that Should have Triggered Further Enquiry.**

10      64.    In addition to the inadequate due diligence found in Factual Findings
11 ¶¶ 57-63 above, the Court finds that Diaz Defendants knew or should have known the
12 following facts prior to the closing of the sale of the Villa Property:

13      65.    Mr. Diaz knew that even though the interest in the Villa Property was
14 titled in H&G, Mr.Icenhower retained total control over the management of the Villa
15 Property and its sale price, including the right to reduce that price to repay his
16 personal debts. Mr. Diaz asked no questions about how Mr. Icenhower could adjust
17 the Villa Property sales price. Moreover, Mr. Diaz knew that Mr. Icenhower, a person
18 he barely knew, had approached him for a $100,000 loan just two months before
19 filing bankruptcy without any warning. Mr. Diaz admits he was concerned and he
20 should have been on heightened enquiry. Had Mr. Diaz conducted *any* independent
21 investigation into the bankruptcy, he would have discovered the district court action
22 involved the Villa Property and the Trustee was questioning the Debtors' transfer of
23 the Villa Property to H&G.

24      66.    The Diaz Defendants had actual notice of the possibility of litigation by
25 the Trustee (i) challenging the Debtors' sale of the Villa Property to H&G; and
26 (ii) attempting to tie Debtors with H&G. Mr. Icenhower is one hundred percent
27 certain he discussed the possibility of the litigation with the Diaz Defendants,
28 including the Trustee's claim that H&G was a "shell." He is certain these

1   conversations took place "prior to closing" because he used these facts to hurry up
2   Mr. Diaz's decision to purchase the Villa. He wanted Mr. Diaz to understand that if
3   he wanted to purchase the Villa Property, he needed to act quickly. Mr. Diaz
4   acknowledges the conversation but disputes the timing, claiming it occurred after the
5   close of the transaction.

6        67.    The Court finds that although Mr. Icenhower may be partially mistaken
7   about the scope of that conversation, the conversation about possible litigation
8   avoiding the Debtors' transfer of the Villa Property to H&G did, in fact, take place
9   prior to closing. Mr. Icenhower is a witness who has aligned himself with the Diaz
10  Defendants throughout this litigation. He has no reason to lie about the timing of his
11  disclosure of possible litigation.

12       68.    The Diaz Defendants had in their possession prior to closing the actual
13  Articles of Incorporation of H&G which require a shareholders' resolution to sell
14  substantially all of the property of H&G. They knew that no such resolution had been
15  provided.

16       69.    Consistent with Mr. Icenhower's testimony, Mr. Diaz and Mr. Sanchez
17  testified they were unconcerned about the possibility of litigation against Icenhower
18  in the United States. Mr. Diaz and his counsel had done due diligence in Mexico, and
19  relied upon their finding of no liens filed against the Villa Property

20       70.    Craig Kelley, the purported president of H&G, did not participate in the
21  closing of the sale other than to sign documents handed to him by Icenhower.

22  **II.**

23  **CONCLUSIONS OF LAW**

24
25  A.   **Kismet is Entitled to Judgment on its Claims in the Alter Ego - Avoidance Action.**

26      1.    **H&G is Debtors' alter ego.**

27       71.    To prevail on a claim for alter ego, the plaintiff must demonstrate that:
28  (1) the corporation is influenced and governed by the person asserted to be the alter

1  ego; (2) there is such unity of interest and ownership that one is inseparable from the
2  other; and (3) the facts must be such that adherence to the corporate fiction of a
3  separate entity would, under the circumstances, sanction a fraud or promote injustice.
4  *Polaris Indus. Corp. v. Kaplan*, 103 Nev. 598, 601 (1987).  The plaintiff in an alter
5  ego action must show the three factors by a preponderance of the evidence. *LFC Mktg.*
6  *Group, Inc. v. Loomis*, 116 Nev. 896, 904 (Nev. 2000).

7       72.    In determining whether the "unity of interest and ownership" prong is
8  satisfied, the Nevada Supreme Court requires a finding of equitable ownership, taking
9  into consideration all factors such as comingling of funds, undercapitalization,
10  unauthorized diversion of funds, treatment of corporate assets as the individual's own,
11  and failure to observe corporate formalities.  *See North Arlington Medical Bldg, Inc.*
12  v. *Sanchez Const. Co.*, 86 Nev. 515, 522 n. 8 (1970).  Moreover, under Nevada law,
13  it is not necessary for the plaintiff to prove the alter ego's ownership of shares of the
14  corporation in order to prove unity of ownership. *LFC Mktg. Group*, 116 Nev. at 905;
15  *see also Mallard Automotive Group, Ltd. v. LeClair Management Corp.*, 153 F.Supp.
16  2d 1211, 1215 (D. Nev. 2001).

17       73.    In determining whether the facts are such that adherence to the corporate
18  fiction would sanction a fraud or promote injustice, courts have held  an alter ego
19  finding is appropriate where an entity has been used as an instrumentality against the
20  rights of creditors: where the defendants "have each engaged in transactions with the
21  actual intent to hinder, delay or defraud creditors .... the liability of the corporate
22  pawns for that scheme will be visited  upon the controlling individual."*In re National*
23  *Audit Defense Network*, 367 B.R. 207, 230 (Bankr. D. Nev. 2007).  In this respect,
24  "'[i]t is not necessary that the plaintiff prove actual fraud.  It is enough if the
25  recognition of the two entities as separate would result in injustice.'" *In re Giampietro*,
26  317 B.R. 841, 849 (Bankr. D. Nev. 2004) (citing *McCleary Cattle Co. v. Sewell*, 73
27  Nev. 279, 282 1957)).

28  / / /

74. Where (as here) the plaintiff seeks to pierce the corporate veil in reverse, it is proper to infer equitable ownership and pierce the corporate veil in reverse, based upon findings of the individual's dominion and control of their corporate alter ego. The Nevada Supreme Court explained:

> [Defendant entity] argues that the district court blurred the second element – unity of ownership – with the first – influence and control. [Defendant entity] underscores the fact that William does not own a single share of [Defendant entity], and thus argues that this element cannot be found. We disagree. Although ownership of corporate shares is a strong factor favoring unity of ownership and interest, the absence of corporate ownership is not automatically a controlling event. Instead, the "circumstances of each case" and the interests of justice should control. *This is especially true when considering the ease with which corporations may be formed and shares issued in names other than the controlling individual.*

*LFC Mktg. Group*, 116 Nev. at 904-5 (citations omitted)(emphasis added); *accord Mallard Automotive*, 153 F.Supp. 2d at 1215-16.

75. In this case, the Court found that Mr. Icenhower had complete control over H&G; that H&G had no separate corporate existence and no business purpose other than serving as a sham holding company for Debtors' assets; and that H&G is the alter ego of Mr. Icenhower. [FF ¶ 14; ¶¶ 54-55]

76. The remaining question is whether the circumstances of this case require the corporate veil to be pierced in reverse to prevent a fraud or injustice. In making this determination, the Court must weigh both the reasonable expectations of Kismet who stands in the shoes of the Trustee's predecessor, the Lonie Trust, in its dealings with Mr. Icenhower, and the reasonable expectations of the Diaz Defendants who claim to have dealt with H&G as a separate corporate entity and to have purchased the Villa Property from H&G in good faith. *See e.g. In re Flamingo 55, Inc.*, 242 Fed. Appx. 456, 457-58 (9th Cir. 2007) (Nevada).

77. In contrast, the Diaz Defendants have asked the Court to ignore the reasonable expectations of the Lonie Trust and to focus, instead, on Kismet's reasonable expectations. They point out that Kismet was never a victim of

- 22 -

1  Mr. Icenhower's fraudulent scheme, having been a stranger to the transaction and the
2  bankruptcy case until 2006. [FF ¶¶ 50-53] Kismet is building a golf resort which
3  surrounds the Villa Property. Kismet's alleged motive is to acquire the Villa Property
4  as a "crown jewel" for its golf resort. The Court made no findings concerning these
5  objectives because they are irrelevant to the alter ego claim. Kismet, stands in the
6  shoes of the Trustee who brought the alter ego claim on behalf of the Lonie Trust and
7  other creditors of the estate. As such, the relevant inquiry is not Kismet's objectives
8  or the timing of its entry into this case. The relevant inquiry is *the reasonable*
9  *expectations of the estate's creditors and others who dealt with the Debtors and H&G*
10 *at the time the Villa Property transaction closed*. If this enquiry reveals that
11 adherence to H&G's corporate fiction would sanction a fraud or promote injustice, the
12 remedies of alter ego and reverse veil piercing are appropriate. Here, the evidence
13 demonstrates the Lonie Trust dealt with the Debtors in good faith, and it had a
14 reasonable expectation that its claim would be paid, or the Villa Property would be
15 reconveyed to the Lonie Trust free of any encumbrances or liens. [FF ¶¶ 1-5]  In
16 contrast, as more fully set forth in Conclusions of Law ("CL") ¶¶ 102-105 below, the
17 evidence demonstrates the Diaz Defendants lacked good faith.  They had no
18 reasonable expectation they were dealing with H&G as a separate corporate entity, or
19 that they would be purchasing the Villa Property from H&G free of any claims of the
20 Trustee. [FF ¶¶ 54-55; ¶¶ 60-63; ¶¶ 64-70]

21     78.  The Court concludes the equities of this case support the remedies of alter
22 ego and reverse piercing of the corporate veil *nunc pro tunc* to the petition date. The
23 factual reality is that Mr. Icenhower and H&G were one and the same. Mr. Icenhower
24 was the equitable owner of the Villa Property on the petition date, and the Diaz
25 Defendants had ample notice of his equitable ownership before the Villa Property
26 transaction closed.

27     79.  Further, it is appropriate to substantively consolidate H&G with the
28 Debtors' bankruptcy estate. *See In re Bonham*, 229 F.3d 750, 763-64 (9th Cir. 2000).

1  The *Bonham* test requires that the court consider two factors: "(1) whether creditors

2  dealt with the entities as a single economic unit and did not rely on their separate

3  identity in extending credit; or (2) whether the affairs of the debtor are so entangled

4  that consolidation will benefit all creditors." *Id.* at 766. "The primary purpose of

5  substantive consolidation 'is to ensure the equitable treatment of all creditors.'"

6  *Bonham*, 229 F.3d at 764 (quoting *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515

7  (2nd Cir. 1988)). It allows a truly equitable distribution of assets by treating the

8  corporate shell as a single economic unit with the bankruptcy estate. *Id.* at 768. Here,

9  the same facts that support alter ego and reverse veil piercing support substantive

10  consolidation to return the Villa Property (H&G's sole asset) to the Debtors'

11  bankruptcy estate *nunc pro tunc* to the petition date. *See Id.* (finding that substantive

12  consolidation *nunc pro tunc* to the petition date would allow a truly equitable

13  distribution of assets because it would make it possible for the trustee to pursue

14  avoidance actions for the benefit of the creditors of the consolidated bankruptcy

15  estates).

16      **2.    The Villa Property is property of the estate so the transfer to the**
         **Diaz Defendants is avoidable under 11 U.S.C. § 549 as an**
17       **unauthorized postpetition transfer.**

18      80.    Under 11 U.S.C. § 541(a), "[t]he commencement of a case under section

19  301, 302, or 303 of this title creates an estate." The estate is comprised of, *inter alia*,

20  "all legal or equitable interests of the debtor in property as of the commencement of

21  the case."

22      81. Section 549(a) allows a trustee to avoid a transfer of property of the estate

23  made after the commencement of the case which is not authorized under the

24  Bankruptcy Code or by the court. *In re Goodwin*, 115 B.R. 674, 676 (Bankr. C.D. Cal.

25  1990). Section 549(c) creates an exception to avoidance to protect innocent

26  purchasers of real property who had no knowledge of the pending bankruptcy case.

27  *In re Tippett*, 338 B.R. 82, 87-88 (9th Cir. BAP 2006).

28  / / /

- 24 -

82.    The Court's finding of alter ego and its substantive consolidation of H&G into the Debtors' estate *nunc pro tunc* to the petition date promotes the equitable reality that the Villa Property was property of the estate on the petition date.   The transfer of the Villa Property from the bankruptcy estate to the Diaz Defendants was an unauthorized postpetition transfer of property of the estate avoidable under § 549(a).

83.    The Diaz Defendants have no defense to avoidance because they admit knowledge of the Debtors' bankruptcy case prior to the closing of the Villa Property transaction. [FF ¶ 31]  Further, as more fully set forth in CL ¶ 103-106   below, the Court finds the Diaz Defendants lacked good faith.

### 3.    Kismet's recovery of the avoided postpetition transfer pursuant to 11 U.S.C. § 550(a)(1) is absolute.

84.    Section 550(a) of the Bankruptcy Code provides that to the extent that a transfer is avoided under §§ 544, § 545, 547, 548, 549 or 724(a), the trustee may recover, for the benefit of the estate, the property transferred, or if the court so orders, the value of such property,  from – (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.   Quite simply put, § 550 identifies the parties liable for repayment of an avoided transfer, and empowers the trustee to recover the property transferred or its value for the benefit of the estate. *In re Brun*, 360 B.R. 669, 672 (Bankr. C.D. Cal. 2007).

85.    The purpose of § 550(a) is "'to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred.'" *In re Straightline Investments, Inc.*, __ F.3d __, 2008 WL 1970560 at *9 (9th Cir. May 8, 2008) (citing *In re Acequia, Inc.*, 34 F.3d 800, 812 (9th Cir. 1994)); *Brun*, 360 B.R. at 674-75. If the value of the property has declined following a fraudulent transfer, returning devalued property itself would not make the estate whole.  In such instances, the courts have awarded a money judgment.  On the other hand, when the property has appreciated,

1    the trustee is entitled to recover the property itself, or the value of the property at the

2    time of judgment.  The statute, in prescribing alternatives, is purposefully flexible to

3    accomplish its remedial goal.  *Brun*  at 674-75;  *In re American Way Service Corp.*,

4    229 B.R. 496, 531-32 (Bankr. S.D. Fla. 1999).

5        86.    The Trustee's entitlement to recover an avoided transfer from the initial

6    transferee is absolute under § 550(a)(1).  *In re Cohen*, 300 F.3d 1097, 1102 (9th Cir.

7    2002).  In contrast, § 550(b) provides an exception to the right of recovery against an

8    "immediate or mediate" transferee of the initial transferee who takes for value, in good

9    faith and without knowledge of the voidability of the transfer avoided, or any

10   immediate or mediate good faith transferee of such  transferee.    This good faith

11   defense is only available to subsequent transferees.    *Cohen*, 300 F.3d at 1102; *In re*

12   *Presidential Corp.*, 180 B.R. 233, 236 (9th Cir. BAP 1995).

13       87.  In the present case, as more fully set forth in ¶¶ 80-83 the Diaz

14   Defendants have no defense to the Trustee's § 549 postpetition avoidance claim.

15   Pursuant to § 550(a)(1), they are strictly liable  *as initial transferees* to return the

16   avoided transfer, or its value to the bankruptcy estate.

17
**B.     Alternatively, Even if the Court Declined to Apply the Remedies of Alter**
18   **Ego and/or Substantive Consolidation, Kismet is Entitled to Judgment on**
     **its Fraudulent Conveyance Action.**
19
     **1.    The Debtors' transfer of the Villa Property to H&G is avoidable**
20   **under 11 U.S.C. § 544(a), pursuant to California law.**

21       88.    Pursuant to § 544(b)(1), "the trustee may avoid any transfer of an interest

22   of the debtor in property ... that is voidable under applicable law ...."

23       89.    Under California law, an unsecured creditor may avoid a fraudulent

24   transfer to the extent necessary to satisfy the creditor's claim.  *See* Cal. Civ. Code

25   §§ 3439.04 and 3439.07.  A "transfer" as defined by California law, "means every

26   mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing

27   of or parting with an asset or an interest in an asset, and includes payment of money,

28   release, lease, and creation of a lien or other encumbrance." Civ. Code § 3439.01(i).

- 26 -

1  An "asset" means unencumbered, non-exempt equity in property of a debtor.  Civ.
2  Code § 3439.01(a).

3       90.   A transfer is fraudulent and avoidable under California law if the debtor
4  made the transfer or incurred the obligation as follows: "With actual intent to hinder,
5  delay, or defraud any creditor of the debtor."   Civ.  Code  §  3439.04(a)(1).
6  Alternatively, a transfer is otherwise avoidable as a fraudulent transfer if the debtor
7  made the transfer or incurred the obligation without receiving reasonably equivalent
8  in exchange for the transfer or obligation, and the debtor either: (A) was engaged in,
9  or was about to engage in, a business or a transaction for which the remaining assets
10  were unreasonably small in relation to the business or transaction; or (B) intended to
11  incur, or believed or reasonably should have believed that he or she would incur, debts
12  beyond his or her ability to pay.  Civ. Code § 3439.04(a)(2).

13       91.   Further, in establishing a prima facie case for fraudulent transfer, the
14  plaintiff is required to show that the debtor  made the transfer or incurred the
15  obligation within four years of bringing the action, or if later, within one year after the
16  transfer or obligation was or could have reasonably been discovered by the plaintiff.
17  Civ. Code § 3439.09(a).

18       92.   There is a clear distinction between the law governing the avoidability
19  of a fraudulent transfer, and the law governing the trustee's recovery of an avoided
20  transfer.  Section 550 separates the concepts of *avoiding* a transfer (*i.e.*, the transfer
21  from the Debtors to H&G), and *recovering* from the initial transferee (H&G) or any
22  immediate or mediate transferees of the initial transferee (the Diaz Defendants).  *See*
23  *Acequia, Inc.*, 34 F.3d at 809.  "[W]hile California law governs whether and to what
24  extent a transfer of property is voidable, the value of the avoided transfer, and
25  therefore, the recovery is governed by § 550(a), irrespective of any recovery
26  limitations imposed by California law." *Brun*, 360 B.R. at 672.

27       93.   In this case, the Diaz Defendants acknowledge that the applicable transfer
28  to be *avoided* under § 544(b) and pursuant to California law, is the Debtors' transfer

of the Villa Property to H&G in 2002. [Suppl. Trial Brief at 3:6-7, Adv. Proc. 04-90392 at Doc. #496]    They acknowledge that the claim against the Diaz Defendants is one for *recovery* of the avoided transfer pursuant to § 550(a)(2) as a subsequent transferee of H&G. [*Id.* at page 4:1-4]

94.    The fraudulent transfer claim is deemed admitted as to H&G. [FF ¶ 49] The Diaz Defendants dispute the fraudulent transfer claim, but presented no evidence at trial to show the transfer from Debtors to H&G was *not* fraudulent. [PTO in Adv. Proc. 04-90392, Remaining Issues of Law ¶ 1]    In closing argument, the Diaz Defendants conceded the Debtors' transfer to H&G was likely a fraudulent transfer.

95.    There is ample evidence to conclude the Debtors' transfer to H&G is avoidable both as a constructively fraudulent, and an actually fraudulent transfer. H&G did not pay any consideration in exchange for the Villa Property, thereby making the transfer constructively fraudulent. [FF ¶ 16]    Additionally, the timing and circumstances surrounding the transfer show Mr. Icenhower intended the transfer to be actually fraudulent. [FF ¶¶ 7-21] Finally, there is no dispute as to the timeliness of the Fraudulent Conveyance Action.  [Suppl. Trial Brief at page 3:9-10, Adv. Proc. 04-90392 at Doc. # 496]

**2.    Recovery of the Villa Property from the Diaz Defendants is permitted pursuant to 11 U.S.C. § 550(a)(2).**

96.    As more fully set forth in CL ¶¶ 84-85 above, to the extent a transfer is avoided,  § 550(a) of the Bankruptcy Code permits *recovery* of the avoided transfer or, if the courts so orders, the value of such property,  from – (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee. [CL 86] In the present case, the Diaz Defendants have asserted the good faith defense in § 550(b) available to a subsequent transferee of the initial transferee.

97.    A subsequent transferee asserting the good faith defense must prove all three elements of that defense: (1) taking a property for value; (2) in good faith; and

- 28 -

1 (3) without knowledge of the voidability of the transfer avoided. *In re Laguna Beach*

2 *Motors, Inc.*, 159 B.R. 562, 565-66 (Bankr. C.D. Cal. 1993)(citing *Bonded Financial*

3 *Svcs., Inc. v. European American Bank*, 838 F.2d 890, 896-97 (7th Cir. 1988). The

4 party asserting this defense bears the burden of proving the validity of the affirmative

5 defense. *Laguna Beach Motors*, 159 B.R. at 566.

6   98. The Bankruptcy Code does not define the meaning of the phrases "good

7 faith" and "without knowledge of the voidability of the transfer avoided." *Goodwin*,

8 115 B.R. at 676. The courts have generally treated the requirements of "good faith"

9 and "lack of knowledge of voidability" synonymously and have looked to whether a

10 transferee had knowledge of the transferor's unfavorable financial condition, or other

11 circumstances sufficient to lead a reasonable person to investigate the voidability of

12 the transfer, to determine whether the transferee acted in good faith. *In re Smoot*, 265

13 B.R. 128, 141(Bankr. E.D. Va. 1999) (a person is not a good faith transferee under

14 § 550(b)(1) if the person has knowledge of the transferor's unfavorable financial

15 condition at the time of transfer); *Bonded Financial*, 838 F.2d at 897-98 (a recipient

16 of fraudulent transfer lacks good faith if he possessed enough knowledge of the events

17 to induce a reasonable person to investigate); *see also* 5 A. Resnick & H. Sommer,

18 eds., *Collier on Bankruptcy*, ¶ 550.03[2] and [3] at 550-23-25 (15th ed. Rev. 2007)

19 (recognizing the growing body of case law that has applied an objective standard for

20 good faith).

21   99. The courts within this circuit have adopted the objective standard for

22 good faith enunciated in *Bonded Financial*. *See e.g. In re Richmond Produce Co.,*

23 *Inc.*, 195 B.R. 455, 464 (N.D. Cal. 1996); *Goodwin*, 115 B.R. at 677; *In re Concord*

24 *Senior Housing Foundation*, 94 B.R. 180, 183 (Bankr. C.D. Cal. 1988) (overruled on

25 other grounds).[7]

26

27   [7] *See Rupp v. Markgraf*, 95 F.3d 936, 943 n. 1 (10th Cir. 1996) (recognizing *Concord Senior*
*Housing* is overruled to the extent it supported the proposition that a corporate principal becomes

28 an initial "transferee" by the mere act of causing the debtor to make a fraudulent transfer).

- 29 -

100. Specifically, the district court in *Richmond Produce* rejected the defendant's argument that lack of good faith means "actual knowledge" of the voidabiltiy of the transfer by the transferee. The court explained the standard is one of objective good faith:

> [T]he recipient of a voidable transfer may lack good faith if he possessed enough knowledge of the events to induce a reasonable person to investigate. No one supposes that "knowledge of voidability" means complete understanding of the facts and receipt of a lawyer's opinion that such a transfer is voidable; some lesser knowledge will do. Some facts strongly suggest the presence of others; a recipient that closes its eyes to the remaining facts may not deny knowledge.

195 B.R. at 464 (quoting *Bonded Financial*, 838 F.2d at 897-98). The bankruptcy court in *Concord Senior Housing* stated:

> [A] transferee acts in good faith if it had no facts before it that would cause a reasonable person to investigate whether the transfer would be avoidable. Within the context of a section 549 proceeding, I conclude that if the subsequent transferee knew, or if a reasonable person would suspect, that the initial transfer was an unauthorized one from a bankruptcy estate, then the immediate transferee would not have received the transfer in good faith.

94 B.R. at 183.

101. Likewise, in considering the meaning of the phrase "without knowledge of the voidability of the transfer avoided," the bankruptcy court in *Goodwin* concluded:

> It is my view that the transferee must have knowledge of sufficient facts that (i) puts the transferee on notice that the transfer might be avoidable or (ii) requires further inquiry into the situation and such inquiry is likely to lead to the conclusion that the transfer *might* be avoidable.

115 B.R. at 677 (emphasis added).

102. Accordingly, the courts within this circuit reject an "actual knowledge" standard for § 550(b). They have consistently applied a standard of objective good faith. This standard examines what the transferee knew or should have known given the events, and whether it would cause a reasonable person to investigate. If such investigation would have likely led to the conclusion the transfer *might* be avoidable,

1  then the transferee lacks good faith and knowledge of the voidability of the transfer
2  is imputed to the transferee. A transferee cannot turn a blind eye to factual
3  circumstances that would cause a reasonable person to investigate in order to deny
4  knowledge and claim good faith. *Bonded Financial*, 838 F.2d at 897-98.

5      103. The Court concludes the Diaz Defendants are liable as subsequent
6  transferees pursuant to § 550(a)(2) because they have failed to show they received
7  the transfer from H&G in objective good faith. First, the Court observes this *not* a
8  situation where Mr. Diaz had no reason to question Mr. Icenhower. *Cf. Goodwin*, 115
9  B.R. at 677-78 (transferee had no reason to question any wrongdoing due to past
10  business dealings and family relationship). To the contrary, Mr. Diaz barely knew
11  Mr. Icenhower, and even he concedes their past dealings (unwittingly lending
12  $100,000 to a bankrupt), would put any reasonable person on heightened enquiry in
13  conducting further business with Mr. Icenhower. [FF ¶¶ 27-32; ¶ 65]

14      104. Second, Mr. Diaz cannot claim he failed to enquire due to lack of
15  sophistication. He is an educated, experienced businessman who has owned companies
16  and served on an audit committee. [*See* FF ¶ 23] Any reasonable person of similar
17  sophistication who had made the same bad loan would have investigated
18  circumstances surrounding the Debtors' bankruptcy, and enquired into the reason
19  Mr. Icenhower could cause H&G to lower the Villa Property sales price to repay his
20  personal debt. Had Mr. Diaz conducted any enquiry, he would have discovered the
21  district court litigation involved the Villa Property and the Trustee was questioning
22  the Debtors' transfer of the Villa Property to H&G. [FF ¶ 65] Additionally, Mr. Diaz
23  would have discovered what he likely already knew, that Mr. Icenhower had
24  fraudulently transferred the Villa Property to H&G to keep it away from the Lonies.

25      105. Third, there were many other "red flags" that should have caused
26  Mr. Diaz, and any other reasonable person in his shoes, to investigate the voidability
27  of the transfer to H&G. [*See* FF ¶¶ 60-61] The Diaz Defendants and their attorney
28  Mr. Sanchez closed their eyes to these "red flags" to avoid actual knowledge. Their

1    own Mexican law expert (Prof. Vargas) conceded that, given the cross-border nature
2    of this transaction, a heightened level of due diligence was required.  [FF ¶ 57;
3    ¶¶ 61-63]  Had any heightened enquiry been made, the Diaz Defendants would have
4    learned what they likely already knew, that H&G was a shell entity controlled by
5    Mr. Icenhower.

6        106.   Finally, the Court finds the Diaz Defendants cannot possibly be good
7    faith transferees because, prior to closing of the Villa Property transaction, Mr. Diaz
8    actually knew the Debtors' transfer of the Villa Property to H&G *might* be voidable
9    by the Trustee.   Mr. Icenhower is one hundred percent certain he disclosed this
10   information to "hurry up" Mr. Diaz's decision to purchase the Villa Property while the
11   title in Mexico remained clear. [FF ¶¶ 66-67]  Mr. Diaz denies knowledge, but other
12   facts suggest this was likely the case. [FF ¶ 60, ¶ 67]  Mr. Diaz proceeded with the
13   Villa Property transaction because he believed the clear title in the Mexican Public
14   Registry would defeat the Trustee. Having made the conscious decision to "hurry up"
15   the transfer to defeat the Trustee, the Diaz Defendants cannot be good faith
16   transferees.

17       107.   Because the Diaz Defendants are not good faith transferees, Kismet is
18   entitled to recover for the benefit of the estate, either the Villa Property or its value at
19   the time of judgment from any combination of the transferees, subject to the limitation
20   of a single satisfaction set forth in § 550(d). [CL ¶¶ 84-85]   The Diaz Defendants
21   cannot complain about the inequities of being ordered to return their cherished
22   vacation home to the estate when the evidence shows  they are renting to the public.
23   [FF ¶ 26]  Moreover, the equities favor an order directing the return of the Villa
24   Property where it appears Mr. Diaz conspired with Mr. Icenhower to use the clear title
25   in Mexico to defeat the Trustee.    *See Straightline Investments*, 2008 WL at * 9
26   (requiring return of wrongfully transferred property to the estate was proper course of
27   action where defendant was aware of the bankruptcy and conspired with Debtor's
28   president to transfer the property).

108. The Court makes no legal conclusion concerning whether its consolidated judgment in these actions is enforceable in Mexico. As this Court has previously ruled, it has subject matter jurisdiction over claims to avoid and recover the wrongful transfer of the Debtors' interest in the *fideicomiso* trust, and it has *in personam* jurisdiction over each of the Defendants in these actions to *order them to execute the necessary conveyance documents* to return the Villa Property to the estate, subject to enforcement through this Court's contempt powers, even though it indirectly affects title to real property in Mexico. [PTO in Adv. Proc. 06-90369, Doc. # 191, Judicially Noticeable Facts ¶ 5]; *see also Fall v. Eastin*, 215 U.S. 1, 9-12 (1909) (recognizing that a court of equity, having authority to act upon the person, may indirectly act upon real estate in another jurisdiction, and even in a foreign country, through the instrumentality of its authority over the person); A. Ahart, *Cal. Prac. Guide: Enf. J. & Debts*, Ch. 6, ¶ 6:1849.9 (The Rutter Group 2008).

109. Any findings of facts which may be considered a conclusion of law shall be deemed a conclusion of law. Any conclusions of law which may be considered a findings of facts shall be deemed a findings of facts. A separate judgment is filed concurrently with these findings.

Dated: 2 June 08

LOUISE DE CARL ADLER, Judge

- 33 -

1  CAD 168
   [Revised July 1985]
2

3               UNITED STATES BANKRUPTCY COURT
4               SOUTHERN DISTRICT OF CALIFORNIA

5
   Case No. <u>03-11155-A7</u>
6  Adv. No. <u>06-90369-A7</u>
   Adv. No. <u>04-90392-A7</u>
7  Case Name:  In Re: JERRY L. ICENHOWER dba Seaview
                  Properties, et al.
8

9               CERTIFICATE OF MAILING

10

         The undersigned, a regularly appointed and qualified clerk in the Office of the
11  United States Bankruptcy Court for the Southern District of California, at San Diego,
    hereby certifies that a true copy of the attached document, to-wit:
12
               CONSOLIDATED FINDINGS OF FACT
13                 AND CONCLUSIONS OF LAW

14  was enclosed in a stamped and sealed envelope and mailed to the following parties at
    their respective addresses listed below:
15

16  Stephen B. Morris, Esq.              Howell & Gardner Investors, Inc.
    Mark C. Hinkley, Esq.                c/o Jerry and Donna Icenhower
17  MORRIS AND ASSOCIATES                684 Margarita Avenue
    444 West C Street Suite 300          Coronado CA 92118
18  San Diego CA 92101
                                         Gerald H. Davis, Chapter 7 Trustee
19  Ali Mojdehi Esq.                     P.O. Box 2850
    Janet Gertz, Esq.                    Palm Springs CA 92263
20  BAKER & MC KENZIE LLP
    12544 High Bluff Dr. Third Floor     Office of the United States Trustee
21  San Diego CA 92130-3051              402 West Broadway, Suite 600
                                         San Diego CA 92101
22  Jerry L. and Donna L. Icenhower
    684 Margarita Avenue
23  Coronado CA 92118

24
         The envelope(s) containing the above document was deposited in a regular
25  United States mail box in the City of San Diego in said district on <u>June 2, 2008.</u>

26

27                                    _____, Deputy Clerk
28  CAD 168                           Roma London

                                   - 34 -

CSD 1001A [08/21/04]

Name, Address, Telephone No. & I.D. No.

Gary B. Rudolph, Esq. (#101921)
James F. Lewin, Esq. (#140268)
SPARBER RUDOLPH ANNEN, APLC
701 "B" Street, Suite 1000
San Diego, CA 92101
Telephone (619) 239-3600
Attorneys for Gerald H. Davis, Chapter 7 Trustee

Order Entered on
December 07, 2006
by Clerk U.S. Bankruptcy Court
Southern District of California

## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF CALIFORNIA
325 West "F" Street, San Diego, California 92101-6991

In Re
JERRY L. ICENHOWER DBA Seaview Properties, and
DONNA L. ICENHOWER fka DONNA L. HANKS

BANKRUPTCY NO. 03-11155-LA7

Date of Hearing: November 30, 2006
Time of Hearing: 2:30 p.m.
Name of Judge: Louise DeCarl Adler

Debtors.

## ORDER APPROVING TRUSTEE'S MOTION AUTHORIZING SALE OF ASSETS OUTSIDE OF ORDINARY COURSE OF BUSINESS

IT IS ORDERED THAT the relief sought as set forth on the continuation pages attached and numbered two (2)

through __(2)__ with exhibits, if any, for a total of __(2)__ pages, is granted. Motion/Application Docket Entry No. __92__.

//

//

//

//

//

//

DATED:    December 07, 2006

Signature by the attorney constitutes a certification under
Fed. R. of Bankr. P. 9011 that the relief in the order is the
relief granted by the court.

Submitted by:
SPARBER RUDOLPH ANNEN

Judge, United States Bankruptcy Court

By: /s/ Gary B. Rudolph
Attorneys for Gerald H. Davis, Chapter 7 Trustee

CSD 1001A    231263.1

**EXHIBIT    2**

CSD 1001A [08/28/03] (Page 2)
ORDER APPROVING TRUSTEE'S MOTION AUTHORIZING SALE OF ASSETS OUTSIDE OF ORDINARY COURSE OF BUSINESS
DEBTOR: JERRY L. ICENHOWER DBA Seaview Properties, and          CASE NO: 03-11155-LA7
DONNA L. ICENHOWER fka DONNA L. HAWKS

---

The Trustee's Motion for an Order Authorizing Sale of Assets Outside of Ordinary Course of Business came on regularly for hearing on November 30, 2006 at 2:30 p.m. in Department Two of the United States Bankruptcy Court, Southern District of California, the Honorable Louise DeCarl Adler Bankruptcy Judge presiding. Appearances were noted on the record. After considering the pleadings filed in support of and in response to the motion and after hearing presentations of counsel and good cause appearing therefor,

1. The Trustee's Motion Authorizing Sale of Assets Outside of Ordinary Course of Business is approved. The Purchase and the Assignment Agreement attached hereto as Exhibit "A" (which was also attached as Exhibit "A" to the Declaration of Gerald Davis, Trustee, filed November 1, 2006 as document no. 91) is approved.

2. The approval herein does not adjudicate assignee's entitlement to assert privileges currently belonging to the Trustee or to continuing access to the jurisdiction of this court or the United States District Court except as it relates to interpretation and/or enforcement of the terms of the Purchase and Assignment Agreement. Assignee is not receiving any greater rights than the estate has to convey.

3. Pursuant to 11 U.S.C. Section 363(m), assignee is purchasing the assets in good faith, without collusion and at arm's length, such that the parties are entitled to the protections of 11 U.S.C. Section 363(m). The sale herein is an exercise of the Trustee's sound business judgment and the sale is in the best interest of the estate and its creditors.

4. The assets are being sold in an "As-Is" "Where-Is" condition without any representations or warranties except those set forth in the Purchase and Assignment Agreement. The motion notified parties-in-interest that have an opportunity to make a bid superior to that by assignee and a reasonable opportunity was afforded parties-in-interest to make a higher and better offer for the assets being purchased. No party qualified as a bidder with the Trustee, nor presented a bid prior to or at the time of the hearing. The Purchase and Sale Agreement represents the highest and best offer received by the Trustee for the assets to be sold therein.

CSD 1001A    231263.1

*Signed by Judge Louise DeCarl Adler December 07, 2006*

CSD 1001A (08/22/03) (Page 3)
ORDER APPROVING TRUSTEE'S MOTION AUTHORIZING SALE OF ASSETS OUTSIDE OF ORDINARY COURSE OF BUSINESS
DEBTOR JERRY L. ICENHOWER DBA Seaview Properties, and          CASE NO: 03-11155-LA7
DONNA L. ICENHOWER fka DONNA L. HAWKS

5       Following the close of the sale for this transaction, assignee shall be deemed to have replaced the Trustee

as the party plaintiff in the avoidance action, adversary proceeding no. 04-90932 and the postpetition transfer

avoidance action, adversary proceeding no. 04-90126 without any further action or order of this court.

APPROVED AS TO FORM AND CONTENT

Baker & McKenzie

By:/s/ Ali M. M. Mojdehi
        Ali M.M. Mojdehi, Esq.
Attorneys for assignee

/s/ Alan Vanderhoff
        Alan Vanderhoff, Esq.,
Attorneys for Alejandro Diaz Barba and Martha B. Diaz

CSD 1001A   231263.1

*Signed by Judge Louise DeCarl Adler December 07,2006*

# EXHIBIT A

*Signed by Judge Louise DeCarl Adler December 07,2006*

## PURCHASE AND ASSIGNMENT AGREEMENT

This Purchase and Assignment Agreement ("Agreement") is entered into as of the last date of signature below ("Effective Date") by Gerald H. Davis, Chapter 7 Trustee (the "Assignor" or the "Trustee") for the bankruptcy estate of Jerry L. Icenhower DBA Seaview Properties and Donna L. Icenhower (the "Bankruptcy Estate") on the one hand; and Kismet Acquisition, LLC, a Delaware limited liability company or its assignees, and Kismet Acquisition II, LLC, a Delaware limited liability company or its assignees (collectively, "Assignee") on the other hand.

## RECITALS

**A.    Whereas** on December 15, 2003, Jerry L. Icenhower DBA Seaview Properties and Donna L. Icenhower (the "Debtors") filed a petition under Chapter 7 of Title 11 of the United States Code, Case No. 03-11155-LA7 (the "Bankruptcy Case");

**B.    Whereas,** the Trustee entered into a certain letter agreement with Pyle Sims Duncan & Stevenson, APC ("PSDS") dated August 1, 2004 concerning PSDS' representation of the Trustee as special counsel to the Trustee related to the Avoidance Action (as defined below) (the "Bankruptcy Trustee Representation Agreement");

**C.    Whereas,** on August 23, 2004, the Trustee commenced Adversary Proceeding No. 04-90392 against Jerry L. Icenhower DBA Seaview Properties, and Donna L. Icenhower FKA Donna L. Hawks; Howell & Gardner Investors, Inc., a Nevada Corporation; Martha Margarita Barba De La Torre, an individual, et al., for recovery of money or property, as such was amended by the First Amended Complaint and the Second Amended Complaint (collectively, the "Avoidance Action");

**D.    Whereas,** on November 19, 2004, the Bankruptcy Court for the Southern District of California entered an order approving the retention of PSDS as special counsel to the Bankruptcy Trustee on the terms set forth in the Bankruptcy Trustee Representation Agreement and otherwise providing for a priority right of reimbursement from the Bankruptcy Estate for all amounts advanced by the D. Donald Lonie Jr. Family Trust ("Lonie Trust") for fees and costs pertaining to the Avoidance Action ("Court Order Approving Retention of PSDS");

**E.    Whereas,** on August 3, 2006, the Trustee commenced Adversary Proceeding No. 06-90369 against Jerry L. Icenhower DBA Seaview Properties, And Donna L. Icenhower FKA Donna L. Hawks; Howell & Gardner Investors, Inc., a Nevada Corporation; Martha Margarita Barba De La Torre, an individual, et al. for recovery of money or property (the "Post Petition Transfer Avoidance Action"); and

**F.    Whereas,** Assignee has certain claims pending against the Bankruptcy Estate, in that (i) on or about October 27, 2004 a Proof of Claim was filed by the Lonie Trust in the Bankruptcy Case, as amended on or about December 6, 2004 by the Amended Proof of Claim No. 4 in the amount of $1,385,950.65, which was subsequently assigned on or about June 30, 2006 to Kismet Acquisition, LLC along with a partial assignment of the same on or about July 14, 2006 to Kismet Acquisition II, LLC (the "Claim"); (ii) Kismet Acquisition II LLC has received assignment by the Lonie Trust of all its rights for priority reimbursement from the Bankruptcy Estate arising under the Court Order Approving Retention of PSDS for amounts advanced by the

EXHIBIT 1.1

*Signed by Judge Louise DeCarl Adler December 07, 2006*

Lonie Trust to PSDS up through and including May 31, 2006, in the amount of $348,805.98; and (iii) Kismet Acquisition, LLC has received assignment of all rights and duties arising under the Court Order Approving Retention of PSDS for priority reimbursement from the Bankruptcy Estate for amounts advanced by Assignee to PSDS subsequent to May 31, 2006, which are estimated to amount to $90,000.00 as of the Close Date (as defined below).  Collectively, amounts under (ii) and (iii) above are referred to herein as the "Reimbursement Claim";

G.     **Whereas**, Assignee has made an offer to the Trustee for the purchase by Assignee of all the Bankruptcy Estate's rights, title and interest in or to any and all assets of the Bankruptcy Estate, including without limitation,  all rights and/or causes of action against third parties and/or the Debtors in the Bankruptcy Case, whether asserted or unasserted, including without limitation, the Avoidance Action and the Post Petition Transfer Avoidance Action, along with all rights, privileges, and benefits of the Trustee and the Bankruptcy Estate related thereto or in connection therewith, and the Trustee having exercised his informed business judgment and considering the benefit to accrue to the Bankruptcy Estate now desires to sell and assign the same in exchange for the mutual promises herein and other good and lawful consideration; and

H.     **Whereas**, the terms of the sale and assignment to Assignee hereunder have been renegotiated in good faith and on an arm's-length basis between the Trustee and Assignee.

I.     **Therefore**, in consideration of the mutual covenants herein, the adequacy and sufficiency of which are acknowledged, the parties agree as follows:

1.     <u>Assignment</u>.  Upon the Close Date (as defined below), the Trustee absolutely and unconditionally transfers and assigns and Assignee expressly assumes all right, title and interest in or to any and all assets of the Bankruptcy Estate that are either "capital assets" as defined 26 U.S.C. §1221(a) or "property used in the trade or business" for purposes of 26 U.S.C. §1231(b), including all rights, claims, defenses, or causes of action (whether at law or in equity) of the Bankruptcy Estate whether against third parties and/or against the Debtors, whether asserted or yet to be asserted, and whether arising under bankruptcy or nonbankruptcy law, *including without limitation*, the Avoidance Action and the Post Petition Transfer Avoidance Action, along with all other rights, privileges, and benefits of the Trustee and the Bankruptcy Estate arising out of, related thereto, or in connection therewith (collectively, the "Assigned Rights and Interests").

1.1     Subject to the provisions of Section 1.2, the Assigned Rights and Interests include all attorney-client, accountant-client, work product, and similar litigation privileges and all evidence, books, and records subject thereto relating to the Assigned Rights and Interests that are subject to a right of turnover to the Trustee under 11 U.S.C. § 542(e) and which are otherwise assignable by the Trustee to Assignee under applicable bankruptcy and nonbankruptcy law.

1.2     Nothing herein provides, however, for (i) the creation of an attorney-client relationship between Assignee and any of the Trustee's attorneys; (ii) the transfer to Assignee of any attorney-client or work product privilege that may exist between the Trustee and Sparber Rudolph Annen, APLC; or (iii) the transfer to Assignee of any communications between the Trustee and PSDS related to either (a) the assignment of the Claim from the Lonie Trust to Assignee or (b) the negotiation of this Agreement.

EXHIBIT A-2
*Signed by Judge Louise DeCarl Adler December 07,2006*

2.     Substitution of Parties; Substitution of Counsel. As soon as reasonably possible following the Close Date, Assignee will substitute in and replace the Trustee as the party plaintiff and shall substitute in Baker & McKenzie LLP as its counsel in lieu of PSDS in the Avoidance Action and the Post Petition Transfer Avoidance Action.

3.     Payment of Allowed Liabilities of the Bankruptcy Estate; Subordination of Claim; Trust Fund Application; Expenses Escrow; Taxes.

3.1     Upon the Close Date, Assignee shall, except for the amount of its Claim and the Reimbursement Claim, pay to the Trustee an amount equal to all allowed liabilities of the Bankruptcy Estate as follows: (i) the amount of all allowed claims of general unsecured creditors of the Bankruptcy Estate sufficient to pay said claims in full, currently estimated to be in the amount of $2,576.80; (ii) all fees and costs of the Trustee's general counsel, Sparber Rudolph Annen, APLC, through the Close Date, estimated to be in the amount of $50,000.00; (iii) all fees and costs of the Trustee incurred through the Close Date, estimated to be in the amount of $40,000.00; and (iv) all fees and costs of the Trustee's accountant through the Close Date, estimated to be in the amount of $15,000.00 (collectively, the "Payment Amount").

3.2     Furthermore, as of the Close Date, the Assignee shall subordinate its Claim and the Reimbursement Claim to the allowed claims of all other creditors of the Bankruptcy Estate and shall assume all responsibility, cost and expense of litigation of the Avoidance Action and the Post Petition Transfer Avoidance Action as well as the pursuit of any other Assigned Rights and Interests assigned herein.

3.3     Immediately upon the Close Date, PSDS shall deliver to the Trustee all amounts held by PSDS in its client trust fund accounts received from Assignee ("Client Trust Fund Amounts") remaining after PSDS' application of said funds to its outstanding fees and costs on the Close Date, relating to PSDS' services rendered as special counsel to the Trustee. Said monies will be applied by the Trustee towards the Payment Amount to be paid by Assignee. Nothing in this Section 3.3 shall be deemed to limit or otherwise alter Assignee's right to review and preapprove such fees and costs of PSDS prior to any application of Client Trust Fund Amounts towards such fees and costs of PSDS, nor shall it be deemed to limit or otherwise alter PSDS's right to be paid its fees and costs pursuant to the court order approving its retention.

3.4     At the earliest possible date but no less than within ten (10) business days following Bankruptcy Court approval and payment of the final fee applications of the Trustee and his professionals, the Trustee shall provide an accounting to Assignee detailing such allowed amounts: (i) the amounts due in subsections 3.1 (i)-(iv) above; (ii) a calculation of the Client Trust Fund Amounts as of the Close Date; (iii) the Trustee's proposed application of Client Trust Fund Amounts to outstanding fees and costs of PSDS up through the Close Date; (iv) a calculation of Client Trust Fund Amounts to be applied to the Payment Amount to be paid by Assignee; and (v) the remaining balance of the Payment Amount to be refunded by the Trustee to Assignee after such application of the Client Trust Fund Amounts to the amount due (collectively, the "Trustee's Accounting"). At the earliest possible date but no less than within ten (10) business days following delivery of the Trustee's Accounting to Assignee, the Trustee shall refund any balance of the Client Trust Fund Amounts to Assignee or Assignee shall make payment to the Trustee of any verified balance of the Payment Amount due in the Trustee's

EXHIBIT A-3
*Signed by Judge Louise DeCarl Adler December 07, 2006*

Accounting, by wire transfer, in accordance with wire instructions to be provided to the other party.

**3.5**    The parties acknowledge and agree that the Trustee will close the Bankruptcy Case in the ordinary course. The Trustee is holding approximately $20,000 of funds received prior to execution of this Agreement. The Trustee shall retain said funds to be applied to any administrative costs and remaining allowed liabilities incurred by the Trustee after the Close Date. Further, in addition to and concurrent with Assignee's payment of the balance of the Payment Amount as set forth in Section 3.3 above, Assignee shall deposit with the Trustee for the Bankruptcy Estate an additional $20,000 (the "Expenses Escrow") to be used by the Trustee to pay any expenses of administration incurred after the Close Date and any remaining allowed liabilities of the Bankruptcy Estate that exceed the $20,000 that the Trustee possesses as referenced above. At the time of the closing of the Bankruptcy Estate, if there are any funds remaining in the Expenses Escrow after payment of all expenses of the Bankruptcy Estate, said funds shall be promptly returned to Assignee.

**3.6**    As additional consideration in exchange for the Trustee's assignment of the Assigned Rights and Interests under this Agreement, the Assignee shall pay all taxes, penalties and interest (if any) of the Bankruptcy Estate for which the Bankruptcy Estate may be held liable, to the extent arising out of the assignment of the Assigned Rights and Interests hereunder ("Taxes"). Promptly upon Bankruptcy Court approval and payment of professional fees as set forth in Section 3.4, the Trustee shall expeditiously file the final tax returns of the Bankruptcy Estate with the Internal Revenue Service and Franchise Tax Board, respectively, including requesting a determination under 11 U.S.C. § 505(b) of the returns. The Trustee shall use diligent efforts to comply with Revenue Procedure 2006-24, and, prior to filing the returns, shall permit Assignee to review the final returns, including without limitation, to review the Trustee's compliance with Revenue Procedure 2006-24. The Trustee shall discuss and keep Assignee fully advised of all material facts and communications in connection with the filing, processing, and acceptance of such returns. The Trustee shall advise and cooperate with Assignee concerning any request for court determination under 11 U.S.C. § 505(b)(2) (as such was in effect as of the date of the Debtors' petition). The Trust Account (as defined below) shall terminate ten (10) days after the first occurrence of any of the events under 11 U.S.C. § 505(b)(1)(2) or (3) (as such was in effect as of the date of the Debtors' petition), as applicable.

**4**    Continuing Jurisdiction of the Bankruptcy Court. The Bankruptcy Court for the Southern District of California (the "Bankruptcy Court"), or, to the extent necessary, the United States District Court for the Southern District of Southern California, shall retain continuing jurisdiction over the Bankruptcy Case and the Assigned Rights and Interests, including the Avoidance Action and the Post Petition Transfer Avoidance Action.

**5**    Delivery of Information; Cooperation and Further Assurances; Appointment.

**5.1**    Subject to the provisions of Sections 1.1 and 1.2, (i) within three (3) business days following the Close Date, the Trustee shall, and shall require each of his agents, employees, attorneys, and other professionals to transfer all documents, client files of the Bankruptcy Estate, and other information related to the Assigned Rights and Interests in their possession and/or control, including without limitation relating to the Avoidance Action and the Post Petition

EXHIBIT A-4
Signed by Judge Louise DeCarl Adler December 07, 2006

Transfer Avoidance Action; and (ii) the parties acknowledge and agree that, as of the Close Date, Assignee shall receive all rights held by the Trustee and the Bankruptcy Estate in or to all privileges or other similar doctrines associated with the Assigned Rights and Interests, including without limitation, the Avoidance Action and the Post Petition Transfer Avoidance Action. The Trustee, his agents, employees, attorneys and professionals shall fully and immediately cooperate with Assignee pursuant to the performance of this Section 5.1. Any agent, employee, attorney, or other professional of the Trustee who complies with this Section 5.1 may retain a copy of the files delivered to Assignee, with costs to be paid at the expense of Assignee.

5.2     The Trustee, his agents, employees, attorneys, and professionals shall take such further action, including seeking relief under any applicable provisions of the Bankruptcy Code, as may be reasonably necessary to effect the transfer of the Assigned Rights and Interests hereunder, including related to any payments or distributions on account of the forgoing to Assignee and to execute any documents reasonably necessary to perfect or enable such transfer, without waiver of any attorney client or work product privileges.

5.3     The parties acknowledge and agree that, after the Close Date, it is the responsibility of the Assignee, at Assignee's sole expense, to prosecute and make all decisions associated with the prosecution of the Avoidance Action, the Post Petition Transfer Avoidance Action, as well as any other lawsuit or claim Assignee wishes to assert as a result of the transactions under this Agreement. Without limiting the generality of the foregoing sentence, should any law, regulation, or court order prevent and/or limit the Assignee from fully asserting or prosecuting any of the Assigned Rights and Interests, then the Trustee, his agents, employees, and professionals further agree that the Assignee shall have the right to pursue any of the Assigned Rights and Interests hereunder in the name of the Bankruptcy Estate. In such case, the Trustee authorizes Assignee to act in the Bankruptcy Estate's stead and to demand, sue for, compromise, and recover all such amounts as now are, or may hereafter become, due and payable for or on account of the Assigned Rights and Interests.

6.     Indemnification. Assignee agrees to indemnify, defend, and hold harmless the Trustee from any claims which may be asserted against the Trustee, agents, employees, attorneys, and professionals ("Indemnified Persons") by the defendants or any additional parties Assignee may name as defendants or anyone claiming through a defendant or any party claiming a property interest in the property subject to the Avoidance Action or the Post Petition Transfer Avoidance Action ("Claimants") in the Avoidance Action and/or the Post Petition Transfer Avoidance Action arising out of the Assignee's use and enjoyment of the Assigned Rights and Interests after the Close Date. The indemnification in this Section 6 is subject to the Trustee providing Assignee with (i) prompt written notice of the claim, all reasonably requested information about the claim; (ii) reasonable cooperation and assistance; and (iii) sole authority to defend and settle the claim.

7     Bankruptcy Court Approval; Close Date.

7.1     This Agreement is subject to entry of a order by the Bankruptcy Court in the Bankruptcy Case approving this Agreement and the transactions contemplated hereunder (the "Sale Order"). To that end, within the five (5) business days following the parties' execution of

EXHIBIT A-5
*Signed by Judge Louise DeCarl Adler December 07, 2006*

this Agreement, the Trustee shall seek such Sale Order, along with customary pleadings setting forth in detail why approval of this Agreement is in the best interest of the creditors of the estate.

**7.2**    The Close Date shall be the first business day that is the later of: (i) eleven (11) days after entry of the Sale Order if no appeal is timely filed, or an appeal of the Sale Order is timely filed and no stay of the action is granted, (ii) if an appeal is timely filed and a stay is granted then upon final resolution of such appeal upholding the Sale Order, provided no further appeal is possible and (iii) Assignee's delivery to the Trustee of the funds to be deposited into the Trust Account pursuant to Section 7.4 (the "Close Date"). Should the Bankruptcy Court deny approval of this Agreement or should the conditions to the Close Date set forth in the last sentence of Section 7.4 not be performed or otherwise waived in writing by the parties, (a) this Agreement shall immediately terminate and be of no further effect, and (b) the parties shall retain all rights they would have had as if this Agreement had never been entered into.

**7.3**    The assignment of the Assigned Rights and Interests to the Assignee contemplated herein is pursuant to 11 U.S.C. § 363(b). Any person other than Assignee wishing to make a competing bid for the Assigned Rights and Interests must *first* provide evidence to the Trustee that such bid is a higher and better offer, including without limitation, evidence of such person's ability to close the sale absent any contingencies and consistent with the time frames for the Close Date and payments set forth in this Agreement. Furthermore, terms offered in any proposed sale agreement presented by any person other than Assignee must be non-contingent and must provide for payment in full in cash on or before the Close Date as defined herein.

**7.4**    Within three (3) business days following the parties' execution of the Trust Fund Letter (as defined below), Assignee shall wire funds to the Trustee in an amount to be agreed by the parties' estimate to be sufficient to provide the Trustee with assurance of Assignee's performance of its obligations under Section 3.6 of this Agreement. The funds shall be deposited by the Trustee into a segregated trust account (the "Trust Account"). The amount to be deposited in the Trust Account, the terms and conditions for safekeeping of the Trust Account by the Trustee, the terms for any disbursements to the Bankruptcy Estate thereunder, as well as the required accounting for the funds held, disbursed, and/or returned to Assignee thereunder shall be set forth in a mutually agreeable letter to be separately executed by the parties within five (5) business days of the Sale Order (the "Trust Fund Letter"). The Parties are not required to execute the Trust Fund Letter unless and until the Sale Order occurs, and if the Sale Order does not occur, the Parties are not required to execute the Trust Fund Letter. The Parties' execution of the Trust Fund Letter and Assignee's delivery to the Trustee of the funds for deposit into the Trust Account shall each be a condition to the Close Date.

8.    Unconditional Assignment.  The assignments made under this Agreement shall, upon the Close Date, be deemed an absolute and unconditional assignment of the rights and interests related thereto.

9.    Representations and Warranties.

**9.1**    By Trustee and the Bankruptcy Estate.  The Trustee represents and warrants that as of the Effective Date and the Close Date, subject to entry of the Sale Order:

EXHIBIT A - 6

*Signed by Judge Louise DeCarl Adler December 07, 2006*



     **(a)**    The Trustee and the Bankruptcy Estate each has the requisite power and authority to enter into and to execute deliver and perform the obligations under this Agreement and any other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by the Trustee in connection with the consummation of the transactions contemplated hereby and thereby, and to consummate the transactions contemplated hereby and thereby. This Agreement constitutes the legal, valid, and binding obligation of the Trustee and the Bankruptcy Estate, enforceable against the Trustee and the Bankruptcy Estate in accordance with its terms.

     **(b)**    This Agreement does not conflict with or contravene any other agreement, applicable law, or court order, provided, however, that the Trustee makes no representation or warranty that the assignment hereunder has been or will be approved or allowed in whole or in part by the court in the Bankruptcy Case.

     **(c)**    There are no legal proceedings pending or, to the knowledge of the Trustee, threatened against Trustee or the Bankruptcy Estate, or to which he or it is otherwise a party before any governmental body, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Trustee or the Bankruptcy Estate to perform their obligations under this Agreement or to consummate the transactions hereunder. The Trustee and the Bankruptcy Estate are not subject to any order of any governmental body that would reasonably be expected to materially effect their ability to perform the obligations under this Agreement or to consummate the transactions contemplated hereby.

     **(d)**    The Trustee shall not have incurred any obligation that would prevent his or the Bankruptcy Estate's performance of his or its obligations under this Agreement.

    **9.2**    <u>By Assignee</u>. Assignee represents and warrants that, as of the Effective Date and the Close Date, subject to entry of the Sale Order:

     **(a)**    It has the requisite corporate power and authority to enter into and to execute, deliver, and perform the obligations under this Agreement and any other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Assignee in connection with the consummation of the transactions contemplated hereby and thereby, and to consummate the transactions contemplated hereby and thereby. Subject to entry of the Sale Order, this Agreement constitutes the legal, valid, and binding obligation of Assignee, enforceable against Assignee in accordance with its terms.

     **(b)**    Assignee is a limited liability company, duly organized, validly existing and in good standing under the laws of Delaware and has all requisite corporate power and authority to carry on its business as now conducted. None of the execution and delivery by Assignee of this Agreement, the consummation of the transactions contemplated hereby, or the compliance by Assignee with any of the provisions hereof or thereof will conflict with, or result in a violation of, any provision of the organizational documents, operating agreement or by-laws of Assignee.

*Signed by Judge Louise DeCarl Adler December 07, 2006*

(c)     Assignee has performed its own investigation of the status and merits of the Assigned Rights and Interests and is relying solely upon Assignee's independent investigation in entering into this Agreement.

(d)     There are no legal proceedings pending or, to the knowledge of Assignee, threatened against Assignee, or to which Assignee is otherwise a party before any governmental body, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Assignee to perform its obligations under this Agreement or to consummate the transactions hereby. Assignee is not subject to any order of any governmental body which would reasonably be expected to materially effect the ability of Assignee to perform its obligations under this Agreement or to consummate the transactions contemplated hereby.

(e)     Assignee will have available the resources and capabilities (financial or otherwise) to perform its obligations hereunder and will not have incurred any obligation that would prevent Assignee's performance of those obligations.

9.3     Except for the representations contained in this Agreement: (i) neither party makes any other express or implied representation or warranty with respect to the Trustee, the Assigned Rights and Interests, or the transactions contemplated by this Agreement, and each party disclaims any other representations or warranties, whether made by Assignee, the Trustee or any of their respective employees, agents, or representatives; (ii) the Assigned Rights and Interests are being transferred on a "where is" and, as to condition, "as is" basis; and (iii) Assignor expressly disclaims and negates any representation or warranty, express or implied, at common law, by statute, or otherwise relating to the condition of the Assigned Rights and Interests and disclaims all liability and responsibility for any representations, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Assignee, the Lonie Trust, or their respective representatives, any opinion, information, projection, or advice that may have been or may be provided to Assignee by any employee, agent, consultant, or representative of the Trustee. The Trustee makes no representations or warranties to Assignee regarding the probable success or profitability of the Assigned Rights or Interests.

9.4     All representations and warranties made herein shall survive the execution and Close Date of this Agreement.

10.     Status of Bankruptcy Case. The parties acknowledge and agree that, following the Close Date, the Trustee and/or the Bankruptcy Estate is not a party and/or party in interest to the Assigned Rights and Interests and that any recovery upon the Assigned Rights and Interests shall be the sole property of the Assignee. The Trustee and his employees, agents, attorneys and professionals acknowledge and agree that the Trustee's receipt of the payments set forth in Section 3 shall constitute *full satisfaction* of any claims against the Bankruptcy Estate and/or Assignee by the Trustee and his employees, agents, attorneys and professionals, provided, however, that the foregoing shall not in any way limit or modify the indemnification obligation under Section 6 of this Agreement.

EXHIBIT A - 8

Signed by Judge Louise DeCarl Adler December 07, 2006

11.    Miscellaneous

   11.1    The terms of this Agreement shall be binding upon, and shall inure to the benefit of Assignor, Assignee, and their respective predecessors, successors and assigns.

   11.2    Any and all disputes concerning this Agreement are to be resolved in the Bankruptcy Court and any and all courts of appeal therefrom. Each party shall be responsible for its own attorney's fees and costs in connection with any such disputes, however, the successful party shall be entitled to an award of its reasonable attorney fees and costs, such award subject to approval by the Bankruptcy Court. This Agreement shall be governed by and construed in accordance with the laws of the State of California and the federal law of the United States, without reference to principles of conflicts of law.

   11.3    This Agreement represents the entire agreement and understanding of the parties concerning its subject matter and supersedes and replaces any and all prior agreements and understandings among them. Each term of the Agreement is contractual and not merely a recital. Prior to the Close Date, when and if it occurs, nothing herein shall be deemed to supersede, modify, or waive Assignee's Claim and/or Assignee's priority reimbursement rights under the Court Order Approving Retention of PSDS.

   11.4    This Agreement may be executed in counterparts, and each counterpart shall have the same force and effect as the original and shall constitute an effective, binding agreement on the part of each of the undersigned.

   11.5    All notices made under this Agreement will be in writing and delivered by facsimile, electronic mail, or other electronic means; or by prepaid means providing proof of delivery. Notices are effective upon receipt, and will be sent to the following addresses:

   If to Assignor:

   Gerald H. Davis, Chapter 7 Trustee
   c/o
   Gary B. Rudolph
   Sparber Rudolph Annen APLC
   701 B Street, Suite 1000
   San Diego, CA 92101
   Fax: (619) 239-5601
   Email: grudolph@sparberlaw.com

   If to Assignee:

   Kismet Acquisition, LLC; Kismet Acquisition II, LLC
   c/o Ali M.M. Mojdehi,
   Baker & McKenzie LLP
   101 West Broadway, San Diego, CA 92101
   Fax: (619) 236-0429
   Email: ali.m.m.mojdehi@bakernet.com

EXHIBIT A - 9

*Signed by Judge Louise DeCarl Adler December 07, 2006*

**11.6**    The Trustee is executing this Agreement only in his capacity as Trustee of the bankruptcy estate of Jerry L. Icenhower dba Seaview Properties and Donna L. Icenhower and is not executing this in any personal capacity.

**11.7**    Headings.  The headings within this Agreement are for convenience only and will not affect the interpretation of this Agreement.

**11.8**    Time Is of the Essence.  With respect to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

EXHIBIT A -10

*Signed by Judge Louise DeCarl Adler December 07,2006*

. 10/10/2006  13:25    61999  06                GERALD H DAVIS  USD                PAGE  03/04

IN WITNESS WHEREOF, the Parties have executed this Agreement on the respective dates set forth below.

By:    GERALD H. DAVIS, CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATE OF JERRY L. ICENHOWER DBA SEAVIEW PROPERTIES AND DONNA L. ICENHOWER

_____          ___10/31/06_____
            Signature                                     Date


By:    KISMET ACQUISITION, LLC

_____          _____
            Signature                                     Date


By:    KISMET ACQUISITION II, LLC

_____          _____
            Signature                                     Date


                                                    5-11

1
2
3
4  Gary B. Rudolph, Esq. (#101921)
   James F. Lewin, Esq. (#140268)
5  SPARBER RUDOLPH ANNEN, APLC
   701 "B" Street, Suite 1000
6  San Diego, CA 92101
   Tel: (619) 239-3600
7  Fax: (619) 239-5601

8  Attorneys for Gerald H. Davis, Chapter 7 Trustee

9
               **UNITED STATES BANKRUPTCY COURT**
10
               **SOUTHERN DISTRICT OF CALIFORNIA**
11

12  In re                              )Case No. 03-11155-LA7
                                       )
13  JERRY L. ICENHOWER (SSN - 8611)    )**PROOF OF SERVICE OF**
    and DONNA L. ICENHOWER             )**(Proposed) ORDER APPROVING**
14  (SSN - 0222)                       )**TRUSTEE'S MOTION AUTHORIZING**
                                       )**SALE OF ASSETS OUTSIDE OF**
15                                     )**ORDINARY COURSE OF BUSINESS**
                  Debtors.            )
16                                     )
                                       )
17                                     )
                                       )
18  ─────────────────────────────────  )

19        The undersigned declares as follows:

20        1.      I am, and was at the time of service of the papers herein referred to, over the

21  age of 18 years, and not a party to this action; and I am employed in the County of San

22  Diego, California, within which county the subject mailing occurred. My business address

23  is 701 "B" Street, Suite 1000, San Diego, California 92101.

24        2.      The means of service indicated herein is defined as follows:

25              "Electronically" - documents were served by electronic mail pursuant to

26              Amended General Order 162;

27              "First Class Mail" - documents were served by placing the documents in a

28              sealed envelope clearly labeled to identify the parties being served, and

5408-1/231386.1

*Signed by Judge Louise DeCarl Adler December 07, 2006*

1    mailing such envelope by First Class U.S. Mail;

2    "Personal" - documents were served by hand delivering the documents to the

3    parties being served at the address indicated herein;

4    "Overnight Mail" -  documents were served by placing the documents in a

5    sealed U.S. Express Mail envelope clearly labeled to identify the parties being

6    served, and mailing such envelope by U.S. Express Mail; and,

7    "Facsimile" - documents were served by transmitting the documents with a

8    cover sheet clearly identifying the parties being served to the facsimile

9    numbers indicated.

10       3.    On the date indicated below, I served a true and correct copy of the following

11   document(s) on the parties identified on the service list attached hereto:

12   **ORDER APPROVING TRUSTEE'S MOTION AUTHORIZING SALE**
     **OF ASSETS OUTSIDE OF ORDINARY COURSE OF BUSINESS**

13

14       I declare under penalty of perjury under the laws of the United States of America that

15   the foregoing is true and correct.

         Executed December 6, 2006, at San Diego, California.
16

17                                                /s/ Maria A. Annen
18                                                Maria A. Annen

19

20

21

22

23

24

25

26

27

28

                              -  2  -                        5498-1/231386.1

1

**SERVICE LIST:**

2

David Ortiz
Office of the U.S. Trustee
Southern District of California
402 West Broadway, Suite 600
San Diego, CA 92101
Facsimile No. (619) 557-5339
*VIA FIRST CLASS MAIL*

Ali Mojdehi, Esq.
Baker & McKenzie
101 West Broadway, 12th Floor
San Diego, CA 92101
*VIA FIRST CLASS MAIL*

3

4

5

6

Michael Busch, Esq.
Pyle Sims Duncan & Stevenson, APC
401 "B" Street, Suite 1500
San Diego, CA 92101
*VIA FIRST CLASS MAIL*

Fletcher W. Paddison, Esq.
Ross, Dixon & Bell, LLP
550 West B Street, Suite 400
San Diego, CA 92101
*VIA FIRST CLASS MAIL*

7

8

9

William L. Conti, Esq.
330 Rancheros Drive, Suite 212
San Diego, CA 92069
*VIA FIRST CLASS MAIL*

Robert L. Rentto, Esq.
Rentto & Rentto
110 West C Street, Suite 1503
San Diego, CA 92101
*VIA FIRST CLASS MAIL*

10

11

12

Alan Vanderhoff, Esq.
701 "B" Street, Suite 1000
San Diego, CA 92101
*VIA FIRST CLASS MAIL*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iii

5498-1/231386.1

*Signed by Judge Louise DeCarl Adler December 07, 2006*

CSD 1001A [08/22/03]

Name, Address, Telephone No. & I.D. No.
Gary B. Rudolph, Esq. (#101921)
James F. Lewin, Esq. (#140268)
SPARBER RUDOLPH ANNEN, APLC
701 "B" Street, Suite 1000
San Diego, CA 92101
Telephone (619) 239-3600
Attorneys for Gerald H. Davis, Chapter 7 Trustee

Order Entered on
December 07, 2006
by Clerk U.S. Bankruptcy Court
Southern District of California

## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF CALIFORNIA
325 West "F" Street, San Diego, California 92101-6991

In Re
TERRY L. ICENHOWER DBA Seaview Properties, and
DONNA L. ICENHOWER fka DONNA L. HAWKS

Debtors.

BANKRUPTCY NO. 03-11155-LA7

Date of Hearing: November 30, 2006
Time of Hearing: 2:30 p.m.
Name of Judge: Louise DeCarl Adler

## ORDER APPROVING TRUSTEE'S MOTION AUTHORIZING SALE OF ASSETS OUTSIDE OF ORDINARY COURSE OF BUSINESS

IT IS ORDERED THAT the relief sought as set forth on the continuation pages attached and numbered two (2)

through __(2)__ with exhibits, if any, for a total of __(2)__ pages, is granted. Motion/Application Docket Entry No. __92__.

//

//

//

//

//

//

DATED:            December 07, 2006

Signature by the attorney constitutes a certification under
Fed. R. of Bankr. P. 9011 that the relief in the order is the
relief granted by the court.

Submitted by:
SPARBER RUDOLPH ANNEN


By: /s/ Gary B. Rudolph
      Attorneys for Gerald H. Davis, Chapter 7 Trustee

Judge, United States Bankruptcy Court

CSD 1001A    231263.1

CSD 1001A [07/01/98] (Page 2)
ORDER APPROVING TRUSTEE'S MOTION AUTHORIZING SALE OF ASSETS OUTSIDE OF ORDINARY COURSE OF BUSINESS
DEBTOR JERRY L. ICENHOWER DBA Seaview Properties, and          CASE NO: 03-11155-LA7
DONNA L. ICENHOWER fka DONNA L. HAWKS

The Trustee's Motion for an Order Authorizing Sale of Assets Outside of Ordinary Course of Business came on regularly for hearing on November 30, 2006 at 2:30 p.m. in Department Two of the United States Bankruptcy Court, Southern District of California, the Honorable Louise DeCarl Adler Bankruptcy Judge presiding. Appearances were noted on the record. After considering the pleadings filed in support of and in response to the motion and after hearing presentations of counsel and good cause appearing therefor,

1.      The Trustee's Motion Authorizing Sale of Assets Outside of Ordinary Course of Business is approved. The Purchase and the Assignment Agreement attached hereto as Exhibit "A" (which was also attached as Exhibit "A" to the Declaration of Gerald Davis, Trustee, filed November 1, 2006 as document no. 91) is approved.

2.      The approval herein does not adjudicate assignee's entitlement to assert privileges currently belonging to the Trustee or to continuing access to the jurisdiction of this court or the United States District Court except as it relates to interpretation and/or enforcement of the terms of the Purchase and Assignment Agreement. Assignee is not receiving any greater rights than the estate has to convey.

3.      Pursuant to 11 U.S.C. Section 363(m), assignee is purchasing the assets in good faith, without collusion and at arm's length, such that the parties are entitled to the protections of 11 U.S.C. Section 363(m). The sale herein is an exercise of the Trustee's sound business judgment and the sale is in the best interest of the estate and its creditors.

4.      The assets are being sold in an "As-Is" "Where-Is" condition without any representations or warranties except those set forth in the Purchase and Assignment Agreement. The motion notified parties-in-interest that have an opportunity to make a bid superior to that by assignee and a reasonable opportunity was afforded parties-in-interest to make a higher and better offer for the assets being purchased. No party qualified as a bidder with the Trustee, nor presented a bid prior to or at the time of the hearing. The Purchase and Sale Agreement represents the highest and best offer received by the Trustee for the assets to be sold therein.

CSD 1001A   231263.1

*Signed by Judge Louise DeCarl Adler December 07, 2006*

CSD 1001A [08/22/03] (Page 3)
ORDER APPROVING TRUSTEE'S MOTION AUTHORIZING SALE OF ASSETS OUTSIDE OF ORDINARY COURSE OF BUSINESS
DEBTOR: JERRY L. ICENHOWER DBA Seaview Properties, and          CASE NO: 03-11155-LA7
DONNA L. ICENHOWER fka DONNA L. HAWKS

5.    Following the close of the sale for this transaction, assignee shall be deemed to have replaced the Trustee

as the party plaintiff in the avoidance action, adversary proceeding no. 04-90932 and the postpetition transfer

avoidance action, adversary proceeding no. 04-90126 without any further action or order of this court.

APPROVED AS TO FORM AND CONTENT

Baker & McKenzie

By: /s/ Ali M. M. Mojdehi
        Ali M.M. Mojdehi, Esq.
Attorneys for assignee

/s/ Alan Vanderhoff
        Alan Vanderhoff, Esq.,
Attorneys for Alejandro Diaz Barba and Martha B. Diaz

CSD 1001A    231263.1

*Signed by Judge Louise DeCarl Adler December 07, 2006*

# EXHIBIT A

Signed by Judge Louise DeCarl Adler December 07,2006



## PURCHASE AND ASSIGNMENT AGREEMENT

This Purchase and Assignment Agreement ("Agreement") is entered into as of the last date of signature below ("Effective Date") by Gerald H. Davis, Chapter 7 Trustee (the "Assignor" or the "Trustee") for the bankruptcy estate of Jerry L. Icenhower DBA Seaview Properties and Donna L. Icenhower (the "Bankruptcy Estate") on the one hand; and Kismet Acquisition, LLC, a Delaware limited liability company or its assignees, and Kismet Acquisition II, LLC, a Delaware limited liability company or its assignees (collectively, "Assignee") on the other hand.

## RECITALS

**A.      Whereas** on December 15, 2003, Jerry L. Icenhower DBA Seaview Properties and Donna L. Icenhower (the "Debtors") filed a petition under Chapter 7 of Title 11 of the United States Code, Case No. 03-11155-LA7 (the "Bankruptcy Case");

**B.      Whereas,** the Trustee entered into a certain letter agreement with Pyle Sims Duncan & Stevenson, APC ("PSDS") dated August 1, 2004 concerning PSDS' representation of the Trustee as special counsel to the Trustee related to the Avoidance Action (as defined below) (the "Bankruptcy Trustee Representation Agreement");

**C.      Whereas,** on August 23, 2004, the Trustee commenced Adversary Proceeding No. 04-90392 against Jerry L. Icenhower DBA Seaview Properties, and Donna L. Icenhower FKA Donna L. Hawks; Howell & Gardner Investors, Inc., a Nevada Corporation; Martha Margarita Barba De La Torre, an individual, et al., for recovery of money or property, as such was amended by the First Amended Complaint and the Second Amended Complaint (collectively, the "Avoidance Action");

**D.      Whereas,** on November 19, 2004, the Bankruptcy Court for the Southern District of California entered an order approving the retention of PSDS as special counsel to the Bankruptcy Trustee on the terms set forth in the Bankruptcy Trustee Representation Agreement and otherwise providing for a priority right of reimbursement from the Bankruptcy Estate for all amounts advanced by the D. Donald Lonie Jr. Family Trust ("Lonie Trust") for fees and costs pertaining to the Avoidance Action ("Court Order Approving Retention of PSDS");

**E.      Whereas,** on August 3, 2006, the Trustee commenced Adversary Proceeding No. 06-90369 against Jerry L. Icenhower DBA Seaview Properties, And Donna L. Icenhower FKA Donna L. Hawks; Howell & Gardner Investors, Inc., a Nevada Corporation; Martha Margarita Barba De La Torre, an individual, et al. for recovery of money or property (the "Post Petition Transfer Avoidance Action"); and

**F.      Whereas,** Assignee has certain claims pending against the Bankruptcy Estate, in that (i) on or about October 27, 2004 a Proof of Claim was filed by the Lonie Trust in the Bankruptcy Case, as amended on or about December 6, 2004 by the Amended Proof of Claim No. 4 in the amount of $1,385,950.65, which was subsequently assigned on or about June 30, 2006 to Kismet Acquisition, LLC along with a partial assignment of the same on or about July 14, 2006 to Kismet Acquisition II, LLC (the "Claim"); (ii) Kismet Acquisition II LLC has received assignment by the Lonie Trust of all its rights for priority reimbursement from the Bankruptcy Estate arising under the Court Order Approving Retention of PSDS for amounts advanced by the

**EXHIBIT** A-1

*Signed by Judge Louise DeCarl Adler December 07, 2006*



Lonie Trust to PSDS up through and including May 31, 2006, in the amount of $348,805.98; and (iii) Kismet Acquisition, LLC has received assignment of all rights and duties arising under the Court Order Approving Retention of PSDS for priority reimbursement from the Bankruptcy Estate for amounts advanced by Assignee to PSDS subsequent to May 31, 2006, which are estimated to amount to $90,000.00 as of the Close Date (as defined below). Collectively, amounts under (ii) and (iii) above are referred to herein as the "Reimbursement Claim";

G.    **Whereas**, Assignee has made an offer to the Trustee for the purchase by Assignee of all the Bankruptcy Estate's rights, title and interest in or to any and all assets of the Bankruptcy Estate, including without limitation, all rights and/or causes of action against third parties and/or the Debtors in the Bankruptcy Case, whether asserted or unasserted, including without limitation, the Avoidance Action and the Post Petition Transfer Avoidance Action, along with all rights, privileges, and benefits of the Trustee and the Bankruptcy Estate related thereto or in connection therewith, and the Trustee having exercised his informed business judgment and considering the benefit to accrue to the Bankruptcy Estate now desires to sell and assign the same in exchange for the mutual promises herein and other good and lawful consideration; and

H.    **Whereas**, the terms of the sale and assignment to Assignee hereunder have been negotiated in good faith and on an arm's-length basis between the Trustee and Assignee.

I.    **Therefore**, in consideration of the mutual covenants herein, the adequacy and sufficiency of which are acknowledged, the parties agree as follows:

1.    Assignment.  Upon the Close Date (as defined below), the Trustee absolutely and unconditionally transfers and assigns and Assignee expressly assumes all right, title and interest in or to any and all assets of the Bankruptcy Estate that are either "capital assets" as defined 26 U.S.C. §1221(a) or "property used in the trade or business" for purposes of 26 U.S.C. §1231(b), including all rights, claims, defenses, or causes of action (whether at law or in equity) of the Bankruptcy Estate whether against third parties and/or against the Debtors, whether asserted or yet to be asserted, and whether arising under bankruptcy or nonbankruptcy law, *including without limitation*, the Avoidance Action and the Post Petition Transfer Avoidance Action, along with all other rights, privileges, and benefits of the Trustee and the Bankruptcy Estate arising out of, related thereto, or in connection therewith (collectively, the "Assigned Rights and Interests").

1.1    Subject to the provisions of Section 1.2, the Assigned Rights and Interests include all attorney-client, accountant-client, work product, and similar litigation privileges and all evidence, books, and records subject thereto relating to the Assigned Rights and Interests that are subject to a right of turnover to the Trustee under 11 U.S.C. § 542(e) and which are otherwise assignable by the Trustee to Assignee under applicable bankruptcy and nonbankruptcy law.

1.2    Nothing herein provides, however, for (i) the creation of an attorney-client relationship between Assignee and any of the Trustee's attorneys; (ii) the transfer to Assignee of any attorney-client or work product privilege that may exist between the Trustee and Sparber Rudolph Annen, APLC; or (iii) the transfer to Assignee of any communications between the Trustee and PSDS related to either (a) the assignment of the Claim from the Lonie Trust to Assignee or (b) the negotiation of this Agreement.

EXHIBIT A-2

*Signed by Judge Louise DeCarl Adler December 07,2006*



**2.** <u>Substitution of Parties; Substitution of Counsel.</u> As soon as reasonably possible following the Close Date, Assignee will substitute in and replace the Trustee as the party plaintiff and shall substitute in Baker & McKenzie LLP as its counsel in lieu of PSDS in the Avoidance Action and the Post Petition Transfer Avoidance Action.

**3.** <u>Payment of Allowed Liabilities of the Bankruptcy Estate; Subordination of Claim; Trust Fund Application; Expenses Escrow; Taxes.</u>

     **3.1**    Upon the Close Date, Assignee shall, except for the amount of its Claim and the Reimbursement Claim, pay to the Trustee an amount equal to all allowed liabilities of the Bankruptcy Estate as follows: (i) the amount of all allowed claims of general unsecured creditors of the Bankruptcy Estate sufficient to pay said claims in full, currently estimated to be in the amount of $2,576.80; (ii) all fees and costs of the Trustee's general counsel, Sparber Rudolph Annen, APLC, through the Close Date, estimated to be in the amount of $50,000.00; (iii) all fees and costs of the Trustee incurred through the Close Date, estimated to be in the amount of $40,000.00; and (iv) all fees and costs of the Trustee's accountant through the Close Date, estimated to be in the amount of $15,000.00 (collectively, the "<u>Payment Amount</u>").

     **3.2**    Furthermore, as of the Close Date, the Assignee shall subordinate its Claim and the Reimbursement Claim to the allowed claims of all other creditors of the Bankruptcy Estate and shall assume all responsibility, cost and expense of litigation of the Avoidance Action and the Post Petition Transfer Avoidance Action as well as the pursuit of any other Assigned Rights and Interests assigned herein.

     **3.3**    Immediately upon the Close Date, PSDS shall deliver to the Trustee all amounts held by PSDS in its client trust fund accounts received from Assignee ("<u>Client Trust Fund Amounts</u>") remaining after PSDS' application of said funds to its outstanding fees and costs on the Close Date, relating to PSDS' services rendered as special counsel to the Trustee. Said monies will be applied by the Trustee towards the Payment Amount to be paid by Assignee. Nothing in this Section 3.3 shall be deemed to limit or otherwise alter Assignee's right to review and preapprove such fees and costs of PSDS prior to any application of Client Trust Fund Amounts towards such fees and costs of PSDS, nor shall it be deemed to limit or otherwise alter PSDS's right to be paid its fees and costs pursuant to the court order approving its retention.

     **3.4**    At the earliest possible date but no less than within ten (10) business days following Bankruptcy Court approval and payment of the final fee applications of the Trustee and his professionals, the Trustee shall provide an accounting to Assignee detailing such allowed amounts: (i) the amounts due in subsections 3.1 (i)-(iv) above; (ii) a calculation of the Client Trust Fund Amounts as of the Close Date; (iii) the Trustee's proposed application of Client Trust Fund Amounts to outstanding fees and costs of PSDS up through the Close Date; (iv) a calculation of Client Trust Fund Amounts to be applied to the Payment Amount to be paid by Assignee; and (v) the remaining balance of the Payment Amount to be refunded by the Trustee to Assignee after such application of the Client Trust Fund Amounts to the amount due (collectively, the "<u>Trustee's Accounting</u>"). At the earliest possible date but no less than within ten (10) business days following delivery of the Trustee's Accounting to Assignee, the Trustee shall refund any balance of the Client Trust Fund Amounts to Assignee or Assignee shall make payment to the Trustee of any verified balance of the Payment Amount due in the Trustee's

EXHIBIT A·3
*Signed by Judge Louise DeCarl Adler December 07,2006*

Accounting, by wire transfer, in accordance with wire instructions to be provided to the other party.

**3.5**    The parties acknowledge and agree that the Trustee will close the Bankruptcy Case in the ordinary course. The Trustee is holding approximately $20,000 of funds received prior to execution of this Agreement. The Trustee shall retain said funds to be applied to any administrative costs and remaining allowed liabilities incurred by the Trustee after the Close Date. Further, in addition to and concurrent with Assignee's payment of the balance of the Payment Amount as set forth in Section 3.3 above, Assignee shall deposit with the Trustee for the Bankruptcy Estate an additional $20,000 (the "Expenses Escrow") to be used by the Trustee to pay any expenses of administration incurred after the Close Date and any remaining allowed liabilities of the Bankruptcy Estate that exceed the $20,000 that the Trustee possesses as referenced above. At the time of the closing of the Bankruptcy Estate, if there are any funds remaining in the Expenses Escrow after payment of all expenses of the Bankruptcy Estate, said funds shall be promptly returned to Assignee.

**3.6**    As additional consideration in exchange for the Trustee's assignment of the Assigned Rights and Interests under this Agreement, the Assignee shall pay all taxes, penalties and interest (if any) of the Bankruptcy Estate for which the Bankruptcy Estate may be held liable, to the extent arising out of the assignment of the Assigned Rights and Interests hereunder ("Taxes"). Promptly upon Bankruptcy Court approval and payment of professional fees as set forth in Section 3.4, the Trustee shall expeditiously file the final tax returns of the Bankruptcy Estate with the Internal Revenue Service and Franchise Tax Board, respectively, including requesting a determination under 11 U.S.C. § 505(b) of the returns. The Trustee shall use diligent efforts to comply with Revenue Procedure 2006-24, and, prior to filing the returns, shall permit Assignee to review the final returns, including without limitation, to review the Trustee's compliance with Revenue Procedure 2006-24. The Trustee shall discuss and keep Assignee fully advised of all material facts and communications in connection with the filing, processing, and acceptance of such returns. The Trustee shall advise and cooperate with Assignee concerning any request for court determination under 11 U.S.C. § 505(b)(2) (as such was in effect as of the date of the Debtors' petition). The Trust Account (as defined below) shall terminate ten (10) days after the first occurrence of any of the events under 11 U.S.C. § 505(b)(1)(2) or (3) (as such was in effect as of the date of the Debtors' petition), as applicable.

**4.**    Continuing Jurisdiction of the Bankruptcy Court. The Bankruptcy Court for the Southern District of California (the "Bankruptcy Court"), or, to the extent necessary, the United States District Court for the Southern District of Southern California, shall retain continuing jurisdiction over the Bankruptcy Case and the Assigned Rights and Interests, including the Avoidance Action and the Post Petition Transfer Avoidance Action.

**5.**    Delivery of Information; Cooperation and Further Assurances; Appointment.

**5.1**    Subject to the provisions of Sections 1.1 and 1.2, (i) within three (3) business days following the Close Date, the Trustee shall, and shall require each of his agents, employees, attorneys, and other professionals to transfer all documents, client files of the Bankruptcy Estate, and other information related to the Assigned Rights and Interests in their possession and/or control, including without limitation relating to the Avoidance Action and the Post Petition

EXHIBIT 1-4

*Signed by Judge Louise DeCarl Adler December 07, 2006*

Transfer Avoidance Action; and (ii) the parties acknowledge and agree that, as of the Close Date, Assignee shall receive all rights held by the Trustee and the Bankruptcy Estate in or to all privileges or other similar doctrines associated with the Assigned Rights and Interests, including without limitation, the Avoidance Action and the Post Petition Transfer Avoidance Action. The Trustee, his agents, employees, attorneys and professionals shall fully and immediately cooperate with Assignee pursuant to the performance of this Section 5.1. Any agent, employee, attorney, or other professional of the Trustee who complies with this Section 5.1 may retain a copy of the files delivered to Assignee, with costs to be paid at the expense of Assignee.

5.2    The Trustee, his agents, employees, attorneys, and professionals shall take such further action, including seeking relief under any applicable provisions of the Bankruptcy Code, as may be reasonably necessary to effect the transfer of the Assigned Rights and Interests hereunder, including related to any payments or distributions on account of the forgoing to Assignee and to execute any documents reasonably necessary to perfect or enable such transfer, without waiver of any attorney client or work product privileges.

5.3    The parties acknowledge and agree that, after the Close Date, it is the responsibility of the Assignee, at Assignee's sole expense, to prosecute and make all decisions associated with the prosecution of the Avoidance Action, the Post Petition Transfer Avoidance Action, as well as any other lawsuit or claim Assignee wishes to assert as a result of the transactions under this Agreement. Without limiting the generality of the foregoing sentence, should any law, regulation, or court order prevent and/or limit the Assignee from fully asserting or prosecuting any of the Assigned Rights and Interests, then the Trustee, his agents, employees, and professionals further agree that the Assignee shall have the right to pursue any of the Assigned Rights and Interests hereunder in the name of the Bankruptcy Estate. In such case, the Trustee authorizes Assignee to act in the Bankruptcy Estate's stead and to demand, sue for, compromise, and recover all such amounts as now are, or may hereafter become, due and payable for or on account of the Assigned Rights and Interests.

6.    Indemnification. Assignee agrees to indemnify, defend, and hold harmless the Trustee from any claims which may be asserted against the Trustee, agents, employees, attorneys, and professionals ("Indemnified Persons") by the defendants or any additional parties Assignee may name as defendants or anyone claiming through a defendant or any party claiming a property interest in the property subject to the Avoidance Action or the Post Petition Transfer Avoidance Action ("Claimants") in the Avoidance Action and/or the Post Petition Transfer Avoidance Action arising out of the Assignee's use and enjoyment of the Assigned Rights and Interests after the Close Date. The indemnification in this Section 6 is subject to the Trustee providing Assignee with (i) prompt written notice of the claim, all reasonably requested information about the claim; (ii) reasonable cooperation and assistance; and (iii) sole authority to defend and settle the claim.

7.    Bankruptcy Court Approval; Close Date.

7.1    This Agreement is subject to entry of a order by the Bankruptcy Court in the Bankruptcy Case approving this Agreement and the transactions contemplated hereunder (the "Sale Order"). To that end, within the five (5) business days following the parties' execution of

EXHIBIT A-5
Signed by Judge Louise DeCarl Adler December 07,2006

this Agreement, the Trustee shall seek such Sale Order, along with customary pleadings setting forth in detail why approval of this Agreement is in the best interest of the creditors of the estate.

    **7.2**    The Close Date shall be the first business day that is the later of: (i) eleven (11) days after entry of the Sale Order if no appeal is timely filed, or an appeal of the Sale Order is timely filed and no stay of the action is granted, (ii) if an appeal is timely filed and a stay is granted then upon final resolution of such appeal upholding the Sale Order, provided no further appeal is possible and (iii) Assignee's delivery to the Trustee of the funds to be deposited into the Trust Account pursuant to Section 7.4 (the "Close Date"). Should the Bankruptcy Court deny approval of this Agreement or should the conditions to the Close Date set forth in the last sentence of Section 7.4 not be performed or otherwise waived in writing by the parties, (a) this Agreement shall immediately terminate and be of no further effect, and (b) the parties shall retain all rights they would have had as if this Agreement had never been entered into.

    **7.3**    The assignment of the Assigned Rights and Interests to the Assignee contemplated herein is pursuant to 11 U.S.C. § 363(b). Any person other than Assignee wishing to make a competing bid for the Assigned Rights and Interests must *first* provide evidence to the Trustee that such bid is a higher and better offer, including without limitation, evidence of such person's ability to close the sale absent any contingencies and consistent with the time frames for the Close Date and payments set forth in this Agreement. Furthermore, terms offered in any proposed sale agreement presented by any person other than Assignee must be non-contingent and must provide for payment in full in cash on or before the Close Date as defined herein.

    **7.4**    Within three (3) business days following the parties' execution of the Trust Fund Letter (as defined below), Assignee shall wire funds to the Trustee in an amount to be agreed by the parties' estimate to be sufficient to provide the Trustee with assurance of Assignee's performance of its obligations under Section 3.6 of this Agreement. The funds shall be deposited by the Trustee into a segregated trust account (the "Trust Account"). The amount to be deposited in the Trust Account, the terms and conditions for safekeeping of the Trust Account by the Trustee, the terms for any disbursements to the Bankruptcy Estate thereunder, as well as the required accounting for the funds held, disbursed, and/or returned to Assignee thereunder shall be set forth in a mutually agreeable letter to be separately executed by the parties within five (5) business days of the Sale Order (the "Trust Fund Letter"). The Parties are not required to execute the Trust Fund Letter unless and until the Sale Order occurs, and if the Sale Order does not occur, the Parties are not required to execute the Trust Fund Letter. The Parties' execution of the Trust Fund Letter and Assignee's delivery to the Trustee of the funds for deposit into the Trust Account shall each be a condition to the Close Date.

**8.**    <u>Unconditional Assignment</u>. The assignments made under this Agreement shall, upon the Close Date, be deemed an absolute and unconditional assignment of the rights and interests related thereto.

**9.**    <u>Representations and Warranties</u>.

    **9.1**    <u>By Trustee and the Bankruptcy Estate</u>. The Trustee represents and warrants that as of the Effective Date and the Close Date, subject to entry of the Sale Order:

EXHIBIT A - 6
*Signed by Judge Louise DeCarl Adler December 07, 2006*

**(a)**     The Trustee and the Bankruptcy Estate each has the requisite power and authority to enter into and to execute deliver and perform the obligations under this Agreement and any other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by the Trustee in connection with the consummation of the transactions contemplated hereby and thereby, and to consummate the transactions contemplated hereby and thereby. This Agreement constitutes the legal, valid, and binding obligation of the Trustee and the Bankruptcy Estate, enforceable against the Trustee and the Bankruptcy Estate in accordance with its terms.

**(b)**     This Agreement does not conflict with or contravene any other agreement, applicable law, or court order, provided, however, that the Trustee makes no representation or warranty that the assignment hereunder has been or will be approved or allowed in whole or in part by the court in the Bankruptcy Case.

**(c)**     There are no legal proceedings pending or, to the knowledge of the Trustee, threatened against Trustee or the Bankruptcy Estate, or to which he or it is otherwise a party before any governmental body, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Trustee or the Bankruptcy Estate to perform their obligations under this Agreement or to consummate the transactions hereunder. The Trustee and the Bankruptcy Estate are not subject to any order of any governmental body that would reasonably be expected to materially effect their ability to perform the obligations under this Agreement or to consummate the transactions contemplated hereby.

**(d)**     The Trustee shall not have incurred any obligation that would prevent his or the Bankruptcy Estate's performance of his or its obligations under this Agreement.

**9.2**     By Assignee. Assignee represents and warrants that, as of the Effective Date and the Close Date, subject to entry of the Sale Order:

**(a)**     It has the requisite corporate power and authority to enter into and to execute, deliver, and perform the obligations under this Agreement and any other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Assignee in connection with the consummation of the transactions contemplated hereby and thereby, and to consummate the transactions contemplated hereby and thereby. Subject to entry of the Sale Order, this Agreement constitutes the legal, valid, and binding obligation of Assignee, enforceable against Assignee in accordance with its terms.

**(b)**     Assignee is a limited liability company, duly organized, validly existing and in good standing under the laws of Delaware and has all requisite corporate power and authority to carry on its business as now conducted. None of the execution and delivery by Assignee of this Agreement, the consummation of the transactions contemplated hereby, or the compliance by Assignee with any of the provisions hereof or thereof will conflict with, or result in a violation of, any provision of the organizational documents, operating agreement or by-laws of Assignee.

Signed by Judge Louise DeCarl Adler December 07, 2006



(c)    Assignee has performed its own investigation of the status and merits of the Assigned Rights and Interests and is relying solely upon Assignee's independent investigation in entering into this Agreement.

(d)    There are no legal proceedings pending or, to the knowledge of Assignee, threatened against Assignee, or to which Assignee is otherwise a party before any governmental body, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Assignee to perform its obligations under this Agreement or to consummate the transactions hereby. Assignee is not subject to any order of any governmental body which would reasonably be expected to materially effect the ability of Assignee to perform its obligations under this Agreement or to consummate the transactions contemplated hereby.

(e)    Assignee will have available the resources and capabilities (financial or otherwise) to perform its obligations hereunder and will not have incurred any obligation that would prevent Assignee's performance of those obligations.

9.3    Except for the representations contained in this Agreement: (i) neither party makes any other express or implied representation or warranty with respect to the Trustee, the Assigned Rights and Interests, or the transactions contemplated by this Agreement, and each party disclaims any other representations or warranties, whether made by Assignee, the Trustee or any of their respective employees, agents, or representatives; (ii) the Assigned Rights and Interests are being transferred on a "where is" and, as to condition, "as is" basis; and (iii) Assignor expressly disclaims and negates any representation or warranty, express or implied, at common law, by statute, or otherwise relating to the condition of the Assigned Rights and Interests and disclaims all liability and responsibility for any representations, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Assignee, the Lonie Trust, or their respective representatives, any opinion, information, projection, or advice that may have been or may be provided to Assignee by any employee, agent, consultant, or representative of the Trustee. The Trustee makes no representations or warranties to Assignee regarding the probable success or profitability of the Assigned Rights or Interests.

9.4    All representations and warranties made herein shall survive the execution and Close Date of this Agreement.

10.    Status of Bankruptcy Case. The parties acknowledge and agree that, following the Close Date, the Trustee and/or the Bankruptcy Estate is not a party and/or party in interest to the Assigned Rights and Interests and that any recovery upon the Assigned Rights and Interests shall be the sole property of the Assignee. The Trustee and his employees, agents, attorneys and professionals acknowledge and agree that the Trustee's receipt of the payments set forth in Section 3 shall constitute *full satisfaction* of any claims against the Bankruptcy Estate and/or Assignee by the Trustee and his employees, agents, attorneys and professionals, provided, however, that the foregoing shall not in any way limit or modify the indemnification obligation under Section 6 of this Agreement.

EXHIBIT A - 8

*Signed by Judge Louise DeCarl Adler December 07, 2006*



11.    Miscellaneous

11.1    The terms of this Agreement shall be binding upon, and shall inure to the benefit of Assignor, Assignee, and their respective predecessors, successors and assigns.

11.2    Any and all disputes concerning this Agreement are to be resolved in the Bankruptcy Court and any and all courts of appeal therefrom. Each party shall be responsible for its own attorney's fees and costs in connection with any such disputes, however, the successful party shall be entitled to an award of its reasonable attorney fees and costs, such award subject to approval by the Bankruptcy Court. This Agreement shall be governed by and construed in accordance with the laws of the State of California and the federal law of the United States, without reference to principles of conflicts of law.

11.3    This Agreement represents the entire agreement and understanding of the parties concerning its subject matter and supersedes and replaces any and all prior agreements and understandings among them. Each term of the Agreement is contractual and not merely a recital. Prior to the Close Date, when and if it occurs, nothing herein shall be deemed to supersede, modify, or waive Assignee's Claim and/or Assignee's priority reimbursement rights under the Court Order Approving Retention of PSDS.

11.4    This Agreement may be executed in counterparts, and each counterpart shall have the same force and effect as the original and shall constitute an effective, binding agreement on the part of each of the undersigned.

11.5    All notices made under this Agreement will be in writing and delivered by facsimile, electronic mail, or other electronic means; or by prepaid means providing proof of delivery. Notices are effective upon receipt, and will be sent to the following addresses:

If to Assignor:

Gerald H. Davis, Chapter 7 Trustee
c/o
Gary B. Rudolph
Sparber Rudolph Annen APLC
701 B Street, Suite 1000
San Diego, CA 92101
Fax: (619) 239-5601
Email: grudolph@sparberlaw.com

If to Assignee:

Kismet Acquisition, LLC; Kismet Acquisition II, LLC
c/o Ali M.M. Mojdehi,
Baker & McKenzie LLP
101 West Broadway, San Diego, CA 92101
Fax: (619) 236-0429
Email: ali.m.m.mojdehi@bakernet.com

SDODMS1/066568.219

EXHIBIT A - 9

Signed by Judge Louise DeCarl Adler December 07, 2006

**11.6** The Trustee is executing this Agreement only in his capacity as Trustee of the bankruptcy estate of Jerry L. Icenhower dba Seaview Properties and Donna L. Icenhower and is not executing this in any personal capacity.

**11.7** <u>Headings</u>. The headings within this Agreement are for convenience only and will not affect the interpretation of this Agreement.

**11.8** <u>Time Is of the Essence</u>. With respect to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

EXHIBIT A -10

*Signed by Judge Louise DeCarl Adler December 07, 2006*

. 10/10/2006  13:25    61990  06                    GERALD H DAVIS  USD                      PAGE  03/04

IN WITNESS WHEREOF, the Parties have executed this Agreement on the respective dates set forth below.

By:    **GERALD H. DAVIS, CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATE OF JERRY L. ICENHOWER DBA SEAVIEW PROPERTIES AND DONNA L. ICENHOWER**

_____              ___10|31|06_____
        Signature                                          Date

By:    **KISMET ACQUISITION, LLC**

_____              _____
        Signature                                          Date

By:    **KISMET ACQUISITION II, LLC**

_____              _____
        Signature                                          Date

*Signed by Judge Louise DeCarl Adler December 07, 2006*

**EXHIBIT 3**

CSD 3000A [11/15/04]
Name, Address, Telephone No. & I.D. No.
Ali M.M. Mojdehi, State Bar No. 123846
Janet D. Gertz, State Bar No. 231172
Baker & McKenzie LLP
12544 High Bluff Drive, Third Floor
San Diego, CA 921301-3051
Telephone: +1 858 523 6200
Attorneys for Plaintiff, Kismet Acquisition, LLC

Order Entered on
July 30, 2008
by Clerk U.S. Bankruptcy Court
Southern District of California

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA
325 West "F" Street, San Diego, California 92101-6991

In Re JERRY LEE ICENHOWER dba Seaview Properties, and DONNA LEE ICENHOWER

Debtor.

BANKRUPTCY NO. 03-11155-LA-7

KISMET ACQUISITION, LLC,

Plaintiff(s)

ADVERSARY NO. 04-90392-LA and 06-90369-LA

v.

JERRY L. ICENHOWER an individual; et al.

Defendants(s)

Date of Hearing: July 24, 2008
Time of Hearing: 10:30 a.m.
Name of Judge: Hon. Louise DeCarl Adler

---

## ORDER ON
## MOTION TO ALTER OR AMEND CONSOLIDATED JUDGMENT

IT IS ORDERED THAT the relief sought as set forth on the continuation pages attached and numbered two (2) through 2 with exhibits, if any, for a total of 2 pages, is denied in part and granted in part. Motion/Application Docket Entry No.

(Docket No. 505 in Adversary Proceeding 04-90392; Docket Entry No. 214 in Adversary Proceeding 06-90369).

//

//

//

//

July 29, 2008

DATED:

Judge, United States Bankruptcy Court

Signature by the attorney constitutes a certification under Fed. R. of Bankr. P. 9011 that the relief in the order is the relief granted by the court.

Submitted by:

Baker & McKenzie LLP
(Firm name)

By: /s/ Ali M.M. Mojdehi
Attorney for ☒ Plaintiff ☐ Defendant
Kismet Acquisition, LLC

CSD 3000A
SDODMS1/691893.1

 

EXHIBIT 3

American LegalNet, Inc.
www.USCourtForms.com

CSD 3000A [11/15/04] (Page 2)
ORDER ON MOTION TO ALTER OR AMEND CONSOLIDATED JUDGMENT          CASE NO:  03-11155-LA-7
DEBTOR:  JERRY LEE ICENHOWER dba Seaview Properties, and DONNA LEE ADV. NO.:  04-90392-LA and 06-90369-
ICENHOWER                                                                                                LA

WHEREAS Defendants' Motion to Alter or Amend the Consolidated Judgment ("Motion") came on regularly for hearing at 10:30 a.m. on July 24, 2008 in Department 2 of the above-entitled Court before the Hon. Louise DeCarl Adler, and After having considered the parties' arguments and reviewed all of the papers submitted by the parties in support and in opposition, and for good cause appearing,

IT IS HEREBY ORDERED that

1.  The Consolidated Judgment is amended as set forth in Exhibit "A" attached hereto ("Amended Consolidated Judgment").  A blackline version showing the changes made to the Consolidated Judgment dated June 2, 2008 (Docket No. 504 in Adversary Proceeding 04-90302; Docket Entry No. 213 in Adversary Proceeding 06-90369) is set forth at Exhibit "B" hereto.

2.  All other relief requested in the Motion is denied.

IT IS SO ORDERED.

CSD 3000A
SDODMS1/691893.1

American LegalNet, Inc.
www.USCourtForms.com

*Signed by Judge Louise DeCarl Adler July 29, 2008*

EXHIBIT A

1

2

3

4

5

6

7

8                        UNITED STATES BANKRUPTCY COURT

9                         SOUTHERN DISTRICT OF CALIFORNIA

10    In re:                                 )    Case No. 03-11155-A7
                                             )
11    JERRY L. ICENHOWER dba                 )    Adv. No. 06-90369-A7
      Seaview Properties, and DONNA L.       )    Adv. No. 04-90392-A7
12    ICENHOWER,                             )
                                             )
13             Debtors.                      )
                                             )
      _____       )
14    KISMET ACQUISITION, LLC, a             )    AMENDED CONSOLIDATED JUDGMENT
      Delaware limited liability company,    )
15    Successor-in-interest to Gerald H.     )
      Davis, Chapter 7 Trustee,              )
16                                           )
                                             )
17             Plaintiff,                    )
                                             )
18         v.                                )
                                             )
19    JERRY L. ICENHOWER, an                 )
      individual; et al.                     )
20                                           )
               Defendants.                   )
21                                           )
                                             )
22                                           )

23         The consolidated trials of adversary proceedings 04-90392 and 06-90369 were

24    heard from April 21 to April 25, 2008 before the Honorable Louise DeCarl Adler.

25    Janet D. Gertz and Ali M.M. Mojdehi appeared on behalf of plaintiff, Kismet

26    Acquisition, LLC, successor-in-interest to Gerald H. Davis, the Chapter 7 Trustee

27    ("Plaintiff"), and Stephen B. Morris and Mark C. Hinkley appeared on behalf of

28    defendants Alejandro Diaz Barba and Martha Margarita Barba De La Torre (aka

*Signed by Judge Louise DeCarl Adler July 29, 2008*

Martha Barba Diaz) (the "Diaz Defendants). No appearances were made on behalf of defendants Howell & Gardner Investors, Inc. ("H&G"), and Jerry and Donna Icenhower ("Debtors") (hereinafter the Diaz Defendants, H&G and Debtors are collectively the "Defendants").

Witnesses were sworn in and examined, documentary evidence was introduced on behalf of the parties and the case was argued by counsel for both the Plaintiff and the Diaz Defendants. Having carefully considered the testimony of the witnesses and arguments of counsel and the Court having made findings of fact and conclusions of law on the record in open court and the Court having entered separate Findings of Fact and Conclusions of Law concurrently herewith, and other good cause:

IT IS HEREBY ORDERED that:

1.    Judgment is entered in favor of Plaintiff and against the Defendants on the complaint in adversary proceeding 06-90369. It is hereby adjudged and decreed that --

    (a)    H&G is the alter ego of the Debtors nunc pro tunc to the petition date;

    (b)    The assets of H&G are hereby substantively consolidated with the assets of the bankruptcy estate *nunc pro tunc* to petition date;

    (c)    the property called the Villa Vista Hermosa, located in the Village of Chamela in the Municipality of La Huerta, State of Jalisco, Mexico (the "Villa Property")[1] is property of the bankruptcy estate pursuant to 11 U.S.C. § 541(a) *nunc pro tunc* to the petition date;

    (d)    The Debtors' unauthorized postpetition transfer of the Villa Property to H&G is avoided pursuant to 11 U.S.C. 549(a);

    (e)    Plaintiff is entitled to recover and preserve pursuant to 11 U.S.C. § 550(a)(1) and § 551 the Villa Property from the Diaz Defendants as

---

[1] Under Mexican law, a foreign national may not directly hold title to coastal real property in Mexico, but may hold the beneficial interest in a *fideicomiso* bank trust formed to hold title to the real property. Hereinafter, unless otherwise specified, all references to the transfer or sale of the Villa Property refer to the transfer or sale of the beneficial trust interest.

2

1  the initial transferees of the avoided postpetition transfer. Within ten days

2  of entry of this judgment, Defendants are hereby ordered and directed to

3  take all actions necessary to execute and deliver any and all documents

4  needed to undo the avoided transfer, and to take all actions necessary to

5  cause the property to be reconveyed to a *fideicomiso* trust naming Plaintiff

6  as the sole beneficiary for the benefit of the bankruptcy estate; or

7      (f)    alternatively, at Plaintiff's sole option made upon proper noticed

8  motion, the Court reserves jurisdiction to enter a monetary judgment in

9  favor of Kismet, and against Defendants, in an amount necessary to

10  make the estate whole at the time of judgment.

11      2.    Alternatively, even if the Villa Property is not property of the bankruptcy

12  estate *nunc pro tunc* to the petition date, judgment is entered in favor of Plaintiff and

13  against the Defendants on the remaining claims in the amended complaint in adversary

14  proceeding 04-90392. It is hereby adjudged and decreed that-

15      (a)    the Debtors' transfer of the Villa Property to H&G is avoided as a

16  fraudulent transfer under 11 U.S.C. § 544(b), pursuant to Cal. Civ.

17  Code §§ 3439.04(a)(1) and (a)(2) and § 3439.07;

18  Plaintiff is entitled to recover and preserve pursuant to 11 U.S.C. §§

19  550(a)(1) and (a)(2) and § 551 the avoided fraudulent transfer from H&G

20  as the initial transferee of the avoided fraudulent transfer, and from the

21  Diaz Defendants as the "immediate or mediate" transferees of the initial

22  transferee. Within ten days of entry of this judgment, Defendants are

23  hereby ordered and directed to execute and deliver any and all documents

24  needed to undo the avoided transfer, and to take all actions necessary to

25  cause the property to be reconveyed to a *fideicomisto* trust naming

26  Plaintiff as the sole beneficiary for the benefit of the bankruptcy estate; or

27      (b)    alternatively, at Plaintiff's sole option made upon proper noticed

28  motion, the Court retains jurisdiction to enter a monetary judgment in

3

*Signed by Judge Louise DeCarl Adler July 29, 2008*

favor of Kismet, and against Defendants, in an amount necessary to make the estate whole at the time of judgment.

3.    The Court reserves for future determination made upon proper motion the issues of an award of fees and expenses, and it reserves jurisdiction to issue any and all orders necessary to carry out and enforce this judgment.


Dated: _____              _____
                                             LOUISE DE CARL ADLER, Judge

4

*Signed by Judge Louise DeCarl Adler July 29,2008*

EXHIBIT B

*Signed by Judge Louise DeCarl Adler July 29,2008*

1

2

3

4

5

6

7

8                          UNITED STATES BANKRUPTCY COURT

9                          SOUTHERN DISTRICT OF CALIFORNIA

10    In re:                                    )    Case No. 03-11155-A7
                                                )
11    JERRY L. ICENHOWER dba                     )    Adv. No. 06-90369-A7
      Seaview Properties, and DONNA L.           )    Adv. No. 04-90392-A7
12    ICENHOWER,                                 )
                                                )
13              Debtors.                         )
      _____         )
14    KISMET ACQUISITION, LLC, a                 )    AMENDED CONSOLIDATED JUDGMENT
      Delaware limited liability company,        )
15    Successor-in-interest to Gerald H.         )
      Davis, Chapter 7 Trustee,                  )
16                                               )
17              Plaintiff,                       )
                                                )
18         v.                                    )
                                                )
19    JERRY L. ICENHOWER, an                     )
      individual; et al.                         )
20                                               )
                Defendants.                      )
21                                               )
                                                )
22    _____         )

23         The consolidated trials of adversary proceedings 04-90392 and 06-90369 were

24    heard from April 21 to April 25, 2008 before the Honorable Louise DeCarl Adler.

25    Janet D. Gertz and Ali M.M. Mojdehi appeared on behalf of plaintiff, Kismet

26    Acquisition, LLC, successor-in-interest to Gerald H. Davis, the Chapter 7 Trustee

27    ("Plaintiff"), and Stephen B. Morris and Mark C. Hinkley appeared on behalf of

28    defendants Alejandro Diaz Barba and Martha Margarita Barba De La Torre (aka

*Signed by Judge Louise DeCarl Adler July 29, 2008*

Martha Barba Diaz) (the "Diaz Defendants). No appearances were made on behalf of defendants Howell & Gardner Investors, Inc. ("H&G"), and Jerry and Donna Icenhower ("Debtors") (hereinafter the Diaz Defendants, H&G and Debtors are collectively the "Defendants").

Witnesses were sworn in and examined, documentary evidence was introduced on behalf of the parties and the case was argued by counsel for both the Plaintiff and the Diaz Defendants. Having carefully considered the testimony of the witnesses and arguments of counsel and the Court having made findings of fact and conclusions of law on the record in open court and the Court having entered separate Findings of Fact and Conclusions of Law concurrently herewith, and other good cause:

IT IS HEREBY ORDERED that:

1.    Judgment is entered in favor of Plaintiff and against the Defendants on the complaint in adversary proceeding 06-90369. It is hereby adjudged and decreed that --

(a)    H&G is the alter ego of the Debtors nunc pro tunc to the petition date;

(b)    The assets of H&G are hereby substantively consolidated with the assets of the bankruptcy estate *nunc pro tunc* to petition date;

(c)    the real property called the Villa Vista Hermosa, located in the Village of Chamela in the Municipality of La Huerta, State of Jalisco, Mexico (the "Villa Property")[1] is property of the bankruptcy estate pursuant to 11 U.S.C. § 541(a) *nunc pro tunc* to the petition date;

(d)    The Debtors' unauthorized postpetition transfer of the Villa Property to H&G is avoided pursuant to 11 U.S.C. 549(a);

---

[1] Under Mexican law, a foreign national may not directly hold title to coastal real property in Mexico, but may hold the beneficial interest in a *fideicomiso* bank trust formed to hold title to the real property. Hereinafter, unless otherwise specified, all references to the transfer or sale of the Villa Property refer to the transfer or sale of the beneficial trust interest.

2

*Signed by Judge Louise DeCarl Adler July 29, 2008*

1       (e)    Plaintiff is entitled to recover and preserve pursuant to 11 U.S.C.

2   § 550(a)(1) and § 551 the Villa Property from the Diaz Defendants as

3   the initial transferees of the avoided postpetition transfer. Within ten~~thirty~~

4   days of entry of this judgment, Defendants are hereby ordered and

5   directed to take all actions necessary to execute and deliver any and all

6   documents needed to undo the avoided transfer, and to take all actions

7   necessary to cause the property to be reconveyed to a *fideicomiso* trust

8   naming Plaintiff as the sole beneficiary for the benefit of the bankruptcy

9   estate; or

10       (f)    alternatively, at Plaintiff's sole option made upon proper noticed

11   motion, the Court reserves jurisdiction to enter a monetary judgment in

12   favor of Kismet, and against Defendants, in an amount necessary to

13   make the estate whole at the time of judgment.

14       2.    Alternatively, even if the Villa Property is not property of the bankruptcy

15   estate *nunc pro tunc* to the petition date, judgment is entered in favor of Plaintiff and

16   against the Defendants on the remaining claims in the amended complaint in

17   adversary proceeding 04-90392. It is hereby adjudged and decreed that-

18       (a)    the Debtors' transfer of the Villa Property to H&G is avoided as a

19   fraudulent transfer under 11 U.S.C. § 544(b), pursuant to Cal. Civ.

20   Code §§ 3439.04(a)(1) and (a)(2) and § 3439.07;

21       ~~(b)~~Plaintiff is entitled to recover and preserve pursuant to 11 U.S.C. §§

22   550(a)(1) and (a)(2) and § 551 the avoided fraudulent transfer from H&G

23   as the initial transferee of the avoided fraudulent transfer, and from the

24   Diaz Defendants as the "immediate or mediate" transferees of the initial

25   transferee. Within ten~~thirty~~ days of entry of this judgment, Defendants are

26   hereby ordered and directed to execute and deliver any and all documents

27   needed to undo the avoided transfer, and to take all actions necessary to

28

3

*Signed by Judge Louise DeCarl Adler July 29, 2008*

1    cause the property to be reconveyed to a    *fideicomisto* trust naming

2    Plaintiff as the sole beneficiary for the benefit of the bankruptcy estate; or

3    ~~///~~

4    ~~///~~

5    ~~(e)~~(b)  alternatively, at Plaintiff's sole option made upon proper noticed

6    motion, the Court retains jurisdiction to enter a monetary judgment in

7    favor of Kismet, and against Defendants, in an amount necessary to make

8    the estate whole at the time of judgment.

9        3.    The Court reserves for future determination made upon proper motion the

10   issues of an award of fees and expenses, and it reserves jurisdiction to issue any and

11   all orders necessary to carry out and enforce this judgment.

12

13

14   Dated: _____          _____

                                             LOUISE DE CARL ADLER, Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

**EXHIBIT 4**

**Tentative Ruling**   Motion GRANTED in part; DENIED in part.

GRANTED as to claims for cancellation and rescission of all the contracts for lack of consideration and fraud. It does not appear that Kismet is contesting the request to dismiss claims other than the Sec. 544(b) and Sec. 550 claims and the Dec. Relief claims seeking a declaration of the trustee's rights and remedies under those two sections.

DENIED as to Sec. 544(b) and Sec. 550 claims and that portion of the Declaratory Relief claim seeking a declaration of the trustee's rights and remedies under those two sections (2d Am. Complt. Claims 1 and 4). ). To the extent Kismet seeks to apply sec. 544(b) to avoid subsequent transfers by the initial transferee to the Diaz defendants, the motion to dismiss will be granted.

The Court determines she has subject matter jurisdiction over avoidance of the transfer in question and taking all allegations as true, as well as all reasonable inferences therefrom, the complaint states a claim on which relief can be granted.

TRANSFER AT ISSUE:
Movant incorrectly focuses on transfers that occurred after debtor fraudulently conveyed his beneficial trust interest to H & G.   However, this is a misapplication of Sec. 544(b). Sec. 544(b) enables a court to avoid a transfer of the interest of the debtor in property. Necessarily, we must focus on the transfer between the debtor and the initial transferee (H&G) and whether it was fraudulent to an actual creditor of debtor. Once that transfer was completed, debtor and estate no longer had an interest in the property which was avoidable. [Both the Maxwell and Midland cases cited by Movant agree with the majority view that property fraudulently conveyed is not property of the debtor or POE.]

If the initial transfer is avoided under Sec. 544(b), we must apply Sec. 550 to determine the trustee's remedies against the initial transferee and any immediate or mediate transferee of the initial transferee.

SUBJECT MATTER JURISDICTION:
For purposes of determining subject matter jurisdiction (SMJ) over the Sec. 544(b) and Sec. 550 claims, we look to the initial transfer to determine whether we have jurisdiction, not the later transfers. There is no jurisdictional challenge to the initial transfer. As correctly observed by Kismet, there is a statutory grant of SMJ over claims to avoid and recover a fraudulent conveyance of an interest in real property and so long as the Court has personal jurisdiction over the defendants (as we do over the Diaz defendants), we have the ability to order the person to execute a conveyance or to enter a money judgment for its value, subject to enforcement through contempt powers, EVEN THOUGH IT INDIRECTLY AFFECTS TITLE TO REAL PROPERTY OUTSIDE OUR TERRITORIAL BOUNDARIES. See Fall v. Easton , 215 U.S. 1 (1909).; see also Opposition, p. 5-6. Court rejects movant's claim that we will be required to cancel the transfer of title between the Mexican Bank and the Diaz defendants. Rather, we can order the Diaz defendants to create a fideicomiso trust and order them to convey the property to that trust with the estate holding the beneficial interest.

AVOIDANCE ACTIONS:
The presumption against extraterritoriality is not implicated by this complaint. Once we re-focus our attention to the correct transfer (between debtor & H&G), the "center of gravity" is indisputably within the U.S. Both movant and Kismet agree that we apply the presumption against extraterritoriality only if the "center of gravity" lies outside the U.S.

MOTIONS TO STRIKE:

Both Motions are GRANTED.

Diaz' Motion: Kismet has taken excessive liberties in drawing "reasonable" inferences from the contents of the complaint. See para. 43, 44 and 47 of 2d amended complaint and compare with Kismet opposition.

Kismet Motion: Kismet as Movant is correct that we are not considering international comity today. For purposes of this motion, we must accept Kismet's allegations and characterization of the transfers as true, unless the face of the exhibits clearly contradicts them.

Court observes that the complaint probably should be redrafted to clarify that



EXHIBIT   4

the transfer to be avoided is the initial transfer.  Much of this confusion (and this
motion) might have been avoided if it was clearly stated in the complaint.

ATTORNEY:  Michael E. Busch (GERALD DAVIS, TRUSTEE, Gerald H. Davis)
ATTORNEY:  Kathleen A. Cashman-Kramer (Gerald H. Davis)
ATTORNEY:  Gary B. Rudolph (Gerald H. Davis, GERALD DAVIS, TRUSTEE)
ATTORNEY:  William L. Conti (Jerry L. Icenhower)
ATTORNEY:  Robert L. Rentto (ROBERT MILLER)
ATTORNEY:  Ali M.M. Mojdehi (KISMET ACQUISITIONS)
ATTORNEY:  FLETCHER PADDISON (DIAZ)
ATTORNEY:  WILLIAM CONTI (WESTERN FIN'L ASSETS, INC/BUCKEYE INT'L)


**02:30 PM**

05-03081-LA     Ch 11   **PERGOLA NEVADA, LLC**

    TELE          1) DEBTOR'S MOTION FOR AN ORDER CONFIRMING ITS AUTHORIZATION
                            TO SELL

Tentative Ruling  Motion GRANTED.  Unopposed.  Debtor assumed the Purchase Agreement
                  and the automatic stay has been lifted.  Debtor may sell the property before it is
                  foreclosed.  As this motion is unopposed, counsel's appearance at this hearing
                  is excused; he may submit an order forthwith.

                          2) STATUS CONFERENCE ON CHAPTER 11 PETITION (fr 11/30/06)

                       ATTORNEY:  L. Scott Keehn (Pergola Nevada, LLC)


04-09816-LA     Ch 7    **MATTHEW & KEIKO N. MITCHELL**

ADV: 05-90178          **GENERAL MOTORS CORPORATION, A CORPORATIO v. MATTHEW
                       F. MITCHELL**
                       PRETRIAL STATUS CONFERENCE (fr 11/30/06)

                       ATTORNEY:  Ronald M. Toigo (WAYNE E. RAKE)


06-03848-LA     Ch 11   **JOSE LORENZO ORTEGA**

                       MOTION FOR RELIEF FROM STAY, RS # TSE-1 FILED BY MICHAEL
                       WRIGHT

Tentative Ruling  Motion for Relief from stay DENIED.

                  1. Motion not served on 20 largest unsecured creditors.  (Debtor filed list as d.e.
                  #9 on 12/14/06; motion for r/s not filed and served until 12/20/06)

                  2. No competent evidence of value.  It is movant's burden to provide evidence
                  from a competent witness (Mr. Salas' qualifications to appraise these parcels of
                  real property are not set forth in his declaration)  Based on debtors'
                  uncontroverted evidence of value, movant's interest is adequately protected.

                       ATTORNEY:  Steven A. Wickman (Jose Lorenzo Ortega)
                       ATTORNEY:  Thomas S. Engel (Michael Wright)

**EXHIBIT 5**

1           UNITED STATES BANKRUPTCY COURT

2            SOUTHERN DISTRICT OF CALIFORNIA

3         JUDGE LOUISE DECARL ADLER, JUDGE PRESIDING

4

5

6  IN THE MATTER OF:              )
                                  )
7  GERALD H. DAVIS,               )
                                  )
8  VS.                            )
                                  )
9  JERRY L. & DONNA ICENHOWER     )    ADV. NO. 04-90392-LA7

10                   DEBTOR.      )    CASE. NO.03-11155-LA7
   _____)

11

12

13

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                  SAN DIEGO, CALIFORNIA

17                MONDAY, JANUARY 18, 2007

       1)  PRETRIAL STATUS CONFERENCE (FR 11/30/06)
18     2)  MOTION TO DISMISS FOR LACK OF SUBJECT MATTER
           JURISDICTION AND FOR FAILURE TO STATE A CLAIM, OR
19         IN THE ALTERNATIVE, TO ABSTAIN FILED BY ALAN
           VANDERHOFF ON BEHALF OF ALEJANDRO DIAZ BARBA.

20

21

22

23  FEDERAL COURT REPORTERS
    BY:  DIANE BERGER
24  POST OFFICE BOX 60583
    SAN DIEGO, CALIFORNIA 92166
25  TELEPHONE:  (619) 223-6082

                        1

EXHIBIT    5

1  HEADING — THE HEADING ACTUALLY OF YOUR RECENT BRIEF OF YOUR

2  BRIEF — I DO HAVE A VAGUE RECOLLECTION THAT YOU BIFURCATED IT

3  BUT I DON'T REMEMBER HOW BUT I THINK ONE PORTION OF IT — BUT

4  THE OTHER INDICATES THAT YOUR TOTAL FOR THE SUBJECT MATTER

5  JURISDICTION ABOUT YOUR PROPERTY RIGHTS IN FOREIGN COUNTRIES

6  AND THAT IS AS FAR AS YOU GO. WHY ALL OF A SUDDEN IS IT SUBJECT

7  MATTER JURISDICTION?

8          MR. VANDERHOFF:  WELL, IT IS NOT THAT THE

9  SUBJECT MATTER JURISDICTION IS FINISHED. IT IS JUST THAT OUR

10 MOTION WAS DIRECTED AT THE TRANSFER TO THE DIAZ'S AS IN THE

11 TENTATIVE THOSE ISSUES THAT WE BRIEFED AS TO THE DIAZ

12 TRANSACTION ARE BEING APPLIED TO THE H&G TRANSACTION. THAT IS

13 NOT SOMETHING THAT WE FOCUSED ON IN OUR BRIEF BECAUSE WE WERE

14 FOCUSING ON THE PART OF THE TRANSACTION THAT INVOLVES THE

15 DIAZ'S AS TO WHETHER THERE IS SUBJECT MATTER JURISDICTION THERE

16 OR EXTRATERRITORIALITY ISSUES. THAT IS JUST NOT SOMETHING THAT

17 WE FOCUSED ON IN OUR MOTION.

18          THE COURT:  I KNOW THAT. I KNOW YOU DIDN'T FOCUS

19 ON THAT. THAT IS WHY YOU GOT THE TENTATIVE THAT YOU DID BECAUSE

20 YOU NEED TO FOCUS ON IT.

21          MR. VANDERHOFF: WELL, AND WE WOULD BE HAPPY TO

22 FOCUS ON THAT BUT --

23          THE COURT:  YOU DON'T UNDERSTAND, MR. VANDERHOFF

24 WHAT THE COURT IS SAYING WHAT THE COURT IS SAYING IS THE

25 ARGUMENTS THAT YOU MADE MIGHT HAVE SOME CURRENCY SOME PURCHASE

4

1   IN THIS CASE WERE THE FIRST TRANSACTION YOUR CLIENT AND EVEN

2   THEN IT IS QUESTIONABLE BUT IT WASN'T AND FOR THAT REASON THIS

3   IS WHY YOU HAVE A TENTATIVE TO DEAL WITH BECAUSE YOUR CLIENT

4   WAS OUT OF LINE.

5           MR. VANDERHOFF:  NO, I UNDERSTAND AND THAT IN

6   PART WAS WAS ONE OF THE PROBLEMS WITH THE COMPLAINT AND THAT IT

7   - I AM SURE WE POINTED THIS OUT IN THE PAPERS IS THAT THEY SORT

8   OF LIKE BLENDED ALL OF THESE TRANSACTIONS TOGETHER AND YOU ARE

9   SAYING WELL HOLD ON A SECOND HERE IS THE TRANSACTION THAT

10  INVOLVED THE DIAZ'S AND AS TO THAT TRANSACTION THERE IS NO

11  SUBJECT MATTER JURISDICTION, NO EXTRATERRITORIALITY. NOW WE

12  WEREN'T SUPPOSED TO FILE AN H & G TRANSACTION AND THAT WASN'T

13  THE ONE THAT WE WERE ATTACKING IN OUR MOTION SO WE DON'T THINK

14  THAT THAT IS PROPERLY BEFORE THE COURT IN OUR MOTION BECAUSE WE

15  HAVEN'T ADDRESSED THOSE ISSUES AS TO THAT  TRANSACTION. WE JUST

16  ADDRESSED THEM AS TO THE DIAZ --

17          THE COURT:  WELL, YOU PROBABLY DON'T HAVE

18  STANDING TO DO IT EITHER SINCE YOU REPRESENT DIAZ AND NOT H&G.

19          MR. VANDERHOFF:  WELL, IT IS SORT OF AN

20  INTERESTING ISSUE YOU KNOW IF HE COMES BACK IN AND BRINGS AN

21  ACTION UNDER 550 THEN HAS STANDING TO PARTICIPATE IN THE

22  ORIGINAL BOOM SECTION, I WOULD SUSPECT YES, BUT THAT IS AN

23  INTERESTING ISSUE BUT ALSO AN ISSUE FOR ANOTHER DAY.

24          AS TO OUR MOTION, OUR MOTION WAS FOCUSED ON THE

25  DIAZ TRANSACTION AS OPPOSED TO THE HALE GARDNER TRANSACTION AND

1  STATE OF CALIFORNIA

2  COUNTY OF SAN DIEGO

3

4        I, DIANE BERGER, OFFICIAL REPORTER, DO HEREBY

5  CERTIFY:

6        THAT I REPORTED IN SHORTHAND THE PROCEEDINGS HELD IN

7  THE FOREGOING CAUSE ON THE 18TH DAY OF JANUARY, 2007;

8        THAT MY NOTES WERE LATER TRANSCRIBED INTO TYPEWRITING

9  UNDER MY DIRECTION;

10        AND THAT THE FOREGOING TRANSCRIPT CONTAINS A CORRECT

11  STATEMENT OF THE PROCEEDINGS.

12

13        DATED THIS ___15TH___ DAY OF ___APRIL___ , 2008.

14

15                              _____

16                              DIANE BERGER
                                OFFICIAL REPORTER

17

18

19

20

21

22

23

24

25

                                19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**EXHIBIT 6**

FILED DD

07 DEC 14 AM 7:07

CLERK
US BANKRUPTCY CT
SO DIST OF CALIF

SECRETARÍA DE RELACIONES EXTERIORES

M É X I C O

*C4 -90392*

Mexico City, November 28, 2007

**Bankruptcy No. 03-11155-A7**
**ADV. No. 04-90392-A7**

**In Re JERRY L. ICENHOWER dba**
**Seaview Properties, and DONNA L.**
**ICENHOWER fka DONNA L. HAWK.**
**GERALD H. DAVIS , Chapter Seven**
**Trustee, JERRY L.ICENHOWER, et al.**
**defendants**

**The Hon. Louise De Carl Adler,**
**Judge United States Bankruptcy Court,**
**Southern District of California,**
**San Diego, Cal.**

Dear Judge De Carl:

I would like to make reference to the above captioned case, which has been brought to the attention of the Ministry of Foreign Affairs of Mexico and specifically to the office of the undersigned in his capacity of Legal Adviser. In that regard, I submit to your Honor the following issues:

According to the Ministry's internal regulation, the Legal Adviser task include, *inter alia*, addressing foreign tribunals regarding specific issues of Mexican law. Accordingly, the purpose of this letter is to assist your Honor to properly ascertain points of Mexican law related to the present case. It is also the intention to avoid any judicial precedent that may affect Mexico or its nationals.

In the referred case, your Honor entered an order on February 25, 2005, against two Mexican defendants (Martha Margarita Barba and Alejandro Díaz Barba) granting a preliminary injunction and preventing them *"from taking any action regarding the transfer of, encumbering, or otherwise affecting the title to, or interest in, or taking any action to materially affect the condition of, the real property and related personal property, identified as: the real property located in the Village of Chamela in the Municipality of La Huerta, State of Jalisco, Mexico, known as the Villa Vista Hermosa (the Villa Property)"*.

**EXHIBIT    6**

S<small>ECRETARÍA DE</small> R<small>ELACIONES</small> E<small>XTERIORES</small>

M É X I C O

2.

It is understood that plaintiff's action is based arguably in a simulated sale of the property mentioned. First and foremost, it is essential to mention that the property in dispute is located within the boundaries established in article 27 (I) of the Mexican Constitution, where foreigners are forbidden to acquire direct property of land ('the restricted zone'): a strip of 100 kilometers-wide (70 miles) from land borders and 50 kilometers (35 miles) inland from the beaches. However, foreigners may lease or acquire rights of use on the 'restricted zone' by forming a *fideicomiso* (trust). In all cases regarding ownership of land or property rights by foreigners, they must first renounce to any foreign jurisdiction.

Also, I want to convey to your Honor the following information about Mexican law and Mexican authorities in cases regarding the sale of real estate property, such as the one mentioned above:

1. - Sale of real estate in Mexico is ruled by state legislation, but is based on federal principles and regulations. Three main aspects should be fulfilled by state legislation and complied by local authorities: first, the establishment of a State Public Registry of Property (real estate property), in which all land transactions must be recorded; second, the sale process should be carried out before a Public Notary, which certifies and endorses the transaction in representation of state authorities, validating the legality of the transaction; finally, payment of state and federal taxes.

2. - In the particular case before this Honorable Court, the laws of the State of Jalisco and its Public Registry of Property regulations were applicable to the sale transaction objected here. The Civil Code of Jalisco establishes the specific requirements for selling real estate property. The code states:

a) The seller or the buyer shall obtain from the Public Registry of Property a certificate stating who the owner of the property is and if the property is free of any lien or deed affecting the free disposition of the land.

b) Once the Public Registry of Property certifies the seller is the actual owner and that property is free of liens and claims, the Public Notary shall verify the fulfillment of other possible outstanding debts pending on the property, such as any federal or local taxes. An appraisal of the property shall also be requested in order to determine the amount of taxes to be paid. Also, the property shall be free of pending debts for utilities on public services (e.g. water). Finally, a zoning certificate shall be obtained in



3.

order for the buyer to be aware of the characteristics and restrictions of the real estate he/she is acquiring.  Once all the above requirements are met, acting on behalf of the authority, the Notary Public may proceed to attest and certify, through a deed, the sale/purchase of the property, generally executed through a sales contract. No formal deed is produced until the individuals or entities involved in the buy/sell are duly identified, personally or through their legal representatives, and taxes are paid. Once the process is finished the Notary Public sends the final deed to the Public Registry for registration. Once the sale is duly recorded, a certified formal deed is delivered to the buyer.

3. - The above described process, as complex and rigid as it may seem, has been established to guarantee the legality and certainty of land ownership all through out the country. The whole process is subject to a strict scrutiny and its violation may lead to legal responsibilities (including criminal) against any of the parties involved, including the Public Notary or officers at the Public Registry of Property.

In the case at hand, a copy of the purchase/sale deed was issued to the Mexican defendants, which guarantees that the purchase they made was legal and valid.

It is also needed to be pointed out that if anybody would have had a legal right or lien on the property involved in this case, his or her interest would have been evident in the pertaining record furnished by the Public Registry of Property of the State of Jalisco. As explained before, this was not the case since at the time of the transaction said office certified that there were no liens or claims pending on it.

As mentioned before, article 27 (I) of the Mexican Constitution states that foreigners owning property rights must renounce to any foreign jurisdiction. Therefore, if an alleged owner of the property was a foreign person or corporation at the time of the transaction, by mandate of the Mexican Constitution and other applicable laws, venue and jurisdiction to settle any dispute must have lied solely within the Mexican Courts.

Your Honor will certainly understand why Mexico considers improper the order issued on February 25, 2005. The Government of Mexico kindly requests that the order be dismissed with prejudice at the request of defendants. We believed that it would certainly be unacceptable to your Honor's authority that a foreign court would impose limits to the rights or obligations of persons or property, after a legally binding process had been concluded in your Honor's jurisdiction.

Secretaría de Relaciones Exteriores

M É X I C O

4.

Mexico, as well as the United States, fully observes and respects the 'Act of State Doctrine', which states that a nation is sovereign within its own borders, and its domestic actions may not be questioned in the courts of another nation, a notion undoubtedly well known to your Honor.

In any event, Mexican authorities are ready to cooperate with your Honor's Court should a formal request of judicial cooperation is made, through the multiple bilateral and international channels established in several treaties.

Finally, I would like to point out that nothing in this letter shall be construed as a waiver of immunities to which the Government of Mexico is entitled to under international treaties in force between Mexico and the United States of America, international law, and/or the Foreign Sovereign Immunities Act.

Sincerely

Joel Hernández García
The Legal Adviser
Ministry of Foreign Affairs of the United Mexican States

**EXHIBIT 7**

1  VANDERHOFF LAW GROUP
   Alan Vanderhoff, Cal. Bar No. 138032
2  Jeanne C. Vanderhoff, Cal. Bar No. 138011
   701 "B" Street, Suite 1000
3  San Diego, California  92101
   Telephone: (619) 299-2050
4
   ROSS, DIXON & BELL, LLP
5  Fletcher W. Paddison
   550 West B Street, Suite 400
6  San Diego, CA 92101
   Telephone: (619) 235-4040
7
   Attorneys for Defendants
8  ALEJANDRO DIAZ BARBA and MARTHA B. DIAZ

9

10              UNITED STATES BANKRUPTCY COURT

11              SOUTHERN DISTRICT OF CALIFORNIA

12

13  In re:                              )   BK. No. 03-11155-LA7
                                        )
14  JERRY L. ICENHOWER DBA Seaview      )   Adv. No. 04-90392-LA7
    Properties, and DONNA L. ICENHOWER fka )
15  DONNA L. HAWKS,                     )   **MEMORANDUM OF POINTS
                                        )   AND AUTHORITIES IN
16          Debtors.                    )   SUPPORT OF MOTION TO
                                        )   DISMISS**
17  ─────────────────────────────       )
    GERALD H. DAVIS, CHAPTER 7          )   Date:    January 18, 2007
18  TRUSTEE,                            )   Time:    2:00 p.m.
            Plaintiff,                  )   Dept.    Two
19                                      )   Judge:   Hon. Louise DeCarl
    v.                                  )
20  JERRY L. ICENHOWER an individual;   )
    DONNA L. ICENHOWER an individual;   )
21  HOWELL & GARDNER INVESTORS, INC.,   )
    a Nevada corporation; ROBERT MILLER, an )
22  individual; MARTHA B. DIAZ, an individual; )
    and ALEJANDRO DIAZ BARBA, an        )
23  individual,                         )
            Defendants.                 )
24

25          Alejandro Diaz Barba and his mother, Martha B. Diaz (collectively, "Mr. and Mrs.

26  Diaz" or the "Diaz Family"), through their attorneys, hereby submit this Memorandum of

27  Points and Authorities in Support of Motion To Dismiss for Lack of Subject Matter

28  Jurisdiction and Failure to State a Claim or, In The Alternative, to Abstain.


**EXHIBIT   7**

TABLE OF CONTENTS

Page

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. SUMMARY OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A. The Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B. The Villa Property Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        1. The Interest Acquired by the Debtors in 1995 . . . . . . . . . . . . . . . . . . . . 2

        2. The 2002 Transfer to Howell & Gardner . . . . . . . . . . . . . . . . . . . . . . . . 3

        3. The 2004 Transfer of Legal Title to the Diaz Family . . . . . . . . . . . . . . . . 3

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A. This Court Lacks Subject Matter Jurisdiction to Determine Real Property Rights in

       Mexico . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        1. Title to Real Property Can only Be Decided by a Court in the Jurisdiction

           Where the Property is Located . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        2. U.S. Courts Particularly Lack Jurisdiction to Determine Real Property Rights

           in Foreign Countries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B. This Court Should Abstain on the Grounds of International Comity . . . . . . . . 13

        1. Mexico Has a Strong Policy Against Allowing Foreign Powers to Decide

           Issues Related to Mexican Real Property . . . . . . . . . . . . . . . . . . . . . . 14

        2. Mexican Fraudulent Conveyance Laws Differ From those in the United States

           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

i

TABLE OF AUTHORITIES

Page

Cases

*Asociacion De Reclamantes, v. United Mexican States, 735 F.2d 1517 (DC Cir. 1984)* . 8, 9

*Barclay v. Swiss Finance Corporation Limited (In re Midland Euro Exchange et al), 347 B.R. 708 (Bankr. C.D. Cal. 2006)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Benz v. Compania Naviera Hidalgo, S.A., 353 U.S. 138 (1957)* . . . . . . . . . . . . . . . . . . . . 10

*Casey v. Adams, 102 U.S. (12 Otto) 66 (1880)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Clarke v. Clarke, 178 U.S. 186 (1900)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Ellenwood v. Marietta Chair Co., 158 U.S. 105 (1895)* . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Equal Employment Opportunity Comm. v. Arabian American Oil Co., 499 U.S. 244 (1991)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Foley Bros., Inc. v. Filardo, 336 U.S. 281 (1949)* . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Griner v. Trevino, 207 S.W. 947 (Tex. Civ. App. 1918)* . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Hartford Fire Ins. Co. v. California, 509 U.S. 764 (1993)* . . . . . . . . . . . . . . . . . . . 14

*Hayes v. Gulf Oil, 821 F.2d 285 (5th Cir. 1987)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Hilton v. Guyot, 159 U.S. 113 (1895)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Holt v. Guerguin, 163 S.W. 10 (1914)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*In re French, 440 F.3d 145 (4th Cir. 2006)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Maxwell Commc'n Corp., 170 B.R. 800 (S.D.N.Y. 1994)* . . . . . . . . . . . . . . . . . . . 9

*In re Maxwell Communication Corporation, 186 B.R. 807 (D. S.D.N.Y 1995)* . . . . . . 10, 11

*In re Maxwell, 93 F.3d 1036 (2nd Cir. 1996)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Keller v. Millice, 838 F.Supp. 1163 (D. S.D. Tex. 1993)* . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Labor Union of Pico Korea v. Pico Products, 968 F.2d 191 (2d Cir.) (1992)* . . . . . . . . . 10

*Livingston v. Jefferson, 15 F. Cas. 660 (C.C.D.Va.1811) (No. 8411)* . . . . . . . . . . . . . . . 5, 8

*Louisville & N.R.R. v. Western Union Telegraph Co., 234 U.S. 369 (1914)* . . . . . . . . . . . . 5

*Mann v. Hanil Bank, 900 F.Supp. 1077 (D. E.D. WI 1995)* . . . . . . . . . . . . . . . . . . . . . 8

*McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10 (1963)* . . . . . . . 9

*Oakey v. Bennett, 52 U.S. 33 (1850)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Sarei v. Rio Tinto, PLC, 456 F.3d 1069 (9th Cir. 2006)* . . . . . . . . . . . . . . . . . . . . . . . . . 13

ii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Statutes

11 U.S.C. § 544 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

11 U.S.C. § 547 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

11 U.S.C. § 548 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

11 U.S.C. § 550 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Other Authorities

*Mexican Civil Code Annotated, Jorge A. Vargas, West Group Publishing 2005 ed.* . . . . . 16

*Mexican Constitution, Article 27* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Mexican Federal Civil Code, Article 2164* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Mexican Federal Civil Code, Article 2165* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Mexican Federal Civil Code, Article 2167* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Mexican Federal Civil Code, Article 773* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## I.

## INTRODUCTION

At its core, the Complaint asks this Court to strip Mexican citizens of title to their land in Mexico and to vest title to that land in someone else.  Neither this Court, nor any other court in the United States has the subject matter jurisdiction do such a thing. Two hundred years of American jurisprudence forbids courts in the United States from issuing orders that effect changes to title to real property located in foreign countries. Moreover, the avoidance statutes of the Bankruptcy Code were not intended to have extraterritorial effect. Therefore, as to the avoidance claims seeking to set aside the transfer of Mexican real property to Mr. and Mrs. Diaz, the complaint fails to state a claim for which relief can be granted.  Finally, under principles of international comity it would be appropriate for this Court to abstain from applying the laws of the United States to strip Mexican citizens of title to their real property located in Mexico. For the reasons stated herein, each of the causes of action against Mr. and Mrs. Diaz must be dismissed.

## II.

## SUMMARY OF FACTS

**A.    The Complaint.**

The Second Amended Complaint (the "Complaint") filed by the Trustee contains five causes of action.[1]  These include: (1) avoidance of fraudulent conveyances under Bankruptcy Code section 544(b), (2) cancellation of instruments under California Civil Code section 3439, (3) rescission under California Civil Code section 1689(b), (4) declaratory relief, and (5) injunctive relief.  Each of the causes of action seeks to set aside transfers of two parcels of real property located in Mexico and referred to in the Complaint as the Villa Property and the El Zafrio Property. The Villa Property is owned by the Diaz Family.

---

[1]    Mr. and Mrs. Diaz request that the Court take judicial notice of the full contents of the Complaint.

1

1    The Complaint alleges, *inter alia*, that on March 4, 2002, the debtors in the above-
2    captioned case (the "Debtors") transferred the beneficial interest in the Villa Property to
3    Howell & Gardner Investors, Inc. and the beneficial interest in the El Zafrio Property to
4    Robert Miller. The Complaint further alleges that, over two years later, Howell & Gardner
5    transferred the Villa Property to Mr. and Mrs. Diaz on August 4, 2004.  While the Complaint
6    also alleges that transfer of the Villa Property from Howell & Gardner to Mr. and Mrs. Diaz
7    "appears" to be a fraudulent conveyance for less than reasonably equivalent value, the
8    Trustee concedes that Mr. and Mrs. Diaz paid more than $1 million for the Villa Property.
9    The Complaint admits that Mr. and Mrs. Diaz are both Mexican citizens.

10

11    **B.    The Villa Property Transactions.**

12    These transactions involve Mexican real property and transfers of real property which
13    comply with the requirements of Mexican law and the Mexican Constitution.

14

15    **1.    The Interest Acquired by the Debtors in 1995.**

16    The Mexican land records indicate that, in 1995, Jerry Lee Icenhower and Donna
17    Icenhower (the "Debtors") were assigned a beneficial interest in the fideicomiso trust which
18    held title to the Villa Property. Legal title was held by Banco Nacional de Mexico, S.A. As
19    discussed below, under the terms of the Mexican Constitution, foreigners cannot own title to
20    real property located within a coastal zone. They can only hold a beneficial interest through a
21    trust that complies with Mexican law. Thus, the Debtors never held title to the Villa Property
22    and instead held a beneficial interest in the fideicomiso trust. The Icenhower Escritura under
23    which the Debtors obtained their beneficial interest in the Villa Property contained the
24    following provisions:

25        – The Assignees are subject to the conditions agreed when the trust in reference
         in this instrument was incorporated, at the same time they acquired jointly the
26        rights and the obligations established for the assignees on it, and they expressly
         accept the conditions stated in the permit granted by the Ministry of Foreign
27        Affairs and in compliance with the provided in the text of the permit granted by
         the Secretary itself to affact in trust the property referred by this assignment of
28        rights.
                                    . . .

                                    2

– JURISDICTION AND COMPETENCE – For everthing related to the interpretation and compliance of this agreement, the parties submit to the Laws and Tribunals of Mexico City, Federal District, waiving to any other jurisdiction which they might have due to their addresses.

Icenhower Escritura, p. 5-6.[2/]

## 2.     The 2002 Transfer to Howell & Gardner.

By an Escritura dated May 10, 2002, the Debtors transferred their beneficial interest in the Villa Property to Howell & Gardner Investors, Inc.[3/] As with the Debtors, Howell & Gardner did not own a direct interest in the Villa Property. Legal title was held by the Banco Nacional de Mexico, S.A. and Howell & Gardner held a beneficial interest in the fideicomiso trust. The Howell & Gardner Escritura under which Howell & Gardner obtained its beneficial interest contained the following provisions:

– The Assignee Beneficiary company is subject to the conditions agreed when the trust was incorporated mentioned in the recitals of this Instrument, at the same time it acquires the rights and all the obligations established for the Beneficiaries and expressly accepts the conditions included in the referred Permit.

. . .

– JURISDICTION AND COMPETENCE – For everything relative to the Interpretation and compliance of this agreement, the parties expressly submit to the Laws and Tribunals of the City of Guadalajara, Jalico or Mexico, Federal District at the option of the Trustee, waiving any other jurisdiction that due to their addresses they would currently have or in the future; they also accept to be considered as Mexicans, in regards to the rights derived from this agreement, and that they will not invoke therefore the protection of their Government, in case of breaching this agreement, they would forfeit in favor of Mexico, the rights acquired.

Howell & Gardner Escritura, p. 5-6.

## 3.     The 2004 Transfer of Legal Title to the Diaz Family.

The Diaz Family obtained legal title to the Villa Property by an Escritura dated August 5, 2004 (the "Diaz Escritura"). Because Mr. and Mrs. Diaz are Mexican citizens,

---

[2/]     See the English translation of the Escritura dated April 4, 1995 (the "Icenhower Escritura"), attached as Exhibit "1" to the Declaration of Fletcher W. Paddison.

[3/]     See the English translation of the Escritura dated May 10, 2002 (the "Howell & Gardner Escritura"), attached as Exhibit "3" to the Declaration of Fletcher W. Paddison.

3

they may hold legal title to the Villa Property. Accordingly, the Diaz Family did not merely obtain an assignment of the beneficial interest in the fideicomiso trust by Howell & Gardner. Instead, the Banco Nacional de Mexico, S.A. conveyed legal title to the Villa Property directly to Mr. and Mrs. Diaz and the fideicomiso trust was dissolved and terminated. The Diaz Escritura was filed in the official records of the State of Jalisco, Mexico on September 13, 2004. The Diaz Escritura contained the following provision:

> – JURISDICTION to hear any controversy that arises due to in interpretation of this agreement the parties expressly subimit to the laws and competence of the civil courts of the first judicial district of the State of Jalisco, expressly waiving to the ones that might correspond due to their present or future addresses.

Diaz Escritura, p.8.[4]

The Diaz Family paid approximately $1.4 million for the Villa Property. Mr. Alex Diaz, as a current owner of the Villa Property, believes that the property was worth not more than $1.4 million when he and his mother purchased the property in August of 2004. His opinion is based, in part, on an appraisal obtained by him near the time of the sale and the appraisal commissioned by the Trustee with the cooperation of Mr. Diaz. The Trustee's appraiser concluded that the Villa Property was worth $1,284,209 as of September 13, 2004.

## III.

## ARGUMENT

**A.    This Court Lacks Subject Matter Jurisdiction to Determine Real Property Rights in Mexico.**

The Complaint contains several causes of action including fraudulent conveyance, rescission, cancellation of instruments, and declaratory relief. All of causes of action seek the same result – to strip Mexican citizens (Mr. and Mrs. Diaz) of their title to their real property in Mexico and to vest title to their property in someone else. The United States courts have long respected the sovereignty of foreign nations and have long held that courts in the United

---

[4]    See the English translation of the Diaz Escritura attached as Exhibit "5" to the Declaration of Fletcher W. Paddison.

4

1 States lack the subject matter jurisdiction to effect change of ownership of real property

2 located in foreign countries. Accordingly, all of the claims against Mr. and Mrs. Diaz must

3 be dismissed.

4        **1.**    **Title to Real Property Can only Be Decided by a Court in the Jurisdiction**

5                **Where the Property is Located.**

6        For nearly two hundred years, the Supreme Court has firmly held that issues affecting

7 title to real property are "local actions" and can be decided only by a court in the jurisdiction

8 where the real property is located. This fundamental principle of law was first established in

9 the United States in the celebrated case of *Livingston v. Jefferson, 15 F. Cas. 660*

10 *(C.C.D.Va.1811) (No. 8411).*[2] In that case, Edward Livingston sued former president

11 Thomas Jefferson in a federal court in Virginia for an alleged trespass to land in Louisiana.

12 Chief Justice Marshall, sitting as a Circuit Justice, recognized the common law concept of

13 the local action doctrine and dismissed the action on the grounds that action for trespass to

14 land in Louisiana was local and could not be heard in a Virginia court. See *Hayes v. Gulf Oil,*

15 *821 F.2d 285, 287 (5th Cir. 1987).* Following *Livingston,* the Supreme Court has consistently

16 recognized that a local action must be brought within the state where the land is located. See,

17 *e.g., Louisville & N.R.R. v. Western Union Telegraph Co., 234 U.S. 369 (1914); Ellenwood*

18 *v. Marietta Chair Co., 158 U.S. 105, 107 (1895); Casey v. Adams, 102 U.S. (12 Otto) 66, 67-*

19 *68 (1880).*

20        As the Supreme Court stated in the case of *Casey v. Adams, supra,*" [t]he distinction

21 between local and transitory actions is as old as actions themselves . . . . Local actions are in

22 the nature of suits in rem, and are to be prosecuted where the thing on which they are

23 founded is situated." *Casey v. Adams, 102 U.S. at 67-68.*

24        In the case of *Ellenwood v. Marietta Chair Co., 158 U.S. 105, 107 (1895),* an action

25 was brought in Circuit Court of the United States for the Southern District of Ohio alleging

26

27 [2]    The local action doctrine is much older and dates back at least seven hundred years to the Court of Common Pleas in England in the thirteenth century. *Keller v. Millice,*

28 *838 F.Supp. 1163, 1169 n. 1 (D. S.D. Tex. 1993).*

1  trespass to real property located in West Virginia. The trial court struck the complaint *sua*

2  *sponte* on jurisdictional grounds. On appeal, the United States Supreme Court affirmed the

3  ruling on the basis that:

4     "an action for trespass upon land, like an action to recover the title or the
      possession of the land itself, is a local action, and can only be brought within
5     the State in which the land lies."

6  *158 U.S. at 107.*

7     The Supreme further held that, because the cause of action was local and the real

8  property in questions was located in West Virginia, the U.S. Circuit Court sitting in Ohio had

9  no jurisdiction. The U.S. Circuit Court was correct to strike the complaint *sua sponte* on

10  jurisdictional grounds. *158 U.S. at 108.*

11     The local action rule is so fundamental that state courts are not obligated to give full

12  faith and credit to judgments from either federal or state courts sitting outside the local state's

13  territorial boundaries. See *Clarke v. Clarke, 178 U.S. 186, 190 (1900)* (Connecticut courts

14  are not required to give full faith and credit to a judgment of the South Carolina Supreme

15  Court concerning the construction of a will which affected the passing of title to land situated

16  in Connecticut).

17

18     2.    **U.S. Courts Particularly Lack Jurisdiction to Determine Real Property**

19           **Rights in Foreign Countries.**

20     The Supreme Court has expressly held that U.S. Courts in general, and bankruptcy

21  courts in particular, do not have jurisdiction to determine property rights in foreign countries.

22  In the case of *Oakey v. Bennett, 52 U.S. 33 (1850)*, William Hall filed a petition in

23  bankruptcy in the Eastern District of Louisiana. Hall owned real property in Texas which he

24  included in his bankruptcy filing. At that time, Texas was a sovereign country and had not

25  yet been annexed by the United States. The real property in Texas was purportedly sold

26  pursuant to an order of the bankruptcy court. Hall died and Bennett was appointed his

27  administrator in Texas. The Supreme Court held that the bankruptcy court in the United

28

6

1    States had no jurisdiction to convey real property located in another country. *52 U.S. at 44-*

2    *45.* The Supreme Court stated:

3        A statutable conveyance of property cannot strictly operate beyond the local
    jurisdiction. Any effect which may be given to it beyond this does not depend

4        upon international law, but the principle of comity; and national comity does
    not require any government to give effect to such assignment, when it shall

5        impair the remedies or lessen the securities of its own citizens.

6    *52 U.S. at 44.*

7        The Supreme Court further noted that foreign assignments of real property located in

8    the United States are not recognized in this country and that a proceeding in rem against the

9    property of a foreign bankrupt, under U.S. law may be maintained by creditors

10    notwithstanding the foreign assignment. *52 U.S. at 44.* The Supreme Court emphasized that

11    no country may determine property rights of real property located in other countries. In this

12    regard, the Court stated:

13        It is believed that no sovereignty has, at any time, assumed the power, by
    legislation or otherwise, to regulate the distribution or conveyance of real estate

14        in a foreign government. There is no pretence that this government, through the
    agency of a bankrupt law, could subject the real property in Texas, or in any

15        other foreign government, to the payment of debts. This can only be done by
    the laws of the sovereignty where such property may be situated.

16
17    *52 U.S. at 45.*

18        Other courts have likewise held that U.S. courts have no jurisdiction to determine

19    property rights with regard to real property located in foreign countries. In the case of *Holt v.*

20    *Guerguin, 163 S.W. 10 (1914)*, the Supreme Court of Texas addressed the issue of whether a

21    court in Texas had the power to annul deeds to property located in Mexico. In that case, the

22    grantors, both deceased, had executed a deed to real property located in Mexico to their

23    daughter. The lower court annulled the deed on the grounds of fraud and undue influence.

24    The Texas Supreme Court reversed on the grounds that the court lacked jurisdiction to affect

25    title to land located in Mexico. The court stated:

26        We are of opinion that so far as the decree in this case sets aside and annuls the
    deed to the land in the Republic of Mexico it is void, because the District Court

27        had not jurisdiction of the subject matter; the court of Texas could not acquire
    jurisdiction of land beyond its borders. (Citations omitted.)

28

7

1    The District Court at San Antonio also appointed commissioners and directed
     them to partition the land between the plaintiffs and defendants. That portion
2    of the decree is likewise void because the courts of this State have no power or
     authority over land in Mexico.
3
     *163 S.W. at 12.*
4

5         The issue was similarly addressed in the case of *Griner v. Trevino, 207 S.W. 947,*

6    *949-50 (Tex. Civ. App. 1918).* In that case, the parties entered into a 20-year contract for

7    cutting certain plants from the plaintiff's land located in Mexico. The plaintiff sought a

8    judgment cancelling the contract on the basis of fraud. The lower court entered a judgment

9    cancelling the contract. *207 S.W. at 948.* The Court of Appeal reversed. The Court of

10   Appeal held that the lower court did not have jurisdiction to cancel the contract because it

11   was a determination of property rights in a foreign country. The court noted:

12        [I]t may be premised that real property is subject to the exclusive jurisdiction of
          the courts of the state or country in which it is located. No other courts may
13        properly exercise any jurisdiction over it, and this is as true of courts of equity
          as of courts of law.
14
15   *207 S.W. at 950* (quoting Wharton, Conflict of Laws).

16        This issue was addressed more recently in the case of *Mann v. Hanil Bank, 900*

17   *F.Supp. 1077 (D. E.D. WI 1995).* In that case, the plaintiffs sought an order compelling

18   Korean banks to liquidate certain real property collateral located in Korea. The Korean

19   banks defended on the grounds that the court lacked jurisdiction to order the sale of land in a

20   foreign country. The Court agreed. Citing the case of *Livingston v. Jefferson*, the court held

21   that it was without jurisdiction to order the sale of land in a foreign country. *900 F.Supp. at*

22   *1094-95.*

23        The prohibition on the determination of property rights in foreign countries has as

24   much vitality today as it did when the *Oakey* case was decided. In 1984, Justice Scalia,

25   sitting on the Court of Appeals for the District of Columbia, addressed the issue in the case

26   of *Asociacion De Reclamantes, v. United Mexican States, 735 F.2d 1517 (DC Cir. 1984).* In

27   that case, Justice Scalia addressed the exceptions to sovereign immunity for actions regarding

28   title to real property. Justice Scalia wrote:

8

1   The origin of the traditional exception limited to questions involving property
    interests or possession is self-evident. A territorial sovereign has a primeval
2   interest in resolving all disputes over use or right to use of real property within
    its own domain. As romantically expressed in an early treatise:
3
        A sovereignty cannot safely permit the title to its land to be
4       determined by a foreign power. Each state has its fundamental
        policy as to the tenure of land; a policy wrought up in its history,
5       familiar to its population, incorporated with its institutions,
        suitable to its soil.
6
    (Citation omitted.) A subsidiary concern, less instinctive and mystical, is that
7   courts are simply not well equipped to decide property interests or rights to
    possession with regard to land outside their jurisdiction, particularly land
8   located in a foreign nation . . . . These considerations produced not only the
    exception to sovereign immunity we are here discussing, but also the "local
9   action rule," which makes the locality's power exclusive and deprives other
    courts of jurisdiction to settle questions involving real estate. *Griner v. Trevino*,
10  *207 S.W. 947, 949-50 (Tex. Civ. App. 1918).*

11  *735 F.2d at 1521.*

12      The *Griner v. Trevino* decision cited by Justice Scalia (discussed above) was a case in

13  which a court in Texas held that U.S. courts lacked subject matter jurisdiction to determine

14  real property rights in Mexico.

15

16  **B.     The Bankruptcy Code Avoidance Sections Do Not Apply Extraterritorially.**

17      The avoidance causes of action in the Complaint fail to state a claim on which relief

18  can be granted because the Bankruptcy Code avoidance sections do not apply

19  extraterritorially.

20      It is a long-settled principle of American law "that legislation of Congress, unless a

21  contrary intent appears, is meant to apply only within the territorial jurisdiction of the United

22  States." *Equal Employment Opportunity Comm. v. Arabian American Oil Co., 499 U.S. 244,*

23  *248 (1991)* ("Aramco"); *Foley Bros., Inc. v. Filardo, 336 U.S. 281, 285 (1949); In re*

24  *Maxwell Commc'n Corp., 170 B.R. 800, 809 (S.D.N.Y. 1994).* The presumption "serves to

25  protect against unintended clashes between our laws and those of other nations which could

26  result in international discord." *Aramco, 499 U.S. at 248* (citing *McCulloch v. Sociedad*

27  *Nacional de Marineros de Honduras, 372 U.S. 10, 20-22 (1963)).* Moreover, the

28

9

1  presumption recognizes that Congress is primarily concerned with domestic conditions when

2  it legislates. *Aramco, 499 U.S. at 43* (citing *Foley Bros., Inc., 336 U.S. at 285).*

3      An act of Congress will not be found to apply to conduct occurring outside the U.S.

4  unless "'the affirmative intention of the Congress'" to apply the law extraterritorially is

5  "'clearly expressed'" in the statute. *Aramco, 499 U.S. at 248* (quoting *Benz v. Compania*

6  *Naviera Hidalgo, S.A., 353 U.S. 138, 147 (1957)).* If the legislative purpose is not

7  "unmistakably clear," see *Labor Union of Pico Korea v. Pico Products, 968 F.2d 191, 195*

8  (2d Cir.) *(1992),* any ambiguity in the statute must be resolved in favor of refusing to apply

9  the law to events occurring outside U.S. territory. See *Aramco, 499 U.S. at 253* ("If we were

10  to permit possible, or even plausible, interpretations of language such as that involved here to

11  override the presumption against extraterritorial application, there would be little left of the

12  presumption.").

13      At least two courts have expressly held that Congress did not intend for the

14  Bankruptcy Code avoidance sections to apply extraterritorially.  In the case of *In re Maxwell*

15  *Communication Corporation, 186 B.R. 807 (D. S.D.N.Y 1995),* the District Court for the

16  Southern District of New York held that Congress did not intend for Bankruptcy Code

17  section 547 to apply extraterritorially.  In *Maxwell,* an examiner had brought preference

18  actions against foreign banks to avoid certain transfers of funds.  The defendant banks

19  brought a motion under Federal Rule 12(b)(6) for dismissal for failure to state a claim on

20  which relief can be granted.  The District Court granted the motion and dismissed the claims

21  on the grounds that Bankruptcy Code section 547 was inapplicable because Congress did not

22  intend the statute to apply to transfers occurring outside the United States.

23      The *Maxwell* Court conducted an extensive analysis of the issue of Congressional

24  intent with regard to the Bankruptcy Code in general and Section 547 in particular.  The

25  *Maxwell* Court found that nothing in the language or legislative history of section 547

26  expresses Congress' intent to apply the statute to foreign transfers.  The Court stated:

27      The Supreme Court has stated that "when it desires to do so, Congress knows
        how to place the high seas within the jurisdictional reach of a statute."
28      *Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 440, 102
        L. Ed. 2d 818, 109 S. Ct. 683 (1989).* Because Congress has not "clearly

1    expressed" its desire that § 547 govern extraterritorial conduct, see *Aramco,*
2    *499 U.S. at 248,* that section cannot apply to the foreign transfers at issue in
     this case.

3    *186 B.R. at 821.*

4        The issue of the extraterritorial effect of the Bankruptcy Code avoidance sections was

5    most recently addressed in the case of *Barclay v. Swiss Finance Corporation Limited (In re*

6    *Midland Euro Exchange et al), 347 B.R. 708 (Bankr. C.D. Cal. 2006).* In that case, from the

7    United States Bankruptcy Court for the Central District of California, Judge Mund held that

8    Congress did not intend Bankruptcy Code Section 548 to apply extraterritorially.

9        In that case, a chapter 7 Trustee brought an action under Bankruptcy Code section 548

10   to set aside and recover allegedly fraudulent transfers paid by the debtor in fees and

11   commissions to a foreign exchange brokerage. The Trustee filed a complaint pleading two

12   claims for relief under Bankruptcy Code sections 548(a)(1)(A) and 550(a) and seeking to

13   recover the fees as fraudulent transfers. The defendant filed a motion under Rule 12(b)(6) to

14   dismiss the complaint for failure to state a claim for relief. The motion also argued that

15   Congress did not intend Bankruptcy Code section 548 to apply extraterritorially and that the

16   Court should abstain from exercising jurisdiction on the grounds of international comity.

17       After extensive analysis, the *Midland Euro Exchange* Court found that nothing in the

18   text of Section 548 or other sections of the Bankruptcy Code indicate congressional intent to

19   apply Section 548 extraterritorially. *347 B.R. at 717.* Judge Mund acknowledged that policy

20   considerations favor extraterritorial application of Section 548 because failure to extend

21   application of Section 548 to transfers outside the territorial borders of the United States

22   creates a loophole for unscrupulous debtors to freely transfer their assets to shell entities

23   abroad and avoid the reach of the Bankruptcy Code. *347 B.R. at 718.* However, the Court

24   recognized that, in the Ninth Circuit, policy considerations are insufficient to overcome the

25   presumption against extraterritorial application of U.S. statutes.

26       These policy considerations, however, must be balanced against the
         presumption against extraterritoriality, which serves to protect against
27       unintended clashes between our laws and those of other nations which could
         result in international discord. See *E.E.O.C. v. Arabian American Oil Co., 499*
28       *U.S. 244, 248, 111 S. Ct. 1227, 113 L. Ed. 2d 274 (1991).* The Ninth Circuit
         has held that policy considerations alone are insufficient to overcome the

11

1   presumption against extraterritoriality. See *Subafilms, Ltd. v. MGM-Pathe
    Communications Co., 24 F.3d 1088, 1096 (9th Cir. 1994)* (en banc) (" . . . the
2   ultimate touchstone of extraterritoriality consist[s] of an ascertainment of
    congressional intent; courts [do] not rest solely on the consequences of a failure
3   to give a statutory scheme extraterritorial application.").

4   *347 B.R. at 718.*

5        The *Midland Euro Exchange* Court, having found no evidence of congressional intent

6   to extend the application of Section 548 extraterritorially, the Court held that the trustee

7   could not pursue his claims under that statute. Judge Mund dismissed the claims under

8   Rule 12(b)(6) on the grounds that the trustee had failed to state a claim on which relief could

9   be granted.

10       Counsel for Mr. and Mrs. Diaz has found only one case that has ever applied the

11  Bankruptcy avoidance sections extraterritorially to avoid a transfer of real property located in

12  a foreign country. Earlier this year, the Fourth Circuit Court of Appeal applied Section 548

13  extraterritorially in the case of *In re French, 440 F.3d 145 (4th Cir. 2006)*. The *In re French*

14  case, however, is a rogue decision which is poorly reasoned and which has been roundly

15  criticized. In declining to follow *In re French*, Judge Mund stated:

16       In re French totally ignores § 541(a)(3) and uses an unclear and convoluted
         method to reach its conclusion. I have a great deal of trouble following the
17       Fourth Circuit's reasoning and am not persuaded that it leads to the proper
         conclusion.
18  *347 B.R. at 719.*

19       In the present case, the Trustee has brought his avoidance claims under Bankruptcy

20  Code section 544(b). The question of whether section 544(b) applies extraterritorially

21  appears to be a question of first impression.[6/] However, the analysis would be the same as the

22  extraterritoriality of sections 547 and 548. Just as with sections 547 and 548, there is no

23  evidence of congressional intent to extend the application of Section 544(b) extraterritorially.

24  There is no such intent expressed in section 544(b) itself.[7/] Nor is counsel for the moving

25  _____

26  [6/]    Counsel for Mr. and Mrs. Diaz has not found any case that addresses the
    extraterritoriality of Bankruptcy Code section 544.
27
    [7/]    Bankruptcy Code section 544(b) provides in its entirety:
28
                                                                        (continued...)

                                        12

1  party aware of anything in the Bankruptcy Code or the legislative history of section 544(b)

2  which expresses an intent by Congress to give extraterritorial effect to section 544(b).

3      The Trustee is attempting to apply section 544(b) (and through section 544(b),

4  California's fraudulent conveyance statutes) to a transfers of real property which occurred in

5  Mexico and pursuant to Mexican law.  Bankruptcy Code section 544(b) does not apply to

6  those transfers because the transfers occurred outside the territorial limits of the United

7  States. Accordingly, the avoidance causes of action must be dismissed for failure to state a

8  claim on which relief may be granted.

9

10  **C.    This Court Should Abstain on the Grounds of International Comity.**

11      Under the international comity doctrine, courts sometimes defer to the laws or

12  interests of a foreign country and decline to exercise jurisdiction that is otherwise properly

13  asserted. *Sarei v. Rio Tinto, PLC, 456 F.3d 1069, 1086 (9th Cir. 2006).*  Declining to decide

14  a question of law on the basis of international comity is a form of abstention. *456 F.3d at*

15  *1087.*

16      Analysis of comity often begins with the definition proffered by Justice Gray in *Hilton*

17  *v. Guyot, 159 U.S. 113, 163-64 (1895):* "'Comity,' in the legal sense, is neither a matter of

18  absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But

19  it is the recognition which one nation allows within its territory to the legislative, executive

20  or judicial acts of another nation, having due regard both to international duty and

21  convenience, and to the rights of its own citizens or of other persons who are under the

22

23  ─────────────────

24  [2]/(...continued)
    (b) (1) Except as provided in paragraph (2), the trustee may avoid any transfer of an interest
    of the debtor in property or any obligation incurred by the debtor that is voidable under

25  applicable law by a creditor holding an unsecured claim that is allowable under section 502
    of this title or that is not allowable only under section 502(e) of this title.

26

27  (2) Paragraph (1) shall not apply to a transfer of a charitable contribution (as that term is
    defined in section 548(d)(3) that is not covered under section 548(a)(1)(B), by reason of
    section 548(a)(2). Any claim by any person to recover a transferred contribution described in

28  the preceding sentence under Federal or State law in a Federal or State court shall be
    preempted by the commencement of the case.

13

1  protection of its laws." *In re Maxwell, 93 F.3d 1036, 1046 (2nd Cir. 1996)*. International

2  comity guides the interpretation of statutes that might otherwise be read to apply to certain

3  conduct. When construing a statute, the doctrine of international comity is best understood as

4  a guide where the issues to be resolved are entangled in international relations. *93 F.3d at*

5  *1047*. Moreover, international comity is a separate notion from the "presumption against

6  extraterritoriality," which requires a clear expression from Congress for a statute to reach

7  non-domestic conduct. *Id.*

8        International comity describes two distinct doctrines.  It is a canon of construction

9  based on the principal that "An act of congress ought never to be construed to violate the law

10  of nations if any other possible construction remains." *Hartford Fire Ins. Co. v. California,*

11  *509 U.S. 764, 814-15 (1993)(Scalia, J., dissenting)*. It is also a discretionary act of deference

12  by a national court to decline to exercise jurisdiction in a case properly adjudicated in a

13  foreign state. *In re Maxwell, 93 F.3d at 1047.*

14        In the present case, the Trustee is asking this Court to strip Mexican citizens of their

15  title to land in Mexico which they legally acquired, in Mexico, pursuant to Mexican law.

16  Mexico has a strong policy against allowing foreign powers to decide issues affecting

17  ownership of real property in Mexico.  Moreover, Mexico's fraudulent conveyance law is

18  different from U.S. law and would not permit the avoidance being sought by the Trustee in

19  this case. This Court should abstain from entertaining the causes of action against Mr. and

20  Mrs. Diaz under the doctrine of international comity.

21

22        **1.    <u>Mexico Has a Strong Policy Against Allowing Foreign Powers to Decide</u>**

23               **<u>Issues Related to Mexican Real Property.</u>**

24        Mexico may remain as the only country in the world that still has the Calvo doctrine

25  embodied in its Constitution. Pursuant to Article 27 of the Mexican Constitution, the

26  Mexican State may grant to foreigners the same right conferred to Mexican nationals of

27  acquiring real property:

28        provided they agree before the Ministry of Foreign Relations to consider
          themselves as nationals in respect to such property, and bind themselves not to

14

1    invoke the protection of their governments in matters relating thereto; under
2    penalty, in case of noncompliance with this agreement, of forfeiture of the
     property acquired to the Nation.

3    *Mexican Constitution, Article 27.* An English translation of Article 27 is attached hereto as

4    Appendix "A." See also, *Mexican Law: a Treatise for Legal Practitioners and International*

5    *Investors, § 41.29, Jorge A. Vargas, West Group Publishing 2001 ed.*

6    This policy is carried over into the Mexican Federal Civil Code. Article 773 of the

7    Mexican Federal Civil Code provides:

8    All foreign individuals and corporations are required to observe the provisions
     of Article 27 of the Constitution of the United Mexican States and its organic
9    laws and rules upon acquiring real property within the Mexican republic.

10   *Mexican Federal Civil Code, Article 773.* An English translation of Article 773 is attached

11   hereto as Appendix "B" (*Mexican Civil Code Annotated, Jorge A. Vargas, West Group*

12   *Publishing 2005 ed.*).

13   In the escrituras (deeds under Mexican law) in the chain of title to the Diaz's real

14   property that created the rights of the Debtors, Howell & Gardner Investors, Inc., and Mr.

15   and Mrs. Diaz each reflect the policy under Mexican law that title to Mexican real estate be

16   controlled only by Mexican law and Mexican courts. For example, the escritura for the

17   transfer from the Debtor to Howell & Gardner Investors states:

18
     – JURISCION AND COMPETENCE –
19
     For everything relative to the Interpretation and compliance of this
20   agreement, **the parties expressly submit to the Laws and Tribunals of the**
     **City of Guadalajara, Jalico or Mexico**, Federal District at the option of the
21   Trustee, **waiving any other jursidiction** that due to their addresses they would
     currently have or in the future; they also accept to be considered as Mexicans,
22   in regards to the rights derived from this agreement, and that **they will not**
     **invoke therefore the protection of their Government**, in case of breaching
23   this agreement, they would forfeit in favor of Mexico, the rights acquired.

24   See Declaration of Fletcher W. Paddison, Exhibit "3" (emphasis added). Virtually all of the

25   relevant escrituras contain provisions in which the parties expressly submit to the laws and

26   courts of Mexico and expressly waive all other jurisdictions that the parties may have access

27   to due to their addresses. See Declaration of Fletcher W. Paddison, Exhibits "1" through "6."

28

15

1    The strong overriding policy under Mexican law, as embodied in Mexico's

2    Constitution, that issues regarding Mexican real property be decided only under Mexican law

3    and only by Mexican courts, provides a sound basis for this Court to abstain from deciding

4    the issues in this case on the basis of international comity.

5    The bizarre twist that this case has taken with regard to the proposed sale of the

6    estate's interest in this adversary proceeding to Kismet highlights the inappropriateness of

7    this lawsuit and the need for this Court to abstain on the basis of international comity. Kismet

8    is controlled by Mr. and Mrs. Diaz's neighboring landowner in Mexico. The neighboring

9    landowner has tried unsuccessfully to purchase Mr. and Mrs. Diaz's property. When he

10    learned of the lawsuit filed by the Trustee in this case, he purchased the claim of a creditor

11    and then the avoidance claims of the Trustee. Now he is attempting to use the laws and the

12    courts of the United States to involuntarily strip his Mexican neighbors of their land in

13    Mexico; something that he could never do under Mexican law. This perverse use of the laws

14    and courts of a foreign country, in direct contravention of the Mexican Constitution, only

15    serves to highlight the appropriateness of abstention in this case.

16

17    2.    **Mexican Fraudulent Conveyance Laws Differ From those in the United**

18    **States.**

19    Creditors who have claims against people who have transferred their Mexican real

20    property to the prejudice of their creditors are not without a remedy. Mexican law provides

21    for the recovery of fraudulent conveyances. Creditors can resort to Mexican courts when the

22    fraudulent conveyance involves Mexican real property.

23    Significant differences exist between Mexican fraudulent conveyance law and

24    fraudulent conveyance law under California law or the Bankruptcy Code. Mexico's

25    fraudulent conveyance law is set forth in Articles 2163 through 2179 of the Mexican Federal

26    Civil Code. An English translation of those Articles are attached hereto as Appendix "C"

27    (reprinted from *Mexican Civil Code Annotated, Jorge A. Vargas, West Group Publishing*

28    *2005 ed.*).

16

1    Transfers made without consideration may be voided under Mexican law even if the

2    parties acted in good faith. *Mexican Federal Civil Code, Article 2165*. However, if a

3    transferee has paid consideration for a transfer, the transfer can only be avoided if there is

4    bad faith on the part of <u>both</u> the debtor and the third party contracting with him. *Mexican*

5    *Federal Civil Code, Article 2164*. Mexican law does not provide for the avoidance of a

6    transfer made to a good faith transferee who paid value for the transfer even if the

7    consideration was less than reasonably equivalent value. Moreover, a creditor's right of

8    action against a first purchaser is not available against a subsequent holder, unless the

9    subsequent holder acquired the property in bad faith. *Mexican Federal Civil Code, Article*

10   *2167*.

11   Mr. and Mrs. Diaz paid full value when they purchased their property from Howell &

12   Gardner Investors, Inc. Mr. and Mrs. Diaz paid approximately $1.4 million for their

13   property. The Trustee alleges in his complaint that "the value of the Villa Property appears to

14   be on the order of $1.4 or $1.5 million, or more." *Second Amended Complaint, ¶ 43c*. The

15   appraiser commissioned by the Trustee to appraise Mr. and Mrs. Diaz's property concluded

16   that the property was worth only $1,284,209 on the date that the transfer to Mr. and Mrs.

17   Diaz was recorded (over $115,000 <u>less</u> than what Mr. and Mrs. Diaz paid for it). Mr. and

18   Mrs. Diaz acted in good faith when they bought and paid full price for the property.

19   Kismet tried very hard to keep secret the fact that the Trustee's appraiser concluded

20   that the value of the Villa Property was less than what Mr. and Mrs. Diaz had paid for it.

21   Kismet will likely try to commission a new appraisal with an inflated value that it can use to

22   argue that the Diaz's paid less than reasonably equivalent value and should be stripped of

23   their land in Mexico notwithstanding that they acted in good faith. Such an approach would

24   be contrary to Mexican fraudulent conveyance law.

25   Mexico has its own fraudulent conveyance laws which protects creditors. Those laws

26   differ from the fraudulent conveyance laws in the United States. It would be inappropriate for

27   fraudulent conveyance issues regarding the transfer of real estate located in Mexico to be

28   decided using the laws and courts of a foreign country (*i.e.*, the U.S.), when Mexico's own

17

laws and courts provide sufficient protection to creditors. Deferring consideration of those issues to Mexican courts would not only afford the proper deference and respect to the laws and courts of Mexico with regard to real estate located in Mexico, but would also validate the reasonable expectations of Mexican citizens, who purchase land in their own country, that disputes regarding such transfers would be determined by Mexican courts and pursuant to Mexican law.

## IV.

## CONCLUSION

The Complaint must be dismissed as to the Mr. and Mrs. Diaz. This Court lacks the subject matter jurisdiction to determine title to real property located in a foreign country. Moreover, Congress did not intend to give extraterritorial effect to the avoidance sections of the Bankruptcy Code. Finally, international comity requires that this Court defer to the laws and the courts of Mexico and abstain from exercising jurisdiction in this case.

Dated: November 28, 2006

VANDERHOFF LAW GROUP

/s/ Alan Vanderhoff

By ———————————————
ALAN VANDERHOFF

Attorneys for ALEJANDRO DIAZ BARBA and
MARTHA B. DIAZ

18

**Article 27.** Ownership of the lands and waters within the boundaries of the national territory is vested originally in the Nation, which has had, and has, the right to transmit title thereof to private persons, thereby constituting private property.

Private property shall not be expropriated except for reasons of public use and subject to payment of indemnity.

The Nation shall at all times have the right to impose on private property such limitations as the public interest may demand, as well as the right to regulate the utilization of natural resources which are susceptible of appropriation, in order to conserve them and to ensure a more equitable distribution of public wealth. With this end in view, necessary measures shall be taken to divide up large landed estates: to develop small landed holdings in operation; to create new agricultural centers, with necessary lands and waters; to encourage agriculture in general and to prevent the destruction of natural resources, and to protect property from damage to the detriment of society. Centers of population which at present either have no lands or water or which do not possess them in sufficient quantities for the needs of their inhabitants, shall be entitled to grants thereof, which shall be taken from adjacent properties, the rights of small landed holdings in operation being respected at all times.

In the Nation is vested the direct ownership of all natural resources of the continental shelf and the submarine shelf of the islands; of all minerals or substances, which in veins, ledges, masses or ore pockets, form deposits of a nature distinct from the components of the earth itself, such as the minerals from which industrial metals and metalloids are extracted; deposits of precious stones, rock-salt and the deposits of salt formed by sea water; products derived from the decomposition of rocks, when subterranean works are required for their extraction; mineral or organic deposits of materials susceptible of utilization as fertilizers; solid mineral fuels; petroleum and all solid, liquid, and gaseous hydrocarbons; and the space above the national territory to the extent and within the terms fixed by international law.[6]

In the Nation is likewise vested the ownership of the waters of the territorial seas, within the limits and terms fixed by international law; inland marine waters; those of lagoons and estuaries permanently or intermittently connected with the sea; those of natural, inland lakes which are directly connected with streams having a constant flow; those of rivers and their direct or indirect tributaries from the point in their source where the first permanent, intermittent, or torrential waters begin, to their mouth in the sea, or a lake, lagoon, or estuary forming a part of the public domain; those of constant or intermittent streams and their direct or indirect tributaries, whenever the bed of the stream, throughout the whole or a part of its length, serves as a boundary of the national territory or of two federal divisions, or if it flows from one federal division to another or crosses the boundary line of the Republic; those of lakes, lagoons, or estuaries whose basins, zones, or shores are crossed by the boundary lines of two or more divisions or by the boundary line of the Republic and a neighboring country or when the shoreline serves as the boundary between two federal divisions or of the Republic and a neighboring country; those of springs that issue from beaches, maritime areas, the beds, basins, or shores of lakes, lagoons, or estuaries in the national domain; and waters extracted from mines and the channels, beds, or shores of interior lakes and streams in an area fixed by law. Underground waters may be brought to the surface by artificial works and utilized by the surface owner, but if the public interest so requires or use by others is affected, the Federal Executive may regulate its extraction and utilization, and even establish prohibited areas, the same as may be done with other waters in the public domain. Any other waters not included in the foregoing enumeration shall be considered an integral part of the property through which they flow or in which they are deposited, but if they are located in two or more properties, their utilization shall bedeemed a matter of public use, and shall be subject to laws enacted by the States.[7]

APPENDIX "A"

In those cases to which the two preceding paragraphs refer, ownership by the Nation is inalienable and imprescriptible, and the exploitation, use, or appropriation of the resources concerned, by private persons or by companies organized according to Mexican laws, may not be undertaken except through concessions granted by the Federal Executive, in accordance with rules and conditions established by law. The legal rules relating to the working or exploitation of the minerals and substances referred to in the fourth paragraph shall govern the execution and proofs of what is carried out or should be carried out after they go into effect, independent of the date of granting the concessions, and their nonobservance will be grounds for cancellation thereof. The Federal Government has the power to establish national reserves and to abolish them. The declarations pertaining thereto shall be made by the Executive in those cases and conditions prescribed by law. In the case of petroleum, and solid, liquid, or gaseous hydrocarbons no concessions or contracts will be granted nor may those that have been granted continue, and the Nation shall carry out the exploitation of these products, in accordance with the provisions indicated in the respective regulatory law.[8]

It is exclusively a function of the general Nation to conduct, transform, distribute, and supply electric power which is to be used for public service. No concessions for this purpose will be granted to private persons and the Nation will make use of the property and natural resources which are required for these ends.[9] (Note: A transitory provision of the amendment adding the foregoing paragraph to Article 27 states:

"A regulatory law shall establish the rules to which concessions granted prior to the enactment of the present law (amendment) shall be subject".)

Legal capacity to acquire ownership of lands and waters of the Nation shall be governed by the following provisions:

I. Only Mexicans by birth or naturalization and Mexican companies have the right to acquire ownership of lands, waters, and their appurtenances, or to obtain concessions for the exploitation of mines or of waters. The State may grant the same right to foreigners, provided they agree before the Ministry of Foreign Relations to consider themselves as nationals in respect to such property, and bind themselves not to invoke the protection of their governments in matters relating thereto; under penalty, in case of noncompliance with this agreement, of forfeiture of the property acquired to the Nation. Under no circumstances may foreigners acquire direct ownership of lands or waters within a zone of one hundred kilometers along the frontiers and of fifty kilometers along the shores of the country.

The State, in accordance with its internal public interests and with principles of reciprocity, may in the discretion of the Secretariat of Foreign Affairs authorize foreign states to acquire, at the permanent sites of the Federal Powers, private ownership of real property necessary for the direct services of their embassies or legations.[10]

II. Religious institutions known as churches, regardless of creed, may in no case acquire, hold, or administer real property or hold mortgages thereon; such property held at present either directly or through an intermediary shall revert to the Nation, any person whosoever being authorized to denounce any property so held. Presumptive evidence shall be sufficient to declare the denunciation well founded. Places of public worship are the property of the Nation, as represented by the Federal Government, which shall determine which of them may continue to be devoted to their present purposes. Bishoprics, rectories, seminaries, asylums, and schools belonging to religious orders, convents, or any other buildings built or intended for the administration, propagation, or teaching of a religious creed shall at once become the property of the Nation by

inherent right, to be used exclusively for the public services of the Federal or State Governments, within their respective jurisdictions. All places of public worship hereafter erected shall be the property of the Nation.

III.  Public or private charitable institutions for the rendering of assistance to the needy, for scientific research, the diffusion of knowledge, mutual aid to members, or for any other lawful purpose, may not acquire more real property than actually needed for their purpose and immediately and directly devoted thereto; but they may acquire, hold, or administer mortgages on real property provided the term thereof does not exceed ten years. Under no circumstances may institutions of this kind be under the patronage, direction, administration, charge, or supervision of religious orders or institutions, or of ministers of any religious sect or of their followers, even though the former or the latter may not be in active service.

IV.  Commercial stock companies may not acquire, hold, or administer rural properties. Companies of this kind that are organized to operate any manufacturing, mining, or petroleum industry or for any other purpose that is not agricultural, may acquire, hold, or administer lands only of an area that is strictly necessary for their buildings or services, and this area shall be fixed in each particular case by the Federal or State Executive.

V.  Banks duly authorized to operate in accordance with the laws on credit institutions may hold mortgages on urban and rural property in conformity with the provisions of such laws but they may not own or administer more real property than is actually necessary for their direct purpose.

VI.  With the exception of the corporate entities referred to in clauses III, IV, and V hereof, and the centers of population which by law or in fact possess a communal status or centers that have received grants or restitutions or have been organized as centers of agricultural population, no other civil corporate entity may hold or administer real property or hold mortgages thereon, with the sole exception of the buildings intended immediately and directly for the purposes of the institution. The States, the Federal District, and the Territories, and all Municipalities in the Republic, shall have full legal capacity to acquire and hold all the real property needed to render public services.

The federal and state laws, within their respective jurisdictions, shall determine in what cases the occupation of private property shall be considered to be of public utility; and in accordance with such laws, the administrative authorities shall issue the respective declaration. The amount fixed as compensation for the expropriated property shall be based on the value recorded in assessment or tax offices for tax purposes, whether this value had been declared by the owner or tacitly accepted by him by having paid taxes on that basis. The increased or decreased value of such private property due to improvements or depreciation which occurred after such assessment is the only portion of the value that shall be subject to the decision of experts and judicial proceedings. This same procedure shall be followed in the case of property whose value is not recorded in the tax offices.

The exercise of actions pertaining to the Nation by virtue of the provisions of this article shall be made effective by judicial procedure, but during these proceedings and by order of the proper courts, which must render a decision within a maximum of one month, the administrative authorities shall proceed without delay to occupy, administer, auction, or sell the lands and waters in question and all their appurtenances, and in no case may the acts of such authorities be set aside until a final decision has been rendered.

VII.  [11]The centers of population which, by law or in fact, possess a communal status shall have legal capacity to enjoy common possession of the lands, forests, and waters belonging to them or which have been or may be restored to them.

All questions, regardless of their origin, concerning the boundaries of communal lands, which are now pending or that may arise hereafter between two or more centers of population, are matters of federal jurisdiction. The Federal Executive shall take cognizance of such controversies and propose a solution to the interested parties. If the latter agree thereto, the proposal of the Executive shall take full effect as a final decision and shall be irrevocable; should they not be in conformity, the party or parties may appeal to the Supreme Court of Justice of the Nation, without prejudice to immediate enforcement of the presidential proposal.

The law shall specify the brief procedure to which the settling of such controversies shall conform.

VIII.  The following are declared null and void:
   a.  All transfers of the lands, waters, and forests of villages, *rancherias*, groups, or communities made by local officials (*jefes politicos*), state governors, or other local authorities in violation of the provisions of the Law of June 25, 1856, and other related laws and rulings.
   b.  All concessions, deals or sales of lands, waters, and forests made by the Secretariat of Development, the Secretariat of Finance, or any other federal authority from December 1, 1876 to date, which encroach upon or illegally occupy communal lands (ejidos), lands allotted in common, or lands of any other kind belonging to villages, rancherias, groups or communities, and centers of population.
   c.  All survey or demarcation-of-boundary proceedings, transfers, alienations, or auction sales effected during the period of time referred to in the preceding sub-clause, by companies, judges, or other federal or state authorities entailing encroachments on or illegal occupation of the lands, waters, or forests of communal holdings (ejidos), lands held in common, or other holdings belonging to centers of population.

The sole exception to the aforesaid nullification shall be the lands to which title has been granted in allotments made in conformity with the Law of June 25, 1856, held by persons in their own name for more than ten years and having an area of not more than fifty hectares.

IX.  Divisions or allotments of land among the inhabitants of a given center of population which, although apparently legitimate are not so, due to a mistake or defect, may be annulled at the request of three fourths of the residents holding one fourth so divided, or one fourth of such residents holding three fourths of the lands.

X.  Centers of population which lack communal lands (ejidos) or which are unable to have them restored to them due to lack of titles, impossibility of identification, or because they had been legally transferred, shall be granted sufficient lands and waters to constitute them, in accordance with the needs of the population; but in no case shall they fail to be granted the area needed, and for this purpose the land needed shall be expropriated, at the expense of the Federal Government, to be taken from lands adjoining the villages in question.

The area or individual unit of the grant shall hereafter be not less than ten hectares of moist or irrigated land, or in default of such land its equivalent in other types of land in accordance with the third paragraph of section XV of this article.[12]

XI.  For the purpose of carrying out the provisions of this article and of regulating laws that may be enacted, the following are established:
   a.  A direct agency of the Federal Executive entrusted with the application and enforcement of the agrarian laws;

APPENDIX "A"

    b. An advisory board composed of five persons to be appointed by the President of the Republic and who shall perform the functions specified in the organic laws;

    c. A mixed commission composed of an equal number of representatives of the Federal Government, the local governments, and a representative of the peasants, to be appointed in the manner set forth in the respective regulating law, to function in each State, Territory, and the Federal District, with the powers and duties set forth in the organic and regulatory laws;

    d. Private executive committees for each of the centers of population that are concerned with agrarian cases;

    e. A communal office (comisariado ejidal) for each of the centers of population that possess communal lands (ejidos).

XII. Petitions for a restitution or grant of lands or waters shall be submitted directly to the state and territorial governors.

The governors shall refer the petitions to the mixed commissions, which shall study the cases during a fixed period of time and render a report; the State governors shall approve or modify the report of the mixed commission and issue orders that immediate possession be given to areas which they deem proper. The case shall then be turned over to the Federal Executive for decision.

Whenever the governors fail to comply with the provisions of the preceding paragraph, within the peremptory period of time fixed by law, the report of the mixed commission shall be deemed rejected and the case shall be referred immediately to the Federal Executive.

Inversely, whenever a mixed commission fails to render a report during the peremptory time limit, the Governor shall be empowered to grant possession of the area of land he deems appropriate.

XIII. The agency of the Executive and the Agrarian Advisory Board shall report on the approval, rectification, or modification of the reports submitted by the mixed commissions, containing the changes made therein by the local governments, and so notify the President of the Republic, who as the supreme agrarian authority will render a decision.

XIV. Landowners affected by decisions granting or restoring communal lands and waters to villages, or who may be affected by future decisions, shall have no ordinary legal right or recourse and cannot institute *amparo* proceedings.

Persons affected by such decisions shall have solely the right to apply to the Federal Government for payment of the corresponding indemnity. This right must be exercised by the interested parties within one year counting from the date of publication of the respective resolution in the *Diario Oficial*. After this period has elapsed, no claim is admissible.

Owners or occupants of agricultural or stockraising properties in operation who have been issued or to whom there may be issued in the future certificates of non-affectability may institute amparo proceedings against any illegal deprivation or agrarian claims on their lands or water.[13]

XV. The mixed commissions, the local governments and any other authorities charged with agrarian proceedings cannot in any case affect small agricultural or livestock properties in operation and they shall incur liability for violations of the Constitution if they make grants which affect them.

Small agricultural property is that which does not exceed one hundred hectares of first-class moist or irrigated land or its equivalent in other classes of land, under cultivation.

To determine this equivalence one hectare of irrigated land shall be computed as two hectares of seasonal land; as four of good quality pasturage (agostadero) and as eight as *monte* (scrub land) or arid pasturage.

Also to be considered as small holdings are areas not exceeding two hundred hectares of seasonal lands or pasturage susceptible of cultivation; or one hundred fifty hectares of land used for cotton growing if irrigated from fluvial canals or by pumping; or three hundred, under cultivation, when used for growing bananas, sugar cane, coffee, henequen, rubber, coconuts, grapes, olives, quinine, vanilla, cacao, or fruit trees.

Small holdings for stockraising are lands not exceeding the area necessary to maintain up to five hundred head of cattle (ganado mayor) or their equivalent in smaller animals (ganado menor - sheep, goats, pigs) under provisions of law, in accordance with the forage capacity of the lands.

Whenever, due to irrigation or drainage works or any other works executed by the owners or occupants of a small holding to whom a certificate of non-affectability has been issued, the quality of the land is improved for agricultural or stockraising operations, such holding shall not be subject to agrarian appropriation even if, by virtue of the improvements made, the maximums indicated in this section are lowered, provided that the requirements fixed by law are met.

XVI. Lands which are subject to individual adjudication must be partitioned precisely at the time the presidential order is executed, according to regulatory laws.

VII. The Federal Congress and the State Legislature, within their respective jurisdictions, shall enact laws to fix the maximum area of rural property, and to carry out the subdivision of the excess lands, in accordance with the following bases:

   a. In each State, Territory, or the Federal District, there shall be fixed a maximum area of land of which a single individual or legally constituted society may be the owner.
   b. The excess over the fixed area shall be subdivided by the owner within the time fixed by the local law, and these parcels shall be offered for sale under terms approved by the governments, in accordance with the aforementioned laws.
   c. If the owner should oppose the subdivision, it shall be carried out by the local government, by expropriation.
   d. The value of the parcels shall be paid by annual installments which will amortize principal and interest, at an interest rate not exceeding 3% per annum.
   e. Owners shall be required to receive bonds of the local Agrarian Debt to guarantee payment for the property expropriated. For this purpose, the Federal Congress shall enact a law empowering the States to create their Agrarian Debt.
   f. No subdivision can be sanctioned which fails to satisfy the agrarian needs of neighboring settlements (poblados inmediatos). Whenever subdivision projects are to be executed, the agrarian claims must be settled within a fixed period.
   g. Local laws shall organize the family patrimony, determining what property shall constitute it, on the basis that it shall be inalienable and shall not be subject to attachment or encumbrance of any kind.

VIII. All contracts and concessions made by former Governments since the year 1876, which have resulted in the monopolization of lands, waters, and natural resources of the Nation, by a single person or company, are declared subject to revision, and the Executive of the Union is empowered to declare them void whenever they involve serious prejudice to the public interest.

APPENDIX "A"

**Article 772** Privately held property is that property for which individuals hold full rights of ownership and where no one else can interfere without their consent or without their authorization, as required by law.

**Article 773** All foreign individuals and corporations are required to observe the provisions of Article 27 of the Constitution of the United Mexican States and its organic laws and rules upon acquiring real property within the Mexican Republic.

## II. CONSEQUENCES OF OBLIGATIONS
## AFFECTING THIRD PARTIES

### Chapter I—Agreements in Fraud of Creditors

**Article 2163** Any act by a debtor in prejudice of his creditor may be declared void upon the latter's petition, if the debt precedes such action and it results in the insolvency of the debtor.

**Article 2164** If an act is for consideration, its voidance pursuant to Article 2163 can only be claimed if there is bad faith on the part of the debtor and of the third party contracting with him.

**Article 2165** If an act is gratuitous, its voidance can be claimed even if there was good faith on the part of the debtor and his contracting party.

**Article 2166** Insolvency exists if the total sum of the assets and receivables of a debtor, estimated at a fair price are less than the sum total of his debts. In such case, bad faith consists in the knowledge of the deficit.

**Article 2167** The right of action granted to a creditor by Articles 2163 to 2165 inclusive, against the first purchaser is not available against a subsequent holder, unless he acquired it in bad faith.

**Article 2168** Once the fraudulent transaction of the debtor has been revoked, if property was thereby transferred to a purchaser in bad faith, it shall be returned with its profits.

**Article 2169** Whoever in bad faith acquires property conveyed in fraud of creditors shall be liable to them for damages and losses if such property has been subsequently conveyed to a purchaser in good faith or has been lost.

**Article 2170** A cause of action to declare null and void a transfer arises if a debtor transfers assets that he owns, as well as where he renounces rights which are not exclusively for his personal use and enjoyment.

**Article 2171** If a debtor does not renounce irrevocably acquired rights, but renounces powers by which he can increase his estate, creditors may petition the revocation of such renunciation and exercise those powers on his behalf.

**Article 2172** Prepayment of an obligation by an insolvent debtor can be annulled.

**Article 2173** Any transaction by a debtor performed within thirty (30) days prior to his judicial adjudication of bankruptcy or insolvency, whose object is to extend credit or grant an unwarranted preference to a creditor, may be annulled.

**Article 2174** An action to nullify referred to by Article 2163 shall terminate if the debtor satisfies the debt or obtains sufficient assets to cover it.

**Article 2175** An adjudication of nullity of transactions of a debtor shall only be entered for the benefit of those creditors who petitioned it, and only for an amount sufficient to cover their claims.

711

**Article 2176** The third party recipient of the debtor's assets, can terminate the creditors' action by satisfying their claims or posting sufficient guarantees to satisfy their payment, if the assets of the debtor are insufficient.

**Article 2177** Fraud consisting exclusively of an undue preference to a creditor shall not extinguish his right to his claim, but only the attempted preference.

**Article 2178** If a creditor petitions the annulment of a transaction of a debtor by establishing his insolvency with proof that his debts exceed his known assets, the burden shifts to the debtor to prove that he has sufficient assets to cover his debts.

**Article 2179** A transfer for valuable consideration by persons against whom a judgment has been entered at any level, or against whom an attachment of assets has been issued shall be presumed fraudulent if the transfer is prejudicial to the interests of their creditors.

APPENDIX "C"

<u>Davis v. Icenhower,</u>
Adv. Pro. No. 04-90392

PROOF OF SERVICE BY MAIL

I, the undersigned, declare that I am, and was at the time of service of the papers herein referred to, over the age of 18 years and not a party to the within action or proceeding. My business address is 701 "B" Street, Suite 1000, San Diego, California 92101, which is located in the county in which the within-mentioned mailing occurred. I am readily familiar with the practice at my place of business for collection and processing of correspondence for mailing with the United States Postal Service. Such correspondence will be deposited with the United States Postal Service on the same day in the ordinary course of business.

On November 28, 2006, I served the following document(s):

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS**

by placing a true copy in a separate envelope for each addressee set forth below, with the name and address of the persons served shown on the envelope as shown below, and by sealing the envelope and placing it in the appropriate location at my place of business for collection and mailing with postage fully prepaid in accordance with ordinary business practices.

David Ortiz, Esq.
Office of the United States Trustee
402 West Broadway, Suite 600
San Diego, CA 92101

Michael E. Busch, Esq.
Pyle Sims Duncan & Stevenson
401 'B' Street, Suite 1500
San Diego, CA 92101

Gary B. Rudolph, Esq.
Sparber Rudolph Annen
701 B Street, Suite 1000
San Diego, CA 92101-8103

Robert L. Rentto, Esq.
Rentto & Rentto
110 West C Street, Suite 1503
San Diego, CA 92101

William L. Conti, Esq.
330 Rancheros Drive, Suite 212
San Marcos, CA 92069

Karen R. Frostrom, Esq.
Thorsnes Bartolotta & McGuire
2550 Fifth Avenue, Suite 1100
San Diego, CA 92103

Ali M.M. Mojdehi, Esq.
Baker & McKenzie
101 West Broadway, 12th Floor
San Diego, CA 92101

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct. Executed on November 28, 2006, at San Diego, California.

/s/ Alan Vanderhoff

_____
Alan Vanderhoff

19

**EXHIBIT  8**

1  Fletcher W. Paddison (Cal. Bar No. 77676)
   Malte L. Farnaes (Cal. Bar No. 222608)
2  ROSS, DIXON & BELL, LLP
   550 West "B" Street, Suite 400
3  San Diego, California 92101-3599
   Telephone:    (619) 235-4040
4  Facsimile:    (619) 231-8796

5  Attorneys for Defendants
   ALEJANDRO DIAZ BARBA and
6  MARTHA B. DIAZ

7

8                  UNITED STATES BANKRUPTCY COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10  In Re                                    Case No.: 03-11155-LA7

11  JERRY L. ICENHOWER DBA Seaview
    Properties, and DONNA L. ICENHOWER fka
12  DONNA L. HAWKS,

13            Debtors.

14  _____      Adv. No.: 04-90392-LA7

15  GERALD H. DAVIS, CHAPTER 7 TRUSTEE,

16            Plaintiff,                       **DECLARATION OF FLETCHER W.
                                               PADDISON**
17        v.                                   DATE:
                                               TIME:
18  JERRY L. ICENHOWER DBA Seaview             COURTROOM: 2
    Properties and DONNA L. ICENHOWER fka      JUDGE: Hon. Louise DeCarl Adler
19  DONNA L. HAWKS; HOWELL & GARDNER
    INVESTORS, INC., a Nevada corporation;
20  ROBERT MILLER, an individual, MARTHA
    MARGARITA BARBA DE LA TORRE, an
21  individual, also known as MARTHA BARBA
    DE DIAZ, MARTHA BARBA DeDIAZ,
22  MARTHA BARBA DIAZ, MARTHA M. DIAZ,
    MARTHA MARGARITA DIAZ, MARTHA B.
23  DIAZ; MARTHA M. DIAZ; and MARTHA B.
    de DIAZ; and ALEJANDRO DIAZ-BARBA, an
24  individual, also known as ALEJANDRO DIAZ
    BARBA, ALEX DIAZ, PORFIRIO
25  ALEJANDRO DIAZ, ALEJANDRO B. DIAZ,
    PORFIRIO A. DIAZ and PORFIRIO DIAZ,

26            Defendants.

27

28

641204 v 1                    EXHIBIT    8 4         Case No. 03-11155-LA7
                                                     Adv. No. 04-90392-LA7

## DECLARATION OF FLETCHER W. PADDISON

I, Fletcher W. Paddison, hereby declare that:

1.     I am an attorney for Alex Diaz and his mother Martha Diaz (the "Diaz Family") and if called as a witness I could competently testify to the following facts.

2.     Our office has obtained true, correct and authenticated copies of certain Public Deeds, known as an Escritura, which are filed and recorded with the Mexican Government for the State of Jalisco. Pursuant to the Hague Convention and the requirements for the evidentiary authentication of documents from foreign countries each of the following documents has been duly certified by the required Notary Public, through an Apostille. In addition we have obtained a translation of the document in English by a translator duly certified by the Supreme Court of Justice for the State of Jalisco, Mexico.

3.     Accordingly, attached hereto as Exhibit 1 and 2 is the certified translation and the authenticated copy of the Escritura whereby, in 1995, Donald Lonie transferred the beneficial interest in the Villa Property to Jerry Lee Icenhower and Donna Lee Icenhower, as the Assignee Beneficiaries. As set forth in Exhibit 1, Mr. Lonie executed an "ASSIGNMENT OF BENEFICIARY RIGHTS AGREEMENT".

4.     Accordingly, attached hereto as Exhibit 3 and 4 is the certified translation and the authenticated copy of the Escritura whereby, in May 2002, Jerry Lee Icenhower and Donna Lee Icenhower transferred the beneficial interest in the Villa Property to Howell & Gardner Investors Inc represented by Peter Thompson, Esq. as the Assignee Beneficiaries. As set forth in Exhibit 3, the Icenhowers also executed an "ASSIGNMENT OF BENEFICIARY RIGHTS AGREEMENT".

1        5.    In 2004, however, the Villa Property was transferred to Martha Diaz and Alex

2    Diaz as the ACQUIRING PARTY.   Attached hereto as Exhibits 5 and 6 are the authenticated

3    copy and the translation of the Escritura whereby the Banco Nacional de Mexico transferred fee

4    title to the Villa Property to Alex Diaz and his mother, Martha Diaz. The document provides (at

5    page D000546) for the termination of the fideicomiso trust and provides that:

6        --EXTINCTION OF THE TRUST.   As consequence of the agreement of Transmission of

7        Property in Total execution of the Trust, consigned in this deed, both parties agree to

8        extinguish the TRUST in its totality.

9        I declare under penalty of perjury under the laws of the United States of America that the

10   foregoing is true and correct.

11       Executed this 28th day of _____November_____, 2006 at San Diego, California.

12

13                             _____

14                              Fletcher W. Paddison

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                       2                          Case No. 03-11155-LA7

                                                              Adv. No. 04-90392-LA7

EXHIBIT 1

Lic. Rebeca Camarena Marroquín
PERITO TRADUCTOR INGLES-ESPAÑOL
AUTORIZADO POR EL SUPREMO TRIBUNAL
DE JUSTICIA DEL ESTADO DE JALISCO
Y EL H. AYUNTAMIENTO DE GUADALAJARA.

TEL./FAX:  3632-8198
E-mail: translat@cybercable.net.mx
        transevr@cybercable.net.mx.

D000693

DEED NUMBER 7847, SEVEN THOUSAND EIGHT HUNDRED AND FORTY SEVEN.

VOLUME XXXV, THIRTY FIFTH.- FIRST BOOK.-

--IN CIHUATLAN, JALISCO, on April 4TH (FOURTH), 1995 (nineteen ninety five), Before Me ATTORNEY NARCISO P. LOMELI ENRIQUEZ, NOTARY PUBLIC NUMBER ONE OF THIS MUNICIPALITY; appeared BANCO NACIONAL DE MEXICO, SOCIEDAD ANONIMA, FIDUCIARIO GUADALAJARA, Represented by its Special Representatives MR. AGUSTIN GODOY PELAYO AND RAFAEL NUÑEZ MARTINEZ, hereinafter named "THE TRUSTEE"; MR. D. DONALD LONIE JR., through its representative JACKIE LEE HAWKS, as "ASSIGNOR BENEFICIARY" and MR. JERRY LEE ICENHOWER, by himself and as representative of his wife MRS. DONNA LEE ICENHOWER, who will be, "ASSIGNEE BENEFICIARIES" to execute an ASSIGNMENT OF BENEFICIARY RIGHTS AGREEMENT in accordance to the following Background and Clauses:

## BACKGROUND

I.-As per Public Deed numbers 3997, 3998, 3999, 4000, 4001 and 4002, all of them dated March 5 (fifth) 1989, (nineteen eighty nine) granted before the undersigned, Notary Public Number of this Municipality six different Trust agreements were executed, wherein the parties were the following:

---THE TRUSTOR: EUGENIO KOCHERGA GUMMESSON.

---BENEFICIARIES: DOUGLAS HENSON, BETTY GRACE BELL, BARBARA SCHAFFER, JAMES F. WIDENER III, STEPHANIE HENDRIE AND KAREN HENSON respectively, and the

---TRUSTEE: BANCO NACIONAL DE MEXICO, SOCIEDAD ANONIMA.

---The asset subject matter of the Trust was the property named "VISTA HERMOSA", located in Chamela, Municipality of La Huerta; Jalisco, which has an approximate surface extension of: 22,500 TWENTY TWO THOUSAND FIVE HUNDRED SQUARE METERS, and which was formed by 6 different fractions put into a trust which today they form only one lot of land, and the constructions built on it, with the following metes and

D000694          1

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
autorizada por el Supremo Tribunal
de Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120-07-688

D000695

bounds: From Vertex 2 (two) of this Property "La Burra" exactly corresponding with vertex "2" of "Tambora" and five hundred eighty four meters twenty centimeters from the boundary between both lots that is heading south forty four degrees West, mark "1" is located on the edge of the hill "La Burra". From this mark two hundred and ninety five meters to the North-West heading North, forty one degrees, zero minutes two seconds West, and over the second shoulder of the hill of "La Burra", mark "2" is located of the drawing, mark South-East of the property "Vista Hermosa" to which reference is made of Mr. Jorge Quiroz Huacuja that borders in one hundred and fifty meters with the property of Mrs. Emma Quiroz de Urquiza, boundary that continues the same line and direction of mark "1" of reference.-(north forty one degrees, zero minutes, twenty seconds West).- Arriving at Vertex "3" of this property "Vista Hermosa".-From this vertex "3" to vertex "4" that goes to the bay, heading South forty eight minutes, fifty eight minutes West and a length of one hundred and fifty meters. From vertex "4" to "5"there is a distance of one hundred and fifty meters and the boundary is headed South, forty one degrees, zero minutes two seconds East.-From vertex "5", to Vertex "2" or departure point of the polygon that forms this property, there is a distance of one hundred and fifty meters heading North, forty eight degrees, fifty eight minutes East. All of the internal angles of this polygon are of ninety degrees and borders with the property described as "Vista Hermosa" by all of its winds with the Property of Mrs. Emma Quiroz de Urquiza, as per drawing signed by the parties.

----the previously mentioned titles were registered before the Public Registry of Property of Autlan, Jalisco, in the following manner:

Deed Number 3997, by its incorporation under document number 29 (twenty nine), folios from 172 (one hundred and seventy two) through 183 (one hundred and eighty three), of Book 367 (three hundred and sixty seven), of the First Section

Deed Number 3998, by its incorporation under document number 30 (thirty), folios from 184 (one hundred and eighty four) through 195 (one hundred and ninety five), of Book 367 (three hundred and sixty seven), of the First Section

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
Autorizado por el Supremo Tribunal
de Justicia del Estado de Jalisco,
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120697-688

D000697

Deed Number 3999, by its incorporation under document number 31 (thirty one), folios from 196 (one hundred and ninety six) through 207 (two hundred and seven), of Book 367 (three hundred and sixty seven), of the First Section

Deed Number 4000, by its incorporation under document number 32 (thirty two), folios from 208 (two hundred and eight) through 218 (two hundred and eighteen), of Book 367 (three hundred and sixty seven), of the First Section

Deed Number 4001, by its incorporation under document number 33 (thirty three), folios from 219 (two hundred and nineteen) through 229 (two hundred and twenty nine), of Book 367 (three hundred and sixty seven), of the First Section.

Deed Number 4002, by its incorporation under document number 34 (thirty four), folios from 230 (two hundred and thirty) through 241 (two hundred and forty one), of Book 367 (three hundred and sixty seven), of the First Section

---- As per Public Deed Number 6,906 (six thousand nine hundred and six) dated November 21st, 1992, granted before the undersigned, DOUGLAS HENSON, BETTY GRACE BELL, BARBARA SCHAFFER, JAMES F. WIDENER III, STEPHANIE HENDRIE AND KAREN HENSON, assigned their beneficiary rights to Mr. DONALD LONIE JR.

---MR. D. DONALD LONIE JR., in private document dated December 8th, 1994, issued instructions to BANCO NACIONAL DE MEXICO to intervene in the Assignment of Beneficiary Rights in favor of JERRY LEE ICENHOWER AND DONNA LEE ICENHOWER.-

---The letter succinctly states the following:

---""BANCO NACIONAL DE MEXICO, S.A., DEPARTAMENTO FIDUCIARIO, GUADALAJARA, JAL. REF TRUST #105988-0 I want to refer to the Trust indicated at the heading incorporated with you under Public Deed number 6,908 (six thousand nine hundred and eight) dated November 21st, 1992, granted before ATTORNEY NARCISO P. LOMELI ENRIQUEZ, Notary Public Number 1, of Cihuatlan, Jalisco of

LIC. REBECA CABAÑENA MARROQUIN
PERITO TRADUCTOR
autorizada por el Supremo Tribunal
de Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-SBB

D000699

which the urban property named "VISTA HERMOSA" is the subject matter, located in Chamela, Municipality of La Huerta, Jalisco, with a surface extension of: 22,500 M2, In my capacity of Beneficiary which I have evidenced in the cited Trust, I hereby issue my irrevocable instructions to carry out the ASSIGNMENT OF BENEFICIARY RIGHTS in favor of   JERRY LEE ICENHOWER AND DONNA LEE ICENHOWER, over the property in the trust indicated in the previous background.  The amount of the consideration will be the amount N$ 1,'800,000.00 (ONE   MILLION EIGHT HUNDRED THOUSAND NEW PESOS 00/100 M.N.).- SINCERELY.-CIHUATLAN, JALISCO MARCH 30TH, 1995.- D. DONALD LONIE JR..- AN ILLEGIBLE SIGNATURE"""""…..

---    MR. JERRY LEE ICENHOWER AND DONNA LEE ICENHOWER declare:

a)That they know the Trust Agreement indicated in recitals I and II.

b)That they know the terms and conditions of the Trust referred and agree with its terms.

c)That they know and agree that the rights on the property described is the only subject matter of this Trust, in the terms therein agreed.

---VI.-Banco Nacional de Mexico, Sociedad Anonima, issued to the Undersigned notary a letter dated  on, in which they instruct to carry out  this transaction, a copy of which it is attached to the appendix of my Protocol under the number corresponding to this volume.

Once the previously has been expressed the following clauses are granted.

CLAUSES:

BANCO NACIONAL DE MEXICO, SOCIEDAD ANONIMA, DIVISION FIDUCIARIA, represented as indicated, appointed as "the TRUSTEE" accepts this Assignment and Jackie Lee Wawks, instructions from MR. D. DONALD LONIE JR., with the capacity indicated in the Background, ratified herein, without any responsibility for the "TRUSTEE" itself and based in the Trust Agreement mentioned in the background, ASSIGNS the Beneficiary Rights, over the property named Vista Hermosa, located in Chamela, Municipality of La Huerta, Jalisco, which has an approximate surface extension

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
orizado por el Supremo Tribunal
Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-588

D000701

of: 22,500 TWENTY TWO THOUSAND FIVE HUNDRED SQUARE METERS, in favor of JERRY LEE ICENHOWER AND DONNA LEE ICENHOWER, who will be Assignee Beneficiaries, in regards to the same.

---The Assignee Beneficiaries accepted in this act the Assignment, manifesting that they know the rights and obligations referenced in the previous paragraph.

---CONSIDERATION.-As consequence of the execution of this assignment of rights agreement, the assignee beneficiaries deliver in this act to the assignor beneficiary the amount of N$1'800,000.00 (ONE MILLION EIGHT HUNDRED THOUSAND NEW PESOS, 00/100 NATIONAL CURRENCY).-The Assignor Beneficiary, grants the Assignee Beneficiaries the broadest receipt admitted by the law, additionally, it separates from the trust, except in regards to the obligation established in the third clause of this Agreement.

---The Assignees are subject to the conditions agreed when the trust in reference in this instrument was incorporated, at the same time they acquired jointly the rights and the obligations established for the assignees on it, and they expressly accept the conditions stated in the permit granted by the Ministry of Foreign Affairs and in compliance with the provided in the text of the permit granted by the Secretary itself to affect in trust the property referred by this assignment of rights.

---Addresses:  For all the purposes of this Agreement, the parties indicate as their addresses the following:
---BANCO NACIONAL DE MEXICO, SOCIEDAD ANONIMA, Avenida Primo F. Velazquez  No. 761, First Floor, esq. Lazaro Cardenas, Colonia Jardines de los Arcos, Guadalajara, Jalisco.
----ASSIGNOR BENEFICIARY---74-915 Humminbird Lane Indian Wells California 92210

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
orizado por el Supremo Tribunal
de Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-668

D000703

---ASSIGNEE BENEFICIARIES: P.O. Box 1534, Carlsbad, CA 92018.

---JURISDICTION AND COMPETENCE.- For everything related to the interpretation and compliance of this agreement, the parties submit to the Laws and Tribunals of Mexico City, Federal District, waiving to any other jurisdiction which they might have due to their addresses.

D000704     6

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
rizada por el Supremo Tribunal
de Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120697-688

D000705

----Attorney CARLOS ALBERTO GONZALEZ GONZALEZ, Notary Public Number 1 (one) of this Municipality, in Notary Practice since February 28th (twenty eighth) of the year 1995 (nineteen ninety five), as per the appointment granted by MR. CARLOS RIVERA ACEVES, THEN DEPUTY GOVERNOR OF THE STATE OF JALISCO, STATES:--------------------------------------------------------------------------------------

---That this photocopy is a true reflection of a certified copy before Attorney Narciso F. Lomeli Enriquez, Notary Public number 1 (one) of the town of Cihuatlan, Jalisco, which I saw and I certify the same as per the request of the interested party for the convenient legal purposes .-I Attest-

-—It is issued in 8 (eight) useful sheets on both sides.

---Poncitlan, Jalisco, on the 6 (sixth) day of the month of September of the year 2005 (Two thousand and five).

Illegible Signature

ATTORNEY CARLOS ALBERTO GONZALEZ GONZALEZ

NOTARY PUBLIC NO. 1

Hologram
33594318

A seal that reads:
ATTORNEY CARLOS A. GONZALEZ GONZALEZ
NOTARY PUBLIC NO. 1
United Mexican States
PONCITLAN, JAL.

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
Autorizado por el Supremo Tribunal
Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-688

D000707

An emblem that read:                                             SGG/DC/JAL 1234
United Mexican States

Mexico

Apostille

(Convention de la Haye du 5 octobre 1961)

Fees $125.00

Order No. 1234/2005

In Mexico, this public document has been signed

By MR. CARLOS ALBERTO GONZALEZ GONZALEZ

acting in the capacity of NOTARY PUBLIC NUMBER 1 (ONE) OF PONCITLAN, JALISCO

and bears the corresponding seal of NOTARY NUMBER 1 (ONE), PONCITLAN, JALISCO

Certified in GUADALAJARA, JALISCO    By  MR.  TOMAS  RAMIREZ  CONTRERAS,

CERTIFICATIONS DIRECTOR  OF THE GOVERNMENT OF THE STATE OF JALISCO, on

SEPTEMBER 7TH, 2005.

THIS ENTITY ONLY LEGALIZES THE SIGNATURES EXPRESSLY ACKNOWLEDGED IN

THIS TEXT AND NOT THE CONTENT OF THE DOCUMENT.

Illegible Signature
Signature

D000708          8

TRANSLATOR AUTHORIZED BY THE
SUPREME COURT OF JUSTICE
THE STATE OF JALISCO.
REBECA CAMARENA MARROQUIN
CMR120897-688
The precedent document is a
translation from Spanish into English of an abstract
of public deed number 7,847
September 21st, 2005.

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
Autorizada por el Supremo Tribunal
de Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-688

D000709

EXHIBIT 2

- - - ESCRITURA NUMERO 7847, SIETE MIL OCHOCIENTOS CUARENTA Y SIETE.------------------------------------------

- - - TOMO XXXV, TRIGESIMO QUINTO.- LIBRO 1º PRIMERO.-

- - - EN CIHUATLAN, JALISCO; A los 4 cuatro dias del mes de Abril de 1995, mil novecientos noventa y cinco, Ante Mi, LICENCIADO NARCISO P. LOMELI ENIQUEZ, NOTARIO PUBLICO NUMERO I, UNO DE ESTA MUNICIPALIDAD; Comparecieron por una parte BANCO NACIONAL DE MEXICO, SOCIEDAD ANONIMA, FIDUCIARIO GUADALAJARA, Representado por sus Apoderados Especiales señores LICENCIADO AGUSTIN GODOY PELAYO Y RAFAEL NUÑEZ MARTINEZ, a quienes se les denominará como "EL FIDUCIARIO"; el señor D. DONALD LONIE Jr., por conducto de su Apoderado JACKIE LEE HAWKS, como "FIDEICOMISARIO CEDENTE"; y por otra parte el señor JERRY LEE ICENHOWER, por Sí y como Apoderado de su esposa la señora DONNA LEE ICENHOWER, quienes serán, "FIDEICOMISARIOS CESIONARIOS", a efecto de celebrar UN CONTRATO DE CESION DE DERECHOS FIDEICOMISARIOS, al tenor de los siguientes Antecedentes y Cláusulas:----

- - - - - - - - - A N T E C E D E N T E S: - - - - - - -

- - - 1.- Por Escrituras Públicas Números 3997, 3998, 3999, 4000, 4001 y 4002, todas de fecha 5 cinco de marzo de 1989, mil novecientos ochenta y nueve, otorgadas ante la Fé del Suscrito, Notario Público Número de ésta Municipalidad, se celebraron seis diversos contratos de Fideicomiso en los que fué:----

- - - FIDEICOMITENTE: EUGENIO KOCHERGA GUMMESSON.-----

- - - - FIDEICOMISARIOS: DOUGLAS HENSON, BETTY GRACE BELL, BARBARA SCHAFFER, JAMES F. WIDENER III, STEPHANIE HENDRIE Y KAREN HENSON, respectivamente, y-

- - - FIDUCIARIO: BANCO NACIONAL DE MEXICO, SOCIEDAD ANONIMA.------------------------------------------

- - - El bien materia del Fideicomiso fue la finca denominada "VISTA HERMOSA", ubicada en Chamela, Municipio de la Huerta, Jalisco, que tiene una

D000710

extensión superficial aproximada de: 22,500.00 VEINTIDOS MIL QUINIENTOS METROS CUADRADOS, y que se formó de 6 seis diversas fracciones fideicomitidas que hoy son un solo paño, y las construcciones en ella edificadas, con las medidas y linderos siguientes: A partir del vértice 2 dos de éste Predio "La Burra" correspondiente exactamente con el vértice "2" de "Tambora" y a quinientos ochenta y cuatro metros veinte centímetros del lindero entre ambos lotes es decir con rumbo sur cuarenta y cuatro grados Oeste, se encuentra sobre el filo del cerro "La Burra" la mojonera "1". De ésta mojonera a doscientos noventa y cinco metros al Nor-Oeste y rumbo al Norte, cuarenta y un grados cero minutos dos segundos Oeste, y sobre el segundo hombro del cerro de "La Burra", se localiza la mojonera "2" del plano, mojonera Sur-Este del predio "Vista Hermosa" al que se hace referencia del señor Jorge Quiroz Huacuja que colinda en ciento cincuenta metros con el predio de la señora Emma Quiroz de Urquiza, lindero que continua la misma linea y dirección de la mojonera "1" de referencia.- (Norte cuarenta y un grados, cero minutos, veinte segundos Oeste).- Llegando al vértice "3" de éste predio "Vista Hermosa".- De éste vértice "3" al vértice "4" que va a la bahía, tiene un rumbo de Sur, cuarenta y ocho grados, cincuenta y ocho minutos Oeste y una longitud de ciento cincuenta metros.- Del vértice "4" al "5" hay una distancia de ciento cincuenta metros y el lindero tiene un rumbo de Sur, cuarenta y un Grados cero minutos dos segundos Este.- Del vértice "5", al vértice "2", o punto de partida del polígono que forma éste predio, hay una distancia de ciento cincuenta metros con rumbo Norte cuarenta y ocho grados cincuenta y ocho minutos Este. Todos los ángulos internos de éste polígono son de noventa grados y colinda el predio que se

D000711

describe "Vista Hermosa", por todos sus vientos con el Predio de la señora Emma Quiroz de Urquiza, según plano que firman las partes.--------------------------

- - - Los títulos antes citados quedaron inscritos en el Registro Público de la Propiedad de Autlán, Jalisco, de la siguiente manera:--------------------

- - - La Escritura Número 3997, mediante su incorporación bajo documento número 29 veintinueve, folios del 172 ciento setenta y dos al 183 ciento ochenta y tres, del Libro 367, trescientos sesenta y siete, de la Sección Primera.--------------------------

- - La Escritura Número 3998, mediante su incorporación bajo documento número 30 treinta, folios del 184 ciento ochenta y cuatro al 195 ciento noventa y cinco, del Libro 367, trescientos sesenta y siete, de la Sección Primera.--------------------------

- - - La Escritura Número 3999, mediante su incorporación bajo documento número 31 treinta, folios del 196 ciento noventa y seis, al 207 doscientos siete, del Libro 367, trescientos sesenta y siete, de la Sección Primera.--------------------------

- - - La Escritura Número 4000, mediante su incorporación bajo documento número 32 treinta, folios del 208 doscientos ocho, al 218 doscientos dieciocho, del Libro 367, trescientos sesenta y siete, de la Sección Primera.--------------------------

- - - La Escritura Número 4001, mediante su incorporación bajo documento número 33 treinta, folios del 219 doscientos diecinueve, al 229 doscientos veintinueve, del Libro 367, trescientos sesenta y siete, de la Sección Primera.--------------------

- - La Escritura Número 4002, mediante su incorporación bajo documento número 34 treinta, folios del 230 doscientos treinta, al 241 doscientos cuarenta y uno, del Libro 367, trescientos sesenta y

siete, de la Sección Primera.-----------------------

- - - II.- Por Escritura Pública Número 6,906 seis mil novecientos seis, de fecha 21 veintiuno de noviembre de 1992, mil novecientos noventa y dos, pasada ante la fé del Suscrito, los señores DOUGLAS HENSON, BETTY GRACE BELL, BARBARA SCHAFFER, JAMES F. WIDENER III, STEPHANIE HENDRIE Y KAREN HENSON, Cedieron los derechos Fideicomisarios que les correspondían al señor D. DONALD LONIE Jr.-----------------------

- - - III.- El Señor D. DONALD LONIE Jr., en documento privado de fecha 8 ocho de diciembre de 1994, giró instrucciones al Banco Nacional de México, para que interviniera en la Cesión de Derechos Fideicomisarios a favor de los señores JERRY LEE ICENHOWER y DONNA LEE ICENHOWER.-----------------------

- - - La Carta suscintamente dice:-----------------------

- - - ....""""BANCO   NACIONAL   DE   MEXICO,   S.A., DEPARTAMENTO   FIDUCIARIO,   GUADALAJARA,   JAL.   REF: FIDEICOMISO #105988-0. Deseo referirme al Fideicomiso señalado al rubro constituido con Ustedes mediante Escritura   Pública   Número   6,908,   de   fecha   21   de noviembre de 1992, pasada ante la Fé del LICENCIADO NARCISO F. LOMELI ENRIQUEZ, Notario Público Número de Cihuatlán, Jalisco, del que es materia el Inmueble Urbano denominado "VISTA HERMOSA", ubicado en Chamela, Municipio de La Huerta, Jalisco, con una extensión superficial de: 22,500.00 M2,.- En mi carácter de Fideicomisario   que   tengo   acreditado   en   el   citado Fideicomiso,   con   la   presente   les   extiendo   mis instrucciones irrevocables para que se lleve a cabo la CESION DE DERECHOS FIDEICOMISARIOS en favor de los señores JERRY LEE ICENHOWER Y DONNA LEE ICENHOWER, sobre   el   patrimonio   Fideicomitido   señalado   en   el párrafo   que   antecede." El   importe   de   la contraprestación será la cantidad N$ 1'800,000.00 UN MILLON OCHOCIENTOS MIL NUEVOS PESOS 00/100 M.N.-

D000713

ATENTAMENTE.- Cihuatlán, Jalisco, Marzo 30 de 1995.-

D. DONALD LONIE Jr.- Una firma Ilegible"""""...,.----

- - - V.- Declaran los señores JERRY LEE ICENHOWER Y

DONNA LEE ICENHOWER:------------------------------------

- - - a).- Que conocen el Contrato de Fideicomiso

señalado en las declaraciones I y II.-------------------

- - - b).- Que conocen los terminos y condiciones del

Fideicomiso aludido y estan de acuerdo en sus

terminos.---------------------------------------------

- - c).- Que saben y estan de acuerdo en que solo

son materia de este Fideicomiso los derechos sobre el

inmueble descrito, en los terminos ahi pactados.----

- - - VI.- Banco Nacional de Mexico, Sociedad Anónima,

dirigió al Suscrito Notario carta fechada el día

                              en la que le instruye

para realizar la presente operación, un tanto de la

cual se anexa al apendice de mi Protocolo bajo el

numero que corresponde a este tomo.-------------------

- - - Expuesto lo anterior se otorgan las

siguientes:--------------------------------------------

- - - - - - - - C L A U S U L A S : - - - - - - -

- - - PRIMERA.- BANCO NACIONAL DE MEXICO, SOCIEDAD

ANONIMA, DIVISION FIDUCIARIA, representado como ha

quedado dicho, designado como "EL FIDUCIARIO", acepta

la presente Cesión y JACKIE LEE WANKS,

instrucciones del señor D. DONALD LONIE Jr., con el

carácter señalado en Antecedentes, que aquí ratifica,

sin ninguna responsabilidad para el propio

"FIDUCIARIO" y con base en el Contrato de Fideicomiso

relacionado en los antecedentes, C E D E los derechos

Fideicomisarios, sobre la finca denominada Vista

Hermosa, ubicado en Chamela, Municipio de la Huerta,

Jalisco, que tiene una extensión superficial

aproximada de: 22,500.00 VEINTIDOS MIL QUINIENTOS

METROS CUADRADOS, en favor de los señores JERRY LEE

ICENHOWER Y DONNA LEE ICENHOWER, quienes tendrán el

D000714

carácter de Fideicomisarios Cesionarios, respecto del mismo.------------------------------------------------

- - - Los Fideicomisarios Cesionarios aceptan en este acto la Cesión, manifestando que conocen los derechos y obligaciones a los que se ha hecho referencia en el párrafo anterior.--------------------------------------

- - - SEGUNDA.- CONTRAPRESTACION.- Como consecuencia de la celebración del presente contrato de cesión de derechos, los fideicomisarios cesionarios entregan en este acto a la fideicomisaria cedente la cantidad de N$ 1'800,000.00 UN MILLON OCHOCIENTOS MIL NUEVOS PESOS 00/100 MONEDA NACIONAL.- El Fideicomisario Cedente, otorga a los Fideicomisarios Cesionarios el finiquito más amplio que en derecho corresponda, asimismo, se desliga del fideicomiso, excepto por lo que se refiere a la obligación establecida en cláusula tercera de este Contrato.--------------------------------------

- - - TERCERA.- Los Cesionarios quedan sujetos a las condiciones que se pactaron al constituirse el fideicomiso a que se hace referencia en las Declaraciones de este instrumento, al mismo tiempo adquieren solidariamente los derechos y contraen todas las obligaciones que para los cesionarios establecen en el, y aceptan expresamente las condiciones asentadas el permiso concedido por la Secretaría de Relaciones Exteriores y en cumplimiento a lo dispuesto en el texto del permiso concedido por la Propia Secretaría para afectar en fideicomiso el inmueble a que esta cesión de derechos se refiere, se transcriben integramente las condiciones 6 seis, 7 siete, 8 ocho y 9 nueve, que en el mismo se detallan:-

- - -"""""....6.- En caso de que se viole cualquiera de las condiciones de que éste permiso establece, el Fiduciario procederá a petición de la Secretaría de Relaciones Exteriores a cancelar y liquidar el

D000715

Fideicomiso de un plazo de 180 días.- 7.- En cada caso de Cesión de Derechos personales de uso y aprovechamiento sobre el inmueble materia del Fideicomiso, la Fiduciaria, previo el registro de cada Cesión, deberá notificar en un término no mayor de 30 treinta días a la Secretaría de Relaciones Exteriores, el nombre, nacionalidad y domicilio del nuevo Fideicomisario. 8.- El contrato de Fideicomiso deberá inscribirse en el Registro Nacional de Inversiones Extranjeras, en los términos del Artículo 23 fracción III de la Ley para Promover la Inversión Mexicana y Regular la Inversión Extranjera y de acuerdo con el Título Octavo, Capítulo IV, de su Reglamento. 9.- Todo extranjero que en el momento de la constitución del fideicomiso o en cualquier tiempo ulterior, adquiera un derecho derivado de éste, acepta por ése mismo hecho, en considerarse como nacional respecto de dichos derechos y en que no invocará la protección de su Gobierno, bajo la pena en caso de faltar a su convenio, de perder en beneficio de la Nación Mexicana los derechos que hubiere adquirido"".------------------
- - Doy fé que el anterior inserto concuerda fielmente con su original que tuve a la vista.--------
- - - CUARTA.- SANEAMIENTO PARA EL CASO DE EVICCION.- El Fideicomisario Cedente está obligada a responder del saneamiento para el caso de evicción en los términos de Ley respecto del inmueble objeto del fideicomiso, responsabilidad que asume ante el propio fiduciario, facultándolo para obligarle en dichos términos ante la persona a quien transmita la propiedad o los derechos respecto de ese bien.--------
- - - QUINTA.- DERECHOS Y OBLIGACIONES DE LOS FIDEICOMISARIOS CESIONARIOS.- Son objeto de la presente cesión, los derechos y obligaciones derivadas del contrato de fideicomiso que ha quedado relacionado

D000716

en los antecedentes de esta escritura, respecto del inmueble que allí se precisa y que aquí se tienen por reproducidos como si se insertasen a la letra, siendo los principales los siguientes:------------------------

- - - 1.- Usar el inmueble durante la vigencia del fideicomiso, sin concederle derechos reales sobre el mismo, haciendo posible la facultad del Gobierno Federal de verificar en cualquier tiempo, durante la vigencia del fideicomiso, que se dé cumplimiento a los fines del fideicomiso, que fundamentalmente consiste en destinar el inmueble fideicomitido a casa habitación con fines turísticos, de acuerdo con el permiso otorgado por la Secretaría de Relaciones Exteriores.----------------------------------------

- - - 2.- En caso de que se violen las finalidades antes mencionadas, el Gobierno Federal, por conducto de la Secretaría citada en el inciso anterior, podrá ordenar al fiduciario la cancelación del fideicomiso y la venta del inmueble fideicomitido, la cual deberá realizar dentro del término que para tal efecto señale dicha entidad.---------------------------------------

- - - 3.- Realizar en el inmueble toda clase de construcciones, obras y mejoras, siempre y cuando se ajusten al reglamento de construcciones establecidas para la región donde se encuentre ubicado el inmueble, previa solicitud y obtención ante las autoridades competentes de las licencias y permisos que en su caso se requieran, para lo cual realizará los trámites y efectuará los pagos que sean necesarios para dicho fin, mismos que serán por su cuenta y bajo su responsabilidad, en este caso dichas construcciones quedarán afectas al fideicomiso.----------------------

- - - 4.- El Fideicomisario Cesionario deberá informar al fiduciario del inicio de las obras de construcción o de mejoras al inmueble, así como de la terminación de las mismas, precisando su valor, a fin de que

D000717

proceda a la actualización de sus registros contables, para lo cual deberá proporcionar al fiduciario la documentación que éste le requiera.---------------------

- - - 5.- Celebrar con la persona o personas que por escrito le indique al Fiduciario, los contratos de arrendamiento el respecto del bien inmueble afecto en fideicomiso, por plazos no superiores a 10 diez años, previas instrucciones que por escrito reciba del fideicomisario cesionario, quien tendrá derecho a percibir las rentas derivadas de dicho contrato de arrendamiento, debiendo pagar por éste concepto los impuestos correspondientes.---------------------------

- - - 6.- Ceder sus derechos de Fideicomisario Cesionario de uso y aprovechamiento respecto del bien inmueble afecto en fideicomiso, que adquiere por medio de este contrato, previas instrucciones que por escrito reciba al fiduciario, conforme a lo que más adelante se señala, pactando libremente la contraprestación que deberá recibir por la cesión.-----

- - - 7.- Transmitir a la persona o personas que el fideicomisario cesionario le indique por escrito, la propiedad del inmueble fideicomitido, siempre que conforme a las Leyes mexicanas, tengan capacidad jurídica para adquirirlo.--------------------------

- - - 8.- Instruir al fiduciario seis meses antes del vencimiento del término del permiso otorgado por la Secretaría de Relaciones Exteriores, para la constitución del fideicomiso, o de su prórroga, para que se efectúe la transmisión de propiedad del inmueble a favor de la persona física o moral con capacidad legal para adquirirla, de acuerdo con las Leyes Mexicanas.-----------------------------------

- - - 9.- Tendrá los demás derechos y obligaciones que se deriven del contrato de fideicomiso referido en los antecedentes de esta escritura.------------------------

- - - SEXTA.- CESION DE DERECHOS.- Para que los Fideicomisarios Cesionarios puedan ceder sus derechos

D000718

y obligaciones, se requerirá:--------------------

- - - 1.- La previa aprobación del fiduciario respecto del proyecto del contrato respectivo.-----------------

- - - 2.- El consentimiento expreso y escrito del fiduciario en la operación definitiva de cesión de derechos, la cual se celebrará ante Notario Público.--

- - - 3.- Cumplir con los requisitos para las cesiones de derechos que establece el permiso otorgado por la Secretaría de Relaciones Exteriores que ha quedado relacionado en los antecedentes de este contrato.-----

- - - 4.- Que se paguen los impuestos federales y locales que origine la cesión de derechos, y que se compruebe al fiduciario que éstos se enteraron oportunamente a las autoridades correspondientes; de no cumplirse con lo anterior, quienes contraten como cesionarios quedarán solidariamente a su pago.--------

- - - 5.- Que a la fecha en que pretenda celebrar la cesión de derechos de fideicomisario, las comisiones que le corresponden al fiduciario y que sean a cargo del cedente, estén totalmente pagadas.-----------------

- - - 6.- Si la cesión de derechos se efectúa en el extranjero, en el documento correspondiente deberán consignarse las firmas del cedente y del cesionario y estar autentificadas por un fedatario público y por el Cónsul Mexicano que corresponda a la Jurisdicción del lugar donde se celebre el contrato.-------------------

- - - SEPTIMA.- OBLIGACIONES FISCALES.- El Fiduciario no se encuentra obligado al pago de las contribuciones fiscales que graviten sobre el inmueble fideicomitido, ya que todos los impuestos, derechos, multas, recargos y demás erogaciones que causen los mismos o que sean consecuencia del fideicomiso, serán a cargo de los fideicomisarios cesionarios, quienes están obligados a cubrirlos y a informar al fiduciario de los pagos que realicen por tales conceptos.-------------------------

D000719

- - - Todos los gastos, impuestos y honorarios que se causen con motivo de esta escritura serán por cuenta de los fideicomisarios cesionarios, así como de los gastos que se ocasionen por el registro del presente contrato en el Registro Nacional de Inversiones Extranjeras.-------------------------------------------

- - - OCTAVA.- COMISIONES.- Por su intervención en este contrato de Cesión de derechos, los fideicomisarios cesionarios pagarán al fiduciario las siguientes comisiones:---------------------------------

- - - 1.- Por el estudio y la elaboración del contrato, la cantidad de N$ 3,000.00 TRES MIL NUEVOS PESOS 00/100 MONEDA NACIONAL pagaderos a la firma de esta escritura.----------------------------------------

- - - 2.- Por el manejo del fideicomiso pagará el 0.6% (cero punto seis por ciento) anual calculado sobre el valor del patrimonio en fideicomiso, calculado sobre el avalúo o sobre la contraprestación, lo que sea más alto, dicha comisión deberá de ser pagada por semestre o fracción adelantada, y nunca deberá ser inferior a cantidad de N$ 1,500.00 (MIL QUINIENTOS NUEVOS PESOS 00/100 MONEDA NACIONAL) anuales.------------------

- - - 3.- Por cada cesión de derechos que efectúe el fideicomisario cesionario, la cantidad que se este cobrando a esa fecha por el fiduciario.---------------

- - - 4.- Cuando el fiduciario deba transmitir el inmueble fideicomitido, cobrará la cantidad que tenga establecida a esa fecha por cada carta de instrucción que remita al Notario, teniendo éstas una vigencia de 60 sesenta días contados a partir de su expedición.---

- - - Si al vencer el plazo mencionado en el párrafo anterior, aún no se ha otorgado la escritura, será necesario que la fideicomisaria le solicite al fiduciario la elaboración de nuevas instrucciones, en este último caso, el fideicomisario cesionario deberá pagar al fiduciario el 50% (cincuenta por ciento de la cantidad establecida, por cada instrucción adicional

D000720

que le solicite.----------------------------------------

- - - 5.- Cuando el fiduciario deba otorgar algún poder a la persona o personas que el fideicomisario cesionario le indique por escrito, para la defensa del fondo o la realización de algún trámite relacionado con el fideicomiso, cobrará la cantidad que este cobrando a esa fecha el fiduciario, más los gastos notariales que se originen.---------------------------

- - - 6.- Cuando el fiduciario remita instrucciones escritas al Notario solicitando se haga constar en escritura pública alguna modificación al contrato, de las permitidas por el permiso otorgado por la Secretaría de Relaciones Exteriores, cobrará la cantidad que tenga establecida a esa fecha el fiduciario.----------------------------------------

- - - 7.- Cuando el fiduciario a petición del fideicomisario cesionario realice servicios no previstos en este contrato, cobrará los gastos que los mismos originen.- Las comisiones del fiduciario causan el impuesto al valor agregado.---------------------

- - NOVENA.- ACTUALIZACION DE COMISIONES.- Las comisiones del fiduciario se actualizarán anualmente, dándosele a conocer por escrito a los fideicomisarios cesionarios el resultado respectivo para los futuros pagos de comisiones.----------------------------------

- - DECIMA.- DEL NO PAGO DE COMISIONES.- Si los Fideicomisarios Cesionarios no pagan al fiduciario las comisiones que les corresponden en la forma señalada, deberán pagarle una comisión adicional por concepto de mora, agregando mensualmente a la comisión no pagada, el importe del costo porcentual promedio de captación (C.P.P.), que fije el Banco de México, más 10 (diez) puntos, más el 50% (cincuenta por ciento) del total que resulte de esa suma; así mismo, el Fiduciario tendrá derecho a cobrar los gastos de la cobranza

D000721

extrajudicial.- Para calcular el importe de la mora, el fiduciario tomará mes a mes el C.P.P. que corresponda.------------------------------------------

- - - Cuando el Banco de México no proporcione el C.P.P. mensual, el fiduciario fijará la tasa moratoria que deba aplicarse. Si los Fideicomisarios Cesionarios no estuviese de acuerdo con dicha tasa, el fideicomiso se dará por terminado, sin menoscabo de las acciones legales que el fiduciario pueda iniciar para el cobro de las comisiones que le correspondan, más la tasa moratoria aplicable, que se fijará según el último C.P.P. dado a conocer por el Banco de México.----------

- - - El fiduciario podrá renunciar a su cargo si las comisiones a que tiene derecho no le fueren pagadas oportunamente, sin detrimento de las acciones legales que le correspondan para cobrarlas.--------------------

- - - DECIMA PRIMERA.- DE LA DEFENSA DEL PATRIMONIO EN FIDEICOMISO.- Los Fideicomisarios Cesionarios y en su caso el fideicomisario sustituto, tienen el deber de informar al fiduciario de cualquier situación que pudiera afectar al patrimonio en fideicomiso.- Asi mismo están obligados a designar a una persona que se encargue de ejercitar las acciones que sean necesarias para la defensa del patrimonio en fideicomiso, en este caso, el fiduciario atendiendo a las instrucciones que por escrito reciba de los fideicomisarios cesionarios o del sustituto, otorgará el poder que en derecho proceda y les proporcionará los documentos que al efecto requieran.- En caso de urgencia, siempre y cuando el fiduciario cuente con los documentos necesarios y la provisión de fondos correspondiente, llevará a cabo los actos indispensables para la conservación del patrimonio fideicomitido, sin perjuicio de la facultad que tienen los fideicomisarios de nombrar el apoderado a que se refiere el párrafo anterior.----------------------------

D000722

- - - DECIMA SEBUNDA.- DOMICILIOS: Para todos los efectos de este contrato, las partes señalan como sus domicilios los siguientes:--------------------------------

- - - BANCO NACIONAL DE MEXICO, SOCIEDAD ANONIMA, Avenida Primo F. Velázquez número 761, planta baja, esquina con Lázaro Cárdenas, Colonia Jardines de los Arcos, en Guadalajara, Jalisco.--------------------

- - - FIDEICOMISARIO CEDENTE: 74-915 Hummingbird Lane Indian Wells California 92210.--------------------------

- - - LOS FIDEICOMISARIOS CESIONARIOS: P.O. BOX 1534, CARLSBAD, CA. 92018.-----------------------------------

- - - Los Fideicomisarios Cesionarios y en su caso el fideicomisario sustituto, deberán notificar al fiduciario cualquier cambio de domicilio que tuviere o llegare a tener en el futuro, y en caso de no hacerlo, los avisos que le haga el fiduciario al último domicilio indicado, surtirán plenamente sus efectos y lo librerarán de toda responsabilidad.--------------

- - - DECIMA TERCERA.- JURISDICCION Y COMPETENCIA: Para todo lo relativo a la interpretación y cumplimiento de este contrato, las partes se someten a las Leyes y Tribunales de la Ciudad de México, Distrito Federal, renunciando a cualquier otro fuero que por razones de domicilio o vecindad tuvieren o llegaren a tener en lo futuro.----------------------

- - - - - - - P E R S O N A L I D A D : - - - - - -

- - - Banco Nacional de México, es actualmente Sociedad Anónima, cuyo objeto es entre otros, la realización de todas las operaciones de Banca Múltiple a que se refiere la Ley General de Instituciones de Crédito y Organizaciones Auxiliares en sus modalidades es una Sociedad regulada conforme a la Ley Reglamentaria del Servicio Público de Banca y Crédito publicado en el Diario Oficial de la Federación de fecha 18 dieciocho de Julio de 1990, mil novecientos noventa, y por el decreto de transformación del Banco

D000723

Nacional de México, Sociedad Anónima en Banco Nacional
de México, Sociedad Nacional de Crédito, hoy Anónima
de nuevo, de fecha 16 dieciséis de Agosto de 1991, mil
novecientos noventa y uno.------------------------------

- - - Los Apoderados Especiales del Banco Nacional de
México, Sociedad Anónima, Licenciados AGUSTIN GODOY
PELAYO Y RAFAEL NUÑEZ MARTINEZ, me acreditan el
carácter que ostentan con el mandato que le fué
otorgado y hasta la fecha sigue en regla, pues no les
han sido revocados ni modificados en forma alguna; el
primero con la Escritura Pública Número 112,355 ciento
doce mil trescientos cincuenta y cinco, suscrita el
día 18 dieciocho de Mayo de 1992, mil novecientos
noventa y dos, en la Ciudad de México, Distrito
Federal,    ante    la    Fé    del    Licenciado
ALEJANDRO SOBERON ALONSO, Notario Público número 68,
sesenta y ocho, y el segundo con el Testimonio de la
Escritura Pública Número 41,967 cuarenta y un mil
novecientos sesenta y siete, del 3 tres de febrero de
1994, mil novecientos noventa y cuatro, otorgada ante
la Fé del Licenciado BENITO IVAN GUERRA SILLA, Notario
Público Número 7, de México, D. F., un tanto de cada
uno obra anexado al Apéndice del Protocolo a mi cargo,
bajo el número que corresponde a éste Tomo, Libro y
Escritura.-----------------------------------------------

- - - El señor JACKIE LEE HAWKS, me acreditó las
facultades que ostenta, con el poder especial que le
fué otorgado ante la Notaria THERESA M. YUCHASZ, del
Condado de Riverside, County, California, el cual fué
debidamente legalizado ante el Cónsul Mexicano en San
Bernardino, California, COLUMBA M. CALVO VARGAS, de
fecha 3 de Abril del año en curso.------------------------

- - - El señor JERRY LEE ICENHOWER, me acredita las
facultades que ostenta, con el poder que le fué
conferido por su esposa, ante el Notario D.S.
SHATTUCK, de San Diego, California, y que fué

D000724

debidamente legalizado ante el Cónsul de México, en ésa Ciudad BEATRIZ LOPEZ, de fecha 31 treinta y uno de marzo del año en curso, un tanto de éstos documentos se anexan al apéndice de mi Protocolo bajo el número que corresponde a éste Tomo, Libro y Escritura.--------

- - - Que los insertos que anteceden, concuerdan fielmente con sus originales como lo Certifico.-------

- - - EL SUSCRITO NOTARIO CERTIFICA Y DA FE.----------

- - - a).- Que conozco a los comparecientes, a quienes conceptúo con capacidad legal para contratar y obligarse, y por sus generales manifestaron ser:------

- - b).- Los Señores Licenciados AGUSTIN GODINEZ PELAYO Y RAFAEL NUÑEZ MARTINEZ, mexicanos, funcionarios bancarios, solteros, el originario de Autlán, Jalisco, nació el 15 quince de diciembre de 1960.- El Segundo originario de México, Distrito Federal, nació el 17 de Enero de 1970, mil novecientos setenta, ambos con domicilio en Avenida Primo F. Velázquez número 761 setecientos sesenta y uno, planta baja, esquina con Lázaro Cárdenas, Colonia Jardines de Los Arcos, en Guadalajara, Jalisco.--------

- - - El señor JACKIE LEE HAWKS, es; Norteaméricano, casado, mayor de edad, con legal estancia en el País, según documento migratorio número FM 354622.----------

- - - Los señores JERRY LEE Y DONNA LEE ICENHOWER, son; norteamericanoss, mayores de edad, el caballero con legal estancia en el País según Documento Migratorio Número FM 256825 Y 26.---------------------

- - - Que leí la presente escritura a las partes, y les advertí de su alcance, consecuencias legales y de la necesidad de su registro, se mostraron conformes con la misma, la ratificaron y firmaron en unión del Suscrito Notario, a las 12.30 doce horas con treinta minutos del día 4 cuatro de Mayo de 1995, mil novecientos noventa y cinco.- DOY FE.--------------------

D000725

--- El Ciudadano Licenciado CARLOS ALBERTO GONZÁLEZ GONZÁLEZ, Notario

Público Titular número 1 uno de esta municipalidad, en ejercicio Notarial desde el

día 28 veintiocho de febrero del año 1995 mil novecientos noventa y cinco, por

la designación que me otorga el señor Licenciado CARLOS RIVERA ACEVES,

ENTONCES GOBERNADOR SUSTITUTO DEL ESTADO DE JALISCO, *C E R T I F I C O*:-

--- Que la presente copia fotostática es trasunto fiel de copia certificada ante la

fe del señor Licenciado Narciso F. Lomelí Enríquez, Notario Público número 1 uno

de la población de Cihuatlán, Jalisco, misma que tuve a la vista y la certifico a

solicitud del interesado para los fines legales que le convenga.- Doy fe.-------------

-- Se expide en 8 ocho hojas útiles por ambos lados. -------------------------------

--- Poncitlán, Jalisco, a los 6 seis días del mes de septiembre del año 2005 dos

mil cinco.-------------




LIC. CARLOS ALBERTO GONZALEZ GONZALEZ.

NOTARIO PUBLICO TITULAR No. 1

SGG/DC/JAL    1234



# México

### Apostille
### (Convention de la Haye du 5 octobre 1961)

| Derechos | $ 125.00 |
|---|---|
| No. orden | 1234/2005 |

En México si presente documento público ha sido firmado

por LICENCIADO  CARLOS ALBERTO GONZALEZ GONZALEZ

quien actúa en calidad de NOTARIO PUBLICO NUMERO 1 ( UNO) DE

PONCITLAN, JALISCO

está revestido del sello correspondiente a LA NOTARIA NUMERO 1(UNO)

PONCITLAN, JAL.

certificado en GUADALAJARA, JALISCO    por EL LICENCIADO

CONTRERAS RAMIREZ CONTRERAS, DIRECTOR DE CERTIFICACIONES DEL

GOBIERNO DEL ESTADO DE JALISCO el 07 de SEPTIEMBRE de 2005

ESTA DEPENDENCIA SOLAMENTE LEGALIZA LAS FIRMAS EXPRESAMENTE

RECONOCIDAS EN EL PRESENTE TEXTO Y NO EL CONTENIDO DEL DOCUMENTO.

Firma

D000726

CANCELADO

CANCELADO

D000727

EXHIBIT 3

Lic. Rebeca Camarena Marroquín
PERITO TRADUCTOR INGLES-ESPAÑOL
AUTORIZADO POR EL SUPREMO TRIBUNAL
DE JUSTICIA DEL ESTADO DE JALISCO
Y EL H. AYUNTAMIENTO DE GUADALAJARA.

TEL./FAX: 3532-8198
E-mail: translat@cybercable.net.mx
        transevr@cybercable.net.mx

D000602

PUBLIC DEED NUMBER 11,778 ELEVEN THOUSAND SEVEN HUNDRED AND SEVENTY EIGHT

VOLUME XXXX FORTIETH.-

FIFTH BOOK

IN CIHUATLAN, JALISCO, On May 10th, 2002 (Two thousand and two), before me, ATTORNEY NARCISO P. LOMELI ENRIQUEZ NOTARY PUBLIC NUMBER 1, OF THIS MUNICIPALITY: appeared BANCO NACIONAL DE MEXICO, SOCIEDAD ANONIMA, DEPARTAMENTO FIDUCIARIO, represented in this act by RAFAEL NUÑEZ MARTINEZ AND JOSE GUADALUPE NANDE RODRIGUEZ (hereinafter the TRUSTEE) and by Mr. JERRY LEE ICENHOWER, by himself and as representative of his wife Mrs. DONNA LEE ICENHOWER (hereinafter the ASSIGNOR BENEFICIARIES), and the Company "HOWELL & GARDNER INVESTORS INC." represented by its Representative Mr. PETER R.J. THOMPSON, (hereinafter defined the ASSIGNEE BENEFICIARY) to execute a ASSIGNMENT OF BENEFICIARY RIGHTS AGREEMENT, in accordance with the following Background and Clauses:

## BACKGROUND

I.-BANCO NACIONAL DE MEXICO, SOCIEDAD ANONIMA, DEPARTAMENTO FIDUCIARIO states that: By Public Deed Numbers 3997, 3998, 3999, 4000, 4001, 4002 all of them dated March 5th, 1989, granted before the Undersigned Notary Public of this Municipality, six different Trust Agreements were executed wherein:

---THE TRUSTOR: EUGENIO KOCHERGA GUMMESSON.

---BENEFICIARIES: DOUGLAS HENSON, BETTY GRACE BELL, BARBARA SCHAFFER, JAMES F. WIDENER III, STEPHANIE HENDRIE AND KAREN HENSON respectively, and the

---TRUSTEE: BANCO NACIONAL DE MEXICO, SOCIEDAD ANONIMA.

---The asset subject matter of the Trust was the property named "VISTA HERMOSA", located in Chamela, Municipality of La Huerta; Jalisco, which has an approximate surface extension of: 22,500 TWENTY TWO THOUSAND FIVE HUNDRED SQUARE METERS, and which was formed by 6 different fractions placed in trusts which today they

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
Autorizada por el Supremo Tribunal
de Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-688

D000604

form only one lot of land, and the constructions built on it, with the following metes and bounds: From Vertex 2 (two) of this Property "La Burra" exactly corresponding with vertex "2" of "Tambora" and five hundred eighty four meters twenty centimeters from the boundary between both lots that is headed south forty four degrees West, it is located on the edge of the hill "La Burra" mark "1". From this mark two hundred and ninety five meters to the North-West and headed to the North, forty one degrees, zero minutes two seconds West, and over the second shoulder of the hill of "La Burra", mark "2" is located of the drawing, mark South-East of the property "Vista Hermosa" to which reference is made of Mr. Jorge Quiroz Huacuja that borders in one hundred and fifty meters with the property of Mrs. Emma Quiroz de Urquiza, boundary that continues the same line and direction of mark "1" of reference.-(north forty one degrees, zero minutes, twenty seconds West).- Arriving at Vertex "3" of this property "Vista Hermosa".-From this vertex "3" to vertex "4" that goes to the bay, headed South, forty eight degrees, fifty eight minutes West and a length of one hundred and fifty meters. From vertex "4" to "5"there is a distance of one hundred and fifty meters and the boundary is headed South, forty one degrees, zero minutes two seconds East.-From vertex "5", to vertex "2" or departure point of the polygon that forms this property, there is a distance of one hundred and fifty meters headed North forty eight degrees and fifty eight minutes East. All of the internal angles of this polygon are of ninety degrees and are boundaries with the property described as "Vista Hermosa" by all of its winds with Property of Mrs. Emma Quiroz de Urquiza, as per drawing signed by the parties.

---the previously mentioned titles were registered before the Public Registry of Property of Autlan, Jalisco, in the following manner:

Deed Number 3997, by its incorporation under document number 29 (twenty nine), folios from 172 (one hundred and seventy two) through 183 (one hundred and eighty three), of Book 367 (three hundred and sixty seven), of the First Section

Deed Number 3998, by its incorporation under document number 30 (thirty), folios from 184 (one hundred and eighty four) through 195 (one hundred and ninety five), of Book 367 (three hundred and sixty seven), of the First Section

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
Autorizada por el Supremo Tribunal
e Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-688

Deed Number 3999, by its incorporation under document number 31 (thirty one), folios from 196 (one hundred and ninety six) through 207 (two hundred and seven), of Book 367 (three hundred and sixty seven), of the First Section

Deed Number 4000, by its incorporation under document number 32 (thirty two), folios from 208 (two hundred and eight) through 218 (two hundred and eighteen), of Book 367 (three hundred and sixty seven), of the First Section

Deed Number 4001, by its incorporation under document number 33 (thirty three), folios from 219 (two hundred and nineteen) through 229 (two hundred and twenty nine), of Book 367 (three hundred and sixty seven), of the First Section.

Deed Number 4002, by its incorporation under document number 34 (thirty four), folios from 230 (two hundred and thirty) through 241 (two hundred and forty one), of Book 367 (three hundred and sixty seven), of the First Section.

Subsequently As per Public Deed Number 6,906 (six thousand nine hundred and six) dated November 21st, 1992, granted before the undersigned, **DOUGLAS HENSON, BETTY GRACE BELL, BARBARA SCHAFFER, JAMES F. WIDENER III, STEPHANIE HENDRIE AND KAREN HENSON**, assigned their beneficiary rights to Mr. **DONALD LONIE JR.**

Finally Mr. D. DONALD LONIE JR. in Public Deed number 7847 (seven thousand eight hundred and forty seven) dated April 4th, 1995, (nineteen ninety five), granted before the Undersigned, assigned its Beneficiary Rights in favor of **JERRY LEE ICENHOWER AND DONNA LEE ICENHOWER.**

MR. JERRY LEE ICENHOWER by himself and as representative of his wife MRS. DONNA LEE ICENHOWER, in their capacity of BENEFICIARIES, addressed Letter of Instructions dated May 6th, 2002, to the TRUSTEE to attend this Assignment of Beneficiary Rights made in favor of the company "**HOWELL &**

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
···orizada por el Supremo Tribunal
Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-688

D000608

GARDNER INVESTORS INC." represented by its Representative Mr. Peter J. Thompson.

--The Trustee appears to the execution of this agreement to approve its terms and at the same time to be notified of the Assignment.

---THE TRUSTEE BANCO NACIONAL DE MEXICO, SOCIEDAD ANONIMA, addressed a letter to the Undersigned Notary in which it instructs me to carry out this transaction.

Once the foregoing has been expressed, the appearing parties grant the following:

CLAUSES.

First.- MR. JERRY LEE ICENHOWER by himself and as representative of his wife Mrs. DONNA LEE ICENHOWER, in their capacity of Beneficiaries and with the appearance of BANCO NACIONAL DE MEXICO, SOCIEDAD ANONIMA, DEPARTAMENTO FIDUCIARIO, ASSIGN in a total and irrevocable manner, and without reserves the Beneficiary Rights, in regards to the property identified as "VISTA HERMOSA" located in the town of Chamela, Municipality of La Huerta, Jalisco, with the surface, metes and boundaries stated in the first recital of this instrument and which are considered as reproduced ,herein as if textually inserted, in favor of the company "HOWELL & GARDNER INVESTORS INC." represented by its representative MR. PETER R. J. THOMPSON, of American nationality.

----The Value of the operation is the sum of 3'364,938.00 (Three million three hundred and sixty four thousand nine hundred and thirty eight Pesos 00/1000), which JERRY LEE ICENHOWER and his wife Mrs. DONNA LEE ICENHOWER, in their capacity of Beneficiaries have received to their full satisfaction, this document serves as receipt of such sum.

MC. REBECA CAMARENA MARROQUIN

PERITO TRADUCTOR
Autorizada por el Supremo Tribunal
de Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-688

D000610

---The Assignee Beneficiary company is subject to the conditions agreed when the trust was incorporated mentioned in the recitals of this Instrument, at the same time it acquires the rights and all the obligations established for the Beneficiaries and expressly accepts the conditions included in the referred Permit.

---The property which beneficiary rights are subject matter of this act, are free from any lien, up to date on the payment of every type of taxes and without limitation of ownership, as evidenced with the Certificate of Freedom of Liens issued by the Director of the Public Registry of Property of the City of Autlan, Jalisco .

---ASSIGNMENT OF RIGHTS.- In order for the Assignee Beneficiary to be able to assign its rights and obligations, it will require:

1.-To timely notify the Trustee, and to fully identify the Assignee Beneficiary and that the Trustee approves the project of the respective agreement.

2.-To comply with the requirements for the assignment of rights established in the Incorporation Agreement.

3.-That on the date intended to execute the assignment of beneficiary rights, the commissions corresponding to the trustee and that are under the charge of the assignor, are totally paid.

4.-If the assignment of rights is made abroad, the signatures of the assignor and assignee should be consigned in the corresponding document and authenticated by a Public Official and by the Mexican Consul that corresponds to the jurisdiction of the place where the agreement is executed.

5.-To comply with the requirements for the transfer of rights established in the Permit granted by the Secretary of Foreign Affairs.

D000611

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
Autorizado por el Supremo Tribunal
Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-688

D000612

6.-To pay the federal and local taxes that originate the Assignment of Rights and to prove the trustee, that these were timely paid to the corresponding Authorities.

---JURISDICTION AND COMPETENCE.-

For everything relative to the Interpretation and compliance of this agreement, the parties expressly submit to the Laws and Tribunals of the City of Guadalajara, Jalisco or Mexico, Federal District at the option of the Trustee, waiving any other jurisdiction that due to their addresses they would currently have or in the future; they also accept to be considered as Mexicans, in regards to the rights derived from this agreement, and that they will not invoke therefore the protection of their Government, in case of breaching this agreement, they would forfeit in favor of Mexico, the rights acquired.

---ADDRESSES.-For purposes of this agreement, the parties indicate as their addresses the following:

TRUSTEE: Avenida Lopez Mateos Sur 4145, colonia La Calma in Zapopan, Jalisco

ASSIGNOR BENEFICIARIES: 684 Margarita Ave., in the City of Coronado, State of California, U.S.A.

ASSIGNEE BENEFICIARY: 2701 East 57th, Street, Long Beach, State of California, U.S.A.

## NOTES

---Under number 11,778 and attachments, I add to the appendix of my protocol, the following documents: Copy of the notice given to the Head of the Archive of Public Instruments, the receipt issued by the Income Tax Collection Office of such notice, the notice of Patrimony Transmission to the Department of the Municipal Land Register, copy of the Statement of payments relative to the Income Tax, copies of the Property Tax Receipt, of the land register, sketch of the land, copy of the preventive notice, letters of

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
Autorizada por el Supremo Tribunal
e Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-688

D000614

instructions, and order to be delivered to BANCO NACIONAL DE MEXICO, SOCIEDAD ANONIMA

CIHUATLAN JALISCO, ON JUNE 10TH, 2002

ATTORNEY NARCISO P. LOMELI ENRIQUEZ.

7

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
torizada por el Supremo Tribunal
Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-688

D000616



ACCOUNT 428 RCO.
KM. 63 CARRETERA FEDERAL NO. 200.
RURAL PROPERTY VISTA HERMOSA, LA HUERTA, JAL.

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
Autorizada por el Supremo Tribunal
de Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-688

D000618

DEPARTMENT OF THE PUBLIC REGISTRY OF PROPERTY

Office Sitting in:

Autlan, Jalisco

Document filed for its registration at 14:03 _____ hours of the 10th day of September, 2002, and at 12:00 hours of the 24th day of September 2002 by its incorporation under document number 13 _____, folios from 103 ____ _____ through _____ 121 ___ of Book _____ 92 _____ of the Real Estate Section. The following was registered: Deed No. 11,778 Notary 1 of Cihuatlan, Jalisco by which the totality of the Beneficiary Rights are Assign, in favor of the Company "Howell & Gardner Investors Inc", with the appearance of Banco Nacional de Mexico, Sociedad Anonina, Departamento Fiduciario, over the following property:

_____ ----"VISTA HERMOSA", located in the town of Chamela, Municipality of La Huerta, Jalisco, with a surface of 22,500.00 Twenty two thousand five hundred square meters. With order number 65386.

DIRECTOR OF THE PUBLIC REGISTRY OF
PROPERTY.

Illegible Signature

MR. CARLOS M. DUEÑAS GUERRERO

The fees for the registration were covered under Ref. No. P12175216.
$1,652.00

D000619                 9

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
Autorizada por el Supremo Tribunal
de Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-688

D000620

<u>Government of the State of Jalisco</u>

Department of the Public Registry of Property

Government of the State of
Jalisco
Executive power
General Secretary

PUBLIC REGISTRY OF PROPERTY AND COMMERCE

MR. CARLOS MANUEL DUEÑAS GUERRERO, Director of the Office of the Public Registry of Property and Commerce of this City

CERTIFIES

That this photocopy included in 33 useful pages, truly agrees with Incorporation under Number 13, of book 92 of the Real Estate SECTION of folios from 103 through 121, from where it was compared and it is issued as per the request of JOSE CAMPOS CARLOS, for the uses and legal purposes convenient.

The fees were paid under receipt number P_9714149 for the amount of $430 pesos 00/100 National Currency.

Autlan de Navarro, Jalisco AUGUST 30TH, 2005

DIRECTOR OF THE PUBLIC REGISTRY OF PROPERTY AND COMMERCE

Illegible Signature

MR. CARLOS MANUEL DUEÑAS GUERRERO

10

D000621

MC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
Autorizada por el Supremo Tribunal
e Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-688

GOVERNMENT OF THE STATE OF JALISCO

DEPARTMENT OF THE PUBLIC REGISTRY OF PROPERTY

Government of the
State of Jalisco
Executive Power
General Secretary

Guadalajara, Jalisco September 12th (twelfth) 2005 (Two thousand and five), the undersigned **MR. IGNACIO LUIS RAMIREZ TAPIA**, General Director of the Public Registry of Property and Commerce, states that these certified copies were issued at the Register Office in Autlan, Jalisco, on the 30th (thirtieth) of August 2005 (Two thousand and five), as per the request of JOSE CAMPOS CARLOS. The fees were covered under receipt P-9714147

Sincerely

Illegible Signature
MR. IGNACIO LUIS RAMIREZ TAPIA

A seal that reads:
Department of the Public Registry of Property and Commerce
Guadalajara, Jal.
United Mexican States

An emblem that read:                                                                    SGG/DC/JAL 1281
United Mexican States

Mexico

Apostille

(Convention de la Haye du 5 octobre 1961)

Fees $125.00

Order No. 1281/2005

In Mexico, this public document has been signed

By MR. IGNACIO LUIS RAMIREZ TAPIA

acting in the capacity of GENERAL DIRECTOR OF THE PUBLIC REGISTRY OF PROPERTY AND OF COMMERCE

and bears the corresponding seal of THE DEPARTMENT OF THE PUBLIC REGISTRY OF PROPERTY AND OF COMMERCE GUADALAJARA, JAL

Certified in GUADALAJARA, JALISCO    By MR. TOMAS RAMIREZ CONTRERAS, CERTIFICATIONS DIRECTOR OF THE GOVERNMENT OF THE STATE OF JALISCO, on SEPTEMBER 13TH, 2005.

Illegible Signature
Signature

D000623                          11

TRANSLATOR AUTHORIZED BY THE
SUPREME COURT OF JUSTICE
THE STATE OF JALISCO.
REBECA CAMARENA MARROQUIN
CMR120897-688
The precedent document is a
translation from Spanish into English of an abstract
of public deed number 11,778
September 21st, 2005.

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
Autorizada por el Supremo Tribunal
de Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-688

D000624

EXHIBIT 4

- - - ESCRITURA PUBLICA NUMERO 11,778 ONCE MIL
SETECIENTOS SETENTA Y OCHO.

- - - TOMO XXXX CUADRAGESIMO.

- - - LIBRO 99 EXIMTO.

- - - EN CIMMATLAN, JALISCO. A los 10 diez días del
mes de Mayo del año 2002 dos mil dos, Ante Mí
LICENCIADO NARCISO F. CORELI ENRIQUEZ, NOTARIO
PUBLICO NUMERO 1, UNO DE ESTA MUNICIPALIDAD,
Comparecieron por una parte BANCO NACIONAL DE
MEXICO, SOCIEDAD ANONIMA, DEPARTAMENTO FIDUCIARIO,
representado en este acto por los señores LICENCIADOS
RAFAEL NUÑEZ MARTINEZ y JOSE GUADALUPE MANDE
RODRIGUEZ, (en lo sucesivo definido como EL
FIDUCIARIO), por otra parte el señor JERRY LEE
ICENHOWER, por Si y como apoderado de su esposa la
señora DONNA LEE ICENHOWER, (en lo sucesivo definido
como LOS FIDEICOMISARIOS CEDENTES), y por otra parte
la Empresa "HOWELL & GARDNER INVESTORS INC"
representado por su Apoderado el señor PETER R. J.
THOMPSON, (en lo sucesivo definida como EL
FIDEICOMISARIO CESIONARIO) a efecto de otorgar un
CONTRATO DE CESION DE DERECHOS FIDEICOMISARIOS al
tenor de los siguientes antecedentes y cláusulas:

- - - - - - A N T E C E D E N T E S : - - - -

- - - I.- Manifiesta BANCO NACIONAL DE MEXICO,
SOCIEDAD ANONIMA, DEPARTAMENTO FIDUCIARIO, que
mediante Escrituras Públicas Números 3997, 3998,
3999, 4000, 4001 y 4002, todas de fecha 5 cinco de
marzo de 1989, mil novecientos ochenta y nueve,
otorgadas ante la Fé del Suscrito, Notario Público
Número de ésta Municipalidad, se celebraron seis
diversos contratos de Fideicomiso en los que fueron

- - - FIDEICOMITENTE: EUGENIO KOCHERGA GUMMESSON.- - - -

- - - FIDEICOMISARIOS: DOUGLAS HENSON, BETTY GRACE
BELL, BARBARA SCHAFFER, JAMES F. WIDENER III,
STEPHANIE HENDRIE Y KAREN HENSON, respectivamente, y

D000627



D000628

- - - FIDUCIARIO: BANCO NACIONAL DE MEXICO, SOCIEDAD
ANONIMA.-

- - - El bien materia del Fideicomiso es la finca
denominada "VISTA HERMOSA", ubicada en Chamela,
Municipio de la Huerta, Jalisco, que tiene una
extensión superficial aproximada de 22,500.00
VEINTIDOS MIL QUINIENTOS METROS CUADRADOS, y que se
formó de 6 seis diversas fracciones fideicomitidas
que hoy son un solo paño y las construcciones en
ella edificadas, con las medidas y linderos
siguientes: A partir del vértice 2 dos de este Predio
"La Burra" correspondiente exactamente con el vértice
"2" de "Tambora" y a quinientos ochenta y cuatro
metros veinte centímetros del lindero entre ambos
lotes es decir con rumbo sur cuarenta y cuatro grados
Oeste, se encuentra sobre el filo del cerro "La
Burra" la mojonera "1". De esta mojonera a doscientos
noventa y cinco metros al Nor-Oeste y rumbo al Norte
cuarenta y un grados cero minutos dos segundos Oeste
y sobre el segundo hombro del cerro de "La Burra", se
localiza la mojonera "2" del plano, mojonera Sur-oeste
del predio "Vista Hermosa" al que se hace colindar
del señor Jorge Quiroz Huaquía que colinda en
cincuenta metros con el predio de la señora
Quiroz de Urquiza, lindero que continúa misma
línea y dirección de la mojonera "1" de referencia
(Norte cuarenta y un grados, cero minutos, veinte
segundos Oeste).- Llegando al vértice "3" de este
predio "Vista Hermosa".- De este vértice "3" al
vértice "4" que va a la bahía, tiene un rumbo de Sur
cuarenta y ocho grados, cincuenta y ocho minutos
Oeste y una longitud de ciento cincuenta metros.- Del
vértice "4" al "5" hay una distancia de ciento
cincuenta metros y el lindero tiene un rumbo de Sur
cuarenta y un grados cero minutos dos segundos Este.-
Del vértice "5", al vértice "2", o punto de partida

D000629



D000630

del polígono que forma este predio, hay una distancia
de ciento cincuenta metros con rumbo Norte cuarenta y
ocho grados cincuenta y ocho minutos Este. Todos los
ángulos internos de este polígono son de noventa
grados y colinda el predio que se describe "Vista
Hermosa", por todos sus vientos con el Predio de la
señora Emma Quiroz de Urquiza, según plano que firman
las partes.-

— — — Los títulos antes citados quedaron inscritos en
el Registro Público de la Propiedad de Autlán,
Jalisco, de la siguiente manera:-

— — La Escritura Número 3997, mediante su
incorporación bajo documento número 29 veintinueve,
folios del 172 ciento setenta y dos al 183 ciento
ochenta y tres, del Libro 367 trescientos sesenta y
siete, de la Sección Primera.-

— — La Escritura Número 3998, mediante su
incorporación bajo documento número 30 treinta,
folios del 184 ciento ochenta y cuatro al 195 ciento
noventa y cinco, del Libro 367 trescientos sesenta y
siete, de la Sección Primera.-

— — La Escritura Número 3999, mediante su
incorporación bajo documento número 31 treinta y uno,
folios del 196 ciento noventa y seis al 207
doscientos siete, del Libro 367 trescientos sesenta
y siete, de la Sección Primera.-

— — La Escritura Número 4000, mediante su
incorporación bajo documento número 32 treinta y dos,
folios del 208 doscientos ocho al 218 doscientos
dieciocho, del Libro 367 trescientos sesenta y
siete, de la Sección Primera.-

— — La Escritura Número 4001, mediante su
incorporación bajo documento número 33 treinta y tres,
folios del 219 doscientos diecinueve al 229
doscientos veintinueve, del Libro 367 trescientos
sesenta y siete, de la Sección Primera.-

D000631



D000632

- - -. La Escritura Número 4002, mediante su incorporación bajo Documento Número 34 treinta, folios del 230 doscientos treinta, al 241 doscientos cuarenta y uno, del Libro 367, trescientos sesenta y siete, de la Sección Primera.--------------------

- - - II.- Posteriormente mediante Escritura Pública Número 6,906 seis mil novecientos seis, de fecha 21 veintiuno de noviembre de 1992, mil novecientos noventa y dos, pasada ante la fé del Suscrito, los señores DOUGLAS VERSON, BETTY GRACE BELL, BARBARA SCHMITER, JAMES C. MIDDLER III, STEPHANIE KENDALL y KAREN HENSON, Cedieron los derechos Fideicomisarios que les correspondían al señor D. DONOLD LONIE Jr.

- - - III.- Finalmente el señor D. DONOLD LONIE Jr. en Escritura Pública número 7947 siete mil ochocientos cuarenta y siete, de fecha 4 cuatro de abril de 1995, mil novecientos noventa y cinco, pasada ante la fé del Suscrito, cedió sus Derechos Fideicomisarios en favor de los señores JERRY LEE ICENHOWER y DONNA LEE ICENHOWER.--------------------

- - - II.- El señor JERRY LEE ICENHOWER por sí y como Apoderado de su esposa la señora DONNA LEE ICENHOWER, en su carácter de FIDEICOMISARIOS, dirigió de Instrucciones de fecha 6 seis de mayo de dos mil dos, (la cual se transcribe en el Capítulo de insertos), al FIDUCIARIO, para que asistiera a esta Cesión de Derechos Fideicomisarios, que ahora hacen en favor de la Empresa "HOWELL & GARDNER INVESTORS INC", representado por su Apoderado el señor PETER M. J. THOMPSON.

- - - III.- El Fiduciario comparece a la firma de éste contrato para aprobar sus términos y al mismo tiempo darse por notificado de la Cesión.

- - - IV.- La Fideicomisaria Cesionaria de esta operación, no requiere el permiso de la Secretaría de Gobernación a que se refiere el Artículo 66 sesenta y

D000633



D000634

seis, de la Ley General de población y su reglamento

para la adquisición de los derechos derivados del

Fideicomiso, en virtud de que no constituyen derechos

reales.- - - - - - - - - - - - - - - - - - - -

- - - VI.- El Fiduciario BANCO NACIONAL DE MEXICO

SOCIEDAD ANONIMA, dirigió al suscrito Notario carta

en la que lo instruye para realizar la presente

operación, la cual se transcribirá en el Capítulo de

Insertos de este instrumento.- - - - - - - - - - -

- - - Expuesto lo anterior, los comparecientes

otorgan lo que se contiene en las siguientes:- - -

- - - - - - - - C L A U S U L A S :- - - - - - -

- - - PRIMERA.- El señor JERRY LEE ICENHOWER por si y

como Apoderado de su esposa la señora DONNA LEE

ICENHOWER, en su calidad de Fideicomisarios y con la

comparecencia de BANCO NACIONAL DE MEXICO, SOCIEDAD

ANONIMA, DEPARTAMENTO FIDUCIARIO, C E D E N, de una

manera Total e irrevocable, y sin reservas, los

Derechos Fideicomisarios, respecto al inmueble

identificado como finca "VISTA HERMOSA" ubicada en

población de Chamela, Municipio de La Huerta

Jalisco, con la superficie, medidas y colindancias

citadas en la declaración, I primera de este

instrumento y que se tienen aquí por reproducidas

como si se insertasen a la letra, en favor de la

Empresa "NEWELL & GARDNER, INVESTORS",

representado por su apoderado el señor ARTHUR W.

THOMPSON, de nacionalidad norteamericana.- - - - -

- - - SEGUNDA.- El valor de la operación es la suma

de $ 3'364,738.00 TRES MILLONES TRESCIENTOS SESENTA Y

CUATRO MIL NOVECIENTOS TREINTA Y OCHO, PESOS 00/100

MONEDA NACIONAL, que los señores JERRY LEE ICENHOWER

Y su esposa la señora DONNA LEE ICENHOWER, en su

carácter de Fideicomisarios han recibido a su entera

satisfacción, por lo que sirva este documento como

recibo de tal suma.- - - - - - - - - - - - - - - -



D000636

TERCERA.- La Empresa Fideicomisaria Cesionaria queda sujeta a las condiciones que se pactaron a constituirse el fideicomiso a que se hace referencia en las Declaraciones de este Instrumento, al mismo tiempo adquiere todos derechos y contrae todas las obligaciones que para los Cesionarios se establecen en el, y acepta expresamente las condiciones asentadas en el Permiso referido.-------

CUARTA.- El Inmueble cuyos derechos fideicomisarios son materia de este acto, está libre de todo gravamen, al corriente en el pago de toda clase de contribuciones y sin limitación de dominio como se comprueba con el Certificado de Libertad de Gravamen expedido por el C. Director del Registro Público de la Propiedad de la Ciudad de Autlán Jalisco, el cual se transcribirá en el Capítulo de insertos de este instrumento.-------

QUINTA. SANEAMIENTO.- El Fideicomitente original del contrato referido en declaraciones, y los Fideicomisarios Cedentes, están obligados a responder del saneamiento para el caso de evicción en los términos de Ley, respecto de los fideicomisario que por el presente se inmueble objeto de dichos derechos Fideicomiso liberando expresamente de esta obligación Fiduciario de Banco Nacional de México, Sociedad Anónima, Departamento Fiduciario.-------

SEXTA.- Serán derechos y obligaciones de la Fideicomisaria Cesionaria, los que se derivan del presente Contrato, así como del Contrato de Fideicomiso, a que se refiere la Declaración primera de este instrumento, destacando de entre los principales las siguientes.-------

-- -- a).- Usar y disfrutar del Inmueble durante la vigencia del Fideicomiso, sin concedérseles ningún derecho real sobre el mismo, haciendo posible la

D000637



D000638

facultad del Gobierno Federal de verificar en cualquier tiempo durante la vigencia del fideicomiso que se dé cumplimiento a los fines del Fideicomiso de acuerdo con el permiso otorgado por la Secretaría de Relaciones Exteriores, en caso de que se violen las finalidades antes mencionadas la Secretaría podrá ordenar al Fiduciario la cancelación del Fideicomiso.——————————————

— — b).— Poder realizar en el inmueble toda clase de construcciones, obras y mejoras materiales siempre y cuando se ajusten también al reglamento de construcciones establecido para la región donde se encuentra ubicado el bien y se obtengan las licencias y permisos que en su caso deban extender las Autoridades.— En este caso, dichas construcciones quedarán afectas al Fideicomiso, asimismo, los Fideicomisarios Cesionarios, deberán informar a Fiduciario del inicio de las obras de construcción y mejoras del inmueble así como de terminación de las mismas, precisando su valor antes de que proceda a actualización de sus registros contables, para lo cual deberá proporcionar al Fiduciario la documentación que este le requiera.——————————

— — c).— Celebrar con la persona(s) que por escrito indique al Fiduciario de los contratos de arrendamientos, respecto del inmueble fideicomiso durante plazos no mayores de 10 años, pudiendo fijar libremente condiciones que deban regir en el contrato respectivo, con las limitaciones impuestas en las cláusulas del Contrato Constitutivo del Fideicomiso.— El Fideicomisario Cesionario tendrá derecho a recibir las rentas derivadas de dicho contrato, debiendo pagar por este concepto los impuestos correspondientes.————————————

— — d).— Ordenar al Fiduciario celebrar los contratos de Administración necesarios para el buen



D000640

uso, manejo y mantenimiento del inmueble.-------

- - -e).- Ordenar al Fiduciario dentro de la vigencia del Fideicomiso, la transmisión de propiedad del inmueble a la persona que en su momento designe si tuviere capacidad para adquirirlo, de acuerdo con las Leyes Mexicanas, en vigor de la época de su transmisión, fijándose libremente las condiciones en que debe realizarse la enajenación y la forma en que el Fiduciario deba poner a su disposición la contraprestación que se estipula.-------

- - -f).- Ceder los derechos personales de uso y aprovechamiento que adquieren por medio de este contrato con la comparecencia del Fiduciario pactando libremente la contraprestación que deba recibir por la Cesión y la forma en que deba cobrarla.

- - - Los derechos personales de uso y aprovechamiento podrán ser cedidos a personas mexicanas, o extranjeras previas las formalidades que garanticen su autenticidad.-------

- - -g).- Instruir al Fiduciario 6 seis meses antes del vencimiento del término del permiso otorgado por la Secretaría de Relaciones Exteriores, para la prórroga del Fideicomiso para que se efectúe la transmisión de la propiedad del inmueble a la(s) persona(s) con capacidad de adquirirla.-------

- - - SEPTIMA.- La Fideicomisaria Cesionaria por el hecho de aceptar la Cesión en los términos de este Instrumento, asume las obligaciones que con tal carácter se deriven por virtud de éste contrato y del contrato de Fideicomiso, documentos que les son conocidos con anticipación.-------

- - - OCTAVA.- Los gastos, impuestos y honorarios que se causen por el otorgamiento de esta escritura, así como los honorarios que corresponden a la Institución Fiduciaria, son a cargo de la Fideicomisaria Cesionaria.-------

D000641



D00Q642

- - - NOVENA.- CESION DE DERECHOS.- Para que la fideicomisaria cesionaria pueda ceder sus derechos y obligaciones, se requerirá:

- - 1.- Que se oportuno aviso al Fiduciario, y se identifique plenamente el Fideicomisario cesionario, y que el Fiduciario apruebe el proyecto del contrato respectivo.-

- - 2.- Cumplir con los requisitos para las cesiones de derechos que se establecen en el Contrato Constitutivo.-

- - - 3.- Que a la fecha en que pretenda celebrar la cesión de derechos de fideicomisario, las comisiones que le corresponden al fiduciario y que sean a cargo del cedente, estén totalmente pagadas.-

- - 4.- Si la cesión de derechos se efectúa en el extranjero, en el documento correspondiente, deberán consignarse las firmas del cedente y del cesionario y estar autentificadas por un Fedatario público, y por el Cónsul Mexicano que corresponda a la jurisdicción del lugar donde se celebre el contrato.-

- - - 5.- Cumplir con los requisitos para las cesiones de derechos que establece el Permiso otorgado por la Secretaría de Relaciones Exteriores.-

- - 6.- Que se paguen los impuestos federales y locales que originen la cesión de Derechos, y compruebe al fiduciario, que éstos se enteraron oportunamente a las Autoridades correspondientes.-

- - DECIMA.- OBLIGACIONES FISCALES.- El fiduciario no se encuentra obligado al pago de las contribuciones fiscales que graviten sobre el inmueble fideicomitido, ya que todos los impuestos, derechos, multas, recargos y demás erogaciones que causen los mismos o que sean consecuencia del fideicomiso, serán a cargo de la fideicomisaria cesionaria, quien está obligada a cubrirlos.-

D000643

D000644

- - - DECIMA PRIMERA.- COMISIONES.- Por su intervención en éste contrato de Cesión de Derechos, la Fideicomisaria Cesionaria, pagará al fiduciario las siguientes comisiones:-

- - - 1.- Por el estudio y la elaboración del contrato, la cantidad de $ 3,000.00 TRES MIL PESOS 00/100 MONEDA NACIONAL, pagaderos a la firma de ésta escritura.-

- - - 2.- Por el manejo del Fideicomiso pagará $ 3,000.00 TRES MIL PESOS 00/100 MONEDA NACIONAL anuales, respecto del Fideicomiso descrito en el antecedente I primero de ésta escritura.-

- - - 3.- Por cada cesión de derechos que efectúe la Fideicomisaria Cesionaria, la cantidad que se esté cobrando a esa fecha por el Fiduciario.-

- - - 4.- Cuando el Fiduciario deba transmitir el inmueble fideicomitido, cobrará la cantidad que tenga establecida a esa fecha por cada carta de instrucción que remita al Notario, teniendo éstas una vigencia de 60 sesenta días contados a partir de su expedición.-

- - - Si al vencer el plazo mencionado en el párrafo anterior, aún no se ha otorgado la escritura, será necesario que el Fideicomisario solicite al Fiduciario la elaboración de nuevas instrucciones, en éste último caso, el Fideicomisario Cesionario deberá pagar al Fiduciario la cantidad vigente a esa fecha, por cada instrucción adicional que le solicite.-

- - - 5.- Cuando el Fiduciario deba otorgar algún poder a la persona o personas que el Fideicomisario Cesionario le indique por escrito, para la defensa del fondo o la realización de algún trámite relacionado con el Fideicomiso, cobrará la cantidad que esté cobrando a esa fecha el Fiduciario, más los gastos notariales que se originen.-

- - - 6.- Cuando el Fiduciario remita instrucciones escritas al Notario solicitando se haga constar en

D000645



D000646

NOTARIA PUBLICA No. CIUDAD, JAL.

Escritura Pública alguna modificación al contrato, de las permitidas por el permiso otorgado por la Secretaría de Relaciones Exteriores, cobrará la cantidad que tenga establecida a ésa fecha el Fiduciario.-

- - - 7.- Cuando el Fiduciario a petición del Fideicomisario Cesionario realice servicios no previstos en éste contrato, cobrará los gastos que los mismos originen.- Las comisiones del Fiduciario causan el Impuesto al Valor Agregado.-

- - DECIMA SEGUNDA.- DE LA DEFENSA DEL PATRIMONIO EN FIDEICOMISO.- La Fideicomisaria Cesionaria, tiene el deber de informar al fiduciario de cualquier situación que pudiera afectar al patrimonio en fideicomiso.-

- - Asimismo, está obligada a designar a una persona que se encargue de ejercitar las acciones que sean necesarias para la defensa del patrimonio en fideicomiso, en este caso, el fiduciario atendiendo a las instrucciones que por escrito reciba de la fideicomisaria cesionaria o del sustituto, otorgará el poder que en derecho proceda y les proporcionará los documentos que al efecto requieran.-

- - - En caso de urgencia, siempre y cuando el fiduciario cuente con los documentos necesarios y provisión de fondos correspondiente, llevará a cabo los actos indispensables para la conservación del patrimonio fideicomitido, sin perjuicio de la facultad que tienen los fideicomisarios de nombrar el apoderado a que se refiere el párrafo anterior.-

- - DECIMA TERCERA.- JURISDICCION Y COMPETENCIA.-

- - - Para todo lo relativo a la Interpretación y cumplimiento de éste contrato, las partes se someten expresamente a las Leyes y Tribunales de la Ciudad de Guadalajara, Jalisco, o México, Distrito Federal, a elección del Fiduciario renunciando a cualquier otro

COTEJADO.

D000647



D000648

fuero que por razones de domicilio o vecindad tuvieren actualmente o llegasen a tener en lo futuro; aceptando así mismo en considerarme como mexicano, en cuanto a los derechos que se deriven del presente contrato, y de que no invocarán por lo mismo la protección de su Gobierno, en caso de faltar a este convenio, de perder en beneficio de la Nación Mexicana, los derechos que hubieren adquirido por tal motivo.

— — DECIMA CUARTA.— FINIQUITO: Los señores JERRY LEE ICENBOWER y su señora la señora MARIA LEE ICENBOWER, relevan de toda responsabilidad a Banco Nacional de México, Sociedad Anónima, Departamento Fiduciario, por el desempeño del cargo fiduciario reconociendo que el mismo fue realizado con estricto apego a derecho, extendiéndole en este acto el más amplio y definitivo finiquito que en derecho proceda.

— — DECIMA QUINTA.— DOMICILIOS.— Para los efectos de este contrato, las partes señalan como sus domicilios los siguientes:

— — FIDUCIARIO: Avenida López Mateos número 4145 cuatro mil ciento cuarenta y cinco, Colonia La Calma, en Zapopan, Jalisco.

— — FIDEICOMISARIOS CEDENTES: 684 Margarita Ave. en la Ciudad de Coronado, Estado de California, E.U.A.

— — FIDEICOMISARIO CESIONARIA: 2701 East 57th Street, Long Beach, Estado de California, E.U.A.

— — DECIMA SEXTA.— ACTUALIZACION DE COMISIONES.—

— — Las comisiones del Fiduciario, se actualizarán anualmente, en base al factor de actualización establecida en el Código Fiscal de la Federación dándose a conocer a la Fideicomisaria.

— — DEL NO PAGO DE COMISIONES.— Si los fideicomisarios cesionarios no pagan al fiduciario

D000649



D000650

las comisiones que les corresponden en la forma
señalada, deberán pagarle una comisión adicional por
concepto de mora, agregando mensualmente a la
comisión no pagada, el importe del costo porcentual
promedio de captación (C.P.P.), que fije el Banco de
México, más 10 (diez) puntos, más el 50% (cincuenta
por ciento) del total que resulte de esa suma; así
mismo, el fiduciario tendrá derecho a cobrar los
gastos de la cobranza extrajudicial. Para calcular el
importe de la mora, el fiduciario tomará mes a mes el
C.P.P. que corresponda.— — — — — — — — — — — — — —

— — — Cuando el Banco de México no proporcione el
C.P.P. mensual, el fiduciario fijará la tasa
moratoria que deba aplicarse. Si los fideicomisarios
cesionarios, no estuviesen de acuerdo con dicha tasa,
el fideicomiso se dará por terminado, sin menoscabo
de las acciones legales que el fiduciario pueda
iniciar para el cobro de las comisiones que le
correspondan, más la tasa moratoria aplicable, que se
fijará según el último C.P.P. dado a conocer por el
Banco de México.— — — — — — — — — — — — — — — — — —

— — — El Fiduciario podrá renunciar a su cargo si las
comisiones a que tiene derecho no le fueren pagadas
oportunamente, sin detrimento de las acciones legales
que le correspondan para cobrarlas.— — — — — — — — —

— — — I N S E R T O S: — — — — — —
— — — A CONTINUACIÓN SE INSERTAN: — — — — — —
— — — a).- LA CARTA DE INSTRUCCIONES DE LAS SEÑORAS
JERRY LEE ICENHOWER y DONNA LEE ICENHOWER DIRIGIDA
AL BANCO QUE EN LO CONDUCENTE DICE:—

— — — """BANCO NACIONAL DE MEXICO, S.A. DEPARTAMENTO
FIDUCIARIO, GUADALAJARA, JAL. Muy señores míos: Por el
presente, nos permitimos instruirles para que
comparezcan a la Cesión de Derechos Fideicomisarios
constituido con Ustedes, relativo a la finca
denominada "VISTA HERMOSA", ubicada en Chamela,

D000651



D000652

Municipio de la Huerta, Jalisco, que tiene una
extensión superficial aproximada de 22,000.00
VEINTIDOS MIL QUINIENTOS METROS CUADRADOS, del que
somos fideicomisarios según escritura Pública número
7847 siete mil ochocientos cuarenta y siete, de fecha
4 cuatro de abril de 1990, mil novecientos noventa y
cinco, pasada ante la fe del LICENCIADO NARCISO F.
LOMELI ENRIQUEZ, Notario Público Número 1 uno, de
Cihuatlán, Jalisco. El valor de la operación será la
cantidad que señale el avalúo que se practique, el
cual será recibido por los Suscritos, sin
responsabilidad para el Banco. La Cesión de Derechos
deberá de hacerse en favor de la Empresa "NOMELL &
BANOMER INVESTORS INC" que es una corporación del
Estado de Nevada, en los E.U.A., y que será
representada por su Apoderado el señor PETER R. J.
THOMPSON. Serán por cuenta de la Cesionaria todos los
gastos, impuestos y honorarios que se causen por la
Escritura, a excepción del Impuesto Sobre la Renta
que será cubierto por el Suscrito, en caso de que se
causare. Al elaborarse la Cesión de Derechos les
otorgamos el más amplio finiquito que en derecho
proceda por su actuación como Fiduciario en esta
operación. Ruego a Ustedes instruir al Notario
Público Número 1, uno de Cihuatlán, Jalisco,
LICENCIADO NARCISO F. LOMELI ENRIQUEZ, para que tire
la Escritura respectiva. ATENTAMENTE. CIHUATLAN,
JALISCO, MAYO 6 DEL 2002. JERRY LEE ICENHOWER, por
Sí y como apoderado de su esposa la señora DONNA LEE
ICENHOWER, una firma ilegible. "REVERSO
CERTIFICACION"""......

- - - b).- LAS INDICACIONES DEL BANCO o SUSCRITO
NOTARIO, EN LO CONDUCENTE DICEN:

- - -""""BANAMEX REGIONAL FIDUCIARIA OCCIDENTE
Zapopan, Jalisco, a 10 de Julio del 2002. Lic.
Narciso F. Lomeli Enriquez, Notario Público No. 1 de

D000653



D000654

NOTARIA PUBLICA No. ... CIHUATLAN, JAL.

Cihuatlán, Jalisco. Ref.: Fideicomiso No. 105980-0.

Estimado Licenciado: Por instrucciones de Jerry

Donna de apellidos Lee Icenhower, fideicomisarios en

el contrato de Fideicomiso de la referencia, le

solicitamos hacer constar en el protocolo a su digno

cargo escritura que contenga **Cesión de Derechos**, con

las siguientes Características: **CEDENTE:** Jerry

Donna de apellidos Lee Icenhower.- **CESIONARIO:**

"HOWELL & GARDNER INVESTORS INC", quien comparecerá

la firma.- **OBJETO:** Finca denominada "VISTA HERMOSA"

ubicada en Chamela, Mpio. de La Huerta, Jalisco, con

una superficie aproximada de 22,500.00 mts2. El

importe de la contraprestación le será proporcionado

directamente por los clientes. A la firma de la

escritura comparecerán: El Fiduciario, acatando las

instrucciones del Fideicomisario, el Cedente

transmitiendo sus derechos y el Cesionario recibiendo

el inmueble y aceptando los derechos y obligaciones.

Por parte de esta Institución comparecerán a la firma

los Lics. Rafael Núñez Martínez y José Guadalupe

Nande Rodríguez, en su carácter de Apoderados

Especiales de este Fiduciario. En la escritura deberá

consignarse la nacionalidad y el domicilio de los

nuevos Fideicomisarios. Los antecedentes de

propiedad, Planos, Avalúos y demás documentos que se

requieran le serán proporcionados por nuestros

clientes. La Escritura deberá contener los siguientes

elementos y cláusulas: 1.- transcribir carta

instrucción del Fideicomisario.- 2.- transcribir

carta de instrucciones presente.- 3.- Transcribir

carta complemento.- 4.- Cláusulas Saneamiento para

el caso de evicción.- 5.- Cláusulas Derechos y

obligaciones de los nuevos Fideicomisario.- 6.-

Cláusula: Obligaciones Fiscales.- 7.- Cláusula:

Comisiones.- 8.- Cláusula: Actualización de

Comisiones.- 9.- Cláusula: Del no pago de

COTEJADO

D000655



D000656

comisiones.- 10.- Cláusula: De la defensa del patrimonio en Fideicomiso.- 11.- Cláusula Domicilios.- 12.- Cláusula Jurisdicción competencia.- Favor de retener a nombre de Banamex las siguientes cantidades: $ 6,263.10 (seis mil doscientos sesenta y tres pesos 10/100 m.n.) comisiones de manejo. La vigencia de estas instrucciones es de 60 (sesenta) días naturales, contados a partir de su expedición; vencido el plazo nuestro cliente deberá solicitar nuevamente el trámite de escrituración, lo que tendrá un costo de $ 500.00 (QUINIENTOS PESOS 00/100 M.N.), MÁS I.V.A.; así también tendrán el mismo costo las reposiciones de instructivo por cualquier otro motivo. Concertar cita con Ana Gloria Hdez. para la firma de escritura y realizar la entrega de lo siguiente: a) Proyecto revisado.- b) Cuatro copias de la escritura selladas y firmadas por el Notario y una simple para el trámite de S.R.E. y R.N.I.E. e internos.- c).- Copia de la presente carta.- d).- Exhibir el recibo que ampara el pago de las comisiones generadas. (o liquidarlas). posteriormente, deberá enviarnos el primer testimonio de la escritura que resulte debidamente inscrito en el Registro Público de la Propiedad correspondiente. Atentamente, Banco Nacional de México, S.A. Región Occidente, dos firmas ilegibles" - - - - - - P E R S O N A L I D A D.- - - - Los Apoderados de BANCO NACIONAL DE MEXICO, SOCIEDAD ANÓNIMA. Declaran por conducto de sus representantes: - - - - a).- Que es una sociedad legalmente constituida de conformidad con lo previsto por las Leyes de los Estados Unidos Mexicanos. Y que se encuentra autorizada para operar como Institución de Crédito, según consta en la Escritura Pública Número 40,973

D000657



D000658

NOTARIA PUBLICA No. 1 CIHUATLAN, JAL.

cuarenta mil novecientos setenta y tres, de fecha 11
once de Febrero de 1977 mil novecientos setenta y
siete, otorgada ante la fe del Licenciado Carlos
Garcia Diego Foncerrada, Notario Público Número
cuarenta y uno de la ciudad de México, Distrito
Federal, e inscrita en el Registro Público de
Comercio de aquella ciudad Capital, bajo el número
454, a fojas 344, Volumen 1,012, Libro 32 Tercero, en
las cuales se acordó fusionar "BANCO NACIONAL DE
MEXICO", SOCIEDAD ANONIMA, como INSTITUCION
FUSIONANTE, con "HIPOTECARIA BANAMEX", SOCIEDAD
ANONIMA, "FINANCIADORA DE VENTAS BANAMEX", SOCIEDAD
ANONIMA, Y "FINANCIERA BANAMEX", SOCIEDAD ANONIMA
como INSTITUCIONES FUSIONADAS.

— — b).- Que sus representantes cuentan con las
facultades necesarias para la celebración del
presente contrato, mismas que a la fecha no les han
sido revocadas o modificadas en forma alguna, el
señor LICENCIADO RAFAEL NUÑEZ MARTINEZ, de
conformidad con la Escritura Pública Número 87,297
ochenta y siete mil ducientos noventa y siete, de
fecha 4 cuatro de septiembre de 1998 mil novecientos
noventa y ocho, otorgada ante la fe del Licenciado
INIGO XAVIER REYNOSO DE TERESA, Notario número 58
cincuenta y ocho, de la ciudad de México, Distrito
Federal, la cual se encuentra pendiente
Inscripción en el Registro Público de la Propiedad
de Comercio, el cual en lo conducente dice:

— — — CLAUSULA PRIMERA.- BANCO NACIONAL DE
MEXICO, SOCIEDAD ANONIMA, DIVISION FIDUCIARIA,
Representada en este acto por los señores FRANCISCO
JOSE BALTAZAR RODRIGUEZ Y ANDRES FRANCISCO MELO
CANALS, otorga en favor de los señores...""RAFAEL
NUÑEZ MARTINEZ...UN PODER ESPECIAL pero tan amplio
como en derecho sea necesario, con toda la amplitud
de facultades a que se refieren los tres primeros

D000659



D000660

párrafos del artículo dos mil quinientos cincuenta y cuatro, y el artículo dos mil quinientos ochenta y siete, ambos del Código Civil, así como las disposiciones correlativas de los Códigos Civiles de los Estados de la República en donde se ejercite el poder, para que en su nombre y representación comparezcan a la celebración de operaciones fiduciarias mediante las cuales se formalicen actos jurídicos en los que se haga constar, constituciones, modificaciones, extinciones parciales y totales de fideicomiso, constitución de todo tipo de garantía, contratos de promesa, cesiones de derechos, mandato o comisiones, así como de las demás operaciones en que intervenga con el carácter de FIDUCIARIO, el "BANCO NACIONAL DE MEXICO" SOCIEDAD ANONIMA, con la limitación que se menciona en la cláusula segunda que sigue.— SEGUNDA.— Las facultades a que alude la cláusula anterior, estarán limitadas por los siguientes incisos.— A.— "LOS APODERADOS", deberán ejercitar el poder, siempre en forma CONJUNTA, e indistinta, dos de los apoderados de que se trata, o bien uno de ellos, actuando mancomunadamente con algún Delegado Fiduciario de "BANCO NACIONAL DE MEXICO", SOCIEDAD ANONIMA, División Fiduciaria.— Para su ejercicio, los apoderados requerirán siempre sin excepción alguna, de instrucciones previas y por escrito firmadas por dos Delegados Fiduciarios de "BANCO NACIONAL DE MEXICO", SOCIEDAD ANONIMA, División Fiduciaria".— B.— Y al señor J. GUADALUPE MANDE, de conformidad con la Escritura Pública Número 88,586 ochenta y ocho mil quinientos ochenta seis, de fecha 27 veintinueve de Noviembre de 1996 otorgada, ante la Fe del mismo Fedatario, Un tanto de cada uno obra anexado al Apéndice del Protocolo a mi cargo, bajo el número que corresponde a éste Tomo, Libro y Escritura".— HASTA AQUI LO TRANSCRITO.—

D000661



D000662

NOTARIA PÚBLICA No. 1 CHIHUAHUA, CHI.

- - - El señor JERRY LEE ICENHOWER, me acredita el carácter con que comparece, con el poder que le fue otorgado por su esposa, la señora DONNA LEE ICENHOWER, de fecha 2 dos de mayo del año 2002 dos mil dos, de la Ciudad de Coronado, California, Estados Unidos de América, pasado ante la fe de CHARLOTTE MITCHELL, Notario Público, del Estado de California.- - - - - - - -

- - - El señor PETER R. J. THOMPSON, me acredita el carácter que ostenta, con el testimonio del poder otorgado a su favor por el señor CRAIG MAURICE KELLY, presidente de la Empresa HOWELL & GARDNER INVESTORS INC., el cual fué pasado ante la fe del señor CHARLOTTE MITCHELL, Notario Público del Estado de California, documentos que se encuentran debidamente apostillados, y que se anexan al apéndice de mi Protocolo bajo el número que corresponde a este Tomo, Libro y Escritura.- - - - - - - - - - - - - - - - - -

- - - YO EL NOTARIO EL NOTARIO CERTIFICO Y DOY FE:-

- - - De que los anteriores insertos, concuerdan fielmente con sus originales que tuve a la vista.- - - -

- - - - - - - - - G E N E R A L E S :- - - - - - -

- - - Que conozco a los comparecientes, a quienes conceptúo con capacidad legal para contratar y obligarse, quienes por sus generales manifestaron ser: los señores Licenciados RAFAEL NUÑEZ MARTINEZ J. GUADALUPE NANDE RODRIGUEZ, mexicanos, Ejecutivos Fiduciarios, casados, el primero originario de México, Distrito Federal, donde nació el día 17 diecisiete de enero de 1970 mil novecientos setenta, con Registro Federal de Causantes NUMR-700000117-QS4 el segundo, originario de Cocula, Jalisco, donde nació el 10 diez de junio de 1965 mil novecientos sesenta y cinco, ambos con domicilio en la Avenida López Mateos Sur número 4145 cuatro mil ciento cuarenta y cinco, Colonia La Calma, en Zapopan, Jalisco.- - - - - - - - - - - - - - - - - - - - - - -

COTEJADO

D000663



D000664

- - - Los señores ████████ ████████ y la señora DIANA LEE ████████, son; norteamericanos, casados la dama, originaria de Philadelphia, Pennsylvania, E.U.A., donde nació el día 14 catorce de febrero de 1955 mil novecientos cincuenta y cinco; el caballero es, originario de Millersport, Ohio, en Estados Unidos de Norteamerica, donde nació el día 21 de Septiembre de 1944 mil novecientos cuarenta y cuatro; quien me identifica con Licencia de Conductor Número $0578978, expedida por el Estado de California, Estados Unidos de Norteamerica, con legal estancia en el País según Documento Migratorio Número 01 38024793.- - - - - - - -

- - - EL apoderado de la Empresa "HUNELL & GARDNER INVESTORS INC", señor PETER R. J. THOMPSON, es norteamericano, casado, profesionista, originario y vecino de California, E.U.A. quien se identifica con pasaporte número 156035614 y demuestra su legal estancia en el País, según documento migratorio 01 38275147.- - - - -

- - - Que los comparecientes se identificaron plenamente, y que a mi juicio tienen capacidad legal para contratar y obligarse.-

- - - Que leí la presente escritura, les advertí de su alcance, consecuencias y la necesidad de su Registro, se mostraron con su contenido, la ratificaron y firmaron en Unión del Suscrito Notario, tanto en el original como en el duplicado, siendo las 13:20 trece horas con veinte minutos del día 10 diez de Junio del 2002 dos mil dos.- Doy Fé.-

- - - 4 cuatro firmas ilegibles y el sello de autorizar.-

- - - - - - - - I N S E R T O S: - - - - - - - -

- - - A CONTINUACION SE INSERTAN LOS CERTIFICADOS DE LIBERTAD DE GRAVAMEN, QUE FORMAN PARTE DE ESTE

D000665



D000666

TESTIMONIO, MISMO QUE EN LO CONDUCENTE DICE:—

— — (1)"""Al márgen superior izquierdo un sello
que dice: GOBIERNO DEL ESTADO DE JALISCO.— PODER
EJECUTIVO.— SECRETARIA GENERAL.— DENTRO: DIRECCION DEL
REGISTRO PUBLICO DE LA PROPIEDAD.— COMO DIRECTOR DEL
REGISTRO PUBLICO DE LA PROPIEDAD DE ESTA CIUDAD
CERTIFICO: Que he revisado los libros respectivos
para averiguar que gravámenes reporta el siguiente
inmueble: Finca urbana ubicada al Sureste de la
población de Chamela, en el Municipio de La Huerta,
Jalisco, fracción ade la Finca Vista Hermosa, con
superficie de 3,750.00 mts. y los siguientes medidas
y linderos: NORTE, 75.00 setenta y cinco metros, con
propiedad del fideicomitente; SUR, 75.00 setenta y
cinco metros, también con el fideicomitente; ORIENTE,
50.00 cincuenta metros con propiedad del Dr. Antonio
Urquiza; Y PONIENTE, 50.00 cincuenta metros, con el
fideicomitente.— ESTA REGISTRADO bajo documento
número 29, folios del 172 al 183, del Libro 367, de
la Sección Primera, de la 05 cero cinco Oficina, con
número de orden 12623.— Hice la búsqueda con vista de
los registros relativos del inmueble antes descrito
encontrándose que en los últimos diez años ha estado
registrado en favor de BANCO NACIONAL DE MEXICO
S.N.C.— Durante las epocas anteriormente señaladas
no encontré gravámenes o limitaciones de propiedad
sobre el inmueble en cuestión. A solicitud de LIC.
NARCISO F. LOMELI E. y para los fines legales que le
convenga, expido el presente en la ciudad de AUTLAN,
Jalisco, siendo las 9.20 horas del día 13 de JUNIO de
2002.— Los Derechos se pagaron bajo recibo número
A-11339500, por $ 2,640.00.— EL DIRECTOR DEL REGISTRO
PUBLICO DE LA PROPIEDAD.— LIC. CARLOS MANUEL DUEÑAS
GUERRERO, una firma ilegible y el sello de
autorizar"""—

— — (2)"""Al márgen superior izquierdo un sello

D000667

que dice: GOBIERNO DEL ESTADO DE JALISCO.- PODER
EJECUTIVO, SECRETARIA GENERAL.- DENTRO: DIRECCION DEL
REGISTRO PUBLICO DE LA PROPIEDAD.- COMO DIRECTOR, DEL
REGISTRO PUBLICO DE LA PROPIEDAD DE ESTA CIUDAD,
CERTIFICO: Que he revisado los libros respectivos
para averiguar que gravámenes reporta el siguiente
inmueble: Fracción de la Finca Vista Hermosa,
ubicada en Chamela, en el Municipio de La Huerta,
Jalisco, con superficie de 3,750.00 mts. y los
siguientes linderos: NORTE 75.00 mts. con el lote
número 4; SUR, 75.00 mts. con el lote número 2;
ORIENTE, 50.00 mts. con el lote número 3; PONIENTE
50.00 mts. con propiedad particular.- ESTA REGISTRADO
bajo documento número 30, folios del 194 al 195, del
Libro 367, de la Sección Primera, de la 03 cero cinco
Oficina, con número de orden 12624.- Hice la búsqueda
con vista de los registros relativos del inmueble
antes descrito encontrándose que en los últimos diez
años ha estado registrado en favor de BANCO NACIONAL
DE MEXICO, S.N.C.- Durante las épocas anteriormente
indicadas, no encontré gravámenes o limitaciones de
dominio sobre el inmueble en cuestión. A solicitud de
LIC. NARCISO P. LOMELI E., y para los fines legales
que le convenga, expido el presente en la Ciudad de
AUTLAN, Jalisco, siendo las 9.40 horas del día 12 de
JUNIO de 2002.- Los Derechos se pagaron bajo recibo
número P-11339500, por $ 2,640.00.- EL DIRECTOR DEL
REGISTRO PUBLICO DE LA PROPIEDAD.- LIC. CARLOS MANUEL
DUEÑAS GUERRERO, una firma ilegible y el sello de
autorizar""".

- - - (31)"""Al margen superior izquierdo un sello
que dice: GOBIERNO DEL ESTADO DE JALISCO.- PODER
EJECUTIVO, SECRETARIA GENERAL.- DENTRO: DIRECCION DEL
REGISTRO PUBLICO DE LA PROPIEDAD.- COMO DIRECTOR, DEL
REGISTRO PUBLICO DE LA PROPIEDAD DE ESTA CIUDAD,
CERTIFICO: Que he revisado los libros respectivos

D000669



D000670

NOTARIA PUBLICA No. CIHUATLAN, JAL.

para averiguar que gravámenes reporta el siguiente inmueble: Fracción de la Finca Vista Hermosa, ubicada en Chamela, en el Municipio de La Huerta, Jalisco, con una extensión superficial de 3,750.00 mts. y los siguientes linderos: NORTE, 75.00 mts. con prolongación de la calle Chamela; SUR, 75.00 mts. con propiedad de Nicolás Eugenio Kocherga Gumesson; ORIENTE, 50.00 mts. con propiedad del Doctor Antonio Diquirez; PONIENTE, 50.00 mts. con propiedad de Nicolás Eugenio Kocherga G.- ESTA REGISTRADO bajo documento número 51, folios del 194 al 207, del Libro 547, de la Sección Primera, de la 08 cero cinco Oficina, con número de orden 12625.- Hice la búsqueda con vista de los registros relativos del inmueble antes descrito encontrándose que en los últimos diez años ha estado registrado en favor de BANCO NACIONAL DE MEXICO, S.N.C.- Durante las épocas anteriormente indicadas, no encontré gravámenes o limitaciones de dominio sobre el inmueble en cuestión. A solicitud de LIC. NARCISO P. LOMELI E., y para los fines legales que le convenga, expido el presente en la ciudad de AUTLAN, Jalisco, siendo las 12.10 horas del día 13 de JUNIO de 2002.- Los Derechos se pagaron bajo recibo número F-1135P500 por $ 2,640.00 DIRECTOR DEL REGISTRO PUBLICO DE LA PROPIEDAD LIC. CARLOS MANUEL DUEÑAS GUERRERO, una firma ilegible y el sello de autorizar".-

- - - - "21"""""Al margen superior izquierdo un sello que dice: GOBIERNO DEL ESTADO DE JALISCO.- PODER EJECUTIVO, SECRETARIA GENERAL.- DENTRO: DIRECCION DEL REGISTRO PUBLICO DE LA PROPIEDAD.- COMO DIRECTOR, DEL REGISTRO PUBLICO DE LA PROPIEDAD DE ESTA CIUDAD CERTIFICO: Que he revisado los libros respectivos para averiguar que gravámenes reporta el siguiente inmueble: Fracción de la finca Vista Hermosa, ubicada en Chamela, Municipio de La Huerta, Jalisco, con una



D000672

superficie de 3,750.00 mts. y los siguientes medidas
y linderos: NORTE, 75.00 mts. con propiedad de
Nicolas Eugenio Kocherga Gumesson; SUR, 75.00 mts.
con propiedad de Antonio Urquiza; ORIENTE, 50.00 mts.
con propiedad del doctor Antonio Urquiza; PONIENTE,
50.00 mts. con propiedad de Nicolas Eugenio Kocherga
Gumesson.- ESTA REGISTRADO bajo documento número 32,
folios del 208 al 218 del Libro 367 de la Sección
Primera, de la 05 carp. cinco Oficina, con número de
orden 12626.- Hice la búsqueda con vista de los
registros relativos del inmueble antes descrito
encontrándose que en los últimos diez años ha estado
registrado en favor de BANCO NACIONAL DE MEXICO
S.N.C.- Durante las épocas anteriormente indicadas
no encontré gravámenes ni limitaciones de dominio
sobre el inmueble en cuestión. A solicitud de LIC.
NARCISO P. LOMELI E., y para los fines legales que le
convenga, expido el presente en la ciudad de AUTLAN
DE NAVARRO, Jalisco, siendo las 12.50 horas del día
13 de JUNIO de 2002.- Los Derechos se pagaron bajo
recibo número P-1133/2000 por $ 2,640.00.- EL
DIRECTOR DEL REGISTRO PUBLICO DE LA PROPIEDAD.- LIC.
CARLOS MANUEL DUEÑAS GUERRERO, y una firma ilegible y
el sello de autorizar".".-.............................

- - - (3)""""Al margen superior izquierdo un sello
que dice: GOBIERNO DEL ESTADO DE JALISCO.- PODER
EJECUTIVO, SECRETARIA GENERAL.- DENTRO: DIRECCION
REGISTRO PUBLICO DE LA PROPIEDAD.- COMO DIRECTOR
REGISTRO PUBLICO DE LA PROPIEDAD DE ESTA CIUDAD.
CERTIFICO: Que he revisado los libros respectivos
para averiguar que gravámenes reporta el siguiente
inmueble: Fracción de la finca Vista Hermosa, ubicada
en Chamela, Mpio. de La Huerta, Jalisco, con una
superficie de 3,730.00 mts. con las siguientes
medidas y linderos: NORTE, 75.00 setenta y cinco
metros, con propiedad particular; SUR, 75.00 setenta

D000673



D000674

NOTARIA PUBLICA No. 1 GUADALAJARA, JAL.

y cinco metros, con el lote 1 uno, ORIENTE, 50.00 cincuenta metros, con lote A-cuatro; PONIENTE, 50.00 cincuenta metros, con propiedad particular.- ESTA REGISTRADO bajo documento número 33, folios del 212 al 227, del Libro 342, de la Sección Primera, de la 05 cero cinco Oficina, con número de orden 12627.- Hice la búsqueda con vista de los registros relativos del inmueble antes descrito encontrándome que en los últimos diez años ha estado registrado en favor de BANCO NACIONAL DE MEXICO, S.N.C.- Durante las épocas anteriormente indicadas, no encontré gravámenes o limitaciones de dominio sobre el inmueble en cuestión. A solicitud de LIC. NARCISO F. LOMELI E., para los fines legales que le convenga, expido el presente en la ciudad de AUTLAN DE NAVARRO, Jalisco, siendo las 10.50 horas del día 17 de JUNIO de 2002. Los Derechos se pagaron bajo recibo número P-11533588, por $ 1,200.00.- EL DIRECTOR DEL REGISTRO PUBLICO DE LA PROPIEDAD.- LIC. CARLOS MANUEL DUEÑAS GUERRERO, una firma ilegible y el sello de autorizar"""".-

- - - (6)"""Al margen superior izquierdo un sello que dice: GOBIERNO DEL ESTADO DE JALISCO.- PODER EJECUTIVO, SECRETARIA GENERAL.- DENTRO: DIRECCION DEL REGISTRO PUBLICO DE LA PROPIEDAD.- COMO DIRECTOR DEL REGISTRO PUBLICO DE LA PROPIEDAD DE ESTA CIUDAD, CERTIFICO: Que he revisado los libros respectivos para averiguar que gravámenes reporta el siguiente inmueble: Fracción de la finca Vista Hermosa, ubicada en Chamela, Mpio. de La Huerta, Jalisco, con una superficie de 3,750.00 mts. con las siguientes medidas y linderos: NORTE, 75.00 setenta y cinco metros, con prolongación calle Chamela; SUR, 75.00 setenta y cinco metros, con propiedad del fideicomitente; ORIENTE, 50.00 cincuenta metros también con el fideicomitente; Y AL PONIENTE, 50.00

D000675

D000676

cincuenta metros, con el señor Antonio Urquiza.- ESTÁ
REGISTRADO -bajo documento número 347 fojas del 238
al 241, del Libro 367 de la Sección PRIMERA, de la
05 cero cinco Oficina, con número de orden 12627.-
Hice la búsqueda con vista de los registros relativos
del inmueble antes descrito encontrándome que en los
últimos diez años ha estado registrado en favor de
BANCO NACIONAL DE MEXICO, S.N.C.- Durante las épocas
anteriormente indicadas, no encontré gravámenes o
limitaciones de dominio sobre el inmueble en
cuestión. A solicitud de LIC. NARCISO F. LOMELI E.,
para los fines legales que le convengan, expido el
presente en la ciudad de AUTLAN DE NAVARRO, Jalisco,
siendo las 12.50 horas del día 17 de JUNIO de 2002.
Los Derechos se pagaron bajo recibo número
F-11533588, por $ 1,200.00. EL DIRECTOR DEL REGISTRO
PUBLICO DE LA PROPIEDAD.- LIC. CARLOS MANUEL DUEÑAS
GUERRERO, una firma ilegible y el sello de
autorizar".""".-

- - - - HASTA AQUI LO TRANSCRITO.-
- - - 5. CINCO FIRMAS ILEGIBLES Y EL SELLO DE
AUTORIZAR.
- - - - - - - - - NOTAS AL PIE.- - - - -
- - - - Bajo el número 11778 once mil setecientos
setenta y ocho y anexos, agrego al apéndice de mi
Protocolo, los siguientes documentos: Constancia dada
dado al C. Jefe del Archivo de Instrumentos Públicos,
el recibo expedido por la Recaudadora de Rentas del
pago de dicho aviso, el aviso de Transmisión
Patrimonial a la Dirección Municipal de Catastro,
copia de la Declaración de pagos relativos al
Impuesto Sobre la Renta, copias del Recibo del
Impuesto Predial, del catastral, Croquis del terreno,
copia del aviso preventivo, cartas de instrucciones y
poderes.
- - - - SE SACO DE SU MATRIZ ESTE PRIMER TESTIMONIO EN

D000677



D000678



NOTARIA PUBLICA No. 1 CIHUATLAN, JAL.

SU ORDEN PARA SER ENTREGADO A BANCO NACIONAL DE

MEXICO, SOCIEDAD ANONIMA.

- - - VA EN 14 CATORCE HOJAS UTILES.-

- - - QUEDA CORREGIDO Y COTEJADO.-

- - - CIHUATLAN, JALISCO, A LOS 10 DIEZ DIAS DEL MES

DE JUNIO DEL AÑO 2002 DOS MIL DOS.-

- - - LICENCIADO NARCISO P. LLOMELI ENRIQUEZ.-

D000679



D000680



PROPIEDAD PARTICULAR

150.00

SUPERFICIE 22,500.00 m²

150.00

150.00

PROPIEDAD PARTICULAR

CUENTA 428 Rco.
KM. 63 CARRETERA FEREDRAL No. 200.
PREDIO RUSTICO VISTA HERMOSA, MPIC. DE LA HUERTA, JAL.

D000681

D000682



# H. AYUNTAMIENTO CONSTITUCIONAL
## DE LA HUERTA, JALISCO
### TESORERÍA MUNICIPAL
DEPARTAMENTO DE INGRESOS

#### AVISO DE TRANSMISIONES PATRIMONIALES

FOLIO: 748716
19/07/2002.

RECAUDADORA
NUMERO DE CUENTA
CLAVE CATASTRAL      1713 Uo.

SE ACOMPAÑAN

DESLINDE [X]      AVALÚO BANCARIO [X]      CERTIFICADO DE NO ADEUDO [X]

NOMBRE DEL NOTARIO LIC. NARCISO P. LOMELI ENRIQUEZ.      NÚMERO DEL NOTARIO [ 1 UNO.]
NATURALEZA DEL ACTO O CONCEPTO DE LA ADQUISICIÓN

UN CONTRATO DE CESION DE DERECHOS FIDEICOMISARIOS.
LUGAR Y FECHA DEL OTORGAMIENTO: CIHUATLAN, JAL. A 10 DE MAYO DE 2002.ESCRITURA No. 11,778.
EN CASO, FECHA DE LA RESOLUCIÓN ADJUDICATORIA:
TRANSMITENTE: JERRY LEE ICENHOWER Y DONNA LEE ICENHOWER.
DOMICILIO: 884 MARGARITA AVE. CORONADO, CALIFORNIA. E.U.A.
GENERALES: NORTEAMERICANOS, CASADOS ENTRE SI.
ADQUIRENTE: EMPRESA "HOWELL & GARDNER INVESTORS INC". / BANAMEX, S.A. (FIDUCIARIO).
LUGAR Y FECHA DE NACIMIENTO:
DOMICILIO: 2533 NORTH CARSON STREET, CARSON CITY, ESTADO DE NEVADA, E.U.A.
GENERALES:
REGISTRO FEDERAL DE CONTRIBUYENTES:
CLASIFICACIÓN DEL INMUEBLE TRANSMITIDO:      URBANO [X]    RÚSTICO [ ]    BALDÍO [ ]    CONSTRUIDO [ ]
UBICACIÓN MEDIDAS Y LINDEROS:

********** SE    ANEXAN    EN    UNA    HOJA    APARTE **********

PROCEDENCIA O ANTECEDENTES DE LA ADQUISICIÓN: LO ENAJENADO ES LA TOTALIDAD DE LO ADQUIRIDO EN ESCRI-
TURAS 3,997; 3998; 3999; 4000; 4001 Y 4002; LAS CUALES SE ENCUENTRAN INSCRITAS EN EL REGIS-
TRO PUBLICO DE LA PROPIEDAD DE AUTLAN, JAL.,

| | | | | |
|---|---|---|---|---|
| 3997: | DOCUMENTO 29. | FOLIOS 172 A 183. | LIBRO 367. | SECCION PRIMERA. |
| 3998: | DOCUMENTO 30. | FOLIOS 184 A 195. | LIBRO 367. | SECCION PRIMERA. |
| 3999: | DOCUMENTO 31. | FOLIOS 196 A 207. | LIBRO 367. | SECCION PRIMERA. |
| 4000: | DOCUMENTO 32. | FOLIOS 208 A 218. | LIBRO 367. | SECCION PRIMERA. |
| 4001: | DOCUMENTO 33. | FOLIOS 219 A 229. | LIBRO 367. | SECCION PRIMERA. |

LO TRANSMITIDO CONSTITUYE UNA FRACCIÓN [ ]    RESPETO A LA TOTALIDAD [XX] EN RELACION CON EL TITULO INMEDIATO ANTERIOR.

VALORES:

| CATASTRAL | DE LA OPERACIÓN | DE AVALUO | VALOR DEDUCIBLE | VALOR TOTAL DEL PREDIO EN CASO DE FRACCIÓN |
|---|---|---|---|---|
| $3'500,000.00 | $3'364,988.00 | $3'364,988.00 | | |

| LIQUIDACIÓN | | | CLAVE | IMPORTE | CLAVE |
|---|---|---|---|---|---|
| IMP S/EXC. LIMITE INFERIOR | AL 2.50% BASE $ 599,999.99 | | | $ 14,999.99 | |
| CUOTA FIJA | AL   % BASE $ | | | $ 65,900.00 | |
| RECARGOS | AL   % BASE $ | | | $ | |
| MULTA | | | | $ | |
| | | | TOTAL | $80,899.99 | |

DISPOSICIONES APLICABLES EN CASO EN EXENCIÓN:

EN CASO DE ESCRITURAS PRIVADAS Y OPERACIONES EN FIDEICOMISO, ANEXAR FOTOCOPIAS POR DUPLICADO

La Huerta, Jal., a   10   de    MAYO    de 200 2 .

PARA EL CASO DE OPERACIONES PREVISTAS EN EL ARTÍCULO 42 DE LA LEY DEL INFONAVIT       EN CASO DE ESCRITURA PÚBLICA

NOMBRE Y FIRMA
DEL VENDEDOR

NOMBRE Y FIRMA
DEL CONYUGE DEL VENDEDOR

NOMBRE Y FIRMA
DEL COMPRADOR

NOMBRE Y FIRMA DEL FEDATARIO

D000683



D000684

- - - El bien materia del Fideicomiso fue la finca denominada "VISTA HERMOSA", ubicada en Chamela, Municipio de la Huerta, Jalisco, que tiene una extensión superficial aproximada de: 22,500.00 VEINTIDOS MIL QUINIENTOS METROS CUADRADOS, y que se formó de 6 seis diversas fracciones fideicomitidas que hoy son un solo paño, y las construcciones en ella edificadas, con las medidas y linderos siguientes: A partir del vértice 2 dos de éste Predio "La Burra" correspondiente exactamente con el vértice "2" de "Tambora" y a quinientos ochenta y cuatro metros veinte centímetros del lindero entre ambos lotes es decir con rumbo sur cuarenta y cuatro grados Oeste, se encuentra sobre el filo del cerro "La Burra" la mojonera "1". De ésta mojonera a doscientos noventa y cinco metros al Nor-Oeste y rumbo al Norte, cuarenta y un grados cero minutos dos segundos Oeste, y sobre el segundo hombro del cerro de "La Burra", se localiza la mojonera "2" del plano, mojonera Sur-Este del predio "Vista Hermosa" al que se hace referencia del señor Jorge Quiroz Huacuja que colinda en ciento cincuenta metros con el predio de la señora Emma Quiroz de Urquiza, lindero que continua la misma línea y dirección de la mojonera "1" de referencia.- (Norte cuarenta y un grados, cero minutos, veinte segundos Oeste).- Llegando al vértice "3" de éste predio "Vista Hermosa".- De éste vértice "3" al vértice "4" que va a la bahia, tiene un rumbo de Sur, cuarenta y ocho grados, cincuenta y ocho minutos Oeste y una longitud de ciento cincuenta metros.- Del vértice "4" al "5" hay una distancia de ciento cincuenta metros y el lindero tiene un rumbo de Sur, cuarenta y un grados cero minutos dos segundos Este.- Del vértice "5", al vértice "2", o punto de partida del poligono que forma éste predio, hay una distancia de ciento cincuenta metros con rumbo Norte cuarenta y ocho grados cincuenta y ocho minutos Este. Todos los ángulos internos de éste poligono son de noventa grados y colinda el predio que se describe "Vista Hermosa", por todos sus vientos con el Predio de la señora Emma Quiroz de Urquiza.



D000686

DIRECCIÓN DEL REGISTRO PÚBLICO DE LA PROPIEDAD

OFICINA  Con Sede en :

Autlán _____, Jalisco.

documento fue presentado para su registro a las  14:03 _____ horas del día ____ 10

____ Septiembre _____ de 200 __ 2 __ y a las  12:00 horas del día __ 2? __ de Septiembre – – –

– – __ de 200 __ 2 __, mediante su incorporación bajo documento número ___ 13 – – – – – – – –

s del __ 103 ___ al _____ 121 ____ del Libro ____ 92 ____ de la Sección __ Inmobiliaria –

sta Oficina, quedó registrado La Escritura No. 11,778 Notario 1 de Cihuatlán, Jalisco,

por la que se CEDEN en su Totalidad los Derechos Fideicomisarios ,

en favor de la Empresa "HOWELL & GARDNER INVESTORS INC", con la –

comparecencia de  BANCO NACIONAL DE MEXICO, SOCIEDAD ANONIMA,

DEPARTAMENTO FIDUCIARIO, sobre el siguiente inmueble: – – – – – – – – –

– – – Finca VISTA HERMOSA", ubicada en la Población de Chamela,

Municipio de La Huerta, Jalisco,  con superficie de 22,500.00 –

VEINTIDOS MIL QUINIENTOS METROS  CUADRADOS. – – – – – – – – – –

con número de Orden  65386. – – – – – – – – – – – – – – –

Director del Registro
Público de la Propiedad

Lic. Carlos M. Dueñas Guerrero

derechos por el registro fueron cubiertos bajo Ref. Ing. Núm.(s) P12175216 – – – – – – –

1,652.00

D000687

2001 - 2007



D000688





D000690



GOBIERNO DEL ESTADO DE JALISCO

DIRECCIÓN DEL REGISTRO PÚBLICO DE LA PROPIEDAD

GOBIERNO DEL
ESTADO DE JALISCO
PODER EJECUTIVO
SECRETARIA GENERAL

REGISTRO PUBLICO DE LA PROPIEDAD Y COMERCIO

**EL C. LICENCIADO CARLOS MANUEL DUEÑAS GUERRERO**, Director de la

Oficina del Registro Público de la Propiedad y Comercio de esta Ciudad.

CERTIFICA

Que la presente copia fotostática que consta de 33 Fojas útiles, concuerda

fielmente con la **INCORPORACION** Número **13**, del libro 92 de **DE LA SECCION**

**INMOBILIARIA** de folios del 103 al 121, de donde se compulsa y expide a solicitud

de JOSE CAMPOS CARLOS, para los usos y fines legales que le convengan.

Los derechos se pagan bajo recibo número P_ 9714149 por la cantidad de

$430 pesos 00/100 moneda nacional.

Autlán de Navarro, Jalisco a 30 de AGOSTO DEL 2005

DIRECTOR DEL REGISTRO PUBLICO DE LA PROPIEDAD Y COMERCIO



LIC. CARLOS MANUEL DUEÑAS GUERRERO

D000691



GOBIERNO DEL ESTADO DE JALISCO

DIRECCIÓN DEL REGISTRO PÚBLICO DE LA PROPIEDAD

GOBIERNO DEL
ESTADO DE JALISCO
PODER EJECUTIVO
SECRETARIA GENERAL

Guadalajara, Jalisco a 12 doce de Septiembre de 2005 dos mil cinco, el suscrito **LIC. IGNACIO LUIS RAMIREZ TAPIA**, Director General del Registro Público de la Propiedad y Comercio, hago constar, que las presentes copias certificadas fueron expedidas en la Oficina Registral con Sede en Autlán, Jalisco el día 30 treinta de Agosto de 2005 dos mil cinco, a solicitud del C. JOSE CAMPOS CARLOS. Los derechos fueron cubiertos bajo recibo número P-9714147

Atentamente
"2005, Año del Adulto Mayor en Jalisco"

LIC. IGNACIO LUIS RAMIREZ TAPIA



SGG/DC/JAL    1281

**México**

Apostille
(Convention de la Haye du 5 octobre 1961)

| | |
|---|---|
| Derechos | $ 125.00 |
| No. orden | 1281/2005 |

En México el presente documento público ha sido firmado por LICENCIADO IGNACIO LUIS RAMIREZ TAPIA

quien actúa en calidad de DIRECTOR GENERAL DEL REGISTRO PUBLICO DE LA PROPIEDAD Y DEL COMERCIO

y está revestido del sello correspondiente a LA DIRECCION DEL REGISTRO PUBLICO DE LA PROPIEDAD Y DE COMERCIO GUADALAJARA, JAL.

Certificado en GUADALAJARA, JALISCO por EL LICENCIADO TOMAS RAMIREZ CONTRERAS, DIRECTOR DE CERTIFICACIONES DEL GOBIERNO DEL ESTADO DE JALISCO el 12 de SEPTIEMBRE de 2005

Firma

D000692



SEFIN

INCORPORACION *13* LIBRO *22* PAGINA *103* SECCION *Inmob.* *103*

SECRETARÍA
DE FINANZAS
JALISCO
RECIBO OFICIAL

IMPRESION MAQUINA REGISTRADORA
SF013 2002D910 B 0103 S**********1,652.00
Recibo 1 de 1

| REGISTRO FEDERAL DE CONTRIBUYENTES | | | | REGISTRO ESTATAL | | | RECIBO OFICIAL |
| HOM. | INICIALES | FECHA | DET. | U/R TORNA REC. MPIO. | CUENTA | | p. 12175216 |

Reg. Est. Ant. :                        Edo. de Cta.: 13044602

RECIBIMOS DE
BANCO NACIONAL DE MEXICO SA
NOMBRE O RAZON SOCIAL

POR CONCEPTO DE   REGISTRO PUBLICO DE LA PROP. Y REG. PUB. DE COMERCK
AUTLAN DE NAVA

C/V FINCA URBANA POR $ 3'364,988.00

| | | | | IMPORTE | CTA. APLICACION |
| | | | | $1,652.00 | |
| REG. ACTOS, CONT.O RESOL. JUDIC. ESCR. C/V | 100% | 1 | $1,532.00 | $1,532.00 | 2002 10003 |
| FINCA MAS $279,590.00 VALOR CATASTRAL | | | | | |
| Z.POR INT.SOC.INDIVIDUAL | 100% | 1 | $120.00 | $120.00 | 2002 10001 |
| A.NOTA CACTO CONT.CANC.C/2 P2 NOT. | | | | | |

| | RECARGOS % | | $1,652.00 | |
| TOTAL COMPLETA | SUB TOTAL | | | 8531-01 |
| | GASTOS DE COBRANZA | | | |
| | TOTAL GENERAL | $ | $1,652.00 | Hora: 12:27:21 |

CAJA B 103  Autlan de Navarro          10 SEPTIEMBRE 2002

Cajero(a):  Anastaso Romero              LUGAR Y FECHA DE EXPEDICION   FC/JFHGN
FIRMA DEL RECAUDADOR                     CONTRIBUYENTE

ESTE PAGO NO LIBERA AL CONTRIBUYENTE DE ADEUDOS ANTERIORES.



D000625



D000626

EXHIBIT 5

Lic. Rebeca Camarena Marroquín
PERITO TRADUCTOR INGLES-ESPAÑOL
AUTORIZADO POR EL SUPREMO TRIBUNAL
DE JUSTICIA DEL ESTADO DE JALISCO
Y EL H. AYUNTAMIENTO DE GUADALAJARA.

TEL./FAX: 3632-8198

E-mail: translat@cybercable.net.mx

　　　　transevr@cybercable.net.mx

D000533

NUMBER 12,532 TWELVE THOUSAND FIVE HUNDRED AND THIRTY TWO.

VOLUME 57, BOOK III FOLIOS FROM 112,619 THROUGH 112,627

IN THE CITY OF GUADALAJARA, JALISCO ON THE 5TH DAY OF THE MONTH OF AUGUST 2004, before me ATTORNEY FELIPE IGNACIO VAZQUEZ ALDANA SAUZA, NOTARY PUBLIC NUMBER 9 OF THE MUNICIPALITY OF TLAQUEPAQUE, JALISCO, acting in the terms of the third Article of the Notary Law in force appeared:

BANCO NACIONAL DE MEXICO, SOCIEDAD ANONIMA, MEMBER OF THE GRUPO FINANCIERO BANAMEX, Trustee Division, institution which hereinafter will be identified as the **TRUSTEE,** represented by its Special Representatives MR. JOSE GUADALUPE NANDE RODRIGUEZ AND RAFAEL NUÑEZ MARTINEZ and;

MARTHA MARGARITA BARBA DE LA TORRE AND ALEJANDRO DIAZ BARBA, hereinafter identified jointly as the **ACQUIRING PARTY.**

The appearing parties  stated they are here to execute an **AGREEMENT OF TRANSMISSION OF PROPERTY IN TOTAL EXECUTION OF A TRUST,** for which the following background is evidenced:

### BACKGROUND

On March 5th, 1989 by public deeds numbers 3,997 (three thousand nine hundred and ninety seven), 3,998 (three thousand nine hundred and ninety eight) 3,999 (three thousand nine hundred and ninety nine), 4000 (Four thousand), 4001 (Four thousand and one), 4002 (Four Thousand and Two) granted before Attorney Narciso P. Lomeli Enriquez, Notary Public Number 1 (one) of the Municipality of Cihuatlan, Jalisco, 6 different trust Agreements were executed, by which  Douglas Henson, Berry Grace Bell, Barbara Schaffer, James F. Widener III, Stephanie Hendrie and Karen Henson, acquired six different portions that jointly form only one lot which is the totality of the Property named "Vista Hermosa" located in Chamela, Municipality of La Huerta Jalisco with a total surface of 22,500 m2, and the constructions built on it, with the following metes and measures: From Vertex 2 (two) of this Property "La Burra" exactly corresponding with vertex "2" of

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
Autorizada por el Supremo Tribunal
de Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-588

D000535

"Tambora" and five hundred eighty four meters twenty centimeters from the boundary between both lots that is heading south forty four degrees West, mark "1" is located on the edge of the hill "La Burra". From this mark two hundred and ninety five meters to the North-West heading North, forty one degrees, zero minutes two seconds West, and over the second shoulder of the hill of "La Burra", mark "2" is located of the drawing, mark South-East of the property "Vista Hermosa" to which reference is made of Mr. Jorge Quiroz Huacuja that borders in one hundred and fifty meters with the property of Mrs. Emma Quiroz de Urquiza, boundary that continues the same line and direction of mark "1" of reference.-(north forty one degrees, zero minutes, twenty seconds West).- Arriving at Vertex "3" of this property "Vista Hermosa".-From this vertex "3" to vertex "4" that goes to the bay, heading South forty eight degrees, fifty eight minutes West and a length of one hundred and fifty meters. From vertex "4" to "5" there is a distance of one hundred and fifty meters and the boundary is headed South, forty one degrees, zero minutes two seconds East.-From vertex "5", to Vertex "2" or departure point of the polygon that forms this property, there is a distance of one hundred and fifty meters heading North, forty eight degrees, fifty eight minutes East. All of the internal angles of this polygon are of ninety degrees and borders with the property described as "Vista Hermosa" by all of its winds with the Property of Mrs. Emma Quiroz de Urquiza.

---the previously mentioned titles were registered before the Public Registry of Property of Autlan, Jalisco, in the following manner:

Deed Number 3997, by its incorporation under document number 29 (twenty nine), folios from 172 (one hundred and seventy two) through 183 (one hundred and eighty three), of Book 367 (three hundred and sixty seven), of the First Section of the Fifth Office.

Deed Number 3998, by its incorporation under document number 30 (thirty), folios from 184 (one hundred and eighty four) through 195 (one hundred and ninety five), of Book 367 (three hundred and sixty seven), of the First Section of the Fifth Office.

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
Autorizada por el Supremo Tribunal
de Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-588

D000537

Deed Number 3999, by its incorporation under document number 31 (thirty one), folios from 196 (one hundred and ninety six) through 207 (two hundred and seven), of Book 367 (three hundred and sixty seven), of the First Section of the Fifth Office.

Deed Number 4000, by its incorporation under document number 32 (thirty two), folios from 208 (two hundred and eight) through 218 (two hundred and eighteen), of Book 367 (three hundred and sixty seven), of the First Section of the Fifth Office.

Deed Number 4001, by its incorporation under document number 33 (thirty three), folios from 219 (two hundred and nineteen) through 229 (two hundred and twenty nine), of Book 367 (three hundred and sixty seven), of the First Section of the Fifth Office.

Deed Number 4002, by its incorporation under document number 34 (thirty four), folios from 230 (two hundred and thirty) through 241 (two hundred and forty one), of Book 367 (three hundred and sixty seven), of the First Section of the Fifth Office.

The Trust Agreements previously mentioned, hereinafter will be named jointly the **TRUST.**

---- As per Public Deed Number 6,908 (six thousand nine hundred and eight) dated November 21st, 1992, granted before Attorney Narciso P. Lomeli Enriquez, Notary Public Number 1 (one) of the Municipality of Cihuatlan, Jalisco the assignment of beneficiary rights of DOUGLAS HENSON, BETTY GRACE BELL, BARBARA SCHAFFER, JAMES F. WIDENER III, STEPHANIE HENDRIE AND KAREN HENSON in favor of Mr. DONALD LONIE JR. was evidenced.

---As per public deed number 7,847 (seven thousand eight hundred and forty seven) granted on April 4th, 1995 (nineteen ninety five) before Attorney Narciso P. Lomeli Enriquez, Notary Public Number 1 (one) of the Municipality of Cihuatlan, Jalisco

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
Autorizada por el Supremo Tribunal
de Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-688

D000539

evidenced the assignment of beneficiary rights of Mr. Donald Lonie Jr. in favor of Mr. Jerry Lee Icenhower and Donna Lee Icenhower.

---On May 10th (tenth), 2002 (two thousand and two) by public deed number 11,778 (eleven thousand seven hundred and seventy eight), granted before Attorney Narciso P. Lomeli Enriquez, Notary Public Number 1 (one) of the Municipality of Cihuatlan, Jalisco, registered before the Public Registry of Property of Autlan, Jalisco under document number 13 (thirteen), folios from 103 ( one hundred and three) through 121 (one hundred and twenty one) of Book 92 (ninety two), of the Real Estate Section, an assignment of rights agreement was executed by which Banco Nacional de México, Sociedad Anonima, assigned by instructions from Mr. Jerry Leé Icenhower and Donna Lee Icenhower, in a total and irrevocable manner the beneficiary rights in regards to the property described in paragraph c) of the 1st recital of this instrument in favor of the company Howell & Gardner Investors Inc.

# R E C I T A L S

**The TRUSTEE declares that:**

---It is an institution, duly authorized and empowered by the pertinent Law to execute among other things trustee operations.

---Its special representatives, verify their capacity and the authorities with which they appear by the document attached to this instrument in the corresponding chapter.

---The following property is the asset of the Trust, hereinafter identified as THE PROPERTY:

Description: Property named "Vista Hermosa", located in Chamela, Municipality of La Huerta, Jalisco and that was formed by 6 (six) different sections in trust which today they are only one lot of and the constructions built on it. (hereinafter the Property)which has the following characteristics:

---Approximate Surface: 22,500 (Twenty two thousand five hundred square meters).

Metes and Bounds: From Vertex 2 (two) of this Property "La Burra" exactly corresponding with vertex "2" of "Tambora" and five hundred eighty four meters twenty centimeters from the boundary between both lots that is heading south forty four degrees West, mark "1" is

D000540                4

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
Autorizada por el Supremo Tribunal
de Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-688

located on the edge of the hill "La Burra". From this mark two hundred and ninety five meters to the North-West heading North, forty one degrees, zero minutes two seconds West, and over the second shoulder of the hill of "La Burra", mark "2" is located of the drawing, mark South-East of the property "Vista Hermosa" to which reference is made of Mr. Jorge Quiroz Huacuja that borders in one hundred and fifty meters with the property of Mrs. Emma Quiroz de Urquiza, boundary that continues the same line and direction of mark "1" of reference.-(north forty one degrees, zero minutes, twenty seconds West).- Arriving at Vertex "3" of this property "Vista Hermosa".-From this vertex "3" to vertex "4" that goes to the bay, heading South forty eight degrees, fifty eight minutes West and a length of one hundred and fifty meters. From vertex "4" to "5" there is a distance of one hundred and fifty meters and the boundary is headed South, forty one degrees, zero minutes two seconds East.-From vertex "5", to Vertex "2" or departure point of the polygon that forms this property, there is a distance of one hundred and fifty meters heading North, forty eight degrees, fifty eight minutes East. All of the internal angles of this polygon are of ninety degrees and borders with the property described as "Vista Hermosa" by all of its winds with the Property of Mrs. Emma Quiroz de Urquiza.

---On July 2nd, 2004 instructions were received from Howell & Gardner Investors Inc. in their capacity of Beneficiary in order to transmit to the Acquiring Party the Property described in the previous paragraph c), which forms part of the assets of the Trust; such letter will be reproduced in the chapter of inserts of this deed, and which I add to my Book of Documents corresponding to Volume 57 (fifty seven) under number 434 (four hundred and thirty four).

---That on August 2nd, 2004 (two thousand and four) issued letter of instructions to the undersigned notary, in order to carry out the operation formalize in this instrument. Such letter will be transcribed in the chapter of inserts of this deed, and which I add to my Book of Documents corresponding to Volume (fifty seven ) under number 435 (four hundred and thirty five).

---The Acquiring party declares, that it is aware of the characteristics of the Property, for which it manifests that it is its will to acquire it, in accordance to the agreed in this instrument.

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
Autorizada por el Supremo Tribunal
de Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-688

D000543

---Once the foregoing has been expressed, the parties grant the following:

## CLAUSES

BANCO NACIONAL DE MEXICO, SOCIEDAD ANONIMA, MEMBER OF GRUPO FINANCIERIO BANAMEX, Trustee Division, through its Special Representatives Mr. JOSE GUADALUPE NANDE RODRIGUEZ AND MR. RAFAEL NUÑEZ MARTINEZ, in compliance of the instructions from the Beneficiary Howell & Gardner Investors Inc., **TRANSMITS IN TOTAL EXECUTION OF TRUST**, to MARTHA MARGARITA BARBA DE LA TORRE AND ALEJANDRO DIAZ BARBA, **WHO ACQUIRE**, in joint *pro indiviso* and represented in equal parts, both for their exclusive property, the first one by virtue of being married under the regime of division of marital property and the second one by virtue of being single, the property named "VISTA HERMOSA", located in Chamela, Municipality of La Huerta, Jalisco, with the surface, metes and boundaries specified in paragraph c) of the 1st Recital of this instrument, which are considered as reproduced herein as if textually transcribed for all the applicable legal purposes.

---CONSIDERATION.-The value of the operation is the amount of $7,508,800.00 (Seven million five hundred and eight thousand eight hundred Pesos 00/100 National Currency) which the beneficiary has received without any responsibility for the TRUSTEE prior to this act to its full satisfaction and conformity, as manifested in its letter instructions described in this instrument.

---CONDITIONS OF THE PROPERTY.-The transmission is made in the concept that the Property passes to the Acquiring Party in the following conditions:

a).-Free from any lien, as evidenced with the Certificate of Freedom of Liens issued by the corresponding Public Registry of Property, and with the only limitations proper of the zone where the PROPERTY is located.

D000544        6

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
Autorizada por el Supremo Tribunal
de Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-688

D000545

b).-Up to date in the payment of property taxes, in the current two-months, as evidenced with Certificate of No Fiscal Debt, which I attest have seen.

c).- Without debts for Taxes, Urbanization Works, Cooperation Fees, nor of any other nature.

---EXTINCTION OF THE TRUST.- As consequence of the agreement of Transmission of Property in Total execution of the Trust, consigned in this deed, both parties agree to extinguish the TRUST in its totality.

---SKETCH OF THE PROPERTY .-The appearing parties show me by triple a sketch of the PROPERTY, of which, I add a copy to my Book of Documents corresponding to Volume 57 (Fifty Seven ) under number 436 (four hundred and thirty six), and the rest, one is for the transcript of this deed and the last one for its incorporation in the corresponding Public Registry of Property.-

---Indemnification in Case of Eviction.- The Trustee binds the original trustor Mr. Eugenio Kocherga Gummesson, to respond for the indemnification in case of eviction, in the terms of the law in regards to the property, obligation contracted in the trust, before the Trustee, authorizing it to bind it in such terms before the individuals or entities to whom the property is transferred…

--With the foregoing the acquiring party in this same act expressly states that the cited obligation of responding of indemnification in case of eviction in the terms of the law in regards to the Property which in this case is being acquired is centered exclusively in the Trustor already mentioned, the Trustee being released from such obligation.

--Release.-The Beneficiary Howell & Gardner Investors Inc., in their letter of instructions described herein, released the Trustee from the obligations and responsibilities derived from the Trust, expressly manifesting its agreement in regards to the administration and management of the same, since the incorporation date until the execution date of this deed, granting the broadest release admissible as per the law for the administration of the trust.

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
Autorizada por el Supremo Tribunal
de Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-688

---POSSESSION.-THE ACQUIRING PARTY.-Manifests having received from the Beneficiary, prior to this act, to its full satisfaction the physical possession of the property subject matter of this agreement, manifestation made for all applicable legal purposes, receiving the material, legal and virtual possession of the property, releasing the trustee from any responsibility in that regard.

---ADDRESSES. The parties indicate as their addresses to receive notices the following.

--The Trustee.- Ave. Lopez Mateos Sur, No. 4145 (Four thousand one hundred and forty five), 2nd Floor, La Calma in the Municipality of Zapopan, Jalisco.

--THE ACQUIRING PARTY: Calle Brasilia No. 2964 (two thousand nine hundred and sixty four), Colomos Providencia, in the Municipality of Guadalajara, Jalisco.

---JURISDICTION .-to hear any controversy that arises due to the interpretation of this agreement the parties expressly submit to the laws and competence of the civil courts of the first judicial district of the State of Jalisco, expressly waiving to the ones that might correspond due to their present or future addresses.

---EXPENSES.-all the expenses, taxes and fees borne for the granting of this deed, as well as the ones for its registration before the corresponding Public Registry of Property will be under the charge of the acquiring party, with the exception of the Income Tax which will be under the charge of the Beneficiary Howell & Gardner Investors Inc. the Trustee being released to respond for such concept.

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
Autorizada por el Supremo Tribunal
de Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-688

D000549

Private Property
150.00

```
P                                    P
r                                    r
I                                    I
v                                    v
a                                    a
t                                    t
e                                    e

P            SURFACE  22,500.00m2    P
r                                    r
o                                    o
p                                    p
e                                    e
r                                    r
t                                    t
y                                    y

150.                                 150.
00                                   00
```

Private Property
150.00

ACCOUNT 428 RCO.
KM. 63 CARRETERA FEDERAL NO. 200.
RURAL PROPERTY VISTA HERMOSA, LA HUERTA, JAL.

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
Autorizada por el Supremo Tribunal
de Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-588

D000551

Government of the State of Jalisco

Department of the Public Registry of Property

PUBLIC REGISTRY OF PROPERTY

Autlan, _____ Jalisco, This document filed for its registration at 11:24 _____ hours of the 13th day of September, 2004, and at 14:00 Hours of the 13th day of September, 2004 by its incorporation under document number 16 _____, folios from 120 _____ through ____132____ of Book ____225____ of the Real Estate Section of the Public Registry of Property. The following was registered: Public Deed No. 12,532 of Notary 9 of Tlaquepaque, Jalisco by which Mrs. Martha Margarita Barba de la Torre and Mr. Alejandro Diaz Barba acquire the following property.
Property named "Vista Hermosa", located in Chamela, Municipality of La Huerta, Jalisco, formed by 6 different fractions which today form only one lot and the constructions built on it with a surface of 22,500.00Mts. With order number 65386

Director of the Public Registry of
Property.

Illegible Signature

Mr. Carlos M. Dueñas Guerrero

The fees for the registration were covered under Ref. No. 5175444.
For $31,814.40

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
Autorizada por el Supremo Tribunal
de Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-688

D000553

<u>Government of the State of Jalisco</u>

Department of the Public Registry of Property

Government of the State of
Jalisco
Executive power
General Secretary

## PUBLIC REGISTRY OF PROPERTY AND COMMERCE

MR. CARLOS MANUEL DUEÑAS GUERRERO, Director of the Office of the Public Registry of Property and Commerce of this City

### CERTIFIES

That this photocopy included in 21 useful pages, truly agrees with the Incorporation under Number 16, of book 225 of the Real Estate SECTION of folios from 120 through 132, from where it was compared and it is issued as per the request of JOSE CAMPOS CARLOS, for the uses and legal purposes convenient.

The fees were paid under receipt number P_9714149 for the amount of $430 pesos 00/100 National Currency.

Autlan de Navarro, Jalisco AUGUST 30TH, 2005

DIRECTOR OF THE PUBLIC REGISTRY OF PROPERTY AND COMMERCE

Illegible Signature

MR. CARLOS MANUEL DUEÑAS GUERRERO

D000554                     11

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
Autorizada por el Supremo Tribunal
de Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-688

D000555

GOVERNMENT OF THE STATE OF JALISCO

DEPARTMENT OF THE PUBLIC REGISTRY OF PROPERTY

Government of the
State of Jalisco
Executive Power
General Secretary

Guadalajara, Jalisco September 12th (twelfth) 2005 (Two thousand and five), the undersigned **MR. IGNACIO LUIS RAMIREZ TAPIA,** General Director of the Public Registry of Property and Commerce, states that these certified copies were issued at the Register Office in Autlan, Jalisco, on the 30th (thirtieth) of August 2005 (Two thousand and five), as per the request of JOSE CAMPOS CARLOS. The fees were covered under receipt P-9714149

Sincerely

Illegible Signature
MR. IGNACIO LUIS RAMIREZ TAPIA

A seal that reads:
Department of the Public Registry of Property and Commerce
Guadalajara, Jal.
United Mexican States

An emblem that read:                                                                      SGG/DC/JAL

1280

United Mexican States

Mexico

Apostille

(Convention de la Haye du 5 octobre 1961)

Fees $125.00 _____

Order No. 1280/2005 _____

In Mexico, this public document has been signed

By MR. IGNACIO LUIS RAMIREZ TAPIA _____

acting in the capacity of GENERAL DIRECTOR OF THE PUBLIC REGISTRY OF PROPERTY
AND OF COMMERCE _____

and bears the corresponding seal of THE DEPARTMENT OF THE PUBLIC REGISTRY OF
PROPERTY AND OF COMMERCE GUADALAJARA, JAL

Certified in GUADALAJARA, JALISCO ____ By MR. TOMAS RAMIREZ CONTRERAS,
CERTIFICATIONS DIRECTOR OF THE GOVERNMENT OF THE STATE OF JALISCO, on
SEPTEMBER 13TH, 2005.

Illegible Signature
Signature

TRANSLATOR AUTHORIZED BY THE
SUPREME COURT OF JUSTICE
THE STATE OF JALISCO.
REBECA CAMARENA MARROQUIN
CMR120897-688
The precedent document is a
translation from Spanish into English of an abstract
of public deed number 12,532
September 21st, 2005.

LIC. REBECA CAMARENA MARROQUIN
PERITO TRADUCTOR
Autorizada por el Supremo Tribunal
de Justicia del Estado de Jalisco
y el Consejo del Poder Judicial
del Estado de Jalisco
CMR-120897-688

EXHIBIT 6

NÚMERO **12,532 DOCE MIL QUINIENTOS TREINTA Y DOS**

TOMO: 57 - LIBRO: III.- FOLIOS DEL 112,619 AL 112,627.

En la ciudad de Guadalajara, Jalisco, a los 5 (cinco) días del mes de Agosto de 2004 (dos mil cuatro), ante el LICENCIADO FELIPE IGNACIO VÁZQUEZ ALDANA SAUZA, Notario Público Titular de la Notaría Número 9 nueve en la Municipalidad de Tlaquepaque, Jalisco, actuando en los términos del Artículo 3° tercero de la Ley del Notariado en vigor, comparecieron:

BANCO NACIONAL DE MÉXICO, SOCIEDAD ANÓNIMA, INTEGRANTE DEL GRUPO FINANCIERO BANAMEX, División Fiduciaria, institución a la que en lo sucesivo se le identificará como **EL FIDUCIARIO,** representada por sus Apoderados Especiales los señores LICENCIADOS JOSE GUADALUPE NANDE RODRIGUEZ y RAFAEL NUÑEZ MARTÍNEZ, y;

II.- los señores MARTHA MARGARITA BARBA DE LA TORRE y ALEJANDRO DIAZ BARBA, a quienes en lo sucesivo se les identificará conjuntamente como **LA PARTE ADQUIRENTE.**

Los comparecientes dijeron que vienen a celebrar un **CONTRATO DE TRANSMISIÓN DE PROPIEDAD EN EJECUCIÓN TOTAL DE FIDEICOMISO,** para lo cual se hacen constar los siguientes:

## ━ A N T E C E D E N T E S: ━

UNO.- Con fecha 5 (cinco) de marzo de 1969 (mil novecientos ochenta y nueve), mediante las escrituras públicas números 3,967 (tres mil novecientos noventa y siete), 3,998 (tres mil novecientos noventa y ocho), 3,999 (tres mil novecientos noventa y nueve), 4,000 (cuatro mil), 4,001 (cuatro mil uno) y 4,002 (cuatro mil dos), otorgadas ante la fe del Licenciado Narciso P. Lomelí Enríquez, Notario Público Número 1 uno de la Municipalidad de Cihuatlán, Jalisco, se celebraron 6 seis diversos contratos de Fideicomiso, mediante los cuales los señores Douglas Henson y Betty Grace Bell, Barbara Schaffer, James F. Widener III, Stephanie Hendré y Karen Henson, adquirieron seis diversas porciones que juntas forman en un solo paño la totalidad del Predio denominado "Vista Hermosa" ubicado en Chamela, Municipio de la Huerta Jalisco con una superficie total de 22,500 m2. y sus construcciones en ella edificadas, con las medidas y linderos siguientes: A partir del vértice 2 dos de éste predio "La Burra" correspondiente exactamente con el vértice "2" de "Tambora" y a 584.20 quinientos ochenta y cuatro metros veinte centímetros del lindero entre ambos lotes es decir con rumbo sur 44° cuarenta y cuatro grados Oeste, se encuentra sobre el filo del cerro "La Burra" la mojonera "1".- De ésta mojonera a 295.00 doscientos noventa y cinco metros al Nor-Oeste y rumbo al Norte, 41° cuarenta y un grados 0 cero minutos 2 dos segundos Oeste, y sobre el segundo hombro del cerro de "La Burra", se localiza la mojonera "2" del plano, mojonera Sur-Este del predio "Vista Hermosa" al que se hace referencia del señor Jorge Quiroz Huacuja que colinda en 150.00 ciento cincuenta metros con el predio de la señora Emma Quiroz de Urquiza, lindero que continua la misma línea y dirección de la mojonera "1" de referencia.- (Norte 41° cuarenta y un grados, 0 cero minutos, 20 veinte segundos Oeste).- Llegando al vértice "3" de éste predio "Vista Hermosa".- De éste vértice "3" al vértice "4" que va a la bahía, tiene un rumbo de Sur, 48° cuarenta y ocho grados, 58 cincuenta y ocho minutos 0 cero Oeste y una longitud de 150.00 ciento cincuenta metros.- Del vértice "4" al "5" hay una distancia de 150.00 ciento cincuenta metros y el lindero tiene un rumbo de Sur, 41° cuarenta y un Grados 0 cero minutos 2 dos segundos Este.- Del vértice "5", al vértice "2", 0 punto de partida del polígono que forma éste predio, hay una distancia de 150.00 ciento cincuenta

D000560





D000561

2

metros con rumbo Norte 48° cuarenta y ocho grados 58 cincuenta y ocho minutos Este. Todos los ángulos

internos de éste polígono son de 90° noventa grados y colinda el predio que se describe "Vista Hermosa", por

todos sus vientos con el Predio de la señora Emma Quiroz de Urquiza. —————————————————————

Los títulos de propiedad antes citados quedaron inscritos en el Registro Público de Autlán, Jalisco, de la siguiente

manera.—————————————————————————————————————————————————————

La escritura número 3,997 (tres mil novecientos noventa y siete), mediante su incorporación bajo el documento

número 29 (veintinueve), folios del 172 (ciento setenta y dos) al 183 (ciento ochenta y tres), del Libro 367 (trescientos

sesenta y siete), de la Sección Primera de la Quinta Oficina.—————————————————————————

La escritura número 3,998, (tres mil novecientos noventa y ocho), mediante su incorporación bajo el documento

número 30 (treinta), folios del (184 ciento ochenta y cuatro) al 195 (ciento noventa y cinco), del Libro 367 (trescientos

sesenta y siete), de la Sección Primera de la Quinta Oficina.—————————————————————————

La escritura número 3,999 (tres mil novecientos noventa y nueve), mediante su incorporación bajo el documento

número 31 (treinta y uno), folios del (196 ciento noventa y seis) al 207 (doscientos siete), del Libro 367 (trescientos

sesenta y siete), de la Sección Primera de la Quinta Oficina.—————————————————————————

La escritura número 4,000 (cuatro mil), mediante su incorporación bajo el documento número 32 (treinta y dos), folios

del 208 (doscientos ocho) al 218 (doscientos dieciocho), del Libro 367 (trescientos sesenta y siete), de la Sección

Primera de la Quinta Oficina.————————————————————————————————————————

La escritura número 4,001 (cuatro mil uno), mediante su incorporación bajo el documento número 33 (treinta y tres),

folios del 219 (doscientos diecinueve) al 229 (doscientos veintinueve), del Libro 367 trescientos sesenta y siete), de

la Sección Primera de la Quinta Oficina.——————————————————————————————————

La escritura número 4,002 (cuatro mil dos), mediante su incorporación bajo el documento número 34 (treinta y

cuatro), folios del 230 (doscientos treinta) al 241 (doscientos cuarenta y uno), del Libro 367 (trescientos sesenta y

siete), de la Sección Primera de la Quinta Oficina.—————————————————————————————

A los contratos de fideicomiso antes mencionados, en lo sucesivo se les denominará conjuntamente como EL

FIDEICOMISO.————————————————————————————————————————————————

DOS.- Mediante la escritura pública número 6,908 (seis mil novecientos ocho), otorgada con fecha 21 (veintiuno)

noviembre de 1992 (mil novecientos noventa y dos) ante la del Licenciado Narciso P. Lomelí Enríquez, Notario

Público Número 1 (uno) de la Municipalidad de Cihuatlán, Jalisco, se hizo constar la cesión de derechos

fideicomisarios de los señores Douglas Henson y Betty Grace Bell, Barbara Shaller, James F. Widener III, Stephanie

Hendré y Karen Henson a favor del señor Donald Lonle Jr.——————————————————————————

TRES.- Mediante la escritura pública número 7,847 (siete mil ochocientos cuarenta y siete), otorgada con fecha 4

(cuatro) de abril de 1995 (mil novecientos noventa y cinco) ante la del Licenciado Narciso P. Lomelí Enríquez, Notario

Público Número 1 (uno) de la Municipalidad de Cihuatlán, Jalisco, se hizo constar la cesión de derechos

fideicomisarios del señor Donald Lonle Jr a favor de los señores Jerry Lee Icenhower y Donna Lee Icenhower.————

CUATRO.- Con fecha 10 (diez) de mayo de 2002 (dos mil dos), mediante la escritura pública número 11,778 (once mil

setecientos setenta y ocho), otorgada ante la del Licenciado Narciso P. Lomelí Enríquez, Notario Público Número 1

uno de la Municipalidad de Cihuatlán, Jalisco, inscrita en el Registro Público de la Propiedad de Autlán, Jalisco, bajo el

documento 13 (trece), folios del 103 (ciento tres) al 121 (ciento veintiuno) del Libro 92 (noventa y dos), de la

Sección Inmobiliaria, se celebró un Contrato de Cesión de Derechos Fideicomisarios, mediante el cual Banco Nacional

de México, Sociedad Anónima, cedió por instrucciones de los señores Jerry Lee Icenhower y Donna Lee

D000562



D000563

122

3

Icenhower, de una manera total irrevocable los derechos fideicomisarios respecto del inmueble descrito en el

inciso c) de la declaración I primera de este instrumento, en favor de la empresa denominada Howell & Gardner

Investors Inc.

Hecho constar lo anterior, los comparecientes realizaron las siguientes:

D E C L A R A C I O N E S.

I.- Declara EL FIDUCIARIO, que:

a).- Es una institución, debidamente autorizada y facultada por la Ley de la materia para celebrar entre otras cosas

operaciones fiduciarias.

b).- Sus Apoderado Especiales, acreditan el carácter y facultades con que comparecen  mediante el documento que en

el capítulo correspondiente a quedado agregado a este instrumento.

c).- Forma parte del patrimonio del FIDEICOMISO, el siguiente inmueble, en lo sucesivo identificado como EL

INMUEBLE:

Descripción: FINCA denominada "VISTA HERMOSA", ubicada en Chamela, Municipio de la Huerta,

Jalisco, y que se formó de 6 seis diversas fracciones fideicomitidas que hoy son un solo paño, y las

construcciones en ella edificadas, (en lo sucesivo el INMUEBLE), el cual tiene las siguientes características:

Superficie aproximada: 22,500.00 (veintidós mil quinientos metros cuadrados).

Medidas y linderos:

A partir del vértice 2 dos de éste predio "La Burra" correspondiente exactamente con el vértice "2" de "Tambora" y

a 584.20 quinientos ochenta y cuatro metros veinte centímetros del lindero entre ambos lotes, es decir con rumbo

sur 44° cuarenta y cuatro grados Oeste, se encuentra sobre el filo del cerro "La Burra" la mojonera "1".- De ésta

mojonera a 295.00 doscientos noventa y cinco metros, al Nor-Oeste y rumbo al Norte, 41° cuarenta y un grados 0

cero minutos 2 dos segundos Oeste, y sobre el segundo hombro del cerro de "La Burra", se localiza la mojonera

"2" del plano, mojonera Sur-Este del predio "Vista Hermosa" al que se hace referencia del señor Jorge Quiroz

Huacuja que colinda en 150.00 ciento cincuenta metros con el predio de la señora Emma Quiroz de Urquiza,

lindero que continua la misma línea y dirección de la mojonera "1" de referencia.- (Norte 41° cuarenta y un

grados, 0 cero minutos, 20 veinte segundos Oeste).- Llegando al vértice "3" de éste predio "Vista Hermosa",

éste vértice "3" al vértice "4" que va a la bahía, tiene un rumbo de Sur, 48° cuarenta y ocho grados, 55 cincuenta

y ocho minutos  Oeste y una longitud de 150.00 ciento cincuenta metros.- Del vértice "4" al "5" hay una distancia

de 150.00 ciento cincuenta metros y el lindero tiene un rumbo de Sur, 41° cuarenta y un Grados 0 cero minutos

dos segundos Este.- Del vértice "5", al vértice "2", o punto de partida del polígono que forma éste predio, hay una

distancia de 150.00 ciento cincuenta metros con rumbo Norte 48° cuarenta y ocho grados 55 cincuenta y ocho

minutos Este. Todos los ángulos internos de éste polígono son de 90° noventa grados y colinda el predio que se

describe "Vista Hermosa", por todos sus vientos con el Predio de la señora Emma Quiroz de Urquiza.

d).- Con fecha 2 (dos) de Julio de 2004 (dos mil cuatro), recibió instrucciones por parte de  Howell & Gardner Investors

Inc, en su carácter de Fideicomisaria a efecto de que transmita a LA PARTE ADQUIRENTE el INMUEBLE descrito

en el inciso c) que antecede, el cual forma parte del patrimonio del FIDEICOMISO; dicha carta será transcrita en el

capítulo de insertos de la presente escritura, y la cual agrego a mi Libro de Documentos correspondiente al Tomo 57

(cincuenta y siete) bajo el número 434 (cuatrocientos treinta y cuatro).

D000564



D000565

4

e).- Que con fecha 2 (dos) de Agosto del 2001 (dos mil cuatro) giro carta de instrucción al suscrito notario, a efecto de que se llevará a cabo la operación que en este instrumento se formaliza. Dicha carta será transcrita en el capítulo de insertos de la presente escritura, y la cual agrego a mí Libro de Documentos correspondiente al Tomo 57 (cincuenta y siete) bajo el número 435 (cuatrocientos treinta y cinco).————————————————————

II.- Declara LA PARTE ADQUIRENTE, que conoce las características del INMUEBLE, por lo que manifiesta que es su voluntad adquirirlo, conforme lo pactado en el presente instrumento.————————————————

Expuesto lo anterior, las partes otorgan las siguientes:————————————————————————

————————————————— C L A U S U L A S: —————————————————

PRIMERA.- ACUERDO DE VOLUNTADES.- BANCO NACIONAL DE MÉXICO, SOCIEDAD ANÓNIMA, INTEGRANTE DEL GRUPO FINANCIERO BANAMEX, División Fiduciaria, a través de sus Apoderados Especiales los señores LICENCIADOS JOSE GUADALUPE NANDE RODRIGUEZ y RAFAEL NÚÑEZ MARTÍNEZ, en cumplimiento a las instrucciones de la Fideicomisaria Howell & Gardner Investors Inc., TRANSMITE EN EJECUCION TOTAL DE FIDEICOMISO, a los señores MARTHA MARGARITA BARBA DE LA TORRE y ALEJANDRO DIAZ BARBA, quienes ADQUIEREN, en mancomún proindiviso y representando partes iguales, ambos para su exclusiva propiedad, la primera en virtud de estar casada bajo el régimen de separación de bienes, y el segundo en virtud de que su estado civil es el de soltero, la finca denominada "VISTA HERMOSA", ubicada en Chamela, Municipio de la Huerta, Jalisco, con la superficie, medidas y linderos especificados en el inciso c) de la declaración I (uno romano) de este instrumento, los cuales se tienen por aquí reproducidos íntegramente como si se transcribiesen a la letra para todos los efectos legales a que haya lugar.——————————————————

SEGUNDA.- CONTRAPRESTACIÓN.- El valor de la operación es la cantidad de $7'508,800.00 (SIETE MILLONES QUINIENTOS OCHO MIL OCHOCIENTOS PESOS 00/100 MONEDA NACIONAL), que la fideicomisaria, ha recibido sin responsabilidad para EL FIDUCIARIO con anterioridad a este acto a su entera satisfacción y conformidad, tal y como lo manifestó en su carta de instrucción descrita en el inciso d) de la declaración I (uno romano) de este instrumento.——————————————————————————————————————

TERCERA.- CONDICIONES DEL INMUEBLE.- La transmisión se hace en el concepto de que el INMUEBLE pasa a LA PARTE ADQUIRENTE en las siguientes condiciones:——————————————————————————

a) Libre de todo gravamen, como se acredita con el Certificado de Libertad o Gravamen expedido por el Registro Público de la Propiedad correspondiente, el cual se transcribirá en el Capítulo de insertos correspondiente, las únicas limitaciones propias de la zona donde se encuentra el INMUEBLE;————————

b) Al corriente en el pago de contribuciones prediales, al bimestre en curso, como se acredita con el Certificado No Adeudo Fiscal, el cual doy fe tener a la vista;————————————————————————

c) Sin adeudos por concepto de impuestos de Plusvalía, Obras de Urbanización, Cuotas de Cooperación, ni de ninguna otra naturaleza.————————————————————————————————————

CUARTA.- EXTINCIÓN DE EL FIDEICOMISO.- Como consecuencia del contrato de Transmisión de Propiedad en ejecución Total de Fideicomiso, consignado en ésta escritura, ambas partes de conformidad acuerdan extinguir en su totalidad EL FIDEICOMISO.————————————————————————————————

QUINTA.- CROQUIS DEL INMUEBLE.- Los comparecientes me presentan por triplicado un croquis del INMUEBLE, de los cuales, para constancia, agrego un ejemplar a mí Libro de Documentos correspondiente al Tomo 57 (cincuenta y

D000566



D000567

123

5

siete), bajo el número 436 (cuatrocientos treinta y seis), y de los restantes, uno para el testimonio que de esta escritura

expida y el último, para su incorporación en el Registro Público de la Propiedad correspondiente. ————————

SEXTA.- SANEAMIENTO PARA EL CASO DE EVICCIÓN.- EL FIDUCIARIO obliga al Fideicomitente original señor

Eugenio Kocherga Gummesson, a responder del saneamiento para el caso de evicción en los términos de la ley

respecto del INMUEBLE, obligación que contrajo EL FIDEICOMISO desde luego frente a EL FIDUCIARIO, facultando

a éste, para obligarlo en tales términos ante las personas físicas o morales a quienes se transmita el INMUEBLE. ————

Con lo anterior LA PARTE ADQUIRENTE en este mismo acto deja constancia expresa que la citada obligación de

responder del saneamiento para el caso de evicción en los términos de ley respecto del INMUEBLE que en este acto se

adquiere gravita exclusivamente sobre el Fideicomitente ya mencionado, quedando por tanto liberado EL FIDUCIARIO

de dicha obligación. ————————————————————————————————

SÉPTIMA.- FINIQUITO.- La fideicomisaria Howell & Gardner Investors Inc, en su carta de instrucción descrita en el

inciso d) de las declaraciones de este instrumento, liberó a EL FIDUCIARIO de las obligaciones y responsabilidades

derivadas de EL FIDEICOMISO, manifestando expresamente su conformidad respecto de la administración y manejo del

mismo, desde la fecha de constitución hasta la fecha de firma de esta escritura, otorgando el más amplio finiquito que en

derecho proceda por la administración de EL FIDEICOMISO. ————————————————————

OCTAVA.- POSESIÓN.- LA PARTE ADQUIRENTE manifiesta haber recibido de la Fideicomisaria, con anterioridad a

este acto, a su entera satisfacción la posesión física de el INMUEBLE materia del presente contrato, manifestación que

hace para todos los efectos legales, dándose por recibido de la posesión material, jurídica y virtual del INMUEBLE,

liberando a EL FIDUCIARIO de cualquier responsabilidad al respecto. ——————————————————

NOVENA.- DOMICILIOS.- Las partes señalan como domicilio para oír y recibir notificaciones el siguiente: ——————

- EL FIDUCIARIO, en: Avenida López Mateos Sur número 4145 cuatro mil ciento cuarenta y cinco, segundo piso

  Fraccionamiento La Calma, en la Municipalidad de Zapopan, Jalisco.

LA PARTE ADQUIRENTE, en: Calle Brasilia número 2964 dos mil novecientos sesenta y cuatro, Fraccionamiento

Colomos Providencia, en la Municipalidad de Guadalajara, Jalisco. ————————————————————

DÉCIMA.- JURISDICCIÓN.- Para el conocimiento de cualquier controversia que se suscite con motivo de la

interpretación de este contrato, las partes se someten expresamente a las Leyes y competencia de los Tribunales Civiles

del Primer Partido Judicial del Estado de Jalisco, haciendo renuncia expresa a los que les pudieren corresponder por

razón a su domicilio presente o futuro. ————————————————————————————

DÉCIMA PRIMERA.- GASTOS.- Todos los gastos, impuestos y honorarios que se devenguen por el otorgamiento de la

presente escritura, así como los de su inscripción en el Registro Público de la Propiedad correspondiente, serán a cargo

de LA PARTE ADQUIRENTE, con excepción del impuesto sobre la renta que será a cargo de la Fideicomitente Howell &

Gardner Investors Inc, quedando liberado EL FIDUCIARIO de responder por dicho concepto. ——————————

### RÉGIMEN FISCAL DE LA OPERACIÓN

### IMPUESTO SOBRE TRANSMISIONES PATRIMONIALES.-

La presente operación causa impuesto sobre Transmisiones Patrimoniales, el cual se calculará y enterará en los

términos de la Ley aplicable del Municipio de la ubicación del INMUEBLE. ——————————————————

### IMPUESTO SOBRE LA RENTA

El suscrito Notario calculará y enterará el importe del impuesto Sobre la Renta que cause la presente operación. ————

——————————— I N S E R T O S ———————————

D000568



D000569

6

## I.- CARTAS DE INSTRUCCIÓN:

A continuación transcribo la carta de instrucción dirigida a EL FIDUCIARIO, a que se hace referencia en el inciso d) de la declaración I (uno romano) de esta escritura, la cual transcribo a continuación a la letra como sigue:

a).- "San Diego California, a 16 de Junio del 2004.- BANCO NACIONAL DE MEXICO, S.A.- DEPTO. FIDUCIARIO.- P r e s e n t e.- Al Lic. Rafael Nuñez.- El que suscribe, como Apoderado con facultades de Dominio y Presidente del Consejo de Administración de la Empresa HOWELL & GARDNER INVESTORS INC., una corporación del Estado de Nevada, en los E.U.A., en su carácter de Fideicomisaria en el contrato de Fideicomiso constituido en escritura pública número 11,778 de fecha 10 de Mayo del 2002, pasada en el Tomo XXXX, Libro Quinto del protocolo de la notaría pública número 1 de la ciudad de Cihuatlán, Jalisco, a través del presente escrito le solicito, sirva girar atenta instrucción al Licenciado Felipe Ignacio Vázquez Aldana Sauza, Notario Público número 9 de la ciudad de Tlaquepaque, Jalisco, a fin de en Ejecución Parcial de Fideicomiso, se transmita y lleve a cabo la protocolización en escritura pública por partes iguales a favor de los Señores MARTHA MARGARITA BARBA DE LA TORRE Y ALEJANDRO DIAZ BARBA, respecto del bien inmueble fideicomitido denominado como "VISTA HERMOSA", ubicado en Chamela, Municipio de la Huerta, Jalisco, que tiene una extensión superficial aproximada de 22,500 metros cuadrados, sin necesidad de que comparezca mi representada.- Todos los gastos, impuestos, derechos y honorarios que llegaren a causar con motivo de las operaciones aquí solicitadas, serán pagados por HOWELL & GARDNER INVESTORS INC. y por el adquirente en los términos de Ley, liberando de toda responsabilidad al Fiduciario por dichos conceptos.- Se otorga el más amplio finiquito que en derecho proceda, por la administración que ha tenido en el presente fideicomiso.- El precio de la contraprestación fue de $7'508,800.00 (SIETE MILLONES QUINIENTOS OCHO MIL OCHOCIENTOS PESOS 00/100 M.N.) mismo que manifiesto mi representada ha recibido a su entera satisfacción y conformidad. Renunciamos expresamente a cualquier acción en contra del Fiduciario, si transmite la propiedad en los términos de la presente.- Asimismo por medio de la presente nos obligamos al saneamiento en caso de evicción con el adquirente.- Atte.- LA FIDEICOMISARIA.- HOWELL & GARNER INVESTORS INC.- Por su Apoderado Legal y Presidente de Consejo de Administración Sr. Craig Maurice Kelly.- Una firma ilegible.- State of California Country of San Diego Subcribed & sworn to before me - on June 29, 2004.- by Craig Maurice Nelly.- Una firma ilegible.- OFFICAL SEAL.- AMBER KAE LEE.- NOTARY PUBLIC-CALIFORNIA COMM.NO 1353330.- SAN DIEGO COUNTRY - MY COMM. EXP. APRIL 23, 2006".

"State of California.- SECRETARY OF STATE.- APOSTILLE.- (Convention de la Haye du 5 octubre 1961).- Country: United States of America - This public document - 2. has been signed by GREGORY J. SMITH.- 3. acting in the capacity of COUNTRY ASSESSOR/ RECORDER/ CLECK - 4.- bears the seal/ stmap of the country of SAN DIEGO State of California.- CERTIFIED - 5. AI SAN DIENGO, California.- 6. The 29 TH day of JUNE, 2004.- 7. by Deputy Secretary of Sate, State of California - 8. No. 107620.- 9. Stamp/Seal.- 10. Signature.- KEVIN SHELLEY.- Una firma ilegible.- Secretary os State.- BY Una firma ilegible.- Un sello".

"Un sello.- Gregory J. Smith.- COUNTRY OS SAN DIEGO.- ASSESSOR / RECORDER / COUNTRY CLECK.- ASSESSOR'S OFFICE.- 16600 Pacific Highway, Room 103.- San Diego, CA 92101-2480.- Tel. (619) 236-3771 Fax (619) 557-4056.- www. Sdarcc.com.- RECORDER/COUNTRY CLERKS OFFICE.- 16600 Pacific Highway, Room 260.- P.O. Box 121750.- San Diego, CA 92112-1750.- Tel. (619) 237-0502 Fax (619) 557-4155.- I, GREGORY J SMITH, Asesor/Recorder/Country Clero of Country os San Diego, Sate of California, having by law



D000571

124

7

a Seal, DO HEREBY CERTIFY that: AMBER KAE LEE whose name is subscribed to the ccl or Certificate of Proof

or Acknowledgement, a Notary Public, in and for said Country, duly commissioned and sworn and duly

authorized by the laws of said State to take the same and administer oaths and to take the Acknowledgement

and Proofs of Deeds and other instruments in writing to be recorded in this State. I am acquainted with the

handwriting of such Notary Public and believe that the signature to said oath or Certificate of Proof.

Acknowledgement is genuine. I further certify that under the laws of the State of California the said oath or

Certificate of Proof or Acknowledgement is required to be under seal, but the impression of said seal is not required

by the laws of the State of California to be filed in my office or in any other place.- DATED: June 29, 2004 Witness

by hand.- GREGORY J SMITH, Country Asesor/Recorder/Clerk.- Una firma ilegible.- Branco Offices Available To

Serve You.- CHULA VISTA.- 590 Third Avenue Chula Vista, CA 91910-5617 (619) 498-2200.- EL CAJON 200 S.

Magnolia Avenue.- El Cajon, CA 92020-4524 (619) 401-5700.- KEARNY MESA.- 9225 Clairemont Mesa Blvd.

San Diego, CA 92123-1211. (858) 505-6262.- SAN MARCOS.- 334 Via Vera Cruz, Suite 150 San Marcos, CA

92069-2638.- (760) 940-6868*.---------------

-------- STADO DE CALIFORNIA.- SECRETARIA DE ESTADO.- A P O S T I L L A .- (CONVENCION DE LA HAYA

DEL 5 DE OCTUBRE de 1961).- 1.- Pais: Estados Unidos de América.- Este Documento Público.- 2.- Ha sido

firmado por GREGORY J. SMITH.- 3.- actuando en su capacidad de Oficial del Condado/Registrador/Asesor.- 4.-

sellado por el sello del Condado de San Diego, Estado de California.- CERTIFICADO.- 5.- En San Diego,

California.- 6.- el día 29 de Junio de 2004.- 7.- Por Secretario Encargado de la Secretaria de Estado, Estado de

California.- 8.- Numero 107620.- 9.- Sello o Estampa (Un sello dorado con la siguiente leyenda: "El Gran Sello del

Estado de California").- 10.- Firma (una firma ilegible) Kevin Shelley. Secretario de Estado. Una firma ilegible.- El

suscrito, Sergio Antonio Macias Aldana, Autorizado por el Pleno del H. Tribunal de Justicia del Estado de Jalisco

para ejercer como Perito traductor Ingles-Español , según consta en el Acuerdo Plenario de fecha 11 de Octubre

de 1996. Certifica que el texto que antecede es una traducción fidedigna y completa del documento original en el

idioma Inglés que tuve a la vista y que refleja fielmente a mi saber, y entender, el significado correspondiente en

el Idioma Español. Chapala, Jalisco a 4 de Agosto de 2004.- LIC. SERGIO ANTONIO MACIAS ALDANA.- Una

firma ilegible.- PERITO TRADUCTOR.------------------

A continuación transcribo la carta de instrucción dirigida al Suscrito Notario, misma que dejo agregada a mi Libro de

documentos correspondiente al Tomo 57 (cincuenta y siete), bajo el número 437 (cuatrocientos treinta y siete).-

b).- "Banamex.- citigroup.- REGIONAL FIDUCIARIA OCCIDENTE.- Av. López Mateos Sur 4145, Fraccionamiento Las

Calma, Zapopan, Jalisco, C.P. 45070.- Tel. (0133) 12 26 28 28.- Guadalajara, Jalisco a 2 de Agosto de 2004. Sr. Notario

Ignacio Vazquez Aldana Sauza.- Notario Público No. 9 Tlaquepaque, Jalisco.- Ref.: Fideicomiso No. _____.-

Estimado Licenciado. Por instrucciones de HOWELL & GARDNER INVESTORS INC, fideicomisario en el fideicomiso de

la referencia, le solicitamos haga constar en el protocolo a su digno cargo escritura que contenga Extinción Total del

fideicomiso, mediante la transmisión de propiedad del inmueble denominado VISTA HERMOSA ubicado en Chamela,

Mpio. de la Huerta, Jalisco, con una superficie aproximada de 22,500.00 mts2., a favor de MARTHA MARGARITA

BARBA DE LA TORRE Y ALEJANDRO DIAZ BARBA.- El importe de la contraprestación le será proporcionado

directamente por los fideicomisarios.- A la firma de la escritura comparecerán: El Fiduciario transmitiendo la propiedad

del bien antes mencionado, acatando las instrucciones del Fideicomiso debidamente ratificadas y el adquiriente

recibiendo el inmueble.- Por parte de esta institución comparecerán a la firma el Lic. Rafael Núñez Martinez y Lic. José

Guadalupe Nande Rodriguez, Apoderados Especiales de este fiduciario.- La documentación necesaria para la

D000572



D000573

8

elaboración de la escritura le será proporcionado por nuestros mutuos clientes.- La escritura deberá contener los siguientes elementos y cláusulas.- 1.- Transcribir carta del fideicomisario, carta complementa, así como la instrucción presente.- 2.- Los antecedentes de propiedad, certificado de libertad de gravamen, fecha y número del permiso otorgado ante la SRE del fideicomiso maestro, etc.- 3.- Deberá mencionarse que el Fiduciario realiza la transmisión de propiedad por instrucciones del Fideicomisario y expresar su nombre en los antecedentes como en la cláusula correspondiente.- 4.- CLAUSULA DE SANEAMIENTO PARA EL CASO DE EVICCIÓN.- El Fideicomitente original y el Fideicomisario están obligados a responder del saneamiento para el caso de evicción en términos de la ley, respecto de los inmuebles objeto del fideicomiso, responsabilidad que asumieron ante el propio Fiduciario, facultándolo para obligarse en dichos términos ante la persona a quien se transmita la propiedad.- dos firmas ilegibles.- 5.- CLAUSULA DE FINIQUITO.- El Fideicomisario libera al Fiduciario de las obligaciones y responsabilidades derivadas del contrato de fideicomiso, manifestando expresamente su conformidad respecto de la administración y manejo del mismo, desde la fecha de constitución del Fideicomiso, hasta la fecha de firma de esta escritura.- Favor de retener a nombre de Banamex las siguientes sumas: $29,986.35 (veintinueve mil novecientos ochenta y seis pesos 35/100 m.n.) por comisión de manejo pendiente de pago.- $5,750.00 (cinco mil setecientos cincuenta pesos 00/100 m.n.) por firma de la escritura.- $4,830.00 (cuatro mil ochocientos treinta pesos 00/100 m.n.) por aviso ante S.R.E. y S.E.- Esta instrucción es de 60 (sesenta) días naturales, contados a partir de su expedición.- Vencido el plazo, nuestro cliente deberá solicitar nuevamente el trámite de escrituración, lo que tendrá un costo $500.00 (QUINIENTOS PESOS 00/100 MN) mas IVA., así también tendrán el mismo costo las reposiciones de instructivo por cualquier otro motivo.- Para efectos de revisión del proyecto favor de enviar vía e-mail a la dirección: lliopegome@banamex.com, a la atención de la Licenciada Liliana López.- Los días de firma son los jueves de 10 a 2 de la tarde, favor de comunicarse con Ana Gloria Hernández/ Larios a los teléfonos arriba mencionados (al proyecto de escritura deberán anexarle copia de esta carta de instrucciones y del proyecto debidamente revisado).- El día de la firma deberán entregar: 4 copias de la escritura a firmar con sello y firma del notario, proyecto de escritura revisado y exhibir el recibo que ampara el pago de las comisiones o en su defecto cubrir totalmente las que se han generado.- ATENTAMENTE.- Banco Nacional de México, S.A.- Regional Fiduciaria Occidente.- 2 dos firmas ilegibles."

II.- **CERTIFICADO DE LIBERTAD O GRAVAMEN.** El Certificado de Libertad o Gravamen expedido por el Registro Público de la Propiedad correspondiente, respecto del INMUEBLE, lo transcribo a continuación a la letra y lo agrego a mi Libro de Documentos correspondiente al Tomo 57 cincuenta y siete, bajo el número 438 (cuatrocientos treinta y ocho).-

"Al margen un sello con el Escudo.- GOBIERNO DEL ESTADO DE JALISCO.- PODER EJECUTIVO.- SECRETARÍA GENERAL.- Dentro: GOBIERNO DEL ESTADO DE JALISCO.- DIRECCIÓN DEL REGISTRO PÚBLICO DE LA PROPIEDAD.- 07/05/04.- Un código de barras.- 07/05/04.- NOM.- COMO DIRECTOR DE CERTIFICACIONES DEL REGISTRO PÚBLICO DE LA PROPIEDAD DE ESTA CIUDAD, CERTIFICO: Que he revisado los libros respectivos para averiguar qué gravámenes reporta el siguiente inmueble: finca denominada vista hermosa ubicada en Chanela Municipio de La Huerta, Jalisco, con una superficie de 22,500.00 mts, y que se formó de seis diversas fracciones fideicomitidas que hoy son un solo paño en ellas edificadas con las medidas y linderos siguientes; A partir del vértice 2, dos de este predio La Burra, correspondiente exactamente con el vértice 2, de Tambora, y a quinientos ochenta y cuatro metros veinte centímetros del lindero entre ambos lotes es decir con rumbo sur cuarenta y cuatro grados oeste, se encuentra sobre el filo del cerro La Burra, La mojonera "1", de esta mojonera a doscientos

D000574



D000575

125

9

noventa y cinco metros al NorOeste, y rumbo al Norte, cuarenta y un grados cero minutos dos segundos, Oeste y sobre

el segundo hombro del cerro, de la Burra, se localiza la Mojonera "2", del plano, mojonera Sur-Este, del predio Vista

Hermosa, al que se hace referencia del señor Jorge Quiroz Huacuja, que colinda en ciento cincuenta metros con el

predio de la señora Emma Quiroz de Urquiza, Indero que continúa la misma linea y dirección de la Mojonera "1" de

referencia (Norte cuarenta y un grados, cero minutos, veinte segundos oeste), Llegando al vértice 3, de este predio Vista

Hermosa, de este vértice 3, al vértice 4, que va a la belita, tiene un rumbo sur, cuarenta y ocho grados, cincuenta y ocho

minutos, Oeste, y una longitud de ciento cincuenta metros, del vértice 4, al 5, hay una distancia de ciento cincuenta

metros y el lindero tiene un rumbo de sur, cuarenta y un grados cero minutos dos segundos, Este del vértice 2, o punto

de partida del polígono que forma este predio hay una distancia de ciento cincuenta y ocho minutos Este, todos los

angulos internos de este polígono son de noventa grados y colinda el predio que se describe vista hermosa, por todos

sus vientos con el predio de la señora Emma Quiroz de Urquiza, plano que firman las partes.- ESTA REGISTRADO bajo

el documento número 1 fólios del 103 al 121 del Libro 92 de la Sección Inmobiliaria, con número de orden 65386.-

GOBIERNO DEL ESTADO DE JALISCO.- Hice la búsqueda con vista de los registros relativos del 24 de Septiembre del

2002, al día de hoy se encuentra registrado de: HOWELL & GARDNER INVESTORS INC.- como Fiduciario BANCO

NACIONAL DE MEXICO, S.A.- Durante las épocas anteriormente indicadas, no encontré gravámenes o limitaciones de

dominio sobre el inmueble en cuestión.- A solicitud de ANA LAURA AMEZCUA DELGADILLO y para los fines legales

que le convenga, expido la presente en la ciudad de Autlan, Jalisco, siendo las 10:39:23 a.m. horas del día 07 de Mayo

de 2004.- Los derechos se pagaron bajo recibo número 3565250 POR $260.- EL DIRECTOR REGISTRO PUBLICO DE

LA PROPIEDAD.- LIC. CARLOS MANUEL DUEÑAS GUERRERO.- Firma ilegible.- El sello de la Oficina." -----------

III.- ACTA MATRIMONIO.- Los señores MARTHA MARGARITA BARBA DE LA TORRE, me acredita estar

casada bajo el régimen de separación de bienes, con su acta de matrimonio, copia de la cual dejo agregada a mí Libro

de Documentos correspondiente al Tomo 57 cincuenta y siete, bajo el número 439 (cuatrocientos treinta y nueve), y de la

cual transcribo a continuación lo conducente: ----------------------------------------------------------------

"Al margen el escudo nacional que dice: ESTADOS UNIDOS MEXICANOS.- CERTIFICADOS DE LAS ACTAS

DEL REGISTRO CIVIL PARA.- DE OFICIO.- Acta No. 951.- Novecientos cincuenta y uno.- Matrimonio de Victor

Manuel Díaz Ramos y Martha Margarita Barba de la Torre.- Huellas Digitales.- Dentro: EN NOMBRE DE LA

REPUBLICA DE MEXICO.- y como Oficial del Estado Civil de este lugar, hago saber a los que la presente vieren

y certifico ser cierto que en el libro Núm. 465 del Registro Civil que es a mi cargo, a la foja 64 se encuentra

asentada una Acta del tenor siguiente: En Guadalajara, a 19 diecinueve de Diciembre de 1962, mil novecientos

sesenta y dos a las ... horas ante mí Miguel Mercado Oficial del Registro Civil de este lugar comparecieron Víctor

Manuel Díaz Ramos, .... y Martha Margarita Barba de la Torre, .....optando consciente y deliberadamente el

régimen de separación de bienes.- .....Copia que concuerda fielmente con su original. Se extiende, en esta Oficina

No. Uno del Registro Civil. Guadalajara, Jalisco a los ....días del mes de ... de.... 11 FEB. 1988.- EL OFICIAL

DEL REGISTRO CIVIL.- LIC. PABLO ANTONIO CHAVEZ LOPEZ.- Una firma ilegible" --------------------------

----------------------------- P E R S O N A L I D A D: -----------------------------

UNO.- BANCO NACIONAL DE MEXICO, SOCIEDAD ANÓNIMA, INTEGRANTE

DEL GRUPO FINANCIERO BANAMEX, División Fiduciaria.- Los señores LICENCIADOS

JOSE GUADALUPE NANDE RODRIGUEZ y RAFAEL NUÑEZ MARTINEZ, me acreditan la legal existencia de su

D000576



D000577

10

representada, así como el carácter y facultades con que comparecen, las cuales bajo protesta de decir verdad, manifiestan no les han sido revocadas ni modificadas en sus términos, con lo siguiente: ————————

I.- CONSTITUCIÓN.- Con el testimonio de la escritura pública número 225 doscientos veinticinco, otorgada el día 1° primero de diciembre de 1936 mil novecientos treinta y seis, ante la del Licenciado Carlos Hinojosa Guajardo, inscrita en el Registro Público de la Propiedad de y de comercio de Monterrey, Nuevo León, bajo el número 183 ciento ochenta y tres, volumen 84 ochenta y cuatro, libro 3 tres, Segundo Auxiliar, Sección de comercio y bajo el número 61 sesenta y uno, volumen 9 nueve, Sección Matrículas, mediante la cual se constituyó como "COMPAÑIA GENERAL DE ACEPTACIONES", SOCIEDAD ANONIMA, con domicilio en la ciudad de Monterrey, Nuevo León, con una duración indefinida y un capital social de $500,000.00 QUINIENTOS MIL PESOS 00/100 MONEDA NACIONAL. ————

II.- CAMBIO DE DENOMINACIÓN.- Con el Testimonio de la escritura número 10,470 diez mil cuatrocientos setenta, otorgada con fecha 7 siete de diciembre de 1970 mil novecientos setenta, ante la del Licenciado Fernando Archavaleta Palafox, Notario Público número 27 veintisiete de la ciudad de Monterrey, Nuevo León, inscrita en el Registro Público de la Propiedad y de Comercio de Monterrey, Nuevo León, bajo el número 519 quinientos diecinueve, folio sin número, volumen 38 treinta y ocho, libro 4 cuatro Tercer Auxiliar, Actos y Contratos diversos, Sección de Comercio, en la que se hizo constar el cambio de denominación de la sociedad de "COMPAÑIA GENERAL DE ACEPTACIONES", SOCIEDAD ANONIMA, a "FINANCIERA ACEPTACIONES", SOCIEDAD ANONIMA. ———————————————

III.- FUSION.- Con el testimonio de la escritura pública número 15,761 quince mil setecientos sesenta y uno, de fecha 8 ocho de junio de 1977 mil novecientos setenta y siete, otorgada ante la fe del Licenciado Fernando Archavaleta Palafox, Notario Público número 27 veintisiete de la ciudad de Monterrey, Nuevo León, inscrita en el Registro Público de la Propiedad y de Comercio de Monterrey, Nuevo León, bajo el número 1137 mil ciento treinta y siete, volumen 92 noventa y dos, libro 4 cuatro, Tercer Auxiliar, escritura de sociedades y poderes, se hizo constar la fusión de las sociedades Financiera Aceptaciones, Sociedad Anónima, como fusionante y Financiera Serfin de Tampico, Sociedad Anónima, Hipotecaria Serfin, Sociedad Anónima, Banco de Londres y México, Sociedad Anónima, Banca Serfin de Jalisco, Sociedad Anónima, Banca Serfin de Chihuahua, Sociedad Anónima y Banca Serfin Veracruzano, Sociedad Anónima, como fusionadas, asimismo se protocolizó el cambió la denominación de dicha sociedad por la de "BANCA SERFIN", SOCIEDAD ANONIMA; el aumento de su capital social, ampliar su objeto social y la modificación de los estatutos sociales.- ———————————————————————————————

IV.- DECRETO.- Con el Decreto de fecha 29 veintinueve de agosto de 1983 mil novecientos ochenta y tres, publicado en el Diario Oficial de la Federación, se efectuó la transformación de "BANCA SERFIN", SOCIEDAD ANONIMA en "BANCA SERFIN", SOCIEDAD NACIONAL DE CREDITO, INSTITUCION DE BANCA MULTIPLE, quedando dicha sociedad como fusionante con "BANCO AZTECA", SOCIEDAD NACIONAL DE CREDITO, "BANCO DE TRABAJADORES", SOCIEDAD NACIONAL DE CREDITO, "BANCO DE TUXPAN", SOCIEDAD NACIONAL DE CREDITO y "BANCO DE CREDITO DE MONTERREY", SOCIEDAD NACIONAL DE CREDITO, como fusionadas.- —————————————

V.- DECRETO.- Con el Decreto del 19 diecinueve de junio de 1988 mil novecientos ochenta y ocho, publicado el 29 veintinueve del mismo mes y año en el Diario Oficial de la Federación, se hizo constar la fusión de "BANCA SERFIN", SOCIEDAD NACIONAL DE CREDITO, INSTITUCION DE BANCA MULTIPLE, como fusionante con CREDITO MEXICANO, SOCIEDAD NACIONAL DE CREDITO, como fusionada, subsistiendo la primera de ellas. ———————

VI.- DECRETO.- Con el Decreto de fecha 28 veintiocho de octubre de 1985 mil novecientos ochenta y cinco, publicado en el Diario Oficial, de la Federación, en el que se hizo constar la fusión de "BANCA SERFIN", SOCIEDAD NACIONAL

D000578



D000579

126

11

DE CREDITO, INSTITUCION DE BANCA MULTIPLE, como fusionante con "BANCO CONTINENTAL GANADERO, SOCIEDAD NACIONAL DE CREDITO, como fusionada, subsistiendo la primera de ellas.

VII.- TRANSFORMACIÓN.- Con el Decreto de fecha 16 dieciséis de enero de 1992 mil novecientos noventa y dos, publicado en el Diario Oficial de la Federación, inscrito en el Registro Público de la Propiedad y del Comercio de Monterrey, Nuevo León, bajo el número 413 cuatrocientos trece, volumen 197-9 ciento noventa y siete guión nueve, libro número 4 cuatro, Tercer Auxiliar, actos contrato y diversos, Sección de Comercio el día 24 veinticuatro de enero de 1992 mil novecientos noventa y dos, en el que se dispuso la transformación de "BANCA SERFIN", SOCIEDAD NACIONAL DE CREDITO, INSTITUCION DE BANCA MULTIPLE, en "BANCA SERFIN", SOCIEDAD ANONIMA.

VIII.- REFORMA.- Con el testimonio de la escritura pública número 29,792 veintinueve mil setecientos noventa y dos, de fecha 2 dos de junio de 1992 mil novecientos noventa y dos, otorgada ante la fe del Licenciado Fermín Fulda Fernández, Notario Público número 105 ciento cinco del Distrito Federal, inscrita en el Registro Público de la Propiedad y del Comercio de Monterrey, Nuevo León, bajo el número 3887 tres mil ochocientos ochenta y siete, volumen 197-78 ciento noventa y siete guión setenta y ocho, libro 4 cuatro, Tercer Auxiliar, Actos y Contratos Diversos, Sección de Comercio, en la que se hizo constar la Protocolización de Acata de Asamblea General Extraordinaria de Accionistas de BANCA SERFIN, SOCIEDAD ANONIMA, en la que, entre otros puntos se acordó llevar a cabo la incorporación de "BANCA SERFIN", SOCIEDAD ANONIMA al "GRUPO FINANCIERO SERFIN", SOCIEDAD ANONIMA DE CAPITAL VARIABLE y la modificación total de sus estatutos sociales, quedando bajo la denominación de BANCA SERFIN, SOCIEDAD ANONIMA, Institución de Banca Múltiple, Grupo Financiero Serfin.

IX.- REFORMA.- Con el testimonio de la escritura pública número 86,376 ochenta y seis mil trescientos setenta y ocho, otorgada con fecha 10 diez de marzo de 1993 mil novecientos noventa y tres, ante la fe del Licenciado Alberto T. Sánchez Colín, Notario Público número 83 ochenta y tres, del Distrito Federal, inscrita en el Registro Público de la Propiedad y del Comercio de Monterrey, Nuevo León, bajo la partida número 2088 dos mil ochenta y ocho, volumen 199-42 ciento noventa y nueve guión cuarenta y dos, libro 4 cuatro, Tercer Auxiliar, Actos y Contratos Diversos, Sección de Comercio, en la que se hizo constar la protocolización del acta de asamblea general extraordinaria de accionistas de la sociedad, de fecha 19 diecinueve de noviembre de 1992 mil novecientos noventa y dos, en la que se acordó escindir parte del patrimonio de la sociedad y en consecuencia una parte de su activo, pasivo y capital, el de suprimir el valor nominal de las acciones representativas del capital social, así como la modificación al artículo séptimo de los estatutos sociales.

X.- REFORMA DE ESTATUTOS SOCIALES.- Con el testimonio de la escritura 22,218 veintidós mil doscientos dieciocho otorgada con fecha 9 nueve de junio de 1995 mil novecientos noventa y cinco, ante la fe del Licenciado Eduardo Muñoz Pinchetti, Titular de la Notaría número 71 setenta y uno, del Distrito Federal, cuyo primer testimonio quedó inscrito en el Registro Público de la Propiedad de Monterrey, Nuevo León, bajo la partida número 2216 coscientos ochocientos dieciseis, volumen 201-257 doscientos uno guión doscientos cincuenta y siete, del Libro 4 cuatro, Auxiliar actos y contratos diversos, Sección Comercio, se hizo constar la protocolización del acta de Asamblea Extraordinaria de Accionistas de "BANCA SERFIN", SOCIEDAD ANONIMA, INSTITUCION DE BANCA MULTIPLE, GRUPO FINANCIERO SERFIN, de fecha 27 veintisiete de abril de 1995 mil novecientos noventa y cinco, en la que entre otros, se tomó el acuerdo de reformar totalmente los estatutos sociales para que en lo sucesivo quedara con la citada denominación, con domicilio en Monterrey, Nuevo León, duración indefinida, capital social de $107'474,677.00 CIENTO SIETE MILLONES CUATROCIENTOS SETENTA Y CUATRO MIL SEISCIENTOS SETENTA Y SIETE PESOS, MONEDA NACIONAL, teniendo por objeto entre otros, la prestación de servicios de banca y crédito en los términos de la

D000580



D000581

12

Ley de Instituciones de Crédito, la realización de las operaciones y la prestación de los servicios bancarios a que se refiere el artículo 46 cuarenta y seis de dicha ley en todas sus modalidades y con cláusula de admisión de extranjeros. —

XI.- COMPULSA DE ESTATUTOS SOCIALES.- Con el testimonio de la escritura pública número 22,535 veintidós mil quinientos treinta y cinco, otorgada con fecha 8 ocho de noviembre de 1995 mil novecientos noventa y cinco, ante la fe del Licenciado Eduardo Javier Muñoz Pinchetti, Titular de la Notaría Número 71 setenta y uno del Distrito Federal, cuyo primer testimonio quedó inscrito en el Registro Público de la Propiedad de Monterrey, Estado de Nuevo León, el día 7 siete de julio de 1994 mil novecientos noventa y cuatro, bajo el número 3595 tres mil quinientos noventa y cinco, volumen 201-72 doscientos uno guión setenta y dos, libro 4 cuatro, Tercer Auxiliar de actos y contratos diversos, Sección Comercio, se hizo constar la compulsa de estatutos sociales de "BANCA SERFÍN", SOCIEDAD ANÓNIMA, INSTITUCIÓN DE BANCA MÚLTIPLE, GRUPO FINANCIERO SERFÍN.- De dicha escritura copio en lo conducente lo que es del tenor literal siguiente:- "............ CAPÍTULO TERCERO.- ASAMBLEA DE ACCIONISTAS.- ARTÍCULO 16o.- .-La Asamblea General de Accionistas, es el Órgano Supremo de la sociedad y en la realización de sus funciones tendrá las facultades necesarias para el desempeño de las mismas, así como todas aquellas facultades que le asignan las leyes. - ........ La Asamblea de Accionistas, Ordinaria y Extraordinaria, tiene expresamente facultades para otorgar poderes generales y especiales para pleitos y cobranzas, incluyendo aquellas facultades que requieran cláusula especial, para celebrar actos de administración en todas las materias, actos de dominio, para suscribir títulos de crédito y para delegar o sustituir total o parcialmente las facultades otorgadas, así como revocar cualquier poder. Pudiendo otorgar facultades al apoderado designado para que a su vez otorgue poder en nombre de la Sociedad sin perjuicio de su ejercicio directo..........."

DE CONFORMIDAD CON LO DISPUESTO POR EL ARTÍCULO 68 OCHENTA Y OCHO DE LA LEY DEL NOTARIADO EN VIGOR, OBRA AGREGADA COPIA DEL TESTIMONIO DE MÉRITO, A MI LIBRO DE DOCUMENTOS CORRESPONDIENTE AL TOMO 21 VEINTIUNO, BAJO EL NÚMERO 886 OCHOCIENTOS OCHENTA Y SEIS. —

XII.- LA PERSONALIDAD CON QUE COMPARECEN. —

a).- El señor LICENCIADO JOSE GUADALUPE NANDE RODRIGUEZ, me acredita su personalidad y facultades con que comparece, con el Testimonio de la escritura pública número 88,586 ochenta y ocho mil quinientos ochenta y seis, otorgada con fecha 29 veintinueve de noviembre de 1999 mil novecientos noventa y nueve, otorgada ante la fe del Licenciado Iñigo Xavier Reynoso de Teresa, Titular de la Notaría Pública número 58 cincuenta y ocho del Distrito Federal, inscrita en el Folio Mercantil 65,126 sesenta y cinco mil ciento veintiséis del Registro de Comercio del Distrito Federal, en la cual se hace constar el poder especial que otorga Banco Nacional de México, Sociedad Anónima, División Fiduciaria, de la que transcribo a continuación en lo conducente: ----------

"COPIA CERTIFICADA DE LA ESCRITURA NÚMERO OCHENTA Y OCHO MIL QUINIENTOS OCHENTA Y SEIS.- IÑIGO XAVIER REYNOSO DE TERESA, NOTARIO CINCUENTA Y OCHO DEL DISTRITO FEDERAL, HAGO CONSTAR QUE EN EL LIBRO DOS MIL CIENTO CINCUENTA Y OCHO DEL PROTOCOLO A MI CARGO, SE ENCUENTRA ASENTADO EL INSTRUMENTO QUE TRANSCRIBO A LA LETRA:- "..... México, Distrito Federal a veintinueve de noviembre de mil novecientos noventa y nueve.- IÑIGO XAVIER REYNOSO DE TERESA, Notario cincuenta y ocho del Distrito Federal, hago constar el PODER ESPECIAL que otorga "BANCO NACIONAL DE MÉXICO", SOCIEDAD ANÓNIMA, División Fiduciaria; representada en este acto por los señores FRANCISCO JOSE BALTAZAR RODRIGUEZ y EMILIO FRAGOSO GARCIA, Delegados

D000582



D000583

127

13

Fiduciaria de dicha Institución; en lo sucesivo "EL PODERDANTE"; en favor de los señores .......... GUADALUPE NANDE RODRIGUEZ ........... en lo sucesivo "LOS APODERADOS"; en los términos que siguen:.- C L A U S U L A S .- PRIMERA.- "BANCO NACIONAL DE MÉXICO", SOCIEDAD ANÓNIMA, División Fiduciaria; representada en este acto por los señores FRANCISCO JOSE BALTAZAR RODRIGUEZ Y EMILIO FRAGOSO GARCIA, otorga en favor de los señores .......... JOSE GUADALUPE NANDE RODRIGUEZ..............un PODER ESPECIAL, pero tan amplio como en derecho sea necesario, con toda la amplitud de facultades a que se refieren los tres primeros párrafos del artículo dos mil quinientos cincuenta y cuatro y el artículo dos mil quinientos ochenta y siete, ambos del Código Civil, así como las disposiciones correlativas de los códigos civiles de los Estados de la República en donde se ejerció el poder, para que en su nombre y representación comparezcan a la celebración de operaciones fiduciarias mediante las cuales se formalicen actos jurídicos en los que se haga constar; constituciones, modificaciones, extinciones parciales y totales de fideicomisos, mandatos, depósitos y comisiones mercantiles, en que intervenga con el carácter de Fiduciario, el "BANCO NACIONAL DE MÉXICO", SOCIEDAD ANÓNIMA, con la limitación que se menciona en la cláusula segunda que sigue:.- SEGUNDA.- Las facultades a que alude la cláusula anterior estarán limitadas por los siguientes incisos:.- a).- "LOS APODERADOS" deberán ejercer el poder, siempre en forma conjunta, e indistinta, dos de los apoderados designados, o bien uno de ellos, actuando mancomunadamente con algún Delegado Fiduciario de "BANCO NACIONAL DE MÉXICO", SOCIEDAD ANÓNIMA, División Fiduciaria.- b).- Para su ejercicio, los apoderados requerirán siempre sin excepción alguna, de instrucciones previas y por escrito firmadas por dos Delegados Fiduciarios de "BANCO NACIONAL DE MÉXICO", SOCIEDAD ANÓNIMA, División Fiduciaria ...... R E P R E S E N T A C I O N .- Manifiestan los comparecientes, bajo protesta de decir verdad, que su representada es persona capaz y que las facultades con que actúan, no les han sido revocadas ni en forma alguna modificadas y me acreditan los anteriores extremos, con copia certificada de su personalidad, documento que agrego al apéndice de esta escritura con letra "A" y número de legajo que le corresponde ....... YO, EL NOTARIO HAGO CONSTAR Y DOY FE: ... III.- De que leí íntegramente esta escritura, explicándole el valor y consecuencias legales de su contenido y conforme con ella, la firma ante el suscrito que la AUTORIZA DE INMEDIATO el día de su fecha ....... NOTA PRIMERA.- CON ESTA FECHA EXPEDI PRIMER TESTIMONIO, EN DOS HOHAS, PARA LOS APODERADOS, SEÑORES ..... JOSE GUADALUPE NANDE RODRIGUEZ .......... MEXICO, D.F., A 29 VEINTINUEVE DE NOVIEMBRE DE 1999".- RUBRICA ........ ES COPIA CERTIFICADA DE LA ESCRITURA NUMERO OCHENTA Y OCHO MIL QUINIENTOS OCHENTA Y SEIS, OTORGADA EN EL LIBRO DOS MIL CIENTO CINCUENTA Y OCHO DEL PROTOCOLO A MI CARGO, QUE EXPIDO PARA "LOS APODERADOS", SEÑORES.............. JOSE GUADALUPE NANDE RODRIGUEZ............ESTA COTEJADA, CORREGIDA Y VA EN UNA HOJA UTIL CON TINTA FIJA.- DOY FE.- MEXICO, DISTRITO. FEDERA, A. DIECIOCHO DE FEBRERO DE DOS MIL ....... .-

EN CUMPLIMIENTO DE LO DISPUESTO POR EL ARTICULO 88 (OCHENTA Y OCHO) DE LA LEY DEL NOTARIADO EN VIGOR, UNA COPIA FOTOSTATICA DEL TESTIMONIO DE MERITO OBRA AGREGADA A MI LIBRO DE DOCUMENTOS CORRESPONDIENTE AL TOMO 46 (CUARENTA Y SEIS), BAJO EL NÚMERO 844 (OCHOCIENTOS CUARENTA Y CUATRO).-

b).- El señor LICENCIADO RAFAEL NUÑEZ MARTINEZ, me acredita su personalidad y facultades con que comparece, con el Testimonio de la escritura pública número 87,297 (ochenta y siete mil doscientos noventa y

D000584



D000585

14

siete), otorgada con fecha 4 (cuatro) de septiembre de 1998 (mil novecientos noventa) y ocho, ante la de la Licenciado

Íñigo Xavier Reynoso de Teresa, Notario Titular de la Notaría Número 58 (cincuenta y ocho) del Distrito Federal, inscrita

en el Folio Mercantil 65,126 (sesenta y cinco mil ciento veintiséis) del Registro de Comercio del Distrito

Federal, en la cual se hace constar el poder especial que le otorga Banco Nacional de México, Sociedad

Anónima, División Fiduciaria.

De la escritura antes citada, transcribo en lo conducente lo siguiente:

"..... LIBRO DOS MIL CIENTO VEINTISIETE (962529B).- NUMERO OCHENTA Y SIETE MIL DOSCIENTOS

NOVENTA Y SIETE.- México, Distrito Federal a cuatro de septiembre de mil novecientos noventa y ocho.- ÍÑIGO

XAVIER REYNOSO DE TERESA, Notario cincuenta y ocho del Distrito Federal, hago constar el PODER

ESPECIAL que otorga "BANCO NACIONAL DE MÉXICO", SOCIEDAD ANÓNIMA, División Fiduciaria:

representada en este acto por los señores FRANCISCO JOSÉ BALTAZAR RODRÍGUEZ y ANDRÉS

FRANCISCO MELO CAÑALS, Delegados Fiduciarios de dicha Institución; en lo sucesivo "EL PODERDANTE"; a

favor de los señores CATALINA CELIS GOMEZ, ...... RAFAEL NUÑEZ MARTÍNEZ, CLAUDINA RUIZ ESPARZA

PEON, ...... en lo sucesivo "LOS APODERADOS", en los términos que siguen.- CLAUSULAS.- PRIMERA.-

"BANCO NACIONAL DE MÉXICO", SOCIEDAD ANÓNIMA, División Fiduciaria; representada en este acto por los

señores FRANCISCO JOSÉ BALTAZAR RODRÍGUEZ y ANDRÉS FRANCISCO MELO CAÑALS, otorga a favor

de los señores CATALINA CELIS GÓMEZ, ........ RAFAEL NUÑEZ MARTÍNEZ, CLAUDINA RUIZ ESPARZA

PEON, ..... un PODER ESPECIAL, pero tan amplio como a derecho sea necesario, con toda la amplitud de

facultades a que se refieren los tres primeros párrafos del artículo dos mil quinientos cincuenta y cuatro y el

artículo dos mil quinientos ochenta y siete, ambos del Código Civil, así como las disposiciones correlativas de los

códigos civiles de los Estados de la República en donde se ejercite el poder, para que en su nombre y

representación comparezcan a la celebración de operaciones fiduciarias mediante las cuales se formalicen actos

jurídicos en los que se haga constar: constituciones, modificaciones, extinciones parciales y totales de

fideicomisos, constitución de todo tipo de garantías contratos de promesa; cesiones de derechos, mandatos o

comisiones, así como de las demás operaciones en que intervenga con el carácter de Fiduciario, el "BANCO

NACIONAL DE MÉXICO", SOCIEDAD ANÓNIMA, con la limitación que se menciona en la cláusula segunda que

sigue.- SEGUNDA.- Las facultades a que alude la cláusula anterior estarán limitadas por los siguientes incisos.-

a).- "LOS APODERADOS" deberán ejercitar el poder, siempre en forma conjunta, e indistinta, dos de los

apoderados designados, o bien uno de ellos, actuando mancomunadamente con algún Delegado Fiduciario de

"BANCO NACIONAL DE MÉXICO", SOCIEDAD ANÓNIMA, División Fiduciaria.- b).- Para su ejercicio, los

apoderados requerirán siempre sin excepción alguna, de instrucciones previas y por escrito firmadas por los

Delegados Fiduciarios de "BANCO NACIONAL DE MÉXICO", SOCIEDAD ANÓNIMA, División Fiduciaria.- c).- El

presente poder dejará de surtir efectos para el funcionario que deje de prestar sus servicios al "BANCO

NACIONAL DE MÉXICO", SOCIEDAD ANÓNIMA, División Fiduciaria, desde el momento mismo de su

separación.- d).- "LOS APODERADOS", serán responsables por el uso indebido de la información que les

proporcione el fiduciario. ...... REPRESENTACIÓN.- Manifiestan los comparecientes, bajo protesta de decir

verdad, que su representada es persona capaz y que las facultades con que actúan, no les han sido revocadas ni

en forma alguna modificadas y me acreditan los anteriores extremos, con copia certificada de su personalidad,

documento que agrego al apéndice de ésta escritura ....... POR SUS GENERALES y advertidos de las penas en

que incurren quienes declaran falsamente, los comparecientes manifestaron ser.- EL SEÑOR ANDRÉS

D000586



D000587

128

15

FRANCISCO MELO CAÑALS, mexicano, originario de esta Ciudad, en donde nació el día tres de octubre de mil

novecientos cincuenta y nueve, casado, Funcionario Bancario y con domicilio en Reforma número cuatrocientos

cuatro, piso catorce, Colonia Juárez, en esta Ciudad.- EL SEÑOR FRANCISCO JOSÉ BALTAZAR RODRÍGUEZ,

mexicano, originario de ésta ciudad, en donde nació el día diez de octubre de mil novecientos cuarenta y seis,

casado, funcionario bancario y con igual domicilio que el anterior compareciente.- YO, EL NOTARIO HAGO

CONSTAR Y DOY FE.- I.- De que conozco personalmente a los comparecientes, y a mi juicio los conceptúo

legalmente capacitados para la celebración de este acto.- ........- ES CUARTO TESTIMONIO QUE SE EXPIDE

PARA "LOS APODERADOS", SEÑORES ..... RAFAEL NUÑEZ MARTÍNEZ, CLAUDINA RUIZ ESPARZA PEON,

........ ESTA COTEJADO, CORREGIDO Y VA EN DOS HOJAS ESCRITAS CON TINTA FIJA. DOY FE. MÉXICO,

DISTRITO FEDERAL, A OCHO DE SEPTIEMBRE DE MIL NOVECIENTOS NOVENTA Y OCHO.- Una firma

ilegible.- El sello notarial de autorizar.".—————————————————————————————

DE CONFORMIDAD CON LO DISPUESTO POR EL ARTICULO 88 (OCHENTA Y OCHO) DE LA LEY DEL

NOTARIADO EN VIGOR, AGREGO COPIA CERTIFICADA DEL TESTIMONIO DE MERITO A MI LIBRO DE

DOCUMENTOS CORRESPONDIENTE AL TOMO 57 (CINCUENTA Y SIETE), BAJO EL NÚMERO 440

(CUATROCIENTOS CUARENTA).————————————————————————————————

c).-Con la carta de instrucción de fecha 2 dos de Agosto de 2004 dos mil cuatro, firmada por los Delegados Fiduciarios

señores Licenciado ALBERTO COMONFORT HERNANDEZ y Licenciado OCTAVIO OSNAYA VAZQUEZ, la cual

transcrito como a continuación se indica:————————————————————————————

".- Banamex.- México, D.F., 2 de Agosto del 2004.- Lic. Rafael Nuñez Martínez.- Lic. José Guadalupe Nande Rodríguez.-

Referencia: Fideicomiso No. 105988-0.- Sírvanse concurrir a la Notaría Pública No. 9 de Tlaquepaque, Jalisco, a cargo

del Lic. Felipe Ignacio Vázquez Aldana Sauza, a la firma de la escritura pública en donde contenga transmisión de

inmueble en Ejecución Total de Fideicomiso, con las siguientes características: TRANMITE: Banco Nacional de México,

S.A., por instrucciones de HOWELL & GARDNER INVESTORS INC., fideicomiso del fideicomiso de la referencia.-

INMUEBLE: Inmueble denominado VISTA HERMOSA ubicado en Chamela, Mpio, de la Huerta, Jalisco, con una

superficie aproximada de 22,500.00 mts2.- ADQUIERE: MARTHA MARGARITA BARBA DE LA TORRE Y

ALEJANDRO DIAZ BARBA, quienes comparecerán a la firma de la escritura.- Lo anterior en ejercicio de las facultades

que les fueron conferidas por esta institución, mediante Escritura Pública No. 87,297 de fecha 4 de Septiembre de 1998

y Escritura Pública No. 88,586 de fecha 29 de Noviembre de 1999, ante la fe del Lic. Iñigo X. Reynoso de Teresa,

Notario Público No. 58 de México, Distrito Federal.- La personalidad que nos acredita como Delegados Fiduciarios de

Banco Nacional de México, S.A. se encuentra consignada en la Escritura Pública No. 48,800 de fecha 30 de Octubre de

2003, otorgada ante la fe del Lic. Roberto Nuñez y Bandera Notario Público 1 de México, D.F.- A t e n t a m e n t e.- Lic.

Alberto Comonfort Hernández.- Delegado Fiduciario.- Lic. Octavio Osnaya Vázquez.- Delegado Fiduciario.-  2 dos firmas

ilegibles".————————————————————————————————————————

Manifiestan los comparecientes, bajo protesta de decir verdad, que sus representadas cuentan con capacidad

legal y que la personalidad y las facultades con que comparecen a este otorgamiento, no les han sido revocadas

ni modificadas en sus términos.—————————————————————————————————

**EL SUSCRITO NOTARIO CERTIFICA Y DA FE**————————————————————————————

a).- Que los insertos que contiene esta escritura concuerdan fielmente con sus originales de donde se compulsaron y

tuve a la vista.—————————————————————————————————————————

D000588





D000589

16

b).- Que conozco a los comparecientes y los conceptúo con capacidad legal para contratar y obligarse, habiendo manifestado por sus generales ser: mexicanos por nacimiento, mayores de edad: ————————————

El señor LICENCIADO JOSE GUADALUPE NANDE RODRIGUEZ, casado, funcionario bancario, originario de Cocula, Jalisco, en donde nació el día 10 (diez) de junio de 1965 (mil novecientos sesenta y cinco) y con domicilio en Avenida López Mateos Sur número 4145 (cuatro mil ciento cuarenta y cinco), en el Fraccionamiento La Calma en Zapopan, Jalisco. ————————————

El señor LICENCIADO RAFAEL NUÑEZ MARTÍNEZ, casado, abogado, originario de la ciudad de México, Distrito Federal el 17 (diecisiete) de Enero de 1970 (mil novecientos setenta),  con domicilio en Avenida López Mateos Sur número 4145 (cuatro mil ciento cuarenta y cinco), en el Fraccionamiento La Calma, en la Municipalidad de Zapopan, Jalisco. ————————————

La señora MARTHA MARGARITA BARBA DE LA TORRE, casada bajo el régimen de separación de bienes, dedicada al hogar, originaria de Guadalajara, Jalisco, en donde nació el día 26 (veintiséis) de Septiembre de 1939 (mil novecientos treinta y nueve, con domicilio en calle Brasilia número 2964 (dos mil novecientos sesenta y cuatro), en el Fraccionamiento Colomos Providencia, en la Municipalidad de Guadalajara, Jalisco. ————————————

El señor ALEJANDRO DIAZ BARBA, soltero, profesionista, originario de Guadalajara, Jalisco, en donde nació el día 11 11 (once) de agosto de 1964 (mil novecientos sesenta y cuatro), con domicilio en calle Brasilia número 2964 (dos mil novecientos sesenta y cuatro, en el Fraccionamiento Colomos Providencia, en la Municipalidad de Guadalajara, Jalisco. —

c).- Que en cuanto al pago del Impuesto Sobre la Renta, bajo protesta de decir verdad y advertidos de las penas en que incurre quien declara con falsedad manifestaron que se encuentran al corriente en dicho pago, sin acreditármelo en este acto. ————————————

d).- Que de conformidad con lo previsto por el último párrafo del Artículo 56 (cincuenta y seis) de la Ley del Notariado en vigor, agregó a mi Libro de Documentos correspondiente al Tomo 57 (cincuenta y siete), bajo el número 441 (cuatrocientos cuarenta y uno, hoja anexa en la cual se asentarán las notas correspondientes a la presente escritura. ————————————

e).- Que cada uno de los otorgantes leyó la presente escritura y una vez advertidos de su valor, alcance y consecuencias, así como de la necesidad de su inscripción en el Registro Público de la Propiedad, se manifestaron conformes con su contenido, firmando el protocolo y en el duplicado. ————————————

El suscrito Notario autoriza a continuación la presente escritura con mi firma y sello, haciendo constar que se terminó de firmar el día 12 doce del mes de su fecha, a las 13.00 trece horas. ————————————

Firmados:- JOSE GUADALUPE NANDE RODRIGUEZ.- Una firma legible.- RAFAEL NUÑEZ MARTÍNEZ.- Una firma ilegible.- MARTHA MARGARITA BARBA DE LA TORRE.- Una firma ilegible.- ALEJANDRO DIAZ BARBA.- Una firma ilegible.- FELIPE IGNACIO VÁZQUEZ ALDANA SAUZA.- El Sello de Autorizar.-

————————————NOTAS RELATIVAS————————————

Documento No. 441 .- Escritura No. 12,532.- Tomo No. 57. ————————————

Hoja que se agrega al Libro de Documentos para asentar las notas relativas a la Escritura. ————————————

Bajo el número 1,328 (mil trescientos veintiocho) y siguientes respectivamente agrego a mi Libro de Documentos correspondiente,  al tomo 57 (cincuenta y siete) el duplicado del aviso al Archivo de Instrumentos Públicos, la Declaración del Impuesto Sobre la Renta que importó $1,354,913.00 (UN MILLÓN TRESCIENTOS CINCUENTA Y CUATRO MIL NOVECIENTOS TRECE PESOS 00/100 MONEDA NACIONAL), la Declaración Sobre el Impuesto por Transmisiones Patrimoniales que importó $178,620.00 (CIENTO SETENTA Y OCHO MIL SEISCIENTOS VEINTE

D000590



D000591

129

PESOS 00/100 MONEDA NACIONAL) y el Aviso Preventivo al Registro Público de la Propiedad.- Guadalajara, Jalisco,

a los 8 (ocho) días del mes de septiembre de 2,004 (dos mil cuatro).- Firmado.- Felipe Ignacio Vázquez Aldana Sauza

SE SACO DE SU MATRIZ ESTE PRIMER TESTIMONIO DEBIDAMENTE COTEJADO Y CORREGIDO PARA SU

INCORPORACIÓN EN EL REGISTRO PÚBLICO DE LA PROPIEDAD CORRESPONDIENTE, CONFORME AL

ARTÍCULO 66 (SESENTA Y SEIS, DEL CAPÍTULO I UNO ROMANO, TÍTULO 3 TRES, DE LA LEY DEL

REGISTRO PÚBLICO DE LA PROPIEDAD DEL ESTADO DE JALISCO.- DOY FE.————————————

GUADALAJARA, JALISCO, A LOS 8 (OCHO) DÍAS DEL MES DE SEPTIEMBRE DE 2,004 (DOS MIL CUATRO).————

LIC. FELIPE IGNACIO VÁZQUEZ ALDANA SAUZA



D000592



D000593

130

**H. AYUNTAMIENTO CONSTITUCIONAL**
DE LA HUERTA, JALISCO.

FOLIO  423...

JALISCO
DIRECCION DE INGRESOS
HACIENDA MUNICIPAL

AVISO DE TRANSMISIONES PATRIMONIALES

IMPRESION MAQUINA REGISTRADORA
FECHA  17/08/2004 HACIENDA MUNICIPAL
FOLIO. J 164947          2004-2008

PAGO PROVISIONAL SUJETO A VERIFICACION DE DATOS

OFICINA DE ADMON DE INGRESOS MPALES.
NUMERO DE CUENTA: 1713 UG.

CLAVE CATASTRAL

SE ACOMPAÑAN:  [X] AVALUO DE PERITO   [X] DICTAMEN DE VALOR  [X]  CERTIFICADO DE NO ADEUDO  [X]
(con fotografia y croquis del inmueble)                                    (a nombre del vendedor)

[ ] CERTIFICADO DE USO DE SUELO  [ ]
(en caso de existir plan parcial de desarrollo urbano)

NOMBRE DEL NOTARIO LIC. FELIPE IGNACIO VAZQUEZ ALDANA SAUZA.  NUMERO DEL NOTARIO 9 TLAQUEPAQUE.

NATURALEZA DEL ACTO O CONCEPTO DE LA ADQUISICION
CONTRATO DE TRANSMISION DE PROPIEDAD EN EJECUCION TOTAL DE FIDEICOMISO.  ESCRITURA No. 12,532

EN SU CASO FECHA DE LA RESOLUCION ADJUDICATORIA
LUGAR Y FECHA DE OTORGAMIENTO GUADALAJARA, JAL., AGOSTO 5 DE 2004.
TRANSMITENTE: BANCO NACIONAL DE MEXICO, S.A., INTEGRANTE DEL GRUPO FINANCIERO BANAMEX, DIVISION FIDUCIARIA,
DOMICILIO: rep. sus Apoderados Especiales los señores LICS. JOSE GUADALUPE NANDE RODRIGUEZ Y RAFAEL NUÑEZ
GENERALES: MARTINEZ DOMICILIO: AV. LOPEZ MATEOS SUR NUMERO 4145, FRAC. LA CALMA, EN LA MUNICIPALIDAD DE ZA-
POPAN, JALISCO.
ADQUIRIENTE: MARTHA MARGARITA BARBA DE LA TORRE Y ALEJANDRO DIAZ BARBA.
LUGAR Y FECHA DE NACIMIENTO: GUADALAJARA, JAL., 26 DE SEPTIEMBRE DE 1939 Y AGOSTO 11 DE 1964, RESPEC.
DOMICILIO: AMBOS EN CALLE BRASILIA NUMERO 2964, FRAC. COLONOS PROVIDENCIA, EN GUADALAJARA, JAL.
GENERALES: ELLA CASADA BAJO EL REGIMEN DE SEPARACION DE BIENES, Y DEDICADA AL HOGAR, EL SOLTERO, PROFESIONISTA.
REG. FED. DE CONTRIBUYENTES: BATM-390926 y DIBA-640811, RESPECTIVAMENTE.

CLASIFICACION DEL INMUEBLE TRANSMITIDO  URBANO [ ]  RUSTICO [ ]  BALDIO [ ]  CONSTRUIDO [ ]

UBICACION, MEDIDAS Y LINDEROS: FINCA DENOMINADA "VISTA HERMOSA", UBICADA EN CHAMELA, MP10 DE LA HUERTA, JALISCO,
Y QUE SE FORMO DE 6 DIVERSAS FRACCIONES FIDEICOMITIDAS QUE HOY SON UN SOLO PAÑO, Y LAS CONSTRUCCIONES EN ELLA
EDIFICADAS, CUYA SUPERFICIE, MEDIDAS Y LINDEROS LOS RELACIONO EN HOJA POR SEPARADO Y FORMARA PARTE DEL PRE-
SENTE AVISO.

EL INMUEBLE ANTES DESCRITO LO ADQUIEREN LOS SEÑORES MARTHA MARGARITA BARBA DE LA TORRE Y ALEJANDRO DIAZ BAR-
BA, EN COMUN PROINDIVISO Y REPRESENTANDO PARTES IGUALES, AMBOS PARA SU EXCLUSIVA PROPIEDAD, LA PRIMERA EN
VIRTUD DE ESTAR CASADA BAJO EL REGIMEN DE SEPARACION DE BIENES, Y EL SEGUNDO EN VIRTUD DE QUE SU ESTADO CI-
VIL ES EL DE SOLTERO.

PROCEDENCIA O ANTECEDENTES DE LA ADQUISICION LOS ANTECEDENTES Y DATOS DE ADQUISICION LOS RELACIONO EN HOJA POR SEPA
RADO Y FORMARA PARTE DEL PRESENTE AVISO.

LO TRANSMITIDO CONSTITUYE: FRACCION [ ]  RESTO [ ]  TOTALIDAD [ ]  EN RELACION CON EL TITULO INMEDIATO ANTERIORES

VALORES:

| CATASTRAL | DE LA OPERACION | DEL AVALUO | VALOR DEDUCIBLE | VALOR TOTAL DEL PREDIO EN CASO DE FRACCION |
|---|---|---|---|---|
| 7'508,800.00 | $ 7'508,800.00 | $ 17'400,800.00 | | |

| LIQUIDACION | | CLAVE | IMPORTE | CLAVE |
|---|---|---|---|---|
| IMPUESTO | | | $178,620.00 | |
| RECARGOS | | | | |
| MULTAS | | | | |
| | | TOTAL | | |

DISPOSICIONES APLICABLES EN CASO DE EXENCION

EN CASO DE ESCRITURAS PRIVADAS O OPERACIONES DE FIDEICOMISO, ANEXAR FOTOCOPIAS POR DUPLICADO.
GUADALAJARA JAL., A 12 DE  AGOSTO  2004.

PARA EL CASO DE OPERACIONES PREVISTAS EN LA LEY 42 DE LA LEY DE...

EN CASO DE ESCRITURA PUBLICA

FELIPE I. YAZQUEZ ALDANA SAUZA.
VASF-520913-PN4.

NOMBRE Y FIRMA
DEL VENDEDOR

NOMBRE Y FIRMA
DEL CONYUGE DEL VENDEDOR

NOMBRE Y FIRMA DEL NOTARIO

D000594



D000595



PROPIEDAD PARTICULAR
150.00

SUPERFICIE 22,500.00 m²

150.00
PROPIEDAD PARTICULAR

CUENTA 428 Rco.
KM. 63 CARRETERA FEREDRAL No. 200;
PREDIO RUSTICO VISTA HERMOSA, MPIO. DE LA HUERTA, JAL.

D000596



D000597



GOBIERNO DEL ESTADO DE JALISCO

DIRECCIÓN DEL REGISTRO PÚBLICO DE LA PROPIEDAD

**GOBIERNO DEL
ESTADO DE JALISCO**
PODER EJECUTIVO
SECRETARÍA GENERAL

REGISTRO PÚBLICO DE LA PROPIEDAD

Autlán, Jalisco, _____, Jalisco. El presente documento fue presentado para su registro a las 11:24 horas del día 13 de Septiembre 2004, y a las 14:00 horas del día 13 de Septiembre de 2004, mediante su incorporación bajo documento número 16 folio del 120 al 132 del libro 225 de la Sección Inmobiliaria del Registro Público de la Propiedad, quedó registrado La Escritura Pública número 12,532 del Notario 9, de Tlaquepaque, Jalisco, en la que los señores MARTHA MARGARITA BARBA DE LA TORRE y ALEJANDRO DIAZ BARBA, adquieren el siguiente inmueble: - - - - - - - - - - - - - - - - - - - - - - - - - - - - Finca denominada Vista Hermosa, ubicada en Chamela Mpio. de La Huerta, Jalisco, que se formo de 6. diversas fracciones que hoy son un solo paño y las construcciones en el edificadas, con superficie de 22,500.00 Mts. - - - No. de Orden. 65386
- - -EL DIRECTOR DEL REGISTRO PUBLICO DE LA PROPIEDAD - -

LIC. CARLOS MARIN PEÑAS GUTIERREZ

Los derechos por el registro fueron cubiertos bajo Ref. Ing. No. ($1,834.40) por $ $1,834.40

D000598

F-16

D000599



GOBIERNO DEL ESTADO DE JALISCO

DIRECCIÓN DEL REGISTRO PÚBLICO DE LA PROPIEDAD

GOBIERNO DEL
ESTADO DE JALISCO
PODER EJECUTIVO
SECRETARIA GENERAL

Guadalajara, Jalisco a 12 doce de Septiembre de 2005 dos mil cinco, el suscrito **LIC. IGNACIO LUIS RAMIREZ TAPIA,** Director General del Registro Público de la Propiedad y Comercio, hago constar, que las presentes copias certificadas fueron expedidas en la Oficina Registral con Sede en Autlán, Jalisco el día 30 treinta de Agosto de 2005 dos mil cinco, a solicitud del C. JOSE CAMPOS CARLOS. Los derechos fueron cubiertos bajo recibo número P-9714149

**Atentamente**
**"2005, Año del Adulto Mayor en Jalisco"**



LIC. IGNACIO LUIS RAMIREZ TAPIA

**México**             SGG/DC/JAL   1280

Apostille
(Convention de la Haye du 5 octobre 1961)

| Derechos | $ 125.00 |
| No. orden | 12B072005 |

En México el presente documento público ha sido firmado
por LICENCIADO  IGNACIO LUIS RAMIREZ TAPIA

quien actúa en calidad de  DIRECTOR GENERAL DEL REGISTRO PUBLICO DE
LA PROPIEDAD Y DEL COMERCIO

revestido del sello correspondiente a LA DIRECCION DEL REGISTRO
PUBLICO DE LA PROPIEDAD Y DE COMERCIO GUADALAJARA, JAL.

certificado en  GUADALAJARA, JALISCO        por  EL LICENCIADO
JUAN JOSE RAMIREZ CONTRERAS, DIRECTOR DE CERTIFICACIONES DEL
GOBIERNO DEL ESTADO DE JALISCO  el 13 de  SEPTIEMBRE  de 2005

Firma

D000600



GOBIERNO DEL ESTADO DE JALISCO

DIRECCIÓN DEL REGISTRO PÚBLICO DE LA PROPIEDAD

GOBIERNO DEL
ESTADO DE JALISCO
PODER EJECUTIVO
SECRETARIA GENERAL

REGISTRO PUBLICO DE LA PROPIEDAD Y COMERCIO

**EL C. LICENCIADO CARLOS MANUEL DUEÑAS GUERRERO**, Director de la

Oficina del Registro Público de la Propiedad y Comercio de esta Ciudad.

CERTIFICA

Que la presente copia fotostática que consta de 21 Fojas útiles, concuerda

fielmente con la **INCORPORACION** Número **16**,del libro 225 de **DE LA**

**SECCION INMOBILIARIA** de folios del 120al 132, de donde se compulsa y expide

a solicitud de JOSE CAMPOS CARLOS,para los usos y fines legales que le

convengan.

Los derechos se pagan bajo recibo número P_ 9714149 por la cantidad de

$430pesos 00/100 moneda nacional.

Autlán de Navarro, Jalisco a30 de AGOSTO DEL 2005

DIRECTOR DEL REGISTRO PUBLICO DE LA PROPIEDAD Y COMERCIO

LIC. CARLOS MANUEL DUEÑAS GUERRERO



D000601

1  Geraldine A. Valdez (Bar No. 174305)
   Kendra J. Hall (Bar No. 166836)
2  Farzeen Essa (Bar No. 246971)
   PROCOPIO, CORY, HARGREAVES &
3      SAVITCH LLP
   530 B Street, Suite 2100
4  San Diego, California 92101
   Telephone: 619.238.1900
5
   Attorneys for Appellants Alejandro Diaz-Barba and
6  Martha Margarita Barba de la Torre

7  Stephen B. Morris (SBN 126192)
   Mark C. Hinkley (SBN 138759)
8  MORRIS & ASSOCIATES
   444 West C Street, Suite 300
9  San Diego, California 92101
   Telephone: 619.239-1900
10
11 Attorneys for Appellant Alejandro Diaz-Barba

D. Anthony Gaston (Bar No. 57074)
Attorney At Law
Corporate Center
550 West C Street, Suite 700
San Diego, California 92101
Telephone: 619.234.3103

Attorneys for Appellant
Martha Margarita Barba de la Torre

12              UNITED STATES DISTRICT COURT

13            SOUTHERN DISTRICT OF CALIFORNIA

14  In re:                                Case No. 3:08-CV-01446-BTM-BLM

15  JERRY LEE ICENHOWER dba Seaview       Appeal from Bankruptcy Court (S.D. Cal.)
    Properties, and DONNA LEE ICENHOWER,
16                                        Bkr. Case No. 03-11155-LA7
                                Debtors
17                                        Adv. Proc. No.: 06-90369
                                          Adv. Proc. No.: 04-90392
18  ALEJANDRO DIAZ-BARBA;
    MARTHA MARGARITA BARBA DE LA TORRE    MEMORANDUM OF POINTS AND
19                                        AUTHORITIES IN SUPPORT OF
                                          MOTION OF DEFENDANTS MARTHA
20             Appellants,                MARGARITA BARBA DE LA TORRE
                                          AND ALEJANDRO DIAZ-BARBA FOR
21      v.                                STAY OF JUDGMENT PENDING
                                          APPEAL
22  KISMET ACQUISITION, LLC
                                          Date:   August 28, 2008
23             Appellee.                  Time:   4:00 p.m.
                                          Ctrm:   15
24                                        Judge:  Honorable Barry Ted Moskowitz

25

26

27

28

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................. 1

II. FACTUAL BACKGROUND ............................................................................... 2
    A.    The Villa Property ................................................................................ 2
    B.    Icenhower Induces Diaz To Purchase The Villa Property ................... 3
    C.    The Diaz Family Purchases The Villa Property ................................... 5
    D.    The Avoidance Actions ........................................................................ 6
    E.    Kismet Enters The Picture ................................................................... 6
    F.    Pre-Trial Rulings And The Judgment ................................................. 7

III. THE DIAZ FAMILY IS ENTITLED TO A  DISCRETIONARY STAY WITHOUT
    A BOND ............................................................................................................ 9
    A.    Standard of Review ............................................................................ 10
    B.    The Diaz Family Will Likely Succeed On The Merits ...................... 10
            (a)    H&G is the alter ego of the Debtors, *nunc pro tunc* to the
                 petition date. ............................................................................ 12
            (b)    The assets of H&G are hereby substantively consolidated with
                 the assets of the bankruptcy estate *nunc pro tunc* to the petition
                 date. ......................................................................................... 12
        1.    This Court Lacks Subject Matter Jurisdiction to Determine Real
            Property Rights in Mexico. ............................................................. 12
            (a)    Title to Real Property Can only Be Decided by a Court in the
                 Jurisdiction  Where the Property is Located ............................. 12
            (b)    U.S. Courts Particularly Lack Jurisdiction to Determine Real
                 Property Rights in Foreign Countries ........................................ 13
        2.    The Bankruptcy Code Avoidance Sections Do Not Apply
            Extraterritorially. ............................................................................ 15
        3.    The Judgment Should Be Reversed In That It Disregards The
            International Comity Doctrine and Mexico's Calvo Doctrine. ........ 16
            (a)    Mexico Has a Strong Policy Against Allowing Foreign Powers
                 to Decide Issues Related to Mexican Real Property. ................. 17
            (b)    Mexican Fraudulent Conveyance Laws Differ From those in the
                 United States. ............................................................................ 19
    C.    The Diaz Family Will Suffer Irreparable Harm ................................ 19
    D.    Kismet Will Not Suffer Substantial Harm if the Stay is Granted ..... 21
    E.    Public Interest Considerations Mandate the Issuance of a Stay ....... 21

IV. THE COURT HAS DISCRETION TO REQUIRE A BOND ............................ 22

V. THE DIAZ FAMILY IS ENTITLED TO A STAY AS A MATTER OF RIGHT IF IT
    POSTS A BOND .............................................................................................. 23

VI. EVEN IF THE COURT DETERMINES THE JUDGMENT IS SIMILAR TO AN
    INJUNCTION, THE DIAZ FAMILY IS ENTITLED TO A STAY UNDER RULE
    62(C) ............................................................................................................... 24

VII. CONCLUSION ................................................................................................. 25

i

Bkr. No. 03-1155-LA7
Adv. Proc. No. 06-90369; 04-90392

115634/000000/947280.07

1

<u>**TABLE OF AUTHORITIES**</u>

2

**Page(s)**

3

**FEDERAL CASES**

4

*ACC Bondholders v. Adelphia Communications Corp.* (*In re Adelphia Communications
Corp.*)

5

    361 B.R. 337 (Bankr. S.D.N.Y. 2007) ...................................................................... 19, 20, 21

6

*Argentine Republic v. Amerada Hess Shipping Corp.*

7

    488 U.S. 428, 102 L. Ed. 2d 818, 109 S. Ct. 683 (1989) ........................................ 15

8

*Asociacion De Reclamantes, v. United Mexican States*

    735 F.2d 1517 (DC Cir. 1984) ................................................................................ 14, 18

9

*Barclay v. Swiss Finance Corporation Limited (In re Midland Euro Exchange et al)*

10

    347 B.R. 708 (Bankr. C.D. Cal. 2006) ................................................................... 15

11

*Bermudez v. Reid*

12

    720 F.2d 748 (2d Cir. 1983) .................................................................................... 21

13

*Casey v. Adams*

    102 U.S. at 67-68 ..................................................................................................... 13

14

*Ellenwood v. Marietta Chair Co.*

15

    158 U.S. 105 (1895) ................................................................................................ 13

16

*Equal Employment Opportunity Comm. v. Arabian American Oil Co.*

    499 U.S. 244 (1991) ................................................................................................ 15

17

18

*Feller v. Brock*

    802 F.2d 722 (4th Cir.1986) .................................................................................... 21

19

*Foley Bros., Inc. v. Filardo*

20

    336 U.S. 281 (1949) ................................................................................................ 15

21

*Goldie's Bookstore, Inc. v. Superior Court of State of Cal.*

    739 F.2d 466 (9th Cir. 1984) .................................................................................. 23

22

23

*Hartford Fire Ins. Co. v. California*

    509 U.S. 764 (1993) ................................................................................................ 17

24

*Hebert v. Exxon Corp.*

25

    953 F.2d 936 (5th Cir. 1992) .................................................................................. 23

26

*Hilton v. Braunskill*

    481 U.S. 770, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987) ......................................... 24

27

*Hughes v. Arnod*

28

    No. 2:08-00490 JAM, 2008 WL 2169511 (E.D. Cal. May 22, 2008)...................... 9

ii

*In re Advanced Mining Sys. Inc.*
    173 B.R. 467 (Bankr. S.D.N.Y. 1994) ................................................................ 20

*In re Bridgeport*
    132 B.R. 81 (Bankr. D.Conn. 1991) ..................................................................... 19

*In re Calphine Corp.*
    No. 05-60200 (BRL), 2008 WL 207841 (Bankr. S.D.N.Y., January 24, 2008) ................... 19

*In re Capital West Investors*
    180 B.R. 240 (Bankr. N.D. Cal. 1995) ................................................................. 23

*In re Country Squire Associates of Carle Place, L.P.*
    203 B.R. 182 (2nd Cir. 1996) ............................................................................. 20

*In re Ernst Home Center*
    221 B.R. 243 (9th Cir. BAP 1998) ...................................................................... 10

*In re Forty Eight Insulations, Inc.*
    115 F.3d 1294 (7th Cir. 1997) ............................................................................. 10

*In re Issa Corp.*
    142 B.R. 75 (Bankr. S.D.N.Y. 1992) .................................................................... 19

*In re Max Sugarman Funeral Home, Inc.*
    94 B.R. 16 (Bankr. D.R.I.1988) ..................................................................... 22, 23

*In re Maxwell*
    93 F.3d 1036 (2d Cir. 1996) ............................................................................... 17

*In re Maxwell Commc'n Corp.*
    170 B.R. 800 (S.D.N.Y. 1994) ........................................................................... 15

*In re Maxwell Communication Corporation*
    186 B.R. 807 (S.D.N.Y 1995) ............................................................................ 15

*In re Skinner*
    202 B.R. 867 (Bankr. W.D. VA. 1996) ............................................................ 19, 22

*In re Slater*
    200 B.R. 491 (E.D.N.Y. 1996) ........................................................................... 20

*In re Sphere Holding Corp.*
    162 B.R. 639 (Bankr. E.D.N.Y.1994) ................................................................... 22

*In re Suprema Specialties, Inc.*
    330 B.R. 93 (S.D.N.Y. 2005) .......................................................................... 9, 22

*In re Trans World Airlines, Inc.*
    18 F.3d 208 (3rd Cir. 1994) ................................................................................. 9

iii

Bkr. No. 03-1155-LA7
Adv. Proc. No. 06-90369; 04-90392

115634/000000/947280.07

*Keller v. Malice*
   838 F.Supp. 1163 (D. S.D. Tex. 1993)..................................................................... 12

*LaRouche v. Kezer*
   20 F.3d 68 (2d Cir. 1994) ....................................................................................... 10

*Livingston v. Jefferson*
   15 F. Cas. 660 (C.C.D. Va.1811) ........................................................................... 12

*Lopez v. Heckler*
   713 F.2d 1432 (9th Cir.1983) ........................................................................... 10, 24

*Louisville & N.R.R. v. Western Union Telegraph Co.*
   234 U.S. 369 (1914) ............................................................................................... 12

*Lynch v. California Public Utilities Com'n*
   No. C-04-0580, 2004 U.S. Dist. LEXIS 6022 (N.D. Cal. April 9, 2004) ........... 9, 10

*Mohammed v. Reno*
   309 F.3d 95 (2d Cir. 2002) ............................................................................... 10, 21

*O'Hagan v. U.S.*
   86 F.3d 776,783 (8th Cir. 1996) ............................................................................ 19

*Oakey v. Bennett*
   52 U.S. 33 (1850) ........................................................................................... 13, 14

*S.E.C. v. Platforms Wireless Intern. Corp.*
   No. 04cv2105JM(AJB), 2008 WL 281112 (S.D.Cal. Jan. 31, 2008)..................... 24

*Sarei v. Rio Tinto, PLC*
   456 F.3d 1069,1086 (9th Cir. 2006) ....................................................................... 17

*Southwest Voter Registration Education Project v. Shelley*
   344 F.3d 914 (9th Cir.2003) ..................................................................................... 9

*Thapa v. Gonzales*
   460 F.3d 323 (2d Cir. 2006) ................................................................................... 24

*Tucker Anthony Realty Corp. v. Schlesinger*
   888 F.2d 969 (2d Cir. 1989) ................................................................................... 19

*United States v. Mansion House Center Redevelopment Co.*
   682 F.Supp. 446 (E.D. Mo. 1988) .......................................................................... 23

**OTHER STATE CASES**

*Clarke v. Clarke*
   178 U.S. 186 (1900) ............................................................................................... 13

iv

Bkr. No. 03-1155-LA7
Adv. Proc. No. 06-90369; 04-90392

115634/000000/947280.07

*Holt v. Guerguin*
    163 S.W. 10 (1914) ................................................................ 13, 14

*In re County Squire Assocs. Of Carle Place, L.P.*
    203 B.R. 182 (B.A.P. 2d Cir. 1996) ................................................ 22

### FEDERAL STATUTES

11 U.S.C.
    § 544(A) .......................................................................................... 8
    § 549 ................................................................................................ 8
    § 550(a)(1) and § 551 ...................................................................... 8
    § 550(A)(2) ...................................................................................... 8

Bankruptcy Code
    Chapter 7 ............................................................................ 4, 5, 6, 15
    § 502(h) ...................................................................................... 2, 21
    § 547 .............................................................................................. 15
    § 548 ........................................................................................ 15, 16
    § 7062(d) ........................................................................................ 24

Federal Rule of Civil Procedure
    Rule 62 ............................................................................................ 9
    Rule 62(c) ........................................................................................ 24
    Rule 62(d) ........................................................................................ 23
    Rule 7062 ..................................................................................... 9, 23
    Rule 8005 ................................................................... 9, 10, 19, 22, 24

Federal Civil Code, Article 773 .............................................. 17, 18

### CALIFORNIA STATUES

California Code of Civil Procedure
    § 917.4 ............................................................................................ 23

### OTHER AUTHORITIES

*Divxnetworks, Inc. v. Gericom AG*
    No. 04cv2537 WQH .......................................................................... 24

*Mexican Law: a Treatise for Legal Practitioners and International Investors*,
    § 41.29 ............................................................................................ 18

Mexican Real Estate Company "Impulsora de Chamela" ("IC") ................... 6

115634/000000/947280.07

1           Appellants Martha Margarita Barba De La Torre and Alejandro Diaz-Barba (collectively,

2    "the Diaz Family") respectfully submit their Memorandum Of Points And Authorities In Support

3    Of Emergency Motion For Stay Of Judgment Pending Appeal, as follows:

4                                       **I.**

5                         **<u>INTRODUCTION</u>**

6           The purpose of this motion is to request a stay of the judgment in the above cases pending

7    an appeal to be filed by the Diaz Family.  The appeal is from the judgment of the Bankruptcy

8    Court in two consolidated adversary proceedings avoiding an unauthorized post-petition real

9    property transfer (the "Villa Property") from the Debtor in the underlying bankruptcy proceeding

10    to the Diaz Family (the "Avoidance Actions").  As part of the judgment, the Bankruptcy Court

11    directed Defendants Alejandro Diaz ("Alex") and his elderly mother Martha Margarita Barba De

12    La Torre ("Martha"), two Mexican citizens, to transfer their beloved family vacation home in

13    Mexico, the Villa Property, to Kismet Acquisition LLC, ("Kismet"), a Delaware LLC formed by

14    two German citizens to gain access to the U.S courts.  The Diaz Family paid $1.4 million for the

15    Villa Property and satisfied all  requirements to establish clear title under Mexican law.

16           The Bankruptcy Court reasoned that, although the Diaz Family paid more than fair market

17    value for the Villa Property, Alex had conducted insufficient due diligence in the United States

18    with respect to the transferor to allow him to take advantage of the "good faith purchaser"

19    defense.  It did not find that Alex had colluded or conspired with the Debtors in any way.  If Alex

20    committed any crime, it was that of naivete for believing that the laws of his own country

21    governed a transfer of real property located there.

22           This Court has discretion to grant a stay pending appeal and it need not require the

23    posting of a supersedeas bond.  As addressed below, a discretionary stay is appropriate in this

24    case.  First, the Diaz Family is likely to prevail on the merits.  The Diaz Family's appeal will

25    raise important issues regarding the subject matter jurisdiction of the Bankruptcy Court, and

26    whether the judgment can stand given its direct impact on real property owned by Mexican

27    citizens in Mexico and Mexico's strong policy against allowing foreign powers to decide issues

28    affecting ownership of real property in Mexico.  The Court's determination on these issues at the

1

115634/000000/947280.07

1 trial level is reversible because it was premised on an entirely different theory of the case than

2 that which the Court ultimately adopted in rendering its judgment.

3     Second, absent a stay the Diaz Family will suffer irreparable harm.  If Kismet demolishes

4 the Villa Property, the appeal will become moot and the Diaz Family will never be able to

5 recover what they have lost in the event the Court ultimately reverses the Bankruptcy Court.  The

6 two German property developers that formed Kismet did so solely for the purpose of purchasing

7 the Avoidance Actions from the bankruptcy trustee.  Kismet has made no secret of its intentions.

8 The reason it went to such extraordinary lengths to wrest this property from its reluctant owner is

9 because it obstructs Holes 2 and 5 of a golf course development it is building which will

10 ultimately surround the Villa Property.

11     Third, Kismet will suffer no harm if a stay is granted.  The Villa Property is protected by

12 an injunction issued by the Bankruptcy Court.  Additionally, as consideration for its purchase of

13 the Avoidance Actions from the bankruptcy trustee, Kismet agreed to pay all the unsecured

14 claims against the bankruptcy estate in full.  Under Bankruptcy Code section 502(h), once the

15 Diaz Family turns over the Villa Property, it will have such an unsecured claim for the $1.4

16 million it paid for the property.  Therefore, as a practical matter, Kismet will have to satisfy that

17 claim before it obtains an interest in the Villa Property, Kismet is in no danger of going out of

18 pocket while all rights are finally adjudicated.  Finally, public policy is strongly against the

19 potentially unnecessary forfeiture of homes and disturbance of the status quo.

20     Accordingly, given the significant legal issues in this case, as well as the unique

21 considerations involved when a judgment directly impacts real property located in a foreign

22 country, a stay of the judgment herein is just and proper.

23 **II.**

24 **FACTUAL BACKGROUND**

25     **A.**    **The Villa Property**

26     In or about 1995, D. Donald Lonie and the D. Donald Lonie, Jr., Family Trust (the "Lonie

27 Creditors") entered into an agreement with Debtors Jerry Icenhower ("Icenhower") and Donna

28 Icenhower (collectively, the "Debtors") for the sale of their interest in the Villa Property, a

2

1    beautiful coastal villa in Mexico called the Villa Vista Hermosa.  The Villa Property is located in

2    the village of Chamela in the Municipality of La Huerta, State of Jalisco, Mexico, overlooking

3    the ocean.  *See,* Request for Judicial Notice ("RJN"), Exh. 1, Consolidated Findings of Fact and

4    Conclusions of Law ("FF&CL") entered on June 2, 2008 at ¶3.[1]  Under Mexican law, a foreign

5    national may not directly hold title to coastal real property in Mexico, but may lease or acquire

6    rights of use on such property by forming a *fideicomiso* bank trust to hold title to the real

7    property.  Therefore, the Lonie Creditors sold only a leasehold interest or right of use to the Villa

8    Property to the Debtors who are U.S. citizens (the "Villa Property Interest").  *Id.* at ¶3, fn. 4.

9            In return for their interest in the Villa Property, the Debtors executed two promissory

10    notes in favor of the Lonie Creditors, who recorded a lien to secure the note.  Subsequently, the

11    Lonie Creditors agreed to release the lien to enable the Debtors to sell the Villa Property Interest

12    to a third party.  The sale fell through and a dispute arose between the Debtors and the Lonie

13    Creditors.  *Id.* at ¶4.

14            On March 24, 2000, the Lonie Creditors commenced an action against the Debtors in the

15    United States District Court for the Southern District of California (the "District Court

16    Litigation").  *Id.* at ¶4.  On March 4, 2002, the Debtors purchased a Nevada corporation, H&G,

17    and transferred their Villa Property Interest to that entity.  *Id.* at ¶8.

18        **B.    Icenhower Induces Diaz To Purchase The Villa Property**

19            Alex, a citizen of Mexico, first met Icenhower through a childhood friend, Eugene

20    Kocherga ("Eugene").  Eugene's family formerly owned the Vista Property and Alex and Eugene

21    had spent many happy summers there together.  *Id.* at ¶27.

22            In 2003, Eugene was planning his wedding and was determined to get married in his

23    childhood home.  He made some inquiries to determine the new owners of the Villa Property to

24    see if they would agree to allow him to hold his wedding there.  He was introduced to Icenhower

25    who told him that he was the property manager for the Villa Property.  *Id.*

26            As Eugene was making preparations to rent the Villa Property, he had several meetings

27    with Icenhower.  During one of these meetings in San Diego, Eugene introduced Alex to

28    _____

[1]  The references to the Appendix/docket refer to Adversary Proceeding #04-90392.  The Diaz Family's appeal will also include Adversary Proceeding #06-90369-LA.

1  Icenhower.  Later Eugene and Alex visited the Villa Property together and Alex met Icenhower

2  again.  Alex remembered the Villa Property fondly and found it even nicer than he remembered.

3  Icenhower mentioned that the house was possibly for sale at a selling price of $3 million dollars.

4  Alex indicated that he was interested in the house, but not at that price.  *Id.* at ¶¶27-28.

5      After the wedding, Icenhower contacted Alex several times to ask him if he was still

6  interested in purchasing the Villa Property.  He told Alex that he was only managing the house

7  for H&G which, he said, comprised of a group of investors from Nevada.  Icenhower dropped the

8  asking price a little each time he spoke with Alex.  Finally, he advised Alex that the lowest price

9  H&G would accept for the Villa Property Interest was $1.5 million.  Alex informed his mother,

10  Marth, of this opportunity to purchase the Villa Property.  Martha agreed to become a co-owner

11  with Alex.  Alex told Icenhower that he was interested in purchasing the Villa Property for $1.5

12  million and made a check out to H&G for $25,000.00 as a sign of good faith.  *Id.* at ¶¶29 & 39.

13  Alex then requested his friend and attorney/notary, Mr. Eduardo Sanchez Acosta ("Sanchez") to

14  start the legal process and necessary due diligence to purchase the Villa Property.  While Alex

15  and Sanchez were conducting their due diligence, Martha became very ill and had absolutely no

16  involvement whatsoever in the transaction.

17      On November 24, 2003, the Court entered judgment in favor of the Lonie Creditors in the

18  District Court Litigation.  On December 15, 2003, the Debtors filed for protection under chapter

19  7 of the Bankruptcy Code.    *Id.* at ¶5.  Gerald H. Davis was appointed as trustee (the "Trustee").

20  Shortly thereafter, Alex learned of the Icenhower bankruptcy. *Id.* at ¶31.

21      Alarmed, Alex called Icenhower to inquire about the bankruptcy.  Icenhower explained

22  that he and the Lonie Creditors were in a dispute over a big land development project in

23  Ensenada, Mexico.  The Lonie Creditors wanted to collect on a note that Icenhower assured Alex

24  was already liquidated.  Alex asked if the Villa Property was involved in this dispute.  Icenhower

25  assured him that he had sold it long before the dispute had arisen and that it was not involved in

26  the bankruptcy.  *Id.* at ¶32.

27  / / /

28  / / /

4

1    **C.    The Diaz Family Purchases The Villa Property**

2    Sanchez had completed eight months of due diligence and then presented Alex with a

3    report certifying his findings that there were no outstanding liens on the Villa Property.  The

4    report indicated that Icenhower had formerly owned the Villa Property but that he had transferred

5    it to H&G, a corporation in good standing, two years earlier.  *Id.* at ¶34.

6    Alex received the additional assurances provided for under Mexican law that the Villa

7    Property was free and clear of any liens and encumbrances.  Under Mexican law, a seller or buyer

8    of real property is required to obtain a certificate from the Public Registry of Property, stating

9    who the owner of the property is and if the property is free of any lien or deed affecting the free

10   disposition of the land.  Only after the Public Registry of Property certifies that the seller is the

11   actual owner and that the property is free of liens and claims, will a Public Notary attest and

12   certify, through a deed, the sale/purchase of the property.  Once the process is finished, the

13   Notary Public sends the final deed to the Public Registry for registration, and a certified formal

14   deed is delivered to the buyer.  All liens or claims must be registered with the Mexican

15   government to have any effect, and a notary's certification of no liens is considered a final and

16   conclusive finding of clear title.

17   With respect to Alex's purchase of the Villa Property, both the Public Registry of

18   Property and the Notary Public confirmed that the owner of the Villa Property Interest was H&G

19   and had been so for two years.  They also confirmed that H&G was current with its obligations.

20   Accordingly, on or about June 7, 2004, Alex and H&G closed the sale of the Villa

21   Property.  Upon Icenhower's instruction, Alex transferred the purchase price for the property to

22   the following third-party entities:   (1) $675,000 to Buckeye International Funding, Inc.; (2)

23   $398,663 to Western Financial Assets, Inc. and (3) $191,567 to Icenhower Investments, via a

24   bank account controlled by Icenhower's brother, Hobart Icenhower.  *Id.* at ¶¶37-39.

25   Because Alex and Martha are Mexican citizens, they may hold legal title to the Villa

26   Property, not merely a beneficial interest.  Therefore, they did not merely obtain an assignment

27   of the *ficeicomiso* trust from H&G.  Rather, the Banco Nacional de Mexico, S.A. conveyed legal

28

5

title to the Villa Property directly to the Diaz Family by way of an Escritura dated August 5, 2004 (the "Diaz Escritura"), and the *fideicomiso* trust <u>was dissolved and terminated</u>.

The Diaz Family paid  approximately $1.4 million for the Villa Property.  According to an appraisal commissioned by the Bankruptcy Trustee in September 2004, the Villa Property was worth $1,284,209.

### D.    The Avoidance Actions

On August 23, 2004, The Trustee commenced a fraudulent transfer action against H&G to avoid and recover the Debtors' transfer of their Villa Property Interest to H&G (the "Fraudulent Transfer Action").  The Trustee was unaware of the subsequent transfer of the Villa Property to the Diaz Family.  *Id.* at ¶44.   In February 2005, upon learning of the transfer, the Trustee amended the complaint to add the Diaz Family as defendants and also obtained injunctive relief restraining the Diaz Family from transferring or encumbering the Villa Property.  *Id.* at ¶45.

On August 3, 2006, the Trustee filed a second action against H&G and the Icenhowers seeking a determination that: (1) H&G was the alter ego of the Debtors; and (2) to substantively consolidate the Debtors and H&G *nunc pro tunc* to the date of filing of the bankruptcy petition (the "Alter Ego Action"). (The August 23, 2004 action and the August 3, 2006 actions are collectively referred to as the "Avoidance Actions").  *Id.* at ¶48.

### E.    Kismet Enters The Picture

While the Icenhower bankruptcy was proceeding in the United States, two German property developers, Wolfgang and Dieter Hahn (the "Hahns"), purchased a majority shareholder interest in a Mexican Real Estate Company "Impulsora de Chamela" ("IC").  IC owns more than 350 hectares of land that completely surrounds the Villa Property.  Through IC, the Hahns are developing a golf resort in Mexico called "Tambora".  When completed, Tambora will surround the Villa Property, with Holes 2 through 5 of the golf course wrapping around the property.  The Villa Property is of tremendous strategic value to the Hahn Brothers and they desperately want to obtain it.  However, the Villa Property has great sentimental value to the Diaz Family and they were unwilling to sell it to the Hahns.

6

115634/000000/947280.07

1    The Hahns were not going to give up that easily.  Then, by a stroke of luck, they found a

2    way to out-maneuver Alex and seize the Villa Property.  Ironically, Alex himself informed the

3    Hahns of the Lonie Creditors' claims against the Icenhowers, the bankruptcy and the existence of

4    the Avoidance Actions.  By virtue of Alex's unwitting disclosures, these two German citizens

5    came up with a scheme to use the United States Bankruptcy Court to accomplish their goal to

6    wrest a home located in Mexico from its reluctant Mexican citizen owners.

7        In July 2006, because the Hahns are not U.S. citizens, they set up two shell Delaware

8    corporations, Kismet Acquisitions, LLC and Kismet Acquisitions II, LLC ("Kismet"), to gain

9    access to the bankruptcy court.  They convinced the Lonies to sell Kismet their $1,385,950.65

10    claim arising from the district court litigation.  Next, they entered into an agreement with the

11    Trustee on behalf of Kismet, to purchase the Avoidance Actions (the "Purchase Agreement").  In

12    return for the Avoidance Actions, Kismet agreed to pay an amount sufficient to pay all creditors

13    in full, except for Kismet's own claim, which it agreed to subordinate to those of the other

14    creditors.  On December 7, 2006, the Court entered an order approving the Purchase Agreement.

15    (*See,* RJN Exh. 2, Order Approving Sale of Assets and Exh A thereto.)

16        **F.    Pre-Trial Rulings And The Judgment**

17        On November 29, 2006, the Diaz Family filed a Motion to Dismiss for Lack of Subject

18    Matter Jurisdiction and Failure to State a Claim or, in the Alternative, to Abstain.  See Docket #

19    183-187.  The basis for the motion was the Bankruptcy Court's lack of subject matter jurisdiction

20    to determine real property rights in Mexico and the strong policy considerations involved in

21    deciding issues related to Mexican real property which require abstention on the grounds of

22    international comity.  On February 13, 2007, the Bankruptcy Court issued its order denying the

23    Diaz Family's jurisdictional challenge.

24        On April 21, 2008, the Bankruptcy Court conducted a four-day bench trial of the

25    Avoidance Actions.  On June 2, 2008, the Bankruptcy Court entered judgment against the Diaz

26    Family and its Findings of Fact and Conclusions of Law in support of the Judgment. (*See* RJN

27    Exh. 1).  Preliminarily, the Bankruptcy Court found that Kismet is entitled to Judgment on its

28    claims in the Alter Ego Action.  Therefore, according to the Bankruptcy Court's judgment, the

7

115634/000000/947280.07

1  Villa Property is property of the estate, permitting it to rule that the transfer to the Diaz Family is

2  avoidable under 11 U.S.C. § 549 as an unauthorized post petition transfer.  *Id.* at 80-83.  The

3  Bankruptcy Court went on to rule that alternatively, Kismet is entitled to judgment on the

4  Fraudulent Transfer Action in that the Debtors' transfer of the Villa Property to H&G is

5  avoidable under 11 U.S.C. § 544(A), pursuant to California law and that recovery of the Villa

6  Property from the Diaz Family is permitted pursuant to 11 U.S.C. § 550(A)(2).  *Id.* at 26-33.

7         As indicated in the Bankruptcy Court's Amended Consolidated Judgment, the Bankruptcy

8  Court provided Kismet at its sole option, the following remedies:

9                                          * * *

10        (e)    Plaintiff is entitled to recover and preserve pursuant to 11 U.S.C. §
       550(a)(1) and § 551 the Villa Property from the Diaz Defendants as the initial

11     transferees of the avoided postpetition transfer.  Within ten days of entry of this
       judgment, Defendants are hereby ordered and directed to take all actions

12     necessary to execute and deliver any and all documents needed to undo the
       avoided transfer, and to take all actions necessary to cause the property to be

13     reconveyed to a *fideicomiso* trust naming Plaintiff as the sole beneficiary for the
       benefit of the bankruptcy estate; or

14

15        (f)    Alternatively, at Plaintiff's sole option made upon proper noticed motion,
       the Court reserves jurisdiction to enter a monetary judgment in favor of Kismet,

16     and against Defendants, in an amount necessary to make the estate whole at the
       time of judgment.

17

18        2.     Alternatively, even if the Villa Property is not property of the bankruptcy
       estate *nunc pro tunc* to the petition date, judgment is entered in favor of Plaintiff

19     and against the Defendants on the remaining claims in the amended complaint in
       adversary proceeding 04-90392. It is hereby adjudged and decreed that –

20                                          * * *

21     Plaintiff is entitled to recover and preserve pursuant to 11 U.S.C. §§ 550(a)(1) and

22     (a)(2) and § 551 the avoided fraudulent transfer from H&G as the initial
       transferee of the avoided fraudulent transfer, and from the Diaz Defendants as the

23     "immediate or mediate" transferees of the initial transferee. Within ten days of
       entry of this judgment, Defendants are hereby ordered and directed and execute

24     and deliver any and all documents needed to undo the avoided transfer, and to
       take all actions necessary to cause the property to be reconveyed to a *fideicomiso*

25     trust naming Plaintiff as the sole beneficiary for the benefit of the bankruptcy
       estate;

26

27        (b) Alternatively, at Plaintiff's sole option made upon proper noticed motion,
       the Court retains jurisdiction to enter a monetary judgment in favor of Kismet,

28     and against Defendants, in an amount necessary to make the estate whole at the
       time of judgment.

Bkr. No. 03-11155-LA7
Adv. Proc. No. 06-90369; 04-90392

115634/000000/947280.07

3.    The Court reserves for future determination made upon proper motion the issues of an award of fees and expenses, and it reserves jurisdiction to issue any and all orders necessary to carry out and enforce this judgment.

(*See* RJN, Exh. 3, Amended Consolidated Judgment dated July 30, 2007, Exhibit A.

### III.

### THE DIAZ FAMILY IS ENTITLED TO A

### DISCRETIONARY STAY WITHOUT A BOND

Federal Rules of Procedure 7062 and 8005 establish the procedure to be followed by an appellant seeking to stay a judgment of the bankruptcy court. Bankruptcy Rule 7062 provides that Federal Rule of Civil Procedure Rule 62 is applicable in adversary proceedings, and Bankruptcy Rule 8005 enables the bankruptcy court and the district court to tailor relief to the unique circumstances of the case, "[n]otwithstanding Rule 7062," by making any "appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest." *In re Trans World Airlines, Inc.,* 18 F.3d 208, 212 (3rd Cir. 1994). The court has discretion to grant a stay pending appeal under Bankruptcy Rules 8005 and 7062 and it need not require the posting of a bond. *In re Suprema Specialties, Inc.,* 330 B.R. 93, 96 (S.D.N.Y. 2005)

A motion for a discretionary stay under Rule 8005 is evaluated under standards similar to that of a motion for preliminary injunction. *Hughes v. Arnod,* No. 2:08-00490 JAM, 2008 WL 2169511, at *1 (E.D. Cal. May 22, 2008); *Lynch v. California Public Utilities Com'n,* No. C-04-0580, 2004 U.S. Dist. LEXIS 6022, at *6 (N.D. Cal. April 9, 2004). Therefore, an appellant must show: "(1) a likelihood of probable success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits are raised and the balance of hardships tips sharply in its favor." *Id.* at *6; *Southwest Voter Registration Education Project v. Shelley,* 344 F.3d 914, 917 (9th Cir.2003). Alternatively, "[s]ome courts employ a slightly modified version of this test when evaluating a Rule 8005 motion to stay, finding that appellants must show that: (1) appellants are likely to succeed on the merits of the appeal; (2) appellants will suffer irreparable injury; (3) no substantial harm will come to appellees; and (4) the stay will do no harm to the public interest." *Lynch v. California Public Utilities Com'n,* 2004 U.S. Dist. LEXIS 6022, at *6; In re Wymer, 5 B.R. 802, 806 (9th Cir. 1980). Under either method, "the relative

9

1   hardship to the parties is a 'critical element' in determining whether a stay is warranted." *Id.;*

2   *Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th Cir.1983).

3        In this case, the Diaz Family can satisfy each of these elements.  As dicussed below, the

4   Diaz Family will likely succeed on the merits of the appeal.  The Diaz Family will suffer

5   irreparable injury if it is forced to relinquish its home.  Kismet intends to demolish the Villa

6   Property which could potentially deprive the Diaz Family of its appellate rights altogether by

7   mooting the appeal.  The issuance of the stay would not substantially injure Kismet and the stay

8   would be in the public interest.  Accordingly, the Court should issue a stay pending appeal of the

9   Judgment.

10       **A.**    <u>**Standard of Review**</u>

11        This Court should apply a pure *de novo* determination of whether or not a stay is

12   warranted.  Rule 8005 allows a district court to issue a stay independently of any determination

13   made by the Bankruptcy Court.  *In re Ernst Home Center,* 221 B.R. 243, 248 (9th Cir. BAP

14   1998).  Therefore, even though the Bankruptcy Court initially denied a stay to the Diaz Family,

15   this Court may independently review such denial *de novo.*

16       **B.**    <u>**The Diaz Family Will Likely Succeed On The Merits**</u>

17        Likelihood of success is not certainty of success.  *In re Forty Eight Insulations, Inc.,* 115

18   F.3d 1294, 1301 (7th Cir. 1997) (citing *Michigan Coalition of Radioactive Material Users, Inc. v.*

19   *Griepentrog,* 945 F.2d 150, 153 (6th Cir. 1991).)  The necessary "level" or "degree" of

20   possibility of success will vary according to the court's assessment of the other stay factors.

21   *Mohammed v. Reno,* 309 F.3d 95, 101 (2d Cir. 2002).  The requisite showing of substantial

22   possibility of success is inversely proportional to the amount of irreparable injury defendants will

23   suffer absent the stay. *Id. (quoting, Michigan Coalition of Radioactive Material Users,* 945 F.3d

24   at 153.)  The movant need not always show a 'probability of success' on the merits; instead, the

25   movant need only present a substantial case on the merits when a serious legal question is

26   involved and show that the balance of the equities weighs heavily in favor of granting the stay."

27   *LaRouche v. Kezer,* 20 F.3d 68, 72-73 (2d Cir. 1994).

28

The Diaz Family is likely to succeed on the merits. This Appeal will raise important issues regarding the subject matter jurisdiction of the bankruptcy court and whether the judgment can stand given its direct impact on real property owned by Mexican citizens in Mexico and Mexico's strong policy against allowing foreign powers to decide issues affecting ownership of real property in Mexico. The Diaz Family raised these issues before the Bankruptcy Court in its Motion to Dismiss in January 2007. On January 17, 2007, the Court posted its tentative decision denying the Motion. (RJN Exh. 4, Tentative Decision).

For the purpose of its tentative ruling, the court adopted Kismet's theory of the case <u>at that time</u>—i.e. that there was an initial transfer of the Villa Property from Icenhower to H&G and a subsequent transfer from H&G to the Diaz Family. In so doing, the court was able to insulate itself from the issues raised in the Motion by focusing only on the initial transfer from Icenhower to H&G. The court found that the Diaz Family had "incorrectly focuse[d] on transfers <u>that occurred after</u> Debtor fraudulently conveyed his beneficial interest to H&G". With respect to the Diaz Family's claims of lack of subject matter jurisdiction, the court stated "we look to <u>the initial transfer</u> to determine whether we have jurisdiction, not the later transfers." There is no jurisdictional challenge <u>to the initial tranfers</u>." Finally, with respect to the presumption of extraterritoriality vis a vis avoidance actions the court found that "the presumption against extraterritoriality is not implicated by this complaint. Once we re-focus our attention <u>to the correct transfer (between debtor and H&G)</u> . . ."

At the hearing on the Motion the following day, the court conceded that the arguments set forth in the Motion may have had some merit <u>if the court were to focus on the latter transfer</u>—i.e. the transfer from H&G to the Diaz Family. The court stated: "You don't understand, Mr. Van Derhoff, . . . what the court is saying is the arguments that you made might have some currency, some purchase [sic.] [purpose?] in this case were the first transaction [with] your client [the Diaz Family] . . ." (RJN Exh. 5, Excerpt from Reporter's Transcript of Hearing dated 1/18/08).

The court's emphasis on the initial transfer is significant because, for the purpose of the Judgment, the court determined that:

11

1    (a)    H&G is the alter ego of the Debtors, *nunc pro tunc* to the petition date.

2    (b)    The assets of H&G are hereby substantively consolidated with the assets of the

3    bankruptcy estate *nunc pro tunc* to the petition date.

4    In other words, the judgment collapsed the Debtors and H&G into one entity.  Therefore,

5    for the purpose of the issues raised in the motion to dismiss, which the Diaz Family will now

6    raise on appeal, <u>there was no initial transfer</u> from Icenhower to H&G.  There was only one

7    transfer—the one from H&G/Icenhower to the Diaz Family.  Thus, this Court must focus on that

8    transfer for the purpose of the appeal and, as the bankruptcy court conceded, the issues raised in

9    the Motion to Dismiss—i.e. subject matter jurisdiction, extraterritoriality and international

10   comity may well have merit in the context of that transfer.

11   **1.    <u>This Court Lacks Subject Matter Jurisdiction to Determine Real</u>**

12   **<u>Property Rights in Mexico.</u>**

13   The judgment in this case strips Mexican citizens (the Diaz Family) of title to their real

14   property in Mexico and orders them to execute the necessary conveyance documents to transfer it

15   to someone else.  The United States courts have long respected the sovereignty of foreign nations

16   and have long held that courts in the United States lack the subject matter jurisdiction to effect

17   change of ownership of real property located in foreign countries.

18   **(a)    Title to Real Property Can only Be Decided by a Court in the**

19   **Jurisdiction  Where the Property is Located.**

20   For nearly two hundred years, the Supreme Court has firmly held that issues affecting title

21   to real property are "local actions" and can be decided only by a court in the jurisdiction where

22   the real property is located.  This fundamental principle of law was first established in the United

23   States in *Livingston v. Jefferson*, 15 F. Cas. 660 (C.C.D. Va.1811) (No. 8411).[2]  Following

24   Livingston, the Supreme Court has consistently recognized that a local action must be brought

25   within the state where the land is located.  See, e.g., *Louisville & N.R.R. v. Western Union*

26

27

28   [2]    The local action doctrine is much older and dates back at least seven hundred years to the
Court of Common Pleas in England in the thirteenth century. *Keller v. Malice*, 838 F.Supp. 1163,
1169 n. 1 (D. S.D. Tex. 1993).

Bkr. No. 03-11155-LA7
Adv. Proc. No. 06-90369; 04-90392

115634/000000/947280.07

1  *Telegraph Co.*, 234 U.S. 369 (1914); *Ellenwood v. Marietta Chair Co.,* 158 U.S. 105, 107

2  (1895); *Casey v. Adams*, 102 U.S. (12 Otto) 66, 67-68 (1880).

3        As the Supreme Court stated in *Casey v. Adams*," [t]he distinction between local and

4  transitory actions is as old as actions themselves . . . Local actions are in the nature of suits in

5  rem, and are to be prosecuted where the thing on which they are founded is situated." *Casey v.*

6  *Adams*, 102 U.S. at 67-68. Indeed, the local action rule is so fundamental that state courts are not

7  obligated to give full faith and credit to judgments from either federal or state courts sitting

8  outside the local state's territorial boundaries. See *Clarke v. Clarke*, 178 U.S. 186, 190 (1900)

9  (Connecticut courts are not required to give full faith and credit to a judgment of the South

10 Carolina Supreme Court concerning the construction of a will which affected the passing of title

11 to land situated in Connecticut).

12              **(b)      U.S. Courts Particularly Lack Jurisdiction to Determine Real**

13                         **Property Rights in Foreign Countries.**

14        U.S. Courts in general, and bankruptcy courts in particular, do not have jurisdiction to

15 determine property rights in foreign countries. In *Oakey v. Bennett*, 52 U.S. 33 (1850), the

16 Supreme Court held that the bankruptcy court in the United States had no jurisdiction to convey

17 real property located in another country, stating:

18        A statutable conveyance of property cannot strictly operate beyond the local
          jurisdiction. Any effect which may be given to it beyond this does not depend
19        upon international law, but the principle of comity; and national comity does not
          require any government to give effect to such assignment, when it shall impair the
20        remedies or lessen the securities of its own citizens.

21 *Id.* at 44-45. The Supreme Court emphasized that no country may determine property rights of

22 real property located in other countries, stating:

23        It is believed that no sovereignty has, at any time, assumed the power, by
          legislation or otherwise, to regulate the distribution or conveyance of real estate in
24        a foreign government. There is no pretence that this government, through the
          agency of a bankruptcy law, could subject the real property in Texas, or in any
25        other foreign government, to the payment of debts. This can only be done by the
          laws of the sovereignty where such property may be situated.
26        *Id.* at 45.

27        Other courts have likewise held that U.S. courts have no jurisdiction to determine

28 property rights with regard to real property located in foreign countries. In *Holt v. Guerguin*, 163

                                        13

1  S.W. 10 (1914), the Supreme Court of Texas addressed the issue of whether a court in Texas had

2  the power to annul deeds to property located in Mexico.  The grantors, both deceased, had

3  executed a deed to real property located in Mexico to their daughter.  The lower court annulled

4  the deed on the grounds of fraud and undue influence.  The Supreme Court reversed on the

5  grounds that the court lacked jurisdiction to affect title to land located in Mexico, stating:

6
7      We are of opinion that so far as the decree in this case sets aside and annuls the
       deed to the land in the Republic of Mexico it is void, because the District Court
       had no jurisdiction of the subject matter; the court of Texas could not acquire
       jurisdiction of land beyond its borders.  (Citations omitted.)

8
9      The District Court at San Antonio also appointed commissioners and directed
       them to partition the land between the plaintiffs and defendants.  That portion of
       the decree is likewise void because the courts of this State have no power or

10     authority over land in Mexico.

11 *Id.* at 12.

12     The prohibition on the determination of property rights in foreign countries has as much

13 vitality today as it did when the *Oakey* case was decided.  In *Asociacion De Reclamantes, v.*

14 *United Mexican States*, 735 F.2d 1517 (DC Cir. 1984), Justice Scalia, held that U.S.Courts lacked

15 subject matter jurisdiction to determine property rights in Mexico.  Justice Scalia wrote:

16
17     The origin of the traditional exception limited to questions involving property
       interests or possession is self-evident.  A territorial sovereign has a primeval
       interest in resolving all disputes over use or right to use of real property within its
       own domain.  As romantically expressed in an early treatise:

18
19     A sovereignty cannot safely permit the title to its land to be determined by a
       foreign power.  Each state has its fundamental policy as to the tenure of land; a
       policy wrought up in its history, familiar to its population, incorporated with its

20     institutions, suitable to its soil.

21 *Id.* at 1521.

22     Here, the Bankruptcy Court has reasoned that it is not determining real property rights in

23 Mexico—it is merely using its in personam jurisdiction over the Diaz Family in conjunction with

24 its contempt powers to coerce the Diaz Family to do what it would otherwise be prohibited from

25 doing under Mexican law.  This is form over substance.  Whichever way it is characterized, the

26 court has improperly exercised subject matter jurisdiction to affect title to the Villa Property.

27

28

Bkr. No. 03-11155-LA7
Adv. Proc. No. 06-90369; 04-90392

115634/000000/947280.07

1          2.       **The Bankruptcy Code Avoidance Sections Do Not Apply**

2                   **Extraterritorially.**

3          "Legislation of Congress, unless a contrary intent appears, is meant to apply only within

4   the territorial jurisdiction of the United States." *Equal Employment Opportunity Comm. v.*

5   *Arabian American Oil Co.*, 499 U.S. 244, 248 (1991) ("Aramco"); *Foley Bros., Inc. v. Filardo*,

6   336 U.S. 281, 285 (1949); *In re Maxwell Commc'n Corp.*, 170 B.R. 800, 809 (S.D.N.Y. 1994).

7   The presumption "serves to protect against unintended clashes between our laws and those of

8   other nations which could result in international discord." *Aramco*, 499 U.S. at 248 (*citing*

9   *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 20-22 (1963).

10  Moreover, the presumption recognizes that Congress is primarily concerned with domestic

11  conditions when it legislates. *Aramco*, 499 U.S. at 43 (citing *Foley Bros., Inc.,* 336 U.S. at 285).

12         Congress did not intend for the Bankruptcy Code avoidance sections to apply

13  extraterritorially.  In *In re Maxwell Communication Corporation*, 186 B.R. 807 (S.D.N.Y 1995),

14  the court held that the preference avoidance statute set forth in Bankruptcy Code section 547 was

15  inapplicable to a foreign transfer of funds because Congress did not intend the statute to apply to

16  transfers occurring outside the United States.  The court stated:

17              The Supreme Court has stated that "when it desires to do so, Congress knows how
                to place the high seas within the jurisdictional reach of a statute." *Argentine*
18              *Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 440, 102 L. Ed. 2d 818,
                109 S. Ct. 683 (1989).  Because Congress has not "clearly expressed" its desire
19              that § 547 govern extraterritorial conduct, see *Aramco*, 499 U.S. at 248, that
                section cannot apply to the foreign transfers at issue in this case.
20

21  *Id.* at 821.

22         In *Barclay v. Swiss Finance Corporation Limited (In re Midland Euro Exchange et al)*,

23  347 B.R. 708 (Bankr. C.D. Cal. 2006), the court held that Congress did not intend Bankruptcy

24  Code Section 548 governing fraudulent transfers to apply extraterritorially.   In that case, a

25  chapter 7 Trustee brought an action to set aside and recover allegedly fraudulent transfers paid by

26  the debtor to a foreign exchange brokerage.   The defendant filed a motion to dismiss the

27  complaint, arguing that Congress did not intend Bankruptcy Code section 548 to apply

28

15

115634/000000/947280.07

1   extraterritorially and that the Court should abstain from exercising jurisdiction on the grounds of

2   international comity.

3          The court found that nothing in the Bankruptcy Code indicated congressional intent to

4   apply Section 548 extraterritorially. *Id.* at 717.  It acknowledged that, while policy considerations

5   may favor extraterritorial application of Section 548, such policy considerations are insufficient

6   to overcome the presumption against extraterritorial application of U.S. statutes, stating.

> These policy considerations, however, must be balanced against the presumption
> against extraterritoriality, which serves to protect against unintended clashes
> between our laws and those of other nations which could result in international
> discord.  See *E.E.O.C. v. Arabian American Oil Co.*, 499 U.S. 244, 248, 111 S.
> Ct. 1227, 113 L. Ed. 2d 274 (1991).  The Ninth Circuit has held that policy
> considerations alone are insufficient to overcome the presumption against
> extraterritoriality.  See *Subafilms, Ltd. v. MGM-Pathe Communications Co.,* 24
> F.3d 1088, 1096 (9th Cir. 1994) (en banc).

*Id.* at 718.  Thus the court held that the trustee could not pursue his claims under that statute.

13          Similarly, here, there is no evidence of congressional intent to extend the application of

14   the avoidance statutes extraterritorially.  Moreover, the Mexican Ministry of Foreign Affairs

15   actually wrote a letter to the Bankruptcy Court on November 28, 2007, articulating its concerns

16   that the court was trampling on Mexican Constitutional Law.  (*See,* RJN  Exh. 6, Letter from the

17   Mexican Ministry of Foreign Affairs dated December 14, 2007).  Therefore, not only was it

18   legally improper to apply U.S. Bankruptcy Code avoidance statutes to a transfer of real property

19   which occurred in Mexico and pursuant to Mexican law but there is irrefutable evidence that the

20   Bankruptcy Court's exercise of subject matter jurisdiction over the Villa Property has caused the

21   very international discord that the Supreme Court cautioned against.  Bankruptcy Code avoidance

22   statutes simply should not apply to the transfer in this case because it occurred outside the

23   territorial limits of the United States.

### 3.      The Judgment Should Be Reversed In That It Disregards The
### International Comity Doctrine and Mexico's Calvo Doctrine.

25          The decision in this case essentially strips Mexican citizens of their title to land in Mexico

26   which they legally acquired, in Mexico, pursuant to Mexican law.  Mexico has a strong policy

27   against allowing foreign powers to decide issues affecting ownership of real property in Mexico,

28   and particularly involving Mexican residents.  Moreover, Mexico's fraudulent conveyance law is

16

Bkr. No. 03-11155-LA7
Adv. Proc. No. 06-90369; 04-90392

115634/000000/947280.07

1    different from U.S. law and would not have permitted the avoidance as ordered in this case. The

2    bankruptcy court erred in refusing to abstain from entertaining the causes of action against them

3    under the doctrine of international comity. Most particularly, the specific remedy requiring that

4    the Villa Property be conveyed goes too far and impinges upon the exclusive jurisdiction of a

5    foreign country.

6        Under the International Comity Doctrine, courts defer to the laws or interests of a foreign

7    country and decline to exercise jurisdiction that is otherwise properly asserted. *Sarei v. Rio*

8    *Tinto, PLC*, 456 F.3d 1069,1086 (9th Cir. 2006). International comity is a canon of construction

9    based on the principal that "An act of congress ought never to be construed to violate the law of

10    nations if any other possible construction remains." *Hartford Fire Ins. Co. v. California*, 509 U.S.

11    764, 814-15 (1993)(Scalia, J., dissenting). It is also a discretionary act of deference by a national

12    court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state. *In re*

13    *Maxwell*, 93 F.3d 1036 (2d Cir. 1996).

14        Mexico has a strong policy against allowing foreign powers to decide issues affecting

15    ownership of real property in Mexico. Moreover, Mexico's fraudulent conveyance law is

16    different from U.S. law and would not permit the avoidance ordered in this case. Accordingly,

17    this Court should have abstained from entertaining the causes of action against the Diaz Family

18    under the doctrine of international comity.

19    **(a)    Mexico Has a Strong Policy Against Allowing Foreign Powers**

20    **to Decide Issues Related to Mexican Real Property.**

21        Article 27 of the Mexican Constitution contains the Calvo doctrine, pursuant to which the

22    Mexican State may grant to foreigners the same right conferred to Mexican nationals of acquiring

23    real property:

24        provided they agree before the Ministry of Foreign Relations to consider
         themselves as nationals in respect to such property, and bind themselves not to
25        invoke the protection of their governments in matters relating thereto; under
         penalty, in case of noncompliance with this agreement, of forfeiture of the
26        property acquired to the Nation.

27    *Mexican Constitution, Article 27*.[3]  Article 773 of the Mexican Federal Civil Code provides:

28    _____

[3] An English translation of Article 27 is attached as Appendix "A" to RJN Exh. 7, Memorandum
of Points and Authorities in Support of Motion to Dismiss for Lack of Subject Matter Jurisdiction

17

Bkr. No. 03-11155-LA7
Adv. Proc. No. 06-90369; 04-90392

115634/000000/947280.07

> All foreign individuals and corporations are required to observe the provisions of Article 27 of the Constitution of the United Mexican States and its organic laws and rules upon acquiring real property within the Mexican republic.

*Mexican Federal Civil Code, Article 773. Id.* at Appendix "B" (*Mexican Civil Code Annotated, Jorge A. Vargas, West Group Publishing 2005 ed.*).

Each of the escrituras (deeds under Mexican law) in the chain of title to the Diaz's real property that created the rights of the Debtors, H&G, and the Diaz Family contained that title to Mexican real estate be controlled only by Mexican law and Mexican courts. For example, the escritura for the transfer from the Debtor to H&G states:

> — JURISDICTION AND COMPETENCE —
> For everything relative to the Interpretation and compliance of this agreement, **the parties expressly submit to the Laws and Tribunals of the City of Guadalajara, Jalisco or Mexico**, Federal District at the option of the Trustee, **waiving any other jurisdiction** that due to their addresses they would currently have or in the future; they also accept to be considered as Mexicans, in regards to the rights derived from this agreement, and that **they will not invoke therefore the protection of their Government**, in case of breaching this agreement, they would forfeit in favor of Mexico, the rights acquired.

See RJN, Exhibit 8, Declaration of Fletcher W. Paddison, dated November 29, 2006, at Exhibit "3" (emphasis added).

The strong overriding policy under Mexican law, as embodied in Mexico's Constitution, that issues regarding Mexican real property be decided only under Mexican law and only by Mexican courts, should have guided the Judgment in this case. Instead, the Judgment awards coastal property located in Mexico and owned by Mexican citizens to Kismet, a shell corporation set up by German Citizens to gain access to the U.S. Court System, which was unsuccessful in otherwise purchasing the Villa Property. The use of the laws and the courts of the United States by foreign nationals to involuntarily strip their Mexican neighbors of their land in Mexico, something that they could never do under the Mexican Constitution, is improper. This use of the laws and courts of a foreign country, in direct contravention of the Mexican Constitution, should not have been condoned by the court, particularly when it had an alternative remedy of awarding monetary damages against the Diaz Family.

---

filed November 29, 2006. See also, *Mexican Law: a Treatise for Legal Practitioners and International Investors*, § 41.29, Jorge A. Vargas, West Group Publishing 2001 ed. This policy is carried over into the Mexican Federal Civil Code.

1                         **(b)**       **Mexican Fraudulent Conveyance Laws Differ From those in**

2                                           **the United States.**

3       Parties who have claims against entities that have transferred their Mexican real property

4 to the prejudice of their creditors are not without a remedy. Mexican law provides for the

5 recovery of fraudulent transfers involving Mexican real property.

6       Mexico's fraudulent transfer law is set forth in Articles 2163 through 2179 of the

7 Mexican Federal Civil Code. RJN, Exhibit 9, English translation of those Articles attached as

8 Appendix C to Memorandum of Points and Authorities in Support of Motion to Dismiss for Lack

9 of Subject Matter Jurisdiction filed November 29, 2006 (reprinted from *Mexican Civil Code*

10 *Annotated, Jorge A. Vargas, West Group Publishing 2005 ed.*).

11       Mexico's fraudulent transfer laws differ from fraudulent transfer laws in the United

12 States. It is simply wrong for issues regarding the transfer of real estate located in Mexico to be

13 decided using the laws and courts of a foreign country (i.e., the U.S.), when Mexico's own laws

14 and courts provide sufficient protection to creditors. These issues should have been deferred to

15 the jurisdiction of the Mexican courts for determination pursuant to Mexican law.

16           **C.**     **The Diaz Family Will Suffer Irreparable Harm**

17       "A showing of irreparable harm is the principal prerequisite for the issuance of a stay

18 under Bankruptcy Rule 8005." *In re Calphine Corp.,* No. 05-60200 (BRL), 2008 WL 207841, at

19 *4 (Bankr. S.D.N.Y., January 24, 2008); *ACC Bondholders v. Adelphia Communications Corp.*

20 (*In re Adelphia Communications Corp.*), 361 B.R. 337, 346 (Bankr. S.D.N.Y. 2007). Under this

21 test, the moving party must demonstrate that such injury is likely before the other requirements

22 will be considered. *In re Bridgeport,* 132 B.R. 81, 83 (Bankr. D.Conn. 1991). Most particularly

23 when real property is involved, irreparable harm is established because "monetary relief fails to

24 provide adequate compensation for any interest in real property, which by its very nature unique,

25 which money damages may not adequately compensate." *See e.g. O'Hagan v. U.S.,* 86 F.3d

26 776,783 (8th Cir. 1996); *In re Skinner*, 202 B.R. 867, 869 (Bankr. W.D. VA. 1996) (finding that

27 debtor who would lose his residence had clearly established irreparable harm); *Tucker Anthony*

28 *Realty Corp. v. Schlesinger,* 888 F.2d 969, 975 (2d Cir. 1989). *In re Issa Corp.,* 142 B.R. 75, 78

Bkr. No. 03-11155-LA7
Adv. Proc. No. 06-90369; 04-90392

115634/000000/947280.07

1    (Bankr. S.D.N.Y. 1992) (recognizing that where debtor-restauranteur stands to be evicted from

2    the premises, and thereby lose its restaurant, the debtor will "indisputably" suffer irreparable

3    harm); *In re Slater*, 200 B.R. 491, 495 (E.D.N.Y. 1996) (Chapter 13 debtor would suffer

4    irreparable harm if evicted from home).

5        Moreover, the risk that an appeal might become moot in the absence of a stay pending

6    appeal may satisfy the irreparable injury requirements.  Several courts have held that mooting an

7    appeal "is a quintessential form of prejudice." *In re Adelphia Communications Corp.* 361 B.R. at

8    347-48; *In re Country Squire Associates of Carle Place, L.P.,*  203 B.R. 182, 183 (2nd Cir. 1996)

9    (staying a foreclosure sale where it was "apparent that absent a stay pending appeal . . . the appeal

10   will be rendered moot," resulting in a "quintessential form of prejudice" to appellant); *In re*

11   *Advanced Mining Sys. Inc.,* 173 B.R. 467, 468-69 (Bankr. S.D.N.Y. 1994) (finding irreparable

12   injury prong met where, absent a stay of the bankruptcy court's order, the distribution of assets to

13   creditors would moot an appeal and thus quintessentially prejudice appellants). The loss of

14   appellate rights is a "quintessential form of prejudice."  Thus, where the denial of a stay pending

15   appeal risks mooting any appeal of significant claims of error, the irreparable harm requirement

16   is satisfied. Consequently, in evaluating the irreparable harm element, it is necessary to analyze

17   the risk that an appeal would be mooted in the absence of a stay.  *In re Adelphia Communications*

18   *Corp.,* 361 B.R. 337 at 348.

19       Here, the Villa Property is indisputably unique and requiring the Diaz Family to turn over

20   their cherished vacation home would be tantamount to evicting them from it.  Moreover, if they

21   are forced to turn over the property prior to a determination of their appeal, the appeal may

22   become moot because Kismet intends to demolish the Villa Property to build its golf course.  If

23   that were to happen, the Diaz Family will be left without a remedy to address the findings by the

24   Bankruptcy Court.   Accordingly, under the case law cited above, the Diaz Family has satisfied

25   the requirement that they will be irreparably harmed absent a stay.

26   / / /

27   / / /

28   / / /

115634/000000/947280.07

1    **D.    Kismet Will Not Suffer Substantial Harm if the Stay is Granted**

2    In addition to showing irreparable harm, the party seeking a stay must also establish that

3    the non-moving party or other parties will not suffer substantial harm if the stay is granted. *In re*

4    *Adelphia Communications Corp.,* 361 B.R. at 349; *Mohammed,* 309 F.3d at 100.  In other words,

5    the moving party must show that the balance of harms tips in favor of granting the stay.

6    *Bermudez v. Reid*, 720 F.2d 748, 750 (2d Cir. 1983).  In this case, there will be no substantial

7    harm or prejudice to Kismet if the judgment is stayed.  First, there is no risk of the Villa Property

8    being sold or transferred since it is still subject to the Bankruptcy Court's injunction.

9    Second, this is not a case where the Diaz Family wronged Kismet by somehow

10    expropriating the Villa Property.  Kismet was never harmed by the transfer of the Villa Property

11    to the Diaz Family because it never owned it in the first place.  It simply employed opportunistic

12    tactics to exploit the Icenhower bankruptcy for its own pecuniary ends.

13    Ironically, as consideration for the acquisition of the Avoidance Actions from the

14    bankruptcy trustee, Kismet agreed to pay all of the unsecured claims against the bankruptcy

15    estate in full.  (*See,* Purchase Agreement, RJN Exh. 2, Exh. A).  Pursuant to Bankruptcy Code

16    section 502(h), if the Diaz Family conveys the beneficial interest in the Villa Property to Kismet

17    **for the benefit of the bankruptcy** estate via a *fideicomiso* trust, as directed by the Bankruptcy

18    Court, it will be entitled to an unsecured claim against the Icenhower bankruptcy estate for the

19    $1.4 million it paid for the Villa Property, as if such claim had arisen prior to the bankruptcy

20    filing.  The only remaining asset of the bankruptcy estate with which to satisfy the Diaz Family's

21    claim will be the  the Villa Property itself.  Therefore, there will be a substantial delay anyway

22    before this issue is resolved.  Accordingly, the balance of harms tips in favor of the Diaz Family

23    and a stay is in order.

24    **E.    Public Interest Considerations Mandate the Issuance of a Stay**

25    Lastly, the party seeking stay must also establish that the public interest will be served by

26    granting the stay. Case law signals a preference in favor of maintaining the status quo. *Feller v.*

27    *Brock*, 802 F.2d 722, 727 (4th Cir.1986).  Although satisfaction of debts is no doubt supported by

28    public interest, even stronger is the policy against potentially unnecessary forfeiture of homes and

21

115634/000000/947280.07

1    disturbance of the status quo. *In re Skinner* 202 B.R. 867, 869 (W.D.Va.,1996); *In re County*

2    *Squire Assocs. Of Carle Place, L.P.* 203 B.R. 182 (B.A.P. 2d Cir. 1996).

3         In this case, the public interest will not be served by denying the stay.  The status quo will

4    be disturbed and the Diaz Family will be forced to forfeit their home.  Therefore, granting the

5    stay will be in accordance with public policy against such a drastic result.

6                                              **IV.**

7                    **THE COURT HAS DISCRETION TO REQUIRE A BOND**

8         Bankruptcy Rule 8005 provides in relevant part that the "[t]he district court ... may

9    condition the relief it grants under this rule on the filing of a bond or other appropriate security

10   with the bankruptcy court." *In re Sphere Holding Corp.,* 162 B.R. 639, 644 (Bankr.

11   E.D.N.Y.1994); *In re Max Sugarman Funeral Home, Inc*., 94 B.R. 16, 17 (Bankr. D.R.I.1988)

12   ("[T]he form, the amount, and the sufficiency of the bond generally[ ] are matters within the

13   discretion of and for determination by the bankruptcy court.") (citing *In re Swift Air Lines, Inc.,*

14   21 B.R. 12, 14 (9th Cir. BAP 1982)).

15        In determining whether a bond should be ordered, the court looks to whether the bond

16   would be necessary to protect "against diminution in the value of property pending appeal" and

17   to "secure the prevailing party against any loss that might be sustained as a result of an

18   ineffectual appeal." *In re Sphere Holding Corp.* 162 B.R. at 644.  The posting of a bond

19   "guarantees the costs of delay incident to the appeal." *In re Suprema Specialties,* 330 B.R. at 96.

20        Here, by virtue of the injunction on the Villa Property already issued by the Bankruptcy

21   Court, there is no risk that the property will be transferred pending resolution of an appeal.

22   Further, there is no evidence that the Villa Property is at risk with regard to diminution in value.

23   Therefore, to the extent this court deems a bond to be necessary, any such bond should be

24   minimal.

25   / / /

26   / / /

27   / / /

28   / / /

22

Bkr. No. 03-11155-LA7
Adv. Proc. No. 06-90369; 04-90392

1

## V.

2

## **THE DIAZ FAMILY IS ENTITLED TO A STAY AS A MATTER OF RIGHT IF IT**

3

## **POSTS A BOND**

4         Generally, Rule 7062, which incorporates Rule 62(d) of the Federal Rules of Civil

5    Procedure, provides an automatic stay upon filing a supersedeas bond in cases of money

6    judgments. *In re Capital West Investors*, 180 B.R. 240, 242 (Bankr. N.D. Cal. 1995).

7         When an appeal is taken from a judgment that is not a money judgment, but is

8    comparable to a money judgment, courts have treated that judgment like the judgment to which it

9    is comparable. *Id.*. at 243. For example, in *Hebert v. Exxon Corp*. 953 F.2d 936, 938 (5th Cir.

10   1992), the Fifth Circuit found no meaningful distinction between a judgment for declaratory

11   relief and a money judgment for purposes of Rule 62(d). In *United States v. Mansion House

12   Center Redevelopment Co.,* 682 F.Supp. 446, 450 (E.D. Mo. 1988), the district court determined

13   that a mortgage foreclosure judgment directing the transfer of title to real property should be

14   treated like a money judgment for purposes of Rule 62(d)). Under Bankruptcy Rule 7062 and

15   Fed.R.Civ.P. 62(d), a stay is a matter of right where an interest in property is determined by the

16   judgment. *In re Max Sugarman Funeral Home, Inc.* 94 B.R. 16, 16 -17 (Bkrtcy. D.R.I. 1988).

17        Under California law, appellants in all actions pertaining to possession of real property,

18   other than unlawful detainer actions, are entitled to a stay pending appeal as a matter of right,

19   upon posting a bond under California Code of Civil Procedure section 917.4. *Goldie's Bookstore,

20   Inc. v. Superior Court of State of Cal.,* 739 F.2d 466, 468 (9th Cir. 1984) (*citing,*Section 917.4 of

21   the California Code of Civil Procedure)

22        In this case, as in *Mansion House Center Redevelopment,* the judgment directing the

23   transfer of title to real property is comparable to a money judgment. The bankruptcy court

24   acknowledged this in the judgment itself when it offered Kismet alternative remedies—transfer

25   of title to the Villa Property or monetary damages. Therefore, if the Diaz Family is willing and

26   able to post a bond, it is entitled to a stay of the judgment as a matter of right. If the Court is

27   unwilling to grant a discretionary stay without a bond, it must set the amount of the bond in

28

Bkr. No. 03-11155-LA7
Adv. Proc. No. 06-90369; 04-90392

115634/000000/947280.07

1    accordance with Federal Rule of Bankruptcy Procedure 7062(d).  However, the amount of such

2    bond should be de minimis since Kismet has suffered no pecuniary loss at this time.

3                                              **VI.**

4    **EVEN IF THE COURT DETERMINES THE JUDGMENT IS SIMILAR TO AN**

5    **INJUNCTION, THE DIAZ FAMILY IS ENTITLED TO A STAY UNDER RULE 62(C)**

6

7         Pursuant to Rule 62(c) of the Federal Rules of Civil Procedure, "[w]hile an appeal is

8    pending from an interlocutory order or final judgment that grants, dissolves, or denies an

9    injunction, the [district] court may suspend, modify, restore, or grant an injunction on terms for

10   bond or other terms that secure the opposing party's rights." Fed.R.Civ.P. 62(c). In exercising its

11   discretion to stay an injunctive order pending appeal, the court must consider the same four

12   factors as it must evaluate under Federal Rule of Bankruptcy Procedure 8005—i.e.:  "(1) whether

13   the stay applicant has made a strong showing that he is likely to succeed on the merits; (2)

14   whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay

15   will substantially injure the other parties interested in the proceeding; and (4) where the public

16   interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987);

17   *Divxnetworks, Inc. v. Gericom AG,*  No. 04cv2537 WQH (WMc), 2007 WL 4538623, at *2

18   (S.D.Cal. Dec. 19, 2007).

19        In making such determination, the Ninth Circuit has set forth the following "sliding

20   scale": "At one end of the continuum, the moving party is required to show both a probability of

21   success on the merits and the possibility of irreparable injury. At the other end of the continuum,

22   the moving party must demonstrate that serious legal questions are raised and that the balance of

23   hardships tips sharply in its favor." *Lopez v. Heckler*, 713 F.2d at 1435 (internal citations

24   omitted) (relative hardship is critical to sliding-scale evaluation); *see also S.E.C. v. Platforms

25   Wireless Intern. Corp.,* No. 04cv2105JM(AJB), 2008 WL 281112, at *9 (S.D.Cal. Jan. 31, 2008).

26   Thus, "the necessary level or degree of possibility of success will vary according to the court's

27   assessment of the other stay factors."  *Thapa v. Gonzales,* 460 F.3d 323, 334 (2d Cir. 2006).

28   Since these are the same factors applied under Bankruptcy Rule 8005 and which have been

     briefed extensively in section III above, the Diaz Family incorporates them by reference as if

                                              24

1  fully set forth herein. Based on this analysis, the Diaz Family is entitled to a stay even if the

2  court finds that the judgment is comparable to a mandatory injunction.

3                                              **VII.**

4                                      **<u>CONCLUSION</u>**

5          In light of the foregoing, Defendants Martha Margarita Barba de la Torre and Alejandro

6  Diaz-Barba respectfully request the Court to grant a discretionary stay of the judgment in these

7  cases without requiring a bond or, in the alternative, set the amount of the bond that will be

8  required to be posted.

9  DATED: August 15, 2008                          PROCOPIO, CORY, HARGREAVES
                                                         & SAVITCH, LLP
10

11

12                                           By:   /s/ Geraldine A. Valdez
                                                   Geraldine A. Valdez
13                                                 Attorneys Defendants
                                                   Alejandro Diaz-Barba and
14                                                 Martha Margarita Barba de la Torre

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                              25