1   Ali M.M. Mojdehi, State Bar No. 123846
    Janet D. Gertz, State Bar No. 231172
2   **BAKER & McKENZIE LLP**
    12544 High Bluff Drive, Third Floor
3   San Diego, CA  92130-3051
    Telephone:  +1 858-523-6200
4
5   Attorneys for Plaintiff/Appellee
    KISMET ACQUISITION, LLC
6
7
8                   UNITED STATES DISTRICT COURT
9               SOUTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11  In re | Case No.: 3:08-CV-01446-BTM-BLM |
| 12  JERRY LEE ICENHOWER dba Seaview Properties, and DONNA LEE ICENHOWER, | Bankruptcy Case No.  03-11155-LA-7 |
| 13 | Chapter Number 7 |
| 14  Debtors. | Adv. Proc. No:  04-90392 |
| 15  ALEJANDRO DIAZ-BARBA AND MARTHA MARGARITA BARBA DE LA TORRE, | Adv. Proc. No:  06-90369 |
| 16   Defendants/Appellants, | **OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO MOTION OF DEFENDANTS MARTHA BARBA AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]** |
| 17  v. | |
| 18  KISMET ACQUISITION, LLC, | |
| 19   Plaintiff/Appellee. | |
| 20 | |
| 21 | DATE:  August 28, 2008 |
| 22 | TIME    4:00 p.m.  DEPT:  15 |
| 23 | JUDGE: Hon. Barry Ted Moskowitz |

24   / / /
25   / / /
26   / / /
27   / / /
28   / / /

# TABLE OF CONTENTS

**Page**

I.  STANDARD OF REVIEW ............................................................................................... 2

II. THE DIAZ DEFENDANTS ASSERT A REVISIONIST FACTUAL
    BACKGROUND .......................................................................................................... 4

        1.  Background - The Lonie Trust ..................................................................... 4

        2.  The "Transfers" to Howell & Gardner ........................................................ 5

        3.  The Diaz Defendants Enter the Scene ......................................................... 7

III. THE DIAZ DEFENDANTS ARE NOT ENTITLED TO A STAY OF RIGHT
     UNDER FED. R. BANKR. PROC 7062(D) ............................................................... 9

IV. THE DIAZ DEFENDANTS ARE NOT ENTITLED TO A DISCRETIONARY
    STAY UNDER FED. R. BANKR. PROC. 8005 ....................................................... 12

    A.  Under Rule 8005, the Governing Law Requires Each Hilton Element to be
        Satisfied. ...................................................................................................... 12

    B.  The Diaz Defendants Cannot Demonstrate Any Probability of Success on the
        Merits .......................................................................................................... 15

        1.  The Court Has Subject Matter Jurisdiction Over Both Theories of
            Recovery Contained in the Judgment ........................................................ 18

        2.  The Presumption Against Extraterritoriality Has No Application Here ....... 19

        3.  There Are No Facts Suggesting Comity Should Have Been Applied .......... 22

    C.  The Diaz Defendants' Claims of Irreparable Harm are of No Consequence ............ 25

    D.  The Public Interest Does Not Militate in the Diaz Defendants' Favor ...................... 28

V.  CONCLUSION .......................................................................................................... 29

i

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

CASE NO. 3:08-CV-01446-BTM-BLM; BANKR. ADV. NOS. 04-90392; 06-90369
OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO EMERGENCY MOTION OF DEFENDANTS MARTHA BARBA
AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]

**TABLE OF AUTHORITIES**

**Page**

**FEDERAL CASES**

*Acevedo-Garcia v. Vera Monroig,*
296 F.3d 13 (1st Cir. 2002)..................................................................................7

*Acton v. Fullmer (In re Fullmer),*
323 B.R. 287 (Bankr. D. Nev. 2005) ................................................................2, 3

*In re Adelphia Communications Corp.,*
361 B.R. 337 (S.D.N.Y. 2007)..............................................................................3

*Ariz. Contrs. Ass'n, Inc. v. Candelaria,*
2008 WL 486002 .............................................................................................1, 4

*BC Brickyard Assocs. V. Ernst Home Center Inc. (In re Ernst Home Center, Inc.),*
221 B.R. 243 (BAP 9th Cir. 1998)........................................................................2

*Barclay v. Swiss Finance Corp. (In re Midland Euro Exchange),*
347 B.R. 708 (C.D. Cal. 2006), and *In re Maxwell Communications Corp.*, 170 B.R. 800
(S.D.N.Y. 1994) .................................................................................................13

*Beck v. Fort James Corp. (In re Crown Vantage, Inc.,*
421 F.3d 963 (9th Cir. 2005) ..............................................................................11

*Blankenship v. Boyle,*
447 F.2d 1280 (D.D.C. 1971) ...............................................................................1

*Brady v. Brown,*
51 F.3d 810 (9th Cir. 1995) ....................................................................10, 11, 16

*In re  Brun,*
360 B.R. 669.........................................................................................................3

*Burnham v. Superior Court,*
495 U.S. 604 (1990)............................................................................................11

*In re Calpine Corp.,*
No. 05-60200 (BRL), 8 WL 207841 (Bankr. N.D.N.Y, Jan. 24, 2008) ..................4

*In re Capital West Investors,*
180 B.R. 240 (N.D. Cal. 1995) .........................................................................1, 2

*Colorado River Water Conservation Dist. v. United States,*
424 U.S. 800 (1976)..............................................................................................1

*In re Consolidated Capital Equities Corp.,*
143 B.R. 80 (Bankr. N.D. Tex. 1992)....................................................................1

*County of Alameda v. Weinberger,*
520 F.2d 344 (9th Cir.1975) .................................................................................8

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200
CASE NO. 3:08-CV-01446-BTM-BLM; BANKR. ADV. NOS. 04-90392; 06-90369
OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO MOTION OF DEFENDANTS MARTHA BARBA
AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]

1

<b><u>TABLE OF AUTHORITIES</u></b>

2
<b><u>Page</u></b>

3
*In re Dial Industries, Inc.*
  137 Bankr. 247, 250-251 ....................................................................................6

4

*Donovan v. Fall River Foundry Co.,*
5
  696 F.2d 524 (7th Cir. 1982) ..............................................................................1

6
*E.E.O.C. v. Arabian American Oil Co.,*
  499 U.S. 244 (1991) ...........................................................................................12

7

*Fall v. Easton,*
8
  215 U.S. 1 (1909) ...............................................................................................10

9
*Feltman v. Warmus (In re American Way Serv. Corp.),*
  229 B.R. 496 (Bankr. S.D. Fla. 1999) ...............................................................4

10

*Flores v. DDJ, Inc (In re Enoch Packing Co.),*
11
  2007 U.S. Dist. LEXIS 40010 (E.D. Cal. May 31, 2007)..................................3

12
*In re Forty-Eight Insulations, Inc.,*
  115 F.3d 1294 (7th Cir. 1997) ....................................................................6, 7, 8

13

*In re French,*
14
  440 F.3d 145 (4th Cir. 2006), *cert. den.,* 127 S. Ct. 72 (2006)........................14

15
*French v. Liebmann (In re French),*
  320 B.R. 78 (D. Md. 2004) ..................................................................................3

16

*GMAM Investment Funds Trust I v. Globo Comunicacoes E participacoes S.A. (In re Globo*
17
  *Comunicacoes E Participacoes S.A.),*
  317 B.R. 235 (S.D.N.Y. 2004)............................................................................1

18

*Gagan v. Sharer,*
19
  2005 U.S. Dist. LEXIS 27409 (D. Ariz. Nov. 1, 2005).....................................1

20
*Garcia-Mir v. Meese,*
  781 F.2d 1450 (11th Cir. 1986) ...........................................................................7

21

*Gleasman v. Jones, Day, Reavis & Pogue (In re Gleasman),*
22
  111 B.R. 595 (Bankr. W.D. Tex. 1990)...............................................................3

23
*Golden Gate Restaurant Ass'n. v. City of San Francisco,*
  512 F.3d 1112 (9th Cir. 2008)..............................................................................5

24

*Goldies Bookstore, Inc. v. Superior Court,*
25
  739 F.2d 466 ........................................................................................................2

26
*Government Guarantee Fund of the Republic of Finland v. Hyatt Corp.,*
  167 F.R.D. 399 (D.V.I. 1996)...............................................................................3

27

*In re Grand Jury Proceedings,*
28
  873 F.2d 238 (9th Cir. 1989) .............................................................................16

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

iii

CASE NO. 3:08-CV-01446-BTM-BLM; BANKR. ADV. NOS. 04-90392; 06-90369
OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO MOTION OF DEFENDANTS MARTHA BARBA
AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]

1

<u>**TABLE OF AUTHORITIES**</u>

2

<u>**Page**</u>

3

*Gruntz v. County of Los Angeles (In re Gruntz),*
    202 F.3d 1074 (9th Cir. 2000) ...............................................................11

*Gushi Bros. Co. v. Bank of Guam,*
    28 F.3d 1535 (9th Cir. 1994) ...........................................................12, 13

*In re Hargis,*
    887 F.2d 77 (5th Cir.1989) ..................................................................15

*Hartford Fire Ins.,*
    509 U.S. at 799.........................................................................................14

*Hebert v. Exxon Corp.,*
    953 F.2d 936 (5th Cir. 1992) .................................................................2

*Hilton v. Braunskill,*
    481 U.S. 770 (1987)..................................................................................5

*Hilton v. Guyot,*
    159 U.S. 113, 16 S. Ct. 139, 40 L. Ed. 95 (1895)..............................14

*Hong Kong and Shanghai Banking Corp. v. Simon (In re Simon),*
    153 F.3d 991 (9th Cir. 1995) .........................................11, 13, 14, 15, 16

*In re Krause,*
    2007 Bankr. LEXIS 3049 ........................................................................2

*LaRouche v. Kezer,*
    20 F.3d 68 (2d Cir. 1994) ......................................................................8

*Lopez v. Heckler,*
    713 F. 2d 1432 (9th Cir. 1983, *rev'd on other grounds,* 469 US. 1082 (1984) ...................5, 6

*In re Max Sugarman Funeral Home, Inc.,*
    94 B.R. 16 (Bankr. D.R.I. 1988) ..........................................................2

*Maxwell Commc'n Corp. PLC v. Societe Generale PLC (In re Maxwell Commc'n Corp.),*
    93 F.3d 1036 (2d Cir. 1996)...........................................................14, 16

*Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog,*
    945 F.2d 150 (6th Cir. Mich. 1991) ......................................................7

*Miller v. LeSEA Broadcasting, Inc.,*
    927 F. Supp. 1148 (E.D. Wisc. 1996) ..................................................3

*Mohammed v. Reno,*
    309 F.3d 95 (2d Cir. 2002)......................................................................8

*Mujica v. Occidental Petroleum Corp.,*
    381 F.Supp. 2d 1134 (C.D. Cal. 2005) ...............................................16

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iv

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3     *NLRB v. Westphal*,
      859 F.2d 818 (9th Cir. 1988) ........................................................................1

4

5     *Natural Res. Def. Council, Inc. v. Winter*,
      502 F.3d 859 (9th Cir. 2007) ........................................................................5

6     *O'Hagan v. U.S.*,
      86 F. 3d 776 (8th Cir. 1996) ........................................................................2

7

8     *Ohanian v. Irwin (In re Ohanian)*,
      338 B.R. 839 (E.D. Cal. 2006)................................................................2, 3, 7

9     *Rolen v. Hansen Beverage Co.*
      193 Fed.Appx. 468, 472 (6th cir. 2006)......................................................14

10

11    *Rose Townsend Trust v. Johnston (In re Johnston)*,
      No. 06-80040, 2007 WL 2684736 (Bankr. E.D. Wash. Sept. 7, 2007) ...................6

12    *San Diego Bev. & Kup v. United States*,
      997 F. Supp. 1343 (S.D. Cal. 1998)............................................................2

13

14    *Silicon Valley Bank v. Pon (In re Pon)*,
      1994 U.S. Dist. LEXIS 2559 (N.D. Cal. Feb. 25, 1994) ..............................6

15    *In re Skinner*,
      202 B.R. 867 (W.D. Va. 1996) ....................................................................2

16

17    *Thomas v. City of Evanston*,
      636 F.Supp. 587 ...........................................................................................7

18    *United States v. Fitzgerald*,
      884 F. Supp. 376 (D. Idaho 1995) ........................................................7, 12

19

20    *United States v. Krause (In re Krause)*,
      No. 05-17429, 2007 Bankr. LEXIS 3049 (Bankr. D. Kansas August 29, 2007).....3

21    *United States v. Mansion House Center Redevelopment Co.*,
      682 F. Supp. 446 (E.D. Mo. 1988)............................................................2

22

23    *United States v. Texas*,
      523 F. Supp. 703 (E.D. Tex. 1981) .............................................................1

24    *Wymer v. Wymer (In re Wymer)*,
      5 B.R. 802 (B.A.P. 9th Cir. 1980)............................................................3, 5

25

26    *Yeganeh v. Sims (In re Yeganeh)*,
      2006 U.S. Dist. LEXIS 32765 (N.D. Cal. May 12, 2006) ................................2, 3, 7

27

28

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

# TABLE OF AUTHORITIES

**Page**

## STATE CASES

*Hurtado v. Superior Court*,
   11 Cal. 3d 574 (1974) ...........................................................................................15

## DOCKETED CASES

*Dynamic Finance Corp. v. Kipperman (In re North Plaza, LLC)*,
   Case No. 08-CV-1194 ..........................................................................................3, 6

## FEDERAL STATUTES

11 U.S.C. § 541(a) ................................................................................................9, 13

11 U.S.C. § 544(b) ..........................................................................................9, 10, 12

11 U.S.C. § 549 ............................................................................................9, 13, 14

11 U.S.C. § 550 ..........................................................................................3, 10, 12

28 U.S.C. § 1409(a) ...................................................................................................1

28 U.S.C. § 157(b)(1) ...........................................................................................1, 13

28 U.S.C. § 1334(e) ..............................................................................................1, 9

## MISCELLANEOUS

Mathew Bender Practice Guide,
   *Federal* Pretrial *Civil Procedure in California* § 19.08[3][f] ..............................2, 5

*Wright and Miller Fed. Procedure Civil 2d* § 2904.....................................................5

## FEDERAL RULES

Fed. R. App. Proc. 32.1................................................................................................3, 6

Fed. R. Bankr. Proc. 8005................................................................................1, 3, 4, 6

Fed. R. Civ. Proc. 62 ................................................................................... Passim

Pursuant to Fed. R. Bankr. Proc. 8005................................................................2

Fed. R. Civ. Proc. 1001 ........................................................................................4

Fed. R. Civ. Proc. 7062(d) ....................................................................................2

Fed. R. Civ. Proc. 8005 ..................................................................................... Passim

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

CASE NO. 3:08-CV-01446-BTM-BLM; BANKR. ADV. NOS. 04-90392; 06-90369
OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO MOTION OF DEFENDANTS MARTHA BARBA
AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]

1        Plaintiff and Appellee Kismet Acquisition, LLC ("Kismet"), hereby submits its Opposition to

2    the Motion of Defendants Martha Barba and Alejandro Diaz-Barba ("Diaz Defendants") for Stay of

3    Judgment Pending Appeal ("Stay Motion").  For the reasons set forth below, Kismet respectfully

4    requests the Court to deny the Motion.

5        The statutory predicates governing the determination of the Stay Motion are Fed. R. Bankr.

6    Proc. 7062, which incorporates by reference Fed. R. Civ. Proc. 62, and Fed. R. Bankr. Proc. 8005, as

7    they have been interpreted by the courts of the Ninth Circuit.[1]  As discussed below, there is no stay

8    relief available to the Diaz Defendants under these Rules and their interpretive precedent.  A stay

9    pending appeal is an "extraordinary remedy."  It should be used sparingly.  *Ariz. Contrs. Ass'n, Inc.*

10   *v. Candelaria*, No. CV07-02496, 2008 U.S. Dist. 2008 WL 486002 (D. Ariz. Feb. 19, 2008) (citing

11   *United States v. Texas*, 523 F. Supp. 703, 729 (E.D. Tex. 1981).  Here, there is no reason for

12   granting a stay.

13       As an initial matter, the Diaz Defendants incorrectly represent the standard of review

14   governing the order of the Bankruptcy Court denying the stay as "pure de novo."  [Stay Motion at

15   10, line 11.]  In this respect, the law is crystal clear that the order of the Bankruptcy Court denying

16   the stay is reviewed for abuse of discretion.  Unfortunately for them, the Diaz Defendants' mistake

17   regarding the applicable standard of review contaminates the integrity of the remaining analysis

18   contained in their Stay Motion.  *See* 19-206 Moore's Federal Practice – Civil § 206.01 ("[A]n

19   argument on appeal based upon an incorrect standard of review must fail.").

20       In addition to this initial error, the Stay Motion should otherwise be denied in light of the fact

21   that the substantive arguments raised therein fail on the merits.  First, the Diaz Defendants are not

22   entitled to a stay "of right" upon the posting of a supersedeas bond pursuant to Fed. R. Bankr. Proc.

23   7062(d).  Under Rule 8005, stays of a bankruptcy court order are entirely discretionary.

24   Furthermore, the Bankruptcy Court's Findings of Fact and Conclusions of Law and Amended

25   Judgment (collectively "Judgment") being appealed from is neither a monetary judgment nor it is

---

[1] As is otherwise set forth in the Bankruptcy Court's Judgment (as defined below), jurisdiction over the adversary proceedings arises under 28 U.S.C. § 1334(b).  The actions are core proceedings pursuant to 28 U.S.C. §§ 157(b)(1) and (2)(B), (E), (F), and (O).  Venue is in the Southern District of California pursuant to 28 U.S.C. § 1409(a).  The instant appeal arises under 28 U.S.C. § 157(a)(1).

1

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

CASE NO. 3:08-CV-01446-BTM-BLM; BANKR. ADV. NOS. 04-90392; 06-90369
OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO EMERGENCY MOTION OF DEFENDANTS MARTHA BARBA
AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]
SDODMS1/692905.2

1   closely analogous to a monetary judgment.  Rather, the relief granted is most closely identified with

2   a mandatory injunction.  Thus, the principles of Rule 7062(d) are inapplicable.  Second, the Diaz

3   Defendants' cannot obtain a discretionary stay upon appeal under Fed. R. Bankr. Proc 7062(a) where

4   the Diaz Defendants' legal theory on appeal is founded on a misapprehension of the Bankruptcy

5   Court's jurisdiction.  The Diaz Defendants will thus be unable to demonstrate _any_ likelihood of

6   success on the merits—much less the requisite high probability of success needed to justify a

7   discretionary stay under Rule 8005.

8       Where, as here, the Diaz Defendants cannot present a satisfactory case for probability of

9   success on the merits on appeal, they are not otherwise entitled to a "free ticket" for a stay on appeal

10  based solely upon speculation that they will face "irreparable harm" from the execution of the

11  Judgment.  As such, the Diaz Defendants' request for a stay pending appeal should be denied.

## I.    STANDARD OF REVIEW

13      The Diaz Defendants initially err as to the applicable standard of review of the Bankruptcy

14  Court's order denying their request for a stay.  The Diaz Defendants cite only to *BC Brickyard*

15  *Assocs. V. Ernst Home Center Inc. (In re Ernst Home Center, Inc.)*, 221 B.R. 243 (BAP 9th Cir.

16  1998), for the contention that *de novo* review of the Bankruptcy Court's order is proper.  *In re Ernst*

17  *Home Center* arose, however, out of an entirely different procedural posture and does not even

18  discuss the standard for a district court's review of a bankruptcy court's order denying a stay.  As

19  has been set forth in *Ohanian v. Irwin (In re Ohanian)*, 338 B.R. 839, 845-46 (E.D. Cal. 2006), *Ernst*

20  is not authority for the proposition that *de novo* review will apply.

21      Rather, the precedent is clear that the bankruptcy court's order denying the stay must be

22  reviewed for abuse of discretion.  *Id.*  In light of the clear precedent on this point, this particular slip

23  between the analytical cup and the lip is neither understandable nor excusable.  The relief requested

24  in the Stay Motion cannot withstand review under the abuse of discretion standard.

25      The standard of review applicable to the Motion arises out of its procedural posture.

26  Pursuant to Fed. R. Bankr. Proc. 8005, an application for a stay pending appeal of a final order of a

27  bankruptcy court must ordinarily be presented in the first instance to the bankruptcy judge.  Only

28  when the application has been made to the bankruptcy judge and denied may a stay pending appeal

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

be sought in a district court.  *See* Fed. R. Bankr. Proc. 8005.  Any subsequent motion for a stay to the

district court must discuss why the relief was denied by the bankruptcy judge.  *Id.*  Because Rule

8005 requires the bankruptcy judge to utilize discretion in determining the appropriateness of a stay,

where the bankruptcy court has denied a stay under Rule 8005, the appellate court's review is

limited to a simple determination of "whether the trial court abused its discretion."  *Wymer v. Wymer*

*(In re Wymer)*, 5 B.R. 802 (B.A.P. 9th Cir. 1980); *accord Flores v. DDJ, Inc (In re Enoch Packing*

*Co.)*, 2007 U.S. Dist. LEXIS 40010 (E.D. Cal. May 31, 2007); *Yeganeh v. Sims (In re Yeganeh)*,

2006 U.S. Dist. LEXIS 32765 (N.D. Cal. May 12, 2006); *Ohanian v. Irwin (In re Ohanian)*, 338

B.R. 839, 844 (E.D. Cal. 2006); *Dynamic Finance Corp. v. Kipperman (In re North Plaza, LLC)*,

Case No. 08-CV-1194, Order Denying Appellants' Motion for Stay Pending Appeal (S.D. Cal. July

25, 2008) (Whelan, J.)[2]:

> Discretion will be found to have been abused only where the bankruptcy court's decision was
>
> > arbitrary, fanciful, or unreasonable, which is another way of saying
> > that discretion is abused only where no reasonable man would take the
> > view adopted by the trial court.  If reasonable men could differ as to
> > the propriety of the action taken by the trial court, then it cannot be
> > said that the trial court abused its discretion.

*Id.* at 844.  "The trial court's discretion is so great that it is sometimes said that the appellate

court should not grant a stay of enforcement pending appeal after it has been denied by the trial

court."  *In re Wymer*, 5 Bankr. at 806.

The abuse of discretion standard utilized in reviewing the propriety of the bankruptcy court's

order denying a stay will, of course, encompass the District Court's broader review of the underlying

merits of the appeal.  *Id.* at 844, 848.  In this instance, issues regarding the denial or extension of

comity are reviewed for abuse of discretion.  *In re Manning*, 236 B.R. at 19 (citing *Remington Rand*

*Corporation-Delaware v. Business Sys. Inc.*, 830 F.2d 1260, 1266 (3d Cir. 1987)); *see also French v.*

*Liebmann (In re French)*, 320 B.R. 78, 81 (D. Md. 2004).  The question of subject matter

jurisdiction, including the related question whether Congress may give extraterritorial effect to the

statute in question, is an issue of law reviewed *de novo*.  *Id.*

---

[2] The Opinion is attached as Exhibit "A" hereto.  *See* Fed. R. App. Proc. 32.1; 9th Cir. Rule 36-3
(providing for citation to unpublished dispositions and orders issued on or after January 1, 2007).

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

CASE NO. 3:08-CV-01446-BTM-BLM; BANKR. ADV. NOS. 04-90392; 06-90369
OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO MOTION OF DEFENDANTS MARTHA BARBA
AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]
SDODMS1/692905.2

3

## II.    THE DIAZ DEFENDANTS ASSERT A REVISIONIST FACTUAL BACKGROUND

The Diaz Defendants have included in their Stay Motion approximately seven pages of "Factual Background." Their "Factual Background" contains more than a few very egregious mischaracterizations.[3] For example, notably absent from the Diaz Defendants' recitation are the numerous badges of fraud that came to the Diaz Defendants' attention prior to the close of the transaction, which are otherwise described in great detail in the Judgment. There is no mention of the conclusive fact pertaining to Diaz Defendants' and their attorney's actual knowledge of the Debtors' bankruptcy prior to the close of the 2004 transaction for the Villa Property, which, in and of itself, defeats any affirmative defense of good faith on the part of the Diaz Defendants.

Most important, however, the Diaz Defendants fail to mention the essential history of these adversary proceedings and the genesis of the underlying claim that was ultimately vindicated by the Judgment. The Judgment is, in fact, the final step in what has been a very long and arduous road toward enforcing an earlier judgment of this District Court that was entered against the Debtors concerning the Villa Property. The Diaz Defendants are noticeably silent regarding the elaborate scheme used by the Debtors to defraud two courts. Nor do the Diaz Defendants elaborate on the Bankruptcy Court's findings as to the joint conspiracy between themselves and the Debtors to fraudulently transfer the Villa Property away from the jurisdiction of the Bankruptcy Court and thwart the investigative efforts of the Chapter 7 Trustee. That history, and the Diaz Defendants' active and knowing participation in the Debtors' fraudulent scheme, is otherwise detailed in the Judgment and thus is only briefly set forth herein as follows:

### 1.    Background - The Lonie Trust

As is more fully detailed in the Judgment, Stephen E. Lonie, Diane C. Oney and Thomas E. Lonie, as trustees of the D. Donald Lonie, Jr. Family Trust (the "Lonie Trust"), were creditors of the Debtors in the underlying Chapter 7 case. The Trust had been established by D. Donald Lonie ("Mr. Lonie") on January 10, 1984 under Nevada state law. [*See* Judgment ¶1.] Mr. Lonie and the Trust

---

[3] We pause to mention that Kismet does not fault appellate counsel for these egregious misstatements of fact, which are generally not supported by citations to the record. Appellate counsel is relatively new on the scene and perhaps has not had sufficient opportunity to validate the factual and evidentiary record in these proceedings, which is quite extensive.

4

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

CASE NO. 3:08-CV-01446-BTM-BLM; BANKR. ADV. NOS. 04-90392; 06-90369
OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO MOTION OF DEFENDANTS MARTHA BARBA
AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]
SDODMS1/692905.2

had a history of business dealings with the Debtors concerning the beneficial interests in certain Real Property Trusts for two parcels of real property located in Mexico known as the Villa Property and the El Zafiro (the "El Zafiro Property"). [*See id.* ¶2.] The beneficial interests in the Villa and El Zafiro Properties (the "Real Properties") were held in two separate bank trusts known as "Fideicomiso Trusts" (the "Real Property Trusts"). [*Id.*]

On March 24, 2000, the Lonie Trust, through its trustees, initiated suit against the Debtors in the Southern District of California regarding Mr. Lonie's interest in the Real Properties. *See Stephen P. Lonie, Diane C. Oney, and Thomas E. Lonie Jr. Family Trust vs. Icenhower et al.*, Case No. 00-CV-612-L (JAH) (the "District Court Litigation"). *Id.* ¶4. In the District Court Litigation, on March 11, 2002, the Lonie Trust filed a motion for summary judgment and a motion asking the District Court for a preliminary injunction to enjoin the disposition of any proceeds of any sale of either of the Real Properties. District Court Litigation, Docket Nos. 37-43 (the "District Court Motions"). The District Court Motions were scheduled to be heard on May 13, 2002. *See id.* ¶8.

## 2. The "Transfers" to Howell & Gardner

On March 4, 2002, while the Debtors knew the District Court Motions were pending, the Debtors purported to transfer their interest in the Real Properties to defendant Howell & Gardner Investors, Inc. ("Howell & Gardner"), a corporation formed under the laws of the State of Nevada. Although Howell & Gardner was incorporated in December 2001, the entity was merely a shell until March 4, 2002 when it was sold by Laughlin International, Inc. to the Debtor, for $3,424, which the Debtor charged to his personal credit card. [*See id.* ¶8.] Howell & Gardner existed for no purpose other than to act as a sham company for the fraudulent conveyances of the Villa Property by the Debtors. [*See id.* ¶14.]

There is no evidence that Howell & Gardner paid any consideration to the Debtors for the Villa Property. [*See id.* ¶ 16.] According to the purported agreement for the transfer of the Villa Property to Howell & Gardner, the Debtors retained a right to receive the proceeds of any sale of the Villa Property which is above $1.5 million (later amended to $1.4 million), and a right to buy the Villa Property back from Howell & Gardner. [*Id.* ¶17.] The transfer agreement also purported to give Mr. Icenhower management and control of the Villa Property, the right to all profits and

5

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

CASE NO. 3:08-CV-01446-BTM-BLM; BANKR. ADV. NOS. 04-90392; 06-90369
OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO MOTION OF DEFENDANTS MARTHA BARBA
AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]
SDODMS1/692905.2

1   responsibility for all costs, notwithstanding the purported transfer to Howell & Gardner.  [*Id*.][4]

2          In the District Court Litigation, after the purported transfers to and through Howell &

3   Gardner, the Debtors made explicit statements to the District Court that they were in still control of

4   the Villa Property.  Specifically, a settlement brief filed by the Debtors stated that, "the Icenhowers

5   are able to hold the property while they seek the right buyer…"  The brief then proceeded to offer a

6   settlement option to the Lonie Trust which included a "transfer of the beneficial interest in the [Real

7   Property Trust] for the Villa…"

8          During subsequent proceedings before the District Court, including those referenced above

9   which took place in October 2002, the Debtors represented to the District Court and to the Lonie

10  Trust that they were in control of the Real Property Trust for the Villa Property and actively

11  negotiated a sale of their interests to the Lonie Trust.  In addition, the Debtors represented to the

12  District Court through and including the District Court trial conducted in May 2003 that they were

13  still in ownership and control of the beneficial interest in the Real Property Trust for the Villa

14  Property.  On November 24, 2003, the District Court entered a Memorandum of Decision and Order

15  re: Damages and Directing Entry of Judgment (the "Memorandum").  [Plaintiff's Request for

16  Judicial Notice (hereinafter "Plaintiff's RJN") Exhibit "1".]  In the Memorandum, the District Court

17  Judge made specific findings and rulings, including, without limitation:

18         IT IS FURTHER ORDERED that [Debtors] shall re-register the lien on
           the Villa property within ten (10) days of the filing of this Order.
19         [Debtors] shall submit evidence of the re-registration of the lien to [the
           Trust] within ten (10) days of the registration of the lien.  Upon full
20         payment of the damages in this matter, [the Trust] shall cause the lien to
           be released.  ¶IT IS FURTHER ORDERED that full payment of the
21         damages awarded shall be made within 60 days of the filing of this Order.
           ¶IT IS FURTHER ORDERED that in the event [Debtors] fail to pay to
22         [the Trust] the full damages award within the time provided, defendants
           shall reconvey the [Real Property Trusts], free of any encumbrance, claim,
23         lien or liability that has been placed on upon the property or occasioned by
           defendants' actions or inactions, to [the Trust] in accordance with the
24         terms of the parties' underlying agreement.

25  *Id*.  The District Court also determined that the Debtors owe the Trust a debt in the sum of

26  $1,356,830.32.  [*Id*.]

27  ─────────────────
    [4] Notably, the Diaz Defendants expressly conceded at trial that the transfer by the Debtors to Howell
28  & Gardner is likely avoidable as a fraudulent transfer.  [*Id*. ¶ 94.]

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

CASE NO. 3:08-CV-01446-BTM-BLM; BANKR. ADV. NOS. 04-90392; 06-90369
OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO MOTION OF DEFENDANTS MARTHA BARBA
AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]
SDODMS1/692905.2

### 3.    The Diaz Defendants Enter the Scene

During the Summer of 2003, at approximately the same time as the District Court trial commenced, Mr. Diaz first met the Debtor at a coffee shop in Pacific Beach. They were introduced through a business associate of the Debtors and friend of Mr. Diaz's, Eugene Kocherga, who had a close familiarity with the Villa Property and its history. [*See* Judgment ¶ 27.] Mr. Diaz testified that he learned at that time that the Debtor was the "manager" of the Villa Property. [*Id*. ¶ 27.]

Over the next few months, Mr. Diaz entered into negotiations with the Debtor (on behalf of himself and his mother, Ms. Barba) concerning a potential purchase of the Villa Property by himself and Ms. Barba, ultimately commencing due diligence upon final agreement on the price. [*See id.* ¶¶ 28-29.] At this same time, the Debtor asked Mr. Diaz for a personal loan in the amount of $100,000. Shortly after receiving this loan from Mr. Diaz, and during the due diligence period, on December 15, 2003, the Debtors filed for bankruptcy. [*Id*. ¶ 30.] Mr. Diaz. testified that he was "shocked" when he received a Notice of Commencement of Chapter 7 Bankruptcy Case in the mail. [*Id*. ¶ 32.] Mr. Diaz otherwise testified at trial that he informed Ms. Barba of the Debtors' bankruptcy at or about this same time. When Mr. Diaz inquired of the Debtor regarding the bankruptcy, he was informed by the Debtor that "he had lost a big judgment to the Lonie Trust." [*Id*.] During that conversation, Mr. Diaz was promised by the Debtor that the $100,000 personal loan would be deducted from the purchase price of the Villa Property. [*Id*. ¶ 32.]

The Diaz Defendants jointly retained a Mexican lawyer to conduct due diligence on the transaction for the Villa Property. By any measure, the due diligence was shockingly inadequate. [*See id.* ¶¶ 33-35.] Not even the most basic step was taken to obtain a resolution by Howell & Gardner shareholders authorizing the transaction. [*Id*. ¶ 35.]

The transaction for the transfer of the Villa Property from Howell & Gardner to the Diaz Defendants was otherwise highly irregular. Only $25,000 of the consideration was paid to Howell & Gardner. The remainder was paid (per the instruction of the Debtor, Jerry Icenhower) to other entities, one of which had the distinctly familiar name of "Icenhower Investments." [*See id.* ¶ 39.] Each of these payments was made to the same bank, located in Visalia, California. The purported officer and director of Howell & Gardner played only a passive role in the transaction, taking his

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

1  direction from the Debtor.  [*Id.* ¶ 38.]  There were numerous other "red flags" that should have

2  caused the Diaz Defendants to investigate the voidability of the transfer to Howell & Gardner.  [*See*

3  Judgment ¶¶ 103-05; *see also* Plaintiff's Demonstrative Trial Exhibit, "Diaz Red Flags," Plaintiff's

4  RJN, Exhibit "2".]

5          On January 12, 2004, the Debtors first disclosed their transfer of the Villa Property to Howell

6  & Gardner at the first meeting of creditors.  [*See* Judgment ¶ 44.]  Having received insufficient

7  earlier, at the continued meeting of creditors on March 22, 2004, the Trustee questioned the Debtors

8  further about this matter.  [*Id.*]  On or about June 7, 2004, the closing of the sale of the Villa

9  Property to the Diaz Defendants took place in San Diego, California.  [*Id.* ¶ 38.]  The sale was

10  recorded in the Mexican Registry on September 8, 2004.  [*Id.* ¶ 42.]

11          The evidence at trial demonstrated that the June 2004 closing of the sale was a "hurried up"

12  transaction, timed with the goal of outfoxing the Trustee and defeating the jurisdiction of the

13  Bankruptcy Court over the Villa Property.  The Bankruptcy Court specifically found that Mr. Diaz

14  proceeded with the Villa Property transaction  because "he believed the clear title in the Mexican

15  Public Registry would defeat the Trustee."  *Id.* ¶ 106.  In addition to finding that the Diaz

16  Defendants were aware of the Debtors' bankruptcy, the Bankruptcy Court found that "Mr. Diaz

17  *conspired* with Mr. Icenhower to use the clear title in Mexico to defeat the Trustee."  *Id.* ¶ 107

18  (emphasis added).

19          The Villa Property is currently used a commercial income property by the Diaz Defendants,

20  not a "vacation home."  [*Cf.* Motion at 1, lines 12-13; 20, line 20.]  Subsequent to acquiring the Villa

21  Property, the Diaz Defendants have rented it out to the public, advertising it as a "hotel."  [*See*

22  Plaintiff's RJN, Exhibit "3"  Villa Vista Hermosa, Puerta Vallarta Hotel/Villa, available at

23  http://villavistahermosa.com/tourint.htm (last visited August 22, 2008):

24          The villa accommodations include six guest rooms with bathrooms, a
           two bedroom suite with bathroom, a sumptuous open air palapa suite
25          (with his and hers bathrooms),and a two bedroom "granny flat" with
           its own kitchenette, as well as staff residences.  The main house is in
26          the colonial style with expansive living and dining spaces.  Employees
           of the villa will cater to your every need. These talented individuals
27          include a fulltime gourmet chef and a cheerful staff.  They will ensure
           your stay at the villa is comfortable, enjoyable and convenient.

28

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

SDODMS1/692905.2

CASE NO. 3:08-CV-01446-BTM-BLM; BANKR. ADV. NOS. 04-90392; 06-90369
OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO MOTION OF DEFENDANTS MARTHA BARBA
AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]

1   *see also* Judgment ¶ 107 ("The Diaz Defendants cannot complain about the inequities of being

2   ordered to return their cherished vacation home to the estate when the evidence shows they are

3   renting to the public.").]

4   **III.    THE DIAZ DEFENDANTS ARE NOT ENTITLED TO A STAY OF RIGHT UNDER**
    **FED. R. BANKR. PROC 7062(d)**

5

6          The Diaz Defendants contend that they are entitled to receive a stay as a matter of right under

7   Fed. R. Bankr. Proc. 7062(d), provided that they post a supersedeas bond.  [Motion at 23, lines 25-

8   26.]  Suggesting that the Amended Judgment is "comparable to" a money judgment, the Diaz

9   Defendants boldly claim that "if the Court is unwilling to grant a discretionary stay without a bond,

10  it must set the amount of the bond in accordance with Federal Rule of Bankruptcy Procedure

11  7062(d).  [*Id.* at lines 26-27.]  This is an inaccurate statement of the applicable law.

12         First of all, in contrast to Rule 62(d), Federal Rules of Civil Procedure, a stay under Rule

13  8005 is discretionary and does *not* accord the appellant a stay pending appeal as of right upon the

14  filing of a supersedeas bond.  Furthermore, the provisions of Rule 62(d) are not even applicable to

15  the Judgment in these adversary proceedings.  Fed. R. Civ. Proc. 62(d) provides that "[w]hen an

16  appeal is taken the appellant by giving a supersedeas bond may obtain a stay subject to the

17  exceptions contained in subdivision (a) of this rule."  Rule 62(a) provides that "[u]nless otherwise

18  ordered by the court, an interlocutory or final judgment in an action for an injunction or in a

19  receivership action, or a judgment or order directing an accounting in an action for infringement of

20  letters patent," shall not be stayed pending appeal.  The Ninth Circuit strictly limits the application of

21  Rule 62(d) to monetary judgments.  *See NLRB v. Westphal*, 859 F.2d 818 (9th Cir. 1988) (citing

22  *Donovan v. Fall River Foundry Co.*, 696 F.2d 524 (7th Cir. 1982)); *see also In re Capital West*

23  *Investors*, 180 B.R. 240, 242 (N.D. Cal. 1995) (stating that "the Seventh and Ninth Circuits have

24  given clear effect to the limitation (of the stay of right to appeals from money judgments").

25         Courts necessarily utilize a comparability test for judgments that do not neatly fit into the

26  specific named categories articulated under Rule 62(a) and (d), determining which type they are

27  more closely analogous to.  This application does not assist the Diaz Defendants here.  No amount of

28  shoehorning and legal maneuvering will fit the "square peg" of the quintessentially equitable

9

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

CASE NO. 3:08-CV-01446-BTM-BLM; BANKR. ADV. NOS. 04-90392; 06-90369
OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO MOTION OF DEFENDANTS MARTHA BARBA
AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]
SDODMS1/692905.2

1    Judgment into the "round hole" of a money judgment.

2         The cases cited by the Diaz Defendants are instructive and demonstrate the requirement for a

3    very close equivalency to a monetary judgment to be deemed "comparable." In *Capital West*, the

4    appellants were unsuccessful in attempting to argue that a supersedeas stay would apply to an order

5    confirming a chapter 11 plan. The court held that the order was not the "equivalent" of a money

6    judgment, but instead accomplished a distribution of rights among the parties to the bankruptcy. *Id*.

7    In *Hebert v. Exxon Corp.*, 953 F.2d 936 (5th Cir. 1992), the Fifth Circuit extended a stay of right to a

8    declaratory judgment that required the defendant to pay a specific sum of money. The court aptly

9    reasoned that the applicability of Rule 62(d) turned not on the distinction between a declaratory or

10   money judgment but rather "whether the judgment involved is monetary or nonmonetary." *Id*. at

11   938. *United States v. Mansion House Center Redevelopment Co.*, 682 F. Supp. 446, 450 (E.D. Mo.

12   1988) simply stands for the unremarkable proposition that a foreclosure action on a deed of trust or

13   mortgage—which represents the liquidation of the collateral for a sum certain owed in default of a

14   loan obligation—has equivalency to a money judgment.[5]

15        The policy underlying the limitation of Rule 62(d) to money judgments provides further

16   guidance as to why a stay upon supersedeas bond is inapplicable to these proceedings. Courts have

17   restricted the application of Rule 62(d) to judgments for money "because a bond may not adequately

18   compensate a non-appealing party for loss incurred as a result of the stay of a non-money judgment."

19   *Hebert*, 953 F.2d at 938 (citing *Westphal*, 859 F.2d at 819). In this respect, a stay of right is

20   unavailable where the transfer of an asset is involved, as a bond cannot compensate for the loss of

21   use of the asset by the appellee during the duration of the appeal. In this respect, the supersedeas

22   bond must be a "kind for kind security to guaranty the [money] judgment" *Id*. (quoting *United*

23   *States v. United States Fishing Vessel MAYLIN*, 130 F.R.D. 684, 686 (S.D. Fla. 1990)). The Diaz

24   Defendants' unsupported proposition that actions "pertaining to possession of real property" should

25   always benefit from a stay of right upon posting of a supersedeas bond is belied by the substantial

26

27   [5] *In re Max Sugarman Funeral Home, Inc.*, 94 B.R. 16 (Bankr. D.R.I. 1988), also cited by the Diaz
     Defendants, provided no analysis whatsoever, otherwise disagrees with the narrow construction
28   followed in the Ninth and Seventh Circuits, and thus is not persuasive.

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

CASE NO. 3:08-CV-01446-BTM-BLM; BANKR. ADV. NOS. 04-90392; 06-90369
OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO MOTION OF DEFENDANTS MARTHA BARBA
AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]
SDODMS1/692905.2

weight of authority.  In fact, a judgment affecting the *possession* of real property (as opposed to a mortgage foreclosure action) will generally never be able to be treated "kind for kind" with money because of the issues concerning compensation for the appellee's loss of the <u>use</u> of the property during the pendency of the appeal.  This is particularly true where, as here, income-producing commercial property is involved.  *See, e.g. Government Guarantee Fund of the Republic of Finland v. Hyatt Corp.*, 167 F.R.D. 399 (D.V.I. 1996) (denying motion for stay of order to vacate hotel property, holding that "the posting of mere money by Hyatt in this case cannot adequately ensure that [appellee] would be adequately compensated for the lost possession and use of its property and lost income from the operation of the Hotel during the pendency of an appeal"); *Miller v. LeSEA Broadcasting, Inc.*, 927 F. Supp. 1148 (E.D. Wisc. 1996) (denying motion for stay of order requiring defendant to sell television station property, holding that "where a party has been ordered to do or perform an act, the monetary value of a delay in performance is not so readily ascertained").

        In all practicality, as applied to core proceedings in bankruptcy cases, the supersedeas stay rarely applies.  *See Gleasman v. Jones, Day, Reavis & Pogue (In re Gleasman)*, 111 B.R. 595, 599 (Bankr. W.D. Tex. 1990) (observing that the nature of bankruptcy proceedings is such that supersedeas stays are seldom applicable, because most bankruptcy court rulings adjust the relative rights of parties to property) (footnotes omitted).  Furthermore, where the property involved is "property of the estate" subject to recovery and/or turnover, the suitability of a supersedeas bond is even more remote.  Such a judgment concerning property of the estate is "in the nature of equitable or injunctive relief, notwithstanding the fact that it is not technically an injunction as referenced in Rule 62(c)"  *United States v. Krause (In re Krause)*, No. 05-17429, 2007 Bankr. LEXIS 3049 at *6 (Bankr. D. Kansas August 29, 2007).

        Although judgments on avoidance actions can take the form of monetary judgments, the Judgment here specifically calls for recovery of the *property*.  Throughout these proceedings, Kismet has demanded recovery of the property and has eschewed a monetary judgment.  The provisions of Section 550 of the Bankruptcy Code provide the prevailing plaintiff in an avoidance action the choice of whether to receive recovery of a money judgment or recovery of the property itself.  The statute, in prescribing alternatives, is purposefully flexible to accomplish its remedial goal.  *In re*

11

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

CASE NO. 3:08-CV-01446-BTM-BLM; BANKR. ADV. NOS. 04-90392; 06-90369
OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO MOTION OF DEFENDANTS MARTHA BARBA
AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]
SDODMS1/692905.2

1    *Brun*, 360 B.R. 669, 674; *Feltman v. Warmus (In re American Way Serv. Corp.)*, 229 B.R. 496

2    (Bankr. S.D. Fla. 1999).  The policy behind providing the prevailing plaintiff this choice recognizes

3    the troublesome valuation difficulties that necessarily exist with fraudulently transferred real or

4    personal property assets and to otherwise ensure that the plaintiff captures any increase in the value

5    of the property that may have occurred subsequent to the date of the fraudulent transfer.  These same

6    considerations serve to negate the applicability of a stay to the Diaz Defendants conditioned upon

7    the posting of a bond.  The proper amount of such a bond would be incalculable and Kismet would

8    be left with unjust exposure to significant risk of loss.

9        The proper analysis of the Diaz Defendants' right to a stay is under the test for a

10   discretionary stay under Fed. R. Bankr. Proc. 8005.  As explained below, the Diaz Defendants fail

11   that test.

12   **IV.    THE DIAZ DEFENDANTS ARE NOT ENTITLED TO A DISCRETIONARY STAY
          UNDER FED. R. BANKR. PROC. 8005**

13

14       In bankruptcy cases, stays pending appeal of "all types of judgments, orders or decrees of a

15   bankruptcy judge, including orders granting, denying or dissolving injunctions, are governed by

16   Bankruptcy Rule 8005."  10-7062 Collier on Bankruptcy ¶ 7062.05 (15th ed. rev. 2008).  Rule 8005

17   expressly provides that "[n]otwithstanding Rule 7062 but subject to the power of the district court

18   and the bankruptcy appellate panel [to condition the stay], the bankruptcy judge may suspend or

19   order the continuation of other proceedings in the case under the Code or make any other appropriate

20   order during the pendency of an appeal on such terms as will protect the rights of all parties in

21   interest."[6]  A stay of a final order on the merits of a dispute is, however, "an extraordinary device

22   which should be sparingly granted." *Ariz. Contrs. Ass'n, Inc. v. Candelaria*, 2008 WL 486002 at *5-

23   6.

     **A.    Under Rule 8005, the Governing Law Requires Each *Hilton* Element to be Satisfied**

24

25       In determining whether a discretionary stay should be granted from an appeal to a district

26   court or bankruptcy appellate panel from the final order of the bankruptcy court under Fed. Rule

27

28   _____
     [6] As such, Section VI of the Stay Motion, arguing for an alternative analysis under Rule 62(c) apart
     from Rule 8005, is founded on an incorrect statement of the law and is thus disregarded.

1    Bankr. Proc. 8005, virtually all courts utilize the four factors used in determining whether to grant a

2    stay pending appeal of a *preliminary* injunction under Federal Rule Civ. Proc. 62(c).  That familiar

3    four-part test articulated by the Supreme Court in *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987), has

4    been adopted by virtually all the circuit courts of appeal, including the Ninth Circuit.  That test is:

5        (1) whether the stay applicant has made a strong showing that he is likely to succeed on the

6    merits;

7        (2) whether the applicant will be irreparably injured absent a stay;

8        (3) whether issuance of the stay will substantially injure the other parties interested in the

9    proceeding; and

10        (4) where the public interest lies.

11    *Id*.

12        Because the burden of meeting this standard lies with the moving party and is a heavy one, in

13    respect to a stay of a final order on the merits, "more commonly stay requests will not meet this

14    standard and will be denied."  Wright, Miller & Kane, *Federal Practice and Procedure Civil 2d* §

15    2904 (West Pub. 1995 & Supp. 2008); *see also* 2 Matthew Bender Practice Guide, *Federal Pretrial*

16    *Civil Procedure in California* § 19.08[3][f] (noting that the moving party bears the burden of proof

17    as to each element of the test).

18        Although under Rule 8005 the four enumerated factors utilized in determining the

19    applicability of a stay are identical to those used for determination of a stay of a preliminary

20    injunction pending appeal, *see In re Wymer*, 5 B.R. 806 (B.A.P. 9th Cir. 1980) (adopting the standard

21    for discretionary stays of a preliminary injunction under the predecessor to Rule 8005), the practical

22    *application* of these four factors in a case arising under the Bankruptcy Code is very different.  In the

23    context of a stay pending *injunction* under Rule 62(c), courts often apply several alternative

24    formulations of this traditional test in a "sliding scale" fashion, with the strength of any one factor

25    varying inversely with the strength of the remaining factors.  *See, e.g., Lopez v. Heckler*, 713 F. 2d

26    1432 (9th Cir. 1983, *rev'd on other grounds*, 469 US. 1082 (1984).[7]

27    _____

28    [7] The Ninth Circuit, for example uses at least three "alternative" tests of this type.  For example, to
      prevail the moving party must show either (1) "a strong likelihood of success on the merits" and "the
      possibility of irreparable injury to plaintiff if preliminary relief is not granted" or (2) "that serious

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

CASE NO. 3:08-CV-01446-BTM-BLM; BANKR. ADV. NOS. 04-90392; 06-90369
OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO MOTION OF DEFENDANTS MARTHA BARBA
AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]
SDODMS1/692905.2

1    Courts of this circuit, as well as those of other circuits, generally agree that under Rule 8005

2    a traditional sliding scale formulation is not appropriate for use in making the determination of

3    whether a stay should be granted pending the appeal of a bankruptcy court order. *See Rose*

4    *Townsend Trust v. Johnston (In re Johnston)*, No. 06-80040, 2007 WL 2684736 (Bankr. E.D. Wash.

5    Sept. 7, 2007) (rejecting the movants' citations to cases, such as *Lopez v. Heckler*, 713 F. 2d 1432,

6    that did not rely upon F.R.B.P. 8005); *compare In re Forty-Eight Insulations, Inc.*, 115 F.3d 1294,

7    1301 (7th Cir. 1997) (stating that if the movant failed to make the requisite threshold showings of

8    both a "strong" likelihood of success on the merits and irreparable harm, the stay should be denied

9    without further analysis). The reason for the rejection of the standard sliding scale analysis under

10    Fed. R. Bankr. Proc. 8005 relates to the procedural posture of an appeal, *i.e.*, whether it is from a

11    final order of a bankruptcy court on the merits; or from a preliminary determination, not on the

12    merits. *See, e.g., Dynamic Finance Corp. v. Kipperman (In re North Plaza, LLC)*, Case No. 08-CV-

13    1194, Order Denying Appellants' Motion for Stay Pending Appeal (S.D. Cal. July 25, 2008)

14    (Whelan, J.)[8]:

15          A "sliding scale" approach, which often results in disproportionately
              weighting the "irreparable harm" prong, is appropriate for preliminary
16          injunctions because a court deals with the dispute on first impressions,
              relies on a less-than-developed factual and legal record, and will
17          ultimately revisit the issue down the road. In contrast, where-as here-a
              court has taken extensive evidence and briefing and issued a
18          determination on the merits, an interest in finality arises.

19    Under Rule 8005, therefore, the substantial weight of authority in the Ninth Circuit requires

20    that, _each element_ of the test must be proved by the moving party by a _preponderance_ of the

21    evidence. *See, e.g., Silicon Valley Bank v. Pon (In re Pon)*, 1994 U.S. Dist. LEXIS 2559 at * 6

22    (N.D. Cal. Feb. 25, 1994) (citing *In re Dial Industries, Inc.*, 137 Bankr. 247, 250-251 (Bankr. N.D.

23    Ohio 1992)). The Diaz Defendants' contrary suggestion that they need not make a strong showing

24    of likely success on the merits of the appeal [Motion at 10], misstates the governing law under Rule

25    legal questions are raised and that the balance of hardships tips sharply in its favor." *Golden Gate*
26    *Restaurant Ass'n. v. City of San Francisco*, 512 F.3d 1112, 1116 (9th Cir. 2008) (quoting *Natural*
      *Res. Def. Council, Inc. v. Winter*, 502 F.3d 859, 862 (9th Cir. 2007); *Lopez v. Heckler*, 713 F.2d at
27    1435.
      [8] The Opinion is attached as Exhibit "A" hereto. *See* Fed. R. App. Proc. 32.1; 9th Cir. Rule 36-3
28    (providing for citation to unpublished dispositions and orders issued on or after January 1, 2007).

14

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

CASE NO. 3:08-CV-01446-BTM-BLM; BANKR. ADV. NOS. 04-90392; 06-90369
OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO MOTION OF DEFENDANTS MARTHA BARBA
AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]
SDODMS1/692905.2

8005.  *See Thomas v. City of Evanston*, 636 F.Supp. 587, 590-91 (An appellant's failure to meet their burden of persuasion regarding even *one* of these factors requires denial of the stay);[9] *see also, e.g., Ohanian v. Irwin (In re Irwin)*, 338 B.R. AT 839; *Yeganeh v. Sims*, 2006 WL 1310447 (N.D. Cal. May 12, 2006) at *19 (failure to prove likelihood of success on the merits alone is grounds for denial of the stay).  Tellingly, even the lead case cited by the Diaz Defendants for their proposed "relaxed" standard, *In re Forty Eight Insulations*, 115 F.3d at 1301, holds that a stay pending appeal of a final judgment requires a "strong" and "substantial" showing of success on the merits and that failure to meet this burden alone requires denial of the stay.  *Id.* at 1301.

**B.**  **The Diaz Defendants Cannot Demonstrate Any Probability of Success on the Merits**

The likelihood of success on the merits is a threshold issue, normally "the most important" factor in the determination of whether a stay may be granted.  *United States v. Fitzgerald*, 884 F. Supp. 376, 377 (D. Idaho 1995) (citing *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986)).  Indeed, "[t]he sine qua non of the stay pending appeal standard is whether the movants are likely to succeed on the merits."  Wright, Miller & Kane, Federal Practice and Procedure: 16A Jurisdiction 3d § 3954 & n.10.1 (West Supp. April 2008) (quoting *Acevedo-Garcia v. Vera Monroig*, 296 F.3d 13, 16 (1st Cir. 2002)).

A movant seeking a stay pending review on the merits of a final judgment will necessarily have greater difficulty in demonstrating a likelihood of success on the merits.  "In essence, a party seeking a stay must ordinarily demonstrate to a reviewing court that there is a likelihood of reversal."  *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150 (6th Cir. Mich. 1991); *see also, e.g., In re Forty-Eight Insulations, Inc.*, 115 F.3d at 1301 (describing the required showing as a "strong" and "substantial" likelihood of success, and stating, "in the context of a stay pending appeal, where the applicant's arguments have already been evaluated on the success scale, the applicant must make a stronger threshold showing of likelihood of success to meet his burden.").

---

[9] Although these required elements may be "balanced," the threshold preponderance of evidence burden of proof obviously does not leave as much "play" in the machinery as does the more liberal "sliding scale" approach used in the determination of a stay of a preliminary injunction.

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

CASE NO. 3:08-CV-01446-BTM-BLM; BANKR. ADV. NOS. 04-90392; 06-90369
OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO MOTION OF DEFENDANTS MARTHA BARBA
AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]
SDODMS1/692905.2

1   The requisite showing for "likelihood of success" requires, at an absolute minimum, that the

2   movant raise "'questions going to the merits so *serious, substantial, difficult and doubtful* as to make

3   them a fair ground for litigation and thus for more deliberate inquiry.'" *County of Alameda v.*

4   *Weinberger*, 520 F.2d 344, 349 n.12 (9th Cir.1975) (citations omitted) (emphasis added). Stated a

5   different way, at this procedural juncture—after numerous dispositive motions and where the

6   Bankruptcy Court has conducted a five-day trial on the merits—in order to satisfy this prong of the

7   test, this Court would need to find that there is a substantial possibility that the Bankruptcy Court

8   had based its decision on an erroneous view of the law or clearly erroneous factual findings, or that it

9   made a clear error of judgment in the Amended Judgment. Cases cited by the Diaz Defendants for a

10  contrary position, such as *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002) (stay of deportation)

11  and *LaRouche v. Kezer*, 20 F.3d 68, 72-23 (2d Cir. 1994) (stay of preliminary injunction) discuss the

12  standard for preliminary injunctive relief on appeal and do pertain to the standard for final judgments

13  on the merits, nor do they apply Rule 8005. The other case cited by the Diaz Defendants, *In re Forty*

14  *Eight Insulations, Inc.*, 115 F.3d at 1301, as discussed above, absolutely requires a threshold

15  showing of "strong" and "substantial" showing of likelihood of success, not merely a "possibility,"

16  as suggested by the Diaz Defendants. Here, the minimal showing on the merits has not been made—

17  and cannot be made under any circumstances.

18  Here, the Diaz Defendants attempt to establish the asserted merits of their appeal on a single

19  faulty proposition: They argue that the Judgment, which ordered, in the alternative, substantive

20  consolidation of Howell and Gardner with the Debtors *nunc pro tunc* to the petition date, is

21  inconsistent with the Bankruptcy Court's earlier "Tentative Decision"[10] on the Diaz Defendants

22  Motion to Dismiss, which had looked to "the initial transfer" between Howell & Gardner Debtors,

23  not the subsequent transfer from Howell & Gardner to the Diaz Defendants. The Diaz Defendants

24  thus contend (erroneously) that upon substantive consolidation of the Debtor with Howell & Gardner

25  "*there was no initial transfer* from [the Debtor] to H&G." As such, they contend that the issues

26  raised in the earlier Motion to Dismiss again become relevant, *i.e.*, (i) that the Court lacked subject

27
28

---

[10] The Tentative was later replaced with the Court's Order on the Diaz Defendants' Motion to Dismiss dated February 13, 2007, which is attached as Exhibit "4" to Plaintiff's RJN ("Order on Motion to Dismiss").

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

16

1   matter jurisdiction over the proceeding; (ii) that the "avoidance" provisions of the Bankruptcy Code

2   may not be applied extraterritorially; and (iii) that comity considerations dictate the use of Mexican

3   law. [Stay Motion at 12 (emphasis in original)]. This contention is based upon a faulty premise and

4   a resulting flawed analysis. The Diaz Defendants otherwise miss the great import of the four most

5   powerful jurisdictional words under the Bankruptcy Code: "*property of the estate*."

6         First, the Diaz Defendants initially misapprehend the structure of the Judgment. The

7   Bankruptcy Court's Judgment is premised upon two <u>*alternative*</u> theories of recovery to Kismet: (i)

8   for avoidance and recovery of a fraudulent transfer under 11 U.S.C. §§ 544(b) and 550 (the

9   "Fraudulent Transfer Remedy"); <u>*or*</u> (ii) for avoidance and recovery of a post-petition transfer under

10   11 U.S.C. §§ 549 and 550, joined with a finding of alter ego and the substantive consolidation of

11   Howell & Gardner with the Debtors, *nunc pro tunc* to the petition date (the "Post Petition Transfer

12   Remedy"). Under the Judgment, either Remedy is independently operative; either Remedy may be

13   independently affirmed on appeal.

14         In this respect, as to the Fraudulent Transfer Remedy, the Judgment adopts, jot-for-jot, the

15   reasoning of the Bankruptcy Court's Order on the Motion to the Dismiss. The Diaz Defendants do

16   not question the integrity of this Order with respect to the Fraudulent Transfer Remedy. This alone

17   is sufficient ground to deny the stay.

18         In respect to the second theory of avoidance, the Post Petition Transfer Remedy, under 11

19   U.S.C. § 549, a trustee may "avoid a transfer of *property of the estate* -- (1) that occurs after the

20   commencement of the case; and . . . (2) . . . (B) that is not authorized under this title or by the court."

21   11 U.S.C. § 549(a)(1), (2)(B) (emphasis added). Under 11 U.S.C. § 541(a), "property of the estate"

22   is defined to mean property "*wherever located* and by whomever held" (emphasis added). Likewise,

23   28 U.S.C. § 1334(e) provides that "[t]he district court in which a case under title 11 is commenced or

24   is pending shall have exclusive jurisdiction . . . of all of the property, *wherever located*, of the debtor

25   as of the commencement of such case, and of property of the estate (emphasis added). As such, the

26   jurisdiction of the Bankruptcy Court is without question. Under binding Ninth Circuit precedent,

27   questions as to the extraterritorial application of the Bankruptcy Code, and comity are similarly

28   rendered substantially irrelevant as to property of the estate.

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

CASE NO. 3:08-CV-01446-BTM-BLM; BANKR. ADV. NOS. 04-90392; 06-90369
OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO MOTION OF DEFENDANTS MARTHA BARBA
AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]

**1.     The Court Has Subject Matter Jurisdiction Over Both Theories of Recovery Contained in the Judgment**

There is no validity to the Diaz Defendants' contention that the Bankruptcy Court lacks subject matter jurisdiction.  First, the Bankruptcy Court possesses the requisite *in personam jurisdiction* over the Diaz Defendants to order *recovery* of the Villa Property under 11 U.S.C. § 550, under either the Fraudulent Transfer Remedy or the Post Petition Transfer Remedy.

With respect to the Fraudulent Transfer Remedy, avoidance under 11 U.S.C. § 544(b) is not sought against the Diaz Defendants, only recovery under § 550.[11]  As is set forth in the Amended Judgment, the Court "has subject matter jurisdiction over claims to avoid and recover the wrongful transfer of the Debtor's interest in the fideicomiso trust, and it has *in personam* jurisdiction over each of the Defendants in these actions to order them to execute the necessary conveyance documents to return the Villa Property to the estate, subject to enforcement through this Court's contempt powers, even though it indirectly affects title to real property in Mexico."  [Judgment at 33. (citing, *inter alia, Fall v. Easton*, 215 U.S. 1, 9-12 (1909)].

*Fall v. Easton* disposes of any contention to the contrary, holding that

> [t]he territorial limitation of courts of a state over property in another state has a limited exception in the jurisdiction of a court of equity . . . A court of equity, having authority to act upon the person, may indirectly act upon real estate in another state, through the instrumentality of this authority over the person. Whatever it may do through the party, it may do to give effect to its decree respecting property, whether it goes to the entire disposition of [the property] or only to affect [the property] with liens or burdens.

*Id.*  Thus, although a court may not *directly* act on property which lies beyond its borders, it may *indirectly* act on such property by its assertion of *in personam* jurisdiction over the defendant.

In accord with the established rule of *Fall v. Easton*, the Ninth Circuit has further endorsed the use of the contempt power to command a party over whom the court has personal jurisdiction to take all acts necessary to transfer Mexican real property into a *fideicomiso* trust where such is required to do equity.  *See Brady v. Brown*, 51 F.3d 810 (9th Cir. 1995).  *Brady* was a civil

---

[11] The avoidance is sought against Howell & Gardner.

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

CASE NO. 3:08-CV-01446-BTM-BLM; BANKR. ADV. NOS. 04-90392; 06-90369
OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO MOTION OF DEFENDANTS MARTHA BARBA
AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]
SDODMS1/692905.2

1  proceeding with substantially similar facts and with a strikingly similar equitable posture to these

2  proceedings. *Id*. As such, the contention by the Diaz Defendants that the Bankruptcy Court lacks

3  subject matter jurisdiction over these proceedings where the Diaz Defendants both reside in San

4  Diego and have otherwise submitted to the personal jurisdiction of the Bankruptcy Court lacks any

5  colorable merit. *See, e.g., Burnham v. Superior Court*, 495 U.S. 604, 611 (1990) ("Where a party is

6  within a territory, he may justly be subjected to its process, and bound personally by the judgment

7  pronounced, on such process, against him.").

8         With respect to the separate Post Petition Transfer Remedy, in addition to *in personam*

9  jurisdiction over the Diaz Defendants, the Bankruptcy Court also possesses exclusive *in rem*

10  jurisdiction to avoid the transfer of the Villa Property at issue, over which it has legal "custody" as

11  property of the estate. *See Hong Kong and Shanghai Banking Corp. v. Simon (In re Simon)*, 153

12  F.3d 991, 995 (9th Cir. 1995):

13              [T]he estate is comprised of the debtor's legal or equitable interests in
                property "*wherever located and by whomever held*." The district court

14              in which the bankruptcy case is commenced obtains exclusive *in rem*
                jurisdiction over all of the property of the estate. The court's exercise

15              of "custody" over the debtor's property, via its exercise of *in rem*
                jurisdiction, essentially creates a fiction that the property—regardless

16              of actual location—is legally located within the jurisdictional
                boundaries of the district in which the court sits. This includes

17              property outside the territorial jurisdiction of the United States.

18  *Id*. at 996; *accord Beck v. Fort James Corp. (In re Crown Vantage, Inc.)*, 421 F.3d 963, 971 (9th Cir.

19  2005) ("The requirement of uniform application of bankruptcy law dictates that all legal proceedings

20  that affect the administration of the bankruptcy estate be brought either in bankruptcy court or with

21  leave of the bankruptcy court."); *see also, Gruntz v. County of Los Angeles (In re Gruntz)*, 202 F.3d

22  1074 (9th Cir. 2000) (A federal court having custody of property has "exclusive jurisdiction to

23  proceed.") (quoting *Donovan v. City of Dallas*, 377 U.S. 408, 412 (1964)). Cases cited by the Diaz

24  Defendants in Sections III.A.1.(a) & (b) of their Stay Motion in respect to the "local action rule" thus

25  have no application to the facts of these proceedings, which are instead governed by *In re Simon*.

26         **2.     The Presumption Against Extraterritoriality Has No Application Here**

27         A component of the jurisdictional analysis is whether that jurisdiction may be asserted by a

28  court of the United States extraterritorially. Congress has the authority to apply its laws

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

CASE NO. 3:08-CV-01446-BTM-BLM; BANKR. ADV. NOS. 04-90392; 06-90369
OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO MOTION OF DEFENDANTS MARTHA BARBA
AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]
SDODMS1/692905.2

extraterritorially, provided, however, that there is a presumption against such application.  In

*E.E.O.C. v. Arabian American Oil Co.*, 499 U.S. 244 (1991), the Supreme Court held that

"legislation of Congress . . . is meant to apply only within the territorial jurisdiction of the United

States . . . unless a contrary intent appears."

A two-fold inquiry is required when attempting to determine if this presumption against

extraterritoriality should be given effect.  *First*, a court must determine if the presumption is

implicated at all, *i.e.*, the court must make findings on whether the conduct occurred outside the

borders of the United States.  *Gushi Bros. Co. v. Bank of Guam*, 28 F.3d 1535, 1538-39 (9th Cir.

1994).  In conducting this inquiry, the court will look to the specific conduct proscribed by the

particular legislation as well as to the impact of the conduct within the United States.  *Id.*

*Second*, if the presumption is implicated, that is, *if the conduct substantially occurred outside*

*the borders of the United States*, only then is it necessary to inquire whether Congress intended the

statute to extend to extraterritorial conduct.  In conducting this inquiry into legislative intent, a court

should look to "all available evidence," including the text of the statute, the overall statutory scheme,

legislative reports, and any other indicia of congressional intent.  *Id.*

        a.      Recovery from the Diaz Defendants Pursuant to the Fraudulent Transfer Remedy Has No Extraterritorial Effect Where the Center of Gravity of the Transaction Was In San Diego

As a preliminary matter, as stated above, it is important to note that the claim against the

Diaz Defendants is one for *recovery* pursuant to 11 U.S.C. § 550(a)(2), not *avoidance* under 11

U.S.C. § 544(b).  The Diaz Defendants have themselves admitted that the applicable transfer to be

avoided under § 544(b) *pursuant to California law*, is the Debtors' first transfer of the Villa Property

to Howell & Gardner in 2002.  [*See* Judgment ¶ 93 (citing Diaz Defendants' Suppl. Trial Brief,

attached hereto as Exhibit "5" to Plaintiff's RJN)].  As was held by the Bankruptcy Court, "there is a

clear distinction between the law governing the avoidability of a fraudulent transfer, and the law

governing the trustee's recovery of an avoided transfer."  [Judgment at ¶92 (citing, *inter alia*,

*Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800 (9ᵗʰ Cir. 1994).]

Applying the Ninth Circuit's two-part analysis, the presumption against extraterritoriality is

not implicated by the avoidance of the fraudulent conveyance from the Debtors to Howell and

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

1   Gardner, where the parties' conduct substantially occurred within the borders of the United States.

2   *Gushi Bros. Co.*, 28 F.3d at 1538.  In its findings contained in the Order on the Diaz Defendants'

3   Motion to Dismiss, the Bankruptcy Court found that the center of gravity of the transfer between

4   Debtors and Howell & Gardner, was indisputably within the U.S.  [Judgment ¶ 108.; *see also* Pre

5   Trial Orders, Judicially Noticeable Facts, Plaintiff's RJN Exhibits "6" and "7".]

6            b.    Congress Intended That Section 549 of the Bankruptcy Code Have Express
                    Extraterritorial Application

7

8            Analyzing the 2004 transaction from the Debtors/Howell & Gardner to the Diaz Defendants

9   under the Post Petition Transfer Remedy—and assuming *arguendo* that the conduct might have

10  substantially occurred outside the United States (an assumption that is not supported by the

11  evidence)—the Bankruptcy Code will otherwise properly have extraterritorial reach with respect to

12  the avoidance of a post petition transfer under 11 U.S.C. § 549.  This is because Congress expressly

13  *requires* the extraterritorial application of the Bankruptcy Code as to "property of the estate"

14  pursuant to 28 U.S.C. §§ 157(a) and 1334(d) and 11 U.S.C. § 541(a), which grant jurisdiction to the

15  district court over property of the estate, "wherever located and by whomever held."  Furthermore,

16  under binding Ninth Circuit precedent, Section 549 of the Bankruptcy Code applies extraterritorially.

17  *See In re Simon*, 153 F.3d at 996 ("Given the clear expression of intent by Congress in the express

18  language of the Bankruptcy Code, . . . Congress intended extraterritorial application of the

19  Bankruptcy Code as it applies to property of the estate.").

20           Cases cited by the Diaz Defendants, such as *Barclay v. Swiss Finance Corp. (In re Midland*

21  *Euro Exchange)*, 347 B.R. 708 (C.D. Cal. 2006), and *In re Maxwell Communications Corp.*, 170

22  B.R. 800 (S.D.N.Y. 1994), are inapposite to avoidance under Section 549.  Neither of these cases

23  concerned either avoidance or recovery of property of the *estate*.  Rather, these cases expressly

24  construe the applicability of extraterritorial effect to "property of the *debtor*" under different

25  avoidance sections of the Bankruptcy Code.  Indeed, the court in *In re Midland* conceded that the

26  Bankruptcy Code applied extraterritorially with respect to property of the estate.  The court

27  otherwise noted that there was a split among the circuits as to whether *property of the debtor*

28  transferred to third parties *pre-petition* is property of the estate or whether it only becomes so only

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

CASE NO. 3:08-CV-01446-BTM-BLM; BANKR. ADV. NOS. 04-90392; 06-90369
OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO MOTION OF DEFENDANTS MARTHA BARBA
AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]
SDODMS1/692905.2

1    after it is recovered.  *Id.* at 717-18; *but see In re French*, 440 F.3d 145 (4th Cir. 2006), *cert. den.*, 127

2    S. Ct. 72 (2006) (giving extraterritorial effect to avoidance sections dealing with property of the

3    debtor).

4         There is no split of authority in respect to the extraterritorial application of Section 549,

5    which provides for recovery of property of the estate.  The holding in *In re Simon* dictates

6    extraterritorial application of the Bankruptcy Code with respect to property of the estate.[12]

7         **3.    There Are No Facts Suggesting Comity Should Have Been Applied**

8         As stated above, a court's decision to extend or deny comity is reviewed for abuse of

9    discretion.  "The abuse of discretion standard is highly deferential.  An abuse of discretion is found

10   where the reviewing court is firmly convinced that a mistake has been made."  *Rolen v. Hansen*

11   *Beverage Co.*, 193 Fed.Appx. 468, 472 (6th cir. 2006).  No abuse of discretion can be shown here.

12        International comity is "the recognition which one nation allows within its territory to the

13   legislative, executive or judicial acts of another nation, having due regard both to international duty

14   and convenience, and to the rights of its own citizens or of other persons who are under the

15   protection of its laws."  *Hilton v. Guyot*, 159 U.S. 113, 164, 16 S. Ct. 139, 40 L. Ed. 95 (1895).

16   Comity is a discretionary refusal to exercise jurisdiction on the part of a court where the case is more

17   properly adjudicated in a foreign state.  *Maxwell Commc'n Corp. PLC v. Societe Generale PLC (In*

18   *re Maxwell Commc'n Corp.)*, 93 F.3d 1036, 1047 (2d Cir. 1996).

19        In deciding whether to forego application of our own law under the doctrine of international

20   comity, the Supreme Court has referred to the factors in Restatement (Third) of Foreign Relations

21   Law § 403 (1987).  *See Hartford Fire Ins.*, 509 U.S. at 799 & n. 25; id. at 818 (Scalia, J., dissenting);

22   *see also In re Maxwell Commc'n Corp.*, 93 F.3d at 1047-48. The Restatement looks to, *inter alia*, (i)

23   "the extent to which the activity takes place within the territory" of the regulating state; (ii) "the

24   connections, such as nationality, residence, or economic activity, between the regulating state and

25

26   _____

      [12] The Diaz Defendants seek to invoke a purported letter from the Mexican Ministry of Foreign
27   Affairs dated November 28, 2007 as "irrefutable evidence" that the Judgment has caused
     "international discord."  [Stay Motion at 16, lines 13-23.]  Appellate counsel is new on the scene and
28   perhaps is unaware that this letter was not admitted into evidence at trial, has never been
     authenticated, and thus may not be relied upon, nor may it be invoked as any form of "evidence" on
     appeal.

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

1    the person principally responsible for the activity to be regulated;" (iii) "the extent to which other

2    states regulate such activities" or "may have an interest in regulating [them];" (iv) the "likelihood of

3    conflict with regulation by another state," and (v) "the importance of regulation to the regulating

4    state." Restatement (Third) of Foreign Relations Law, § 403(2).

5        Here, the United States unquestionably has a stronger interest than Mexico in regulating the

6    transaction between Howell & Gardner/the Debtors and the Diaz Defendants.  A key purpose of the

7    Bankruptcy Code is to protect the rights of both debtors and creditors during insolvency.  In

8    exchange, the Bankruptcy Code's avoidance provisions protect creditors by preserving the

9    bankruptcy estate against illegitimate depletions. *In re Hargis*, 887 F.2d 77, 79 (5th Cir.1989).  The

10   United States has a strong interest in extending these personal protections to its residents.  Mexico,

11   by contrast, has comparatively little interest in protecting the Diaz Defendants, who are residents of

12   the United States. *Cf. Hurtado v. Superior Court*, 11 Cal. 3d 574 (1974) (holding that Mexico has no

13   interest in applying its statutory limitation on damages when defendants in a tort action were not

14   Mexican residents).

15       In determining comity in bankruptcy cases "the court will defer to where the 'center of

16   gravity' of multiple proceedings exists." *In re Simon*, 153 F.3d at 999.  Where there is no competing

17   proceeding in a foreign nation at issue, the court most properly utilizes its discretion to assert its

18   jurisdiction over property of the estate at issue. *Id*.  Under these facts, the question is not even

19   close.  The evidence admitted at trial shows that substantially all of the activity surrounding the 2004

20   transfer to the Diaz Defendants took place in the United States.  Diaz and Icenhower first met in San

21   Diego.  [Judgment ¶ 27.]  Communications between them concerning the transaction took place in

22   the United States.  All of the transfer documents were signed in the United States at the San Diego

23   offices of Peter Thompson, an attorney licensed by the California Bar.  [*See id.* ¶38.]  The

24   documents were notarized by a California notary public.  Moreover, almost all of the parties with an

25   interest in this litigation, Kismet, the Debtors, the Diaz Defendants, Howell & Gardner Investors,

26   Inc., and Craig Kelley (the purported "officer" of Howell & Gardner)—have a domicile or residence

27   in the United States.  The "fideicomiso" interest held by the Debtors/Howell & Gardner was itself

28   "in reality a *U.S.* real estate irrevocable trust contract."  Jorge A. Vargas, *Acquisition of Real Estate*

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

CASE NO. 3:08-CV-01446-BTM-BLM; BANKR. ADV. NOS. 04-90392; 06-90369
OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO MOTION OF DEFENDANTS MARTHA BARBA
AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]
SDODMS1/692905.2

1  *In Mexico by U.S. Citizens and American Companies* (March 2007) at 14, *available at*

2  http://ssrn.com/abstract=968794 (emphasis added).  There was, and is, no Mexican insolvency

3  proceeding pending.  The center of gravity is thus the United States.

4          Under the governing law, however, the Diaz Defendants' appeal will fail, absent any need to

5  even conduct the "center of gravity" analysis.  Notably absent from the Diaz Defendants' Motion is

6  any briefing of the <u>*threshold*</u> requirement in the Ninth Circuit for proof of the existence of an "actual

7  conflict" between domestic and foreign law.[13]  *See, e.g., In re Simon*, 153 F.3d 991, 998 (9th Cir.

8  1998); *Mujica v. Occidental Petroleum Corp.*, 381 F.Supp. 2d 1134, 1155 (C.D. Cal. 2005).; *cf. In re*

9  *Maxwell Communications Corp.*, 93 F.3d 1036, 1049 (2d Cir. 1996).  Even in a case where the

10  substantial activity takes place in a foreign jurisdiction, comity considerations are rejected under

11  Ninth Circuit precedent where there is no persuasive argument "that there would be problems

12  enforcing a judgment . . . , or that there are any substantial conflicts with Mexican law."  *Brady*, 51

13  F.3d at 819.

14          In this respect, the Diaz Defendants suggest that "Mexico's fraudulent conveyance law is

15  different from U.S. law . . . ."  [Stay Motion at 16, line 28 – 17, line 1.]  This does not meet their

16  burden of  proof as to an actual conflict.  *In re Grand Jury Proceedings*, 873 F.2d 238, 239-40 (9th

17  Cir. 1989) ("A party relying on foreign law to contend that a district court's order violates principles

18  of international comity bears the burden of demonstrating that the foreign law bars compliance with

19  the order.")  Rather, there is no true conflict.  The enforcement here will be accomplished through

20  the contempt power of the Court over the Diaz Defendants, over which the Court has *in personam*

21  jurisdiction.  In addition, the remedy devised by the Court is essentially a "fideicomiso," which is

22  authorized by Article 18 of the 1973 Mexican foreign investment law.  "Such an arrangement . . .

23  does not violate Mexican law."  *Brady*, 51 F.3d at 819.

24          Additionally, comity considerations are negated in respect to the Post Petition Transfer

25  Remedy.  As conceded by the Diaz Defendants, [i]nternational comity is a canon of construction."

26  [Stay Motion at 17, lines 8-9.]  The necessary logical conclusion from this premise is that comity, as

27

28  ─────────────────────
[13] The Diaz Defendants' failure to brief this well-known requirement and its effect on the appeal is
disappointing.

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

CASE NO. 3:08-CV-01446-BTM-BLM; BANKR. ADV. NOS. 04-90392; 06-90369
OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO MOTION OF DEFENDANTS MARTHA BARBA
AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]
SDODMS1/692905.2

1  a rule of statutory construction, "has no application where Congress has indicated otherwise."

2  *Maxwell Communication Corp. v. Societe Generale (In re Maxwell Communication Corp.)*, 93 F.3d

3  1036 (2d Cir. 1996). As stated above, under 28 U.S.C. § 1334(e), the bankruptcy court obtains

4  exclusive *in rem* jurisdiction over all of the property of the estate. As such, the court exercises

5  "custody" over such property, creating a legal fiction "that the property—regardless of actual

6  location—is legally located within the jurisdictional boundaries of the district in which the court

7  sits." *In re Simon*, 153 F.3d at 996.

8      In the end analysis, "abstention from the exercise of federal jurisdiction is the exception, not

9  the rule." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976).

10  Abstention rarely should be invoked, because the federal courts have a "virtually unflagging

11  obligation . . . to exercise the jurisdiction given them." *Id.*, at 817. For a bankruptcy court to decline

12  to assert its exclusive statutory jurisdiction over property of the estate in derogation of creditors'

13  interests (as the Diaz Defendants suggest would have been appropriate here) would likely be

14  reversible error. *See GMAM Investment Funds Trust I v. Globo Comunicacoes E participacoes S.A.*

15  *(In re Globo Comunicacoes E Participacoes S.A.)*, 317 B.R. 235, 253-54 (S.D.N.Y. 2004).[14]

16  **C.    The Diaz Defendants' Claims of Irreparable Harm are of No Consequence**

17      The Diaz Defendants appear to concede the general lack of merit of their appeal and

18  otherwise seek to convince the Court that a stay should still be granted merely because of the

19  "irreparable harm" that would come to them should Kismet execute on the Amended Judgment.

20  This argument is not supportable. A discretionary stay may not be granted absent a threshold strong

21  showing of likely success on the merits, regardless of any showing on the Diaz Defendants' part of

22  irreparable harm. *See, e.g.*, *Blankenship v. Boyle*, 447 F.2d 1280 (D.D.C. 1971); *cf. Gagan v.*

23

24  [14] The Diaz Defendants otherwise attempt to suggest that the dispute should have been litigated in
Mexico due to the so-called "Calvo Clause." This issue, which the Diaz Defendants seek to sweep

25  with a broad brush into their discussion of "comity," instead relates to the affirmative defense of
improper venue. As revealed by the text of Article 27 of the Mexican Constitution quoted by the

26  Diaz Defendants [Stay Motion at 18] the "Calvo Clause" is strictly a matter of contract. In this
respect, the Diaz Defendants have previously waived any affirmative defense of improper venue by

27  failing to raise it in their initial motion to dismiss under Fed. R. Civ. Proc. 12. Contractual forum
selection clauses otherwise have no relevance to avoidance actions under the Bankruptcy Code,

28  which is not a suit on a contract. *See In re Consolidated Capital Equities Corp.*, 143 B.R. 80, 84
(Bankr. N.D. Tex. 1992).

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

25

CASE NO. 3:08-CV-01446-BTM-BLM; BANKR. ADV. NOS. 04-90392; 06-90369
OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO MOTION OF DEFENDANTS MARTHA BARBA
AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]
SDODMS1/692905.2

*Sharer*, 2005 U.S. Dist. LEXIS 27409 (D. Ariz. Nov. 1, 2005).[15]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

A showing of irreparable harm must demonstrate that the injury "be both certain and great . . . actual and not theoretical." *San Diego Bev. & Kup v. United States*, 997 F. Supp. 1343 (S.D. Cal. 1998). The Diaz Defendants attempt to base their claims of irreparable harm on unsubstantiated assertions that "Kismet intends to demolish the property." [Stay Motion at 20, line 22.] This assertion is a mere scurrilous accusation unsupported by any evidence and should be disregarded.

The Diaz Defendants otherwise claim irreparable harm based on the fact that a *per se* showing is met where "real property is involved." [Motion at 19, lines 22-23.] None of the cases cited by the Diaz Defendants provide persuasive support for this principle. The Villa Property is not the Diaz Defendants' residence. It is instead income property. *Cf. Yeganeh v. Sims (In re Yeganeh)*, 2006 U.S. Dist. LEXIS 32765 at *20 (distinguishing *In re Skinner*, 202 B.R. 867, 869 (W.D. Va. 1996), finding sale of other real property other than residence does not establish irreparable harm). The court in *In re Issa Corp.*, 142 Bankr. 75, 78 (Bankr. S.D.N.Y. 1992) only stated that the debtor would "*indisputably*" suffer irreparable harm because the stay motion went unopposed. Neither *O'Hagan v. U.S.*, 86 F. 3d 776, 783 (8th Cir. 1996), nor *Goldies Bookstore, Inc. v. Superior Court*, 739 F.2d 466, dealt with a discretionary stay under Rule 62(a). As such, they are inapposite. The courts of the Ninth Circuit have generally dismissed similar arguments as having only "superficial" appeal. *See, e.g., Acton v. Fullmer (In re Fullmer)*, 323 B.R. 287, 305 (Bankr. D. Nev. 2005). Other courts have recognized that in fact there is actually no "irreparable" harm because, upon any reversal, the Appellee would return the property. *See In re Krause*, 2007 Bankr. LEXIS 3049 at *11.

Furthermore, absent the requisite proof of success on the merits, irreparable harm—no matter how strenuously it is contended—is otherwise irrelevant. A stay under such circumstances would only result in unnecessary delay of the execution of the Bankruptcy Court's lawful order, with no countervailing societal benefit. As stated above, a moving party's failure to establish success on the

---

[15] In this respect, the Diaz Defendants would not be able to obtain a stay even under the "alternative" formulations used in determining a stay upon injunction under which "it must be shown as an irreducible minimum that there is a *fair chance* of success on the merits," even if the balance of harm tips sharply in their favor. 2 Matthew Bender Practice Guide, Federal Pretrial Civil Procedure in California § 19.08[3][d] (emphasis added).

26

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

CASE NO. 3:08-CV-01446-BTM-BLM; BANKR. ADV. NOS. 04-90392; 06-90369
OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO MOTION OF DEFENDANTS MARTHA BARBA
AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]
SDODMS1/692905.2

1    merits is reason for denial of a stay, and any irreparable harm that the Diaz Defendants may

2    demonstrate is nullified by their failure to raise a colorable case for appeal on the merits.

3            To the extent that the Diaz Defendants' irreparable harm argument is based on a contention

4    that that, absent a stay, the appeal will become moot, this also fails.  The majority of cases that have

5    considered the issue have determined that the risk that an appeal would become moot does not, by

6    itself, constitute irreparable harm.  *In re Fullmer*, 323 B.R. at 304 (collecting cases).  *In re Adelphia*

7    *Communications Corp.*, 361 B.R. 337, 347-48 (S.D.N.Y. 2007), does not hold that mootness alone

8    constitutes irreparable harm.  Rather, irreparable harm is shown only where "*any* appeal of

9    *significant* claims of error" is absolutely foreclosed.  *Id* at 348 (emphasis in original).  As set forth

10   above, the Diaz Defendants have not demonstrated that they can raise "significant claims of error"

11   on appeal.

12           On the other hand, the Diaz Defendants must also show that the bankruptcy estate and

13   Kismet would not be harmed by a stay.  *In re Yeganeh*, 2006 U.S. Dist. LEXIS 32765.  Here, the

14   Diaz Defendants (focusing on the harm to come to themselves from enforcement of the Order) have

15   not met this burden.  In characterizing the harm to Kismet as negligible to nonexistent, the Diaz

16   Defendants ignore the very real burdens that delay in the execution of the Amended Judgment will

17   place on Kismet.  The delay in the transfer of the Villa Property will have a significant impact on

18   Kismet in terms of lost opportunities, for development and otherwise, which cannot be compensated

19   for by money.  As to the Diaz Defendants' assertions that pursuant to the Purchase Agreement

20   between Kismet and the estate, the Diaz Defendants will somehow receive remuneration from

21   Kismet, [*see* Stay Motion at 21],—suffice it to say that the Diaz Defendants greatly misapprehend

22   the language and intent of the Purchase Agreement and will, in the end, be disappointed.

23           In sum, the balance of harm tips decidedly against the Diaz Defendants.  The Villa Property

24   is property of the estate wrongfully transferred to the Diaz Defendants post-petition, which whom

25   the Debtors conspired.  The Diaz Defendants have wrongfully withheld this asset (and its rents and

26   other income) for approximately four years.  Furthermore, the estate received ***none*** of the

27   consideration for the transfer of the Villa Property to the Diaz Defendants.

28

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

CASE NO. 3:08-CV-01446-BTM-BLM; BANKR. ADV. NOS. 04-90392; 06-90369
OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO MOTION OF DEFENDANTS MARTHA BARBA
AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]
SDODMS1/692905.2

**D.     The Public Interest Does Not Militate in the Diaz Defendants' Favor**

This is not a case classically "affecting the public interest."  Although a Bankruptcy Case is an *in rem* proceeding and thus affects the rights of the public in general to the "*res*" constituting the bankruptcy estate, there is not a public right at stake in the traditional sense used under the four factor test, such as a constitutional issue or other right affecting the public at large.  As such, this factor need not be specifically added into the equitable determination regarding the granting of the stay.

In the end analysis, however, larger policy considerations are necessarily a factor in the determination of any  motion requesting a stay of an order of a bankruptcy court in a case arising under the Bankruptcy Code.  A longstanding core policy of the Bankruptcy Code is to provide a cost-effective and speedy process to minimize the cost to creditors.  Thus, Rule 8005, along with all the other Rules of Bankruptcy Procedure, need to be construed in light of this overriding policy goal. Rule 1001 states: "These rules shall be construed to secure the just, speedy, and inexpensive determination of every case and proceeding."  There is thus a strong public "need for finality of decisions, especially in a bankruptcy proceeding."  *In re Calpine Corp*., No. 05-60200 (BRL), 8 WL 207841 (Bankr. N.D.N.Y, Jan. 24, 2008).  Under such circumstances, maintenance of the status quo entails *enforcement* of the Judgment, not the grant of a stay of the Judgment.

Further delay is unwarranted and would not serve the interests of justice.  The result of any stay in this proceeding would be to allow *property of the estate* to remain in the hands of a wrongful possessor.  In light of the very thin meritorious reed upon which their Motion hinges, the policy of the Bankruptcy Code militates against granting the Diaz Defendants' Stay Motion.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

CASE NO. 3:08-CV-01446-BTM-BLM; BANKR. ADV. NOS. 04-90392; 06-90369
OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO MOTION OF DEFENDANTS MARTHA BARBA
AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]
SDODMS1/692905.2

1

## V.    CONCLUSION

2        For each of the reasons set forth herein, Kismet respectfully requests that the Court deny the

3   Diaz Defendants' Motion for Stay Pending Appeal.

4

5   Dated:   August 22, 2008               BAKER & McKENZIE LLP

6

7                        By: /s/ Ali M.M. Mojdehi

8                           Ali M.M. Mojdehi
                            Janet D. Gertz

9                         Attorneys for Plaintiff/Appellee
                         Kismet Acquisition, LLC, a Delaware

10                        limited liability company

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

SDODMS1/692905.2

CASE NO. 3:08-CV-01446-BTM-BLM; BANKR. ADV. NOS. 04-90392; 06-90369
OPPOSITION BY PLAINTIFF KISMET ACQUISITION, LLC TO MOTION OF DEFENDANTS MARTHA BARBA
AND ALEJANDRO DIAZ-BARBA FOR STAY OF JUDGMENT PENDING APPEAL [FED. R. BANKR. PROC. 7062, 8005]

**EXHIBIT "A"**

COPY

ENTERED ___JUN - 2 2008___

FILED

JUN - 2 2008

CLERK, U.S. BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# NOT FOR PUBLICATION

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>JERRY L. ICENHOWER dba Seaview Properties, and DONNA L. ICENHOWER,<br><br>Debtors.<br><br>KISMET ACQUISITION, LLC, a Delaware limited liability company, Successor-in-Interest to Gerald H. Davis, Chapter 7 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>JERRY L. ICENHOWER, an individual; et al.<br><br>Defendants. | Case No.  03-11155-A7<br><br>Adv. No.  06-90369-A7<br>Adv. No.  04-90392-A7<br><br>CONSOLIDATED FINDINGS OF FACT AND CONCLUSIONS OF LAW |

### I.

### INTRODUCTION

The matter before this Court is the trial of two related adversary proceedings. The first is an action by Kismet Acquisition, LLC ("Kismet" or "Plaintiff"), as successor to the chapter 7 trustee ("Trustee") to avoid and recover the prepetition transfer of real property called the Villa Vista Hermosa, located in the Village of

1  Chamela in the Municipality of La Huerta, State of Jalisco, Mexico (the "Villa
2  Property") pursuant to §§ 544(b), 550 and 551.[1]  The second is an action by Kismet,
3  as successor to the Trustee, to determine that defendant Howell & Gardner Investors,
4  Inc. ("H&G") is the alter ego of debtors Jerry and Donna Icenhower (collectively
5  "Debtors") and/or for substantive consolidation of Debtors and H&G *nunc pro tunc*
6  to the petition date, and to avoid and recover H&G's postpetition transfer of the Villa
7  Property to defendants, Martha Barba Diaz and her son Alejandro Diaz Barba
8  pursuant to §§ 549, 550 and 551 (collectively the "Diaz Defendants").  [2]  The
9  remaining defendants in these actions are the Debtors, H&G and the Diaz
10  Defendants.[3]

11      The Court has subject matter jurisdiction over the actions pursuant to 28 U.S.C.
12  § 1334(b).  The actions are core proceedings pursuant to 28 U.S.C. §§ 157(b)(1) and
13  (2)(B), (E), (F), (H) and (O).  Venue is proper in the Southern District of California
14  pursuant to 28 U.S.C. § 1409(a).

15                                     **II.**

16                          **FINDINGS OF FACT**

17  **A.    Background – Debtors' Relationship with the Lonie Trust.**

18      1.    In or about January 1984, D. Donald Lonie ("Mr. Lonie") established the
19  D. Donald Lonie, Jr., Family Trust under the laws of the State of Nevada (the "Lonie
20  Trust").  Mr. Lonie died in May 1997, at which time the Lonie Trust became
21  irrevocable. The trustees of the Lonie Trust are Stephen E. Lonie, Diane C. Oney and
22  Thomas E. Lonie.

23

24      [1] *Kismet v. Icenhower et al.*, Adv. Proc. No. 04-90392 (hereinafter the "Fraudulent
25  Conveyance Action").

26      [2] *Kismet v. Icenhower et al.*, Adv. Proc. No. 06-90369 (hereinafter the "Alter Ego -
    Avoidance Action").

27
28      [3] *See* Adv. Proc. 06-90369, Doc. # 190, at Ex. 1 (listing the status of each of the defendants
    in both actions as of trial).

                                     - 2 -

2.    Prior to Mr. Lonie's death, Mr. Lonie and the Lonie Trust engaged in business transactions with the Debtors concerning beneficial interests in a *fideicomiso* bank trust which owned the Villa Property located in the restricted coastal zone of Mexico.[4]

3.    Prior to Mr. Lonie's death, the Lonie Trust agreed to sell its interest in the Villa Property to the Debtors.  The parties executed a Real Estate Purchase Contract, and Mr. Icenhower executed two promissory notes, an English note and a Spanish note to be recorded in Mexico, reflecting a different dollar amount to avoid Mexican taxes.  Thereafter, the Lonie Trust agreed to release its lien on the Villa Property to assist Mr. Icenhower in consummating a sale of the Villa Property to a third party with the agreement he would re-record the lien if the sale fell through. Mr. Icenhower did not consummate the sale, and he disputed his obligation to re-record the lien. Additionally, a dispute arose regarding which note was the operative note – the English note or the Spanish note.

4.    On March 24, 2000, the Lonie Trust initiated an action against the Debtors in the United States District Court for the Southern District of California entitled *Stephen P. Lonie, Diane C. Oney and Thomas E. Lonie, Jr., Family Trust v. Jerry L. Icenhower, et al.*, Civ. No. 00-CV-612 (the "district court action"), seeking *inter alia*, a determination of the parties' respective rights and interests in the Villa Property and injunctive relief (the "district court action").

5.    On November 24, 2003, the district court entered judgment in favor of the Lonie Trust. The judgment directed the Debtors to either: (1) pay damages in the amount of $1,356,830.32 and re-register a lien on the Villa Property as security for the damages until paid by a date certain; or (2) reconvey the Villa Property to the

---

[4] Under Mexican law, a foreign national may not directly hold title to coastal real property in Mexico, but may hold the beneficial interest in a *fideicomiso* bank trust formed to hold title to the real property. Hereinafter, unless otherwise specified, all references to the transfer or sale of the Villa Property refer to the transfer or sale of the beneficial trust interest.

1  Lonie Trust, free of any encumbrance, claim, lien, or liabilities placed on the Property
2  as a result of the Debtors' actions or inactions.  [Pretrial Order ("PTO") entered
3  4/14/08 in Adv. Proc. 06-90369, Doc. # 191, Admitted Facts at ¶ 44]

4      6.    In response to the judgment, Debtors filed this chapter 7 bankruptcy case
5  on December 15, 2003.

6  **B.    Debtors' Relationship with H&G.**

7      7.    H&G is a Nevada Corporation created as a shell corporate entity by
8  Laughlin International, Inc. ("Laughlin") in 2001.

9      8.    On March 4, 2002, at a time when Debtors were facing a motion for
10 preliminary injunction and for summary judgment in the district court action,
11 Mr. Icenhower contacted Laughlin and purchased H&G, paying  $3,424 with his
12 personal credit card. There is no evidence that H&G had any capitalization other than
13 the $3,424 contributed by Mr. Icenhower.  There is no evidence any shares were ever
14 issued in exchange for capital contributions or anything of value.

15     9.    Mr. Icenhower arranged for Laughlin to provide a phone number,
16 physical address and mail forwarding services.  H&G had no separate physical place
17 of business, and simply utilized Laughlin's business address as a place to receive
18 mail.   Mr. Icenhower also asked Laughlin to open a bank account in the name of
19 H&G. However, H&G had no funds of substance in any bank account, or other funds
20 from any source.  Mr. Icenhower paid for Laughlin's continuing services with his
21 personal funds through and including October 22, 2003.

22     10.   Craig Kelley ("Mr. Kelley") served as the sole officer and director of
23 H&G. Mr. Kelley's testimony at trial is that he agreed to serve in these capacities in
24 name only.  Mr. Kelley did not understand his duties as the officer and director of a
25 corporation; he testified that he was a president on paper only.  He took all orders
26 from Mr. Icenhower, and executed all documents because Mr. Icenhower told him to
27 sign them.  Mr. Kelley testified that he never attended or called any shareholders
28 meeting.  He never met or spoke to any of H&G's purported shareholders and was

-4-

1  unaware if there were any shareholders. Also, he was unaware of whether H&G was

2  capitalized.

3        11.   Mr. Kelley was aware of Mr. Icenhower's financial and legal problems.

4  He agreed to help Mr. Icenhower by becoming H&G's officer and director because

5  he felt sorry for Mr. Icenhower, and because he was dating Mr. Icenhower's sister.

6        12.   Mr. Kelley's trial testimony is inconsistent with his earlier deposition

7  testimony and, indeed, a Declaration he executed to alter that testimony. [Ex. "K"]

8  He explained that he gave perjured deposition testimony at Icenhower's urging, felt

9  remorse for doing so and, after consulting his own counsel, contacted Kismet's

10  lawyers to recant the earlier testimony he had given. He executed a Declaration

11  disavowing the earlier testimony which was also, in part, inaccurate. [*Id.*] Many of

12  the inaccuracies in this Declaration appear to be the result of its having been prepared

13  by Kismet's counsel – it is full of "legalese" and Kelley, a substance abuse counselor

14  with no business training, could not explain some of its "statements" because he did

15  not understand them. Also, because he was still trying to protect Mr. Icenhower's

16  sister, he admits the description of how he first met Mr. Icenhower is not accurate.

17  The Court observed his demeanor and his remorse at giving the earlier perjured

18  testimony and finds his explanations to be genuine and his trial testimony sincere and

19  credible.

20        13.   Mr. Icenhower was the point of contact for H&G for all communications

21  from Laughlin until December 18, 2003, at which time he asked Laughlin to remove

22  his name from its records. Mr. Icenhower claims he was contacted by Mr. Diaz in his

23  capacity as the manager of the Villa Property.

24        14.   H&G had no real corporate existence apart from Mr. Icenhower. It had

25  no business purpose other than as a sham company to hold the Debtors' assets.

26        15.   H&G's corporate charter was revoked by the Nevada Secretary of State

27  on January 21, 2006.

28  ///

C.    **The Debtors' Transfer of the Villa Property to H&G.**

16.    On March 4, 2002, prior to judgment in the district court action, Debtors entered into an agreement to transfer the Villa Property to H&G (the "H&G Purchase Agreement"). The H&G Purchase Agreement provided that H&G would pay $100,000 cash and assume Debtors' intra-family debt in the amount of approximately $140,000 in exchange for Debtors' interest in the Villa Property and another property known as the El Zafiro Property. [Ex. 53] However, there is no evidence that H&G paid any of the recited consideration in exchange for transfer of the properties.

17.    The H&G Purchase Agreement gave Mr. Icenhower absolute control over the operation of the Villa Property, the right to all rental income from the Villa, the responsibility for the payment of the expenses of the Villa, control over any sale, a 10% commission on any sale up to $1.5 million and a right to all proceeds over $1.5 million. Further, the Purchase Agreement provided that H&G was required to sell its beneficial interest in the *fideicomiso* trust if Mr. Icenhower presented it with a buyer that made an offer to purchase that would net H&G $1.35 million.

18.    One week later, the H&G Purchase Agreement was amended and through this amendment, the El Zafiro Property was released from the *fideicomiso* trust and sold to Dr. Robert Miller for $90,000. [Ex. 57] The amended agreement provided that the consideration for El Zafiro was to be paid directly to Mr. Icenhower, not H&G. The amendments further adjusted the purchase price as between the Villa Property and the El Zafiro Property; it reduced the $1.5 million number referenced in Factual Finding ("FF") ¶ 17 above to $1.4 million, and placed slightly different restrictions on H&G's right to sell the beneficial interest in the *fideicomiso* trust. All other terms of the original H&G Purchase Agreement remained the same.

19.    The timing of the Debtors' purchase of H&G from Laughlin, and the execution of the H&G Purchase Agreement transferring the Villa Property from Debtors to H&G, coincided with the Lonie Trust's filing of a motion for a preliminary injunction and for summary judgment in the district court action.

1    20.    The transfer of the Villa Property from Debtors to H&G was recorded
2  in the Mexican Registry on September 2, 2002.

3    21.    Debtors never disclosed they had transferred the Villa Property during
4  the district court litigation.

5  **D.    The Background of the Diaz Defendants.**

6    22.    Mr. Diaz and Ms. Barba Diaz are citizens of Mexico but residents of San
7  Diego County, California.  Ms. Barba Diaz is Mr. Diaz' mother.

8    23.    Mr. Diaz has a degree in math and computer science from the University
9  of California at San Diego, and is the officer and/or director or member of numerous
10 limited liability companies and corporations having a principal place of business in
11 San Diego County. [PTO in Adv. Proc. 06-90369, Doc. # 191, Admitted Facts ¶ 9]
12 Mr. Diaz testified that in 2002 he became chairman of the board of e.Digital Corp.,
13 a publicly held company, and was a member of its audit committee.

14    24.    Ms. Barba Diaz is a member of the board and was president of XLNC1,
15 Inc., a radio station broadcasting classical music in San Diego.  Further, it is an
16 admitted fact that she is an officer or director of a number of other companies having
17 a principal place of business in San Diego County. [PTO in Adv. Proc. 06-90369,
18 Doc. # 191, Admitted Facts ¶ 8]

19    25.    At the time period of the Villa Property transaction, Ms. Barba Diaz and
20 her now-deceased husband were very ill.  She relied on her son and their attorney to
21 handle all aspects of the transaction for her.  She never met Mr. Icenhower before this
22 trial.  She had no personal knowledge who owned the Villa Property at the time of its
23 transfer to the Diaz Defendants.

24    26.    Ms. Barba Diaz testified she has a warm emotional attachment to the
25 Villa as it was the place where she spent many happy years visiting with their friends,
26 the Kochergas   She also testified that since its acquisition, she was aware the Villa
27 had been advertised as a vacation rental.  Further, she admitted that she owns five
28 other oceanfront vacation properties in Mexico (which she does not rent).

**E.     Debtors' Relationship with the Diaz Defendants.**

27.     Mr. Icenhower first met Mr. Diaz at a coffee shop in Pacific Beach; they met through Eugene Kocherga ("E. Kocherga"). Mr. Diaz and E. Kocherga were childhood friends, having spent many summers together at the Villa Property when E. Kocherga's family owned the Villa Property. In the Summer of 2003, Mr. Diaz accompanied E. Kocherga on visit to the Villa Property during the planning of a Kocherga family wedding. Mr. Diaz remembers learning Mr. Icenhower was the "manager" of the Villa Property.

28.     Mr. Diaz met Mr. Icenhower again at the wedding in August 2003. At this meeting, Mr. Diaz learned from Mr. Icenhower that the Villa might be for sale, but he considered the price too high. In the following months, and into 2004, Mr. Icenhower contacted Mr. Diaz several times concerning a possible sale of the Villa Property at successively lower prices but Mr. Diaz continued to indicate the price was too high.

29.     As a result of continuing conversations, Mr. Diaz and Mr. Icenhower finally agreed to a purchase price $1.5 million USD for the Villa Property, and Mr. Diaz commenced his due diligence. While Mr. Diaz was conducting his due diligence, Mr. Icenhower asked Mr. Diaz for a $100,000 personal loan to invest in a golf pro shop. Mr. Icenhower promised he would make monthly payments and repay the balance from the fee he would earn from H&G on the sale of the Villa Property. Although Mr. Diaz did not know Mr. Icenhower very well, he made the loan. The loan is evidenced by a promissory note dated October 7, 2003. [Ex. 1]

30.     Mr. Icenhower made the first monthly payment of $750. Then he filed bankruptcy on December 15, 2003. [Ex. 121].

31.     Mr. Icenhower did not contact Mr. Diaz to warn him about his bankruptcy filing. Mr. Diaz learned about the bankruptcy when he received the Notice of Commencement of Chapter 7 Bankruptcy Case. Mr. Diaz received this notice because Debtors listed the $100,000 loan in their bankruptcy schedules.

- 8 -

32.    Mr. Diaz was shocked and concerned about the bankruptcy. He immediately contacted Mr. Icenhower, and they met at Mr. Diaz's residence. Mr. Icenhower explained he filed bankruptcy because he had lost a big judgment to the Lonie Trust which he believed to be improper and unfair. Additionally, at that time, they discussed the sale of the Villa Property. Mr. Icenhower assured Mr. Diaz the loan would be repaid through a $100,000 reduction of the purchase price by H&G. Mr. Diaz indicates he accepted Mr. Icenhower's explanation and did not feel he needed to separately investigate why Mr. Icenhower had authority to lower the sales price of the Villa Property to repay Mr. Icenhower's personal loan.

**F.    The Diaz Defendants' Due Diligence Efforts.**

33.    The Diaz Defendants used the services of Eduardo Sanchez ("Mr. Sanchez"), a lawyer licensed only in Mexico, to conduct due diligence on their purchase of the H&G interest in the *fideicomiso* trust. Mr. Sanchez testified he is not licensed in the U.S. and is not familiar with U.S. law.

34.    Mr. Sanchez testified that he viewed his role in conducting due diligence as follows: to determine the legal existence of H&G; to determine that it was a corporation in good standing in the U.S.; to determine that whoever signed the documents of sale on H&G's behalf had the full power of attorney under Mexican law to sell; and to personally review the records of the title to the Villa Property to determine if previous transfers were legally correct and determine whether there were any liens against the Villa Property. To that end, Mr. Sanchez obtained the Articles of Incorporation of H&G [Ex. U-5]; obtained information from the State of Nevada confirming that H&G was a corporation in good standing [Ex. U-4]; obtained a corporate resolution authorizing Mr. Kelley, as the corporation's sole director, to consummate the sale of the beneficial rights in the *fideicomiso* trust. [Ex. 202]; and personally reviewed the property records in the property office in Autlan, Mexico, determining that previous transfers of the Villa Property were legally correct and that there were no liens or legal claims against the Villa Property.

-9-

35. Mr. Sanchez testified he was unconcerned with any requirements under U.S. law for the transfer of this beneficial interest because he viewed the transaction as one solely governed by Mexican real estate law. He did not request or obtain a shareholders' resolution authorizing the sale of substantially all of H&G's assets and he was unconcerned that the consideration for the sale was being paid to entities other than H&G. Mr. Sanchez was aware of Mr. Icenhower's personal bankruptcy; however, he was unconcerned with it because he viewed the transaction as the purchase of the interest in the *fideicomiso* trust from H&G. He did not check either the bankruptcy court file or call the Trustee. Mr. Sanchez testified that he was not told by Mr. Diaz or anyone else that Mr. Icenhower had warned Mr. Diaz that the Trustee was looking into the transaction by which Debtors sold the Villa Property to H&G. However, the Court observes that Mr. Sanchez also testified that he does not keep any emails or notes from conversations with his clients.

**G.    H&G's Transfer of the Villa Property to the Diaz Defendants**

36. On March 31, 2004, Mr. Diaz gave H&G a check in the amount of $25,000. [Ex. D] The check states in the "memo" section that it is for the "Vista Hermosa." Although this check to H&G is purportedly endorsed by Mr. Kelley, Mr. Kelley testified that he did not sign it. The fact that the endorsement on the check has Mr. Kelley's name misspelled corroborates Mr. Kelley's claim it is not his signature, as it is highly unlikely he would misspell his own name.

37. On June 7, 2004, H&G and the Diaz Defendants executed a formal purchase agreement for the Villa Property ("Agreement") [Ex. 2] The Agreement required the Diaz Defendants to pay stated consideration of $7,508,800 Mexican pesos which is approximately equivalent to $658,071 USD for the Villa Property. However, testimony of Mr. Icenhower, the Diaz Defendants, Mr. Kelley and Mr. Sanchez, establishes that the actual agreed price was $1,500,000 USD. Mr. Diaz, Mr. Sanchez, and Mr. Icenhower acknowledge that the lower stated price in the Agreement was a commonly-used ruse to reduce the Mexican taxes imposed on the

1   sale.

2       38.    On or about June 7, 2004, the closing of the sale of the Villa Property to

3   the Diaz Defendants took place in San Diego, California. Mr. Icenhower, Mr. Kelley,

4   Mr. Sanchez, and Mr. Diaz were present at the closing which was held at the Chula

5   Vista office of Peter Thompson, a lawyer. Even though Mr. Kelley physically signed

6   the documents on behalf of H&G in his capacity as officer and director of H&G, the

7   testimony of Mr. Kelley, and, to some extent, Mr. Diaz, was that Mr. Icenhower

8   controlled the closing of the sale to the Villa Property to the Diaz Defendants .

9   Mr. Kelley was a passive participant. He did what Mr. Icenhower directed him to do.

10  Other than exchanging pleasantries at this meeting, Mr. Kelley had no interaction or

11  communication with the Diaz Defendants.

12      39.    The only consideration paid directly to H&G by the Diaz Defendants

13  was the $25,000 paid in March 2004. [*See* FF ¶ 36] At the closing, Mr. Icenhower

14  directed the Diaz Defendants to pay the balance of the consideration to third parties

15  as follows: (i) $675,000 USD to Buckeye International Funding, Inc. [Ex. C];

16  (ii) $398,663 USD to Western Financial Assets, Inc. [Ex. A]; and (iii) $191,567 USD

17  to Icenhower Investments, to a bank account controlled by Mr. Icenhower's brother

18  [Ex. B].

19      40.    Neither Mr. Diaz nor Mr. Sanchez  thought it odd that Mr. Icenhower

20  directed them to pay most of the consideration (other than the initial $25,000 paid to

21  H&G in March 2004), to third parties and not to H&G.

22      41.    The Villa Property constituted all of the property owned by H&G.

23  However, the only authorizations for the sale of the *fideicomiso* trust interest to the

24  Diaz Defendants was the corporate resolution by Mr. Kelley as sole director.

25  [Ex. 202] There is no evidence of a shareholder resolution authorizing the transfer

26  of all of the property of the corporation as required by Nevada law and, specifically,

27  by Article TENTH of H&G's Articles of Incorporation. [Ex. U-5]

28  / / /

- 11 -

1      42.    The sale of the Villa Property from H&G to the Diaz Defendants was
2  recorded in the Mexican Registry on September 8, 2004.

3      43.    Shortly after the sale was consummated, Mr. Kelley resigned as the
4  officer and director of H&G; Mr. Icenhower informed Laughlin that he and
5  Mr. Kelley were no longer involved with H&G; and Laughlin ceased to provide an
6  address, telephone or mail forwarding services for H&G, as the annual maintenance
7  fees were unpaid.

8  **H.    The Trustee's Litigation Against the Defendants**

9      44.    The Debtors first disclosed their transfer of the Villa Property to H&G
10  at their § 341(a) meeting on January 12, 2004. [PTO in Adv. Proc. 06-90369, Doc.
11  #191, Admitted Facts ¶ 35] At the continued meeting of creditors on March 22, 2004,
12  the Trustee questioned the Debtors further regarding this transfer.

13      45.    On August 23, 2004, the Trustee filed the fraudulent conveyance action
14  to avoid and recover Debtors' transfer of the Villa Property to H&G. Additionally,
15  the Trustee obtained a temporary restraining order and preliminary injunction
16  prohibiting the defendants from transferring or  encumbering the Villa Property.
17  [Adv. Proc. 04-90392, Doc. #14; #28; #42] The Trustee did not name the Diaz
18  Defendants in the complaint because he was unaware that  H&G had already
19  transferred the Villa Property to the Diaz Defendants.

20      46.    In or about February 2005, the Trustee learned about H&G's  transfer
21  of the Villa Property to the Diaz Defendants.  Accordingly, the Trustee filed an
22  *ex parte* application to amend the complaint to include this subsequent transfer to the
23  Diaz Defendants, and he sought and obtained additional injunctive relief restraining
24  the newly added defendants from further transferring or encumbering the Villa
25  Property. [*Id.*, Doc. #63, #65, #71-72]

26      47.    The Trustee asserted that H&G had violated the first injunction
27  precluding transfer of the Villa Property.  However, the sale to the Diaz Defendants
28  had closed *before* entry of the first restraining order, and the Diaz Defendants

1   recorded their deed in the Mexican Registry *before* the Court's Amended Temporary

2   Restraining Order entered on February 5, 2005.

3        48.    On August 3, 2006, the Trustee filed the Alter Ego - Avoidance Action

4   to determine that H&G is Debtors' alter ego and/or for substantive consolidation of

5   Debtors and H&G *nunc pro tunc* to the petition date, and to avoid and recover the

6   postpetition transfer of the Villa Property pursuant to § 549 and § 550.

7        49.    H&G did not appear in either of the actions, and has made no attempt to

8   defend any of the claims alleged against it. The Court has entered the default against

9   H&G in both actions. Accordingly, it is an admitted fact that, as to H&G, the facts

10  alleged in the complaints are deemed admitted. [*See* PTO in Adv. Proc. 06-90369,

11  PTO, Admitted Facts ¶¶ 21-29; PTO in Adv. Proc. 04-90392, Admitted Facts ¶ 14.]

12  **I.    Kismet's Entry into the Bankruptcy Case.**

13       50.    Kismet was a stranger to this bankruptcy case until on or about July 5,

14  2006, when it filed a Notice of Transfer of Claim indicating it had purchased the

15  Lonie Trust's claims against the estate.[5]  [Main Case Doc. # 69]

16       51.    Thereafter, Kismet negotiated with the Trustee to purchase the estate's

17  assets, including assignment of these actions, in exchange for payment of an amount

18  sufficient to pay all creditors in full except its own claims which Kismet voluntarily

19  subordinated ("Asset Purchase Agreement"). The Asset Purchase Agreement was

20  subject to overbid.   Creditors and all interested parties, including the Diaz

21  Defendants, received notice of the motion to sell these actions.

22       52.    At the hearing held November 30, 2006, the Court approved the Asset

23  Purchase Agreement and an order was entered on December 7, 2006. [Main Case

24  Doc. # 95]  Pursuant to the Asset Purchase Agreement, Kismet was substituted into

25

26       [5] The Notice of Transfer of Claim indicates Kismet purchased Proof of Claim No. 4 filed
27  in the amount of $1,385,950.65. This claim includes Kismet's claims arising from the judgment and
    from a Joint Litigation Agreement with the Trustee to advance the Trustee's legal fees to prosecute
28  these actions for the benefit of the estate.

1   these actions in place of the Trustee as the real party in interest.

2       53.    The estate remains open for administration. However, Kismet is the only

3   creditor remaining to be paid.

4

**J.    Expert Testimony Concerning Due Diligence Required by United**

5   **States Law and the Alter Ego Claim.**

6       54.    Professor C. Hugh Friedman of the University of San Diego Law School

7   ("Prof. Friedman"), an expert in United States corporate law, testified regarding the

8   level of due diligence exercised by the Diaz Defendants. He was asked to assume that

9   the Diaz Defendants did not obtain a copy of a corporate or shareholder resolution

10  authorizing the sale of all of H&G's property (the Villa Property); did not obtain any

11  representations or warranties regarding proper corporate authorization to complete

12  the sale; and did not obtain any written authorization from H&G to direct payment

13  of the consideration for the sale to a bank in Visalia, California to the order of third

14  parties, not H&G.    Assuming these facts, which were all proved at trial, Prof.

15  Friedman testified that the standard of care was well below the expected customary

16  standard of care and practice for a buyer or someone acting on behalf of the buyer

17  and, in his view, totally inadequate.

18      55.    Prof. Friedman was further asked to assume the following facts, all of

19  which were also proved at trial:

20  •    that Mr. Icenhower had extensive correspondence with Laughlin regarding

21       payment of their fee and payment of Nevada taxes to keep H&G in good

22       standing; that Mr. Icenhower paid these fees and taxes as requested;

23  •    that there was no evidence of transfer of assets or other capitalization of H&G

24       other than the Icenhower-owned property (the Villa Property and El Zafiro);

25  •    that the transfer of the property to H&G occurred at a time when

26       Mr. Icenhower was under the threat of issuance of an injunction;

27  •    that there was no evidence of a corporate resolution to issue stock;

28  / / /

1    •     that there was no evidence of shareholders whose names were recorded in the
2          corporate register;

3    •     that the only officer was a straw or "dummy" officer who exercised no
4          discretion but did what he was told by Mr. Icenhower;

5    •     that the corporation had no address or phone number other than that of
6          Laughlin, the original seller of the corporate shell;

7    •     that the Diaz Defendants were aware that Mr. Icenhower had previously owned
8          the Villa Property and had a continuing role in managing the property, and was
9          the sole person negotiating its sale on behalf of H&G; and

10   •     that the Diaz Defendants were told by Mr. Icenhower that he would reduce the
11         price of the Villa Property being purchased from H&G to repay them for the
12         $100,000 loan discharged in his personal bankruptcy.

13         Based on the foregoing facts, it was Prof. Friedman's opinion that
14   Mr. Icenhower had total control of H&G and that H&G is the alter ego of
15   Mr. Icenhower. The Court finds this opinion persuasive and adopts it as the finding
16   of the Court.

17   **K.     Expert Testimony Concerning Due Diligence Required by Mexican Law.**
18

19         55.     Professor Jorge Vargas of the University of San Diego Law School
20   ("Prof. Vargas"), testified on behalf of the Diaz Defendants about Mexican law
21   governing the sale of interests in     *fideicomiso* trusts. Prof. Vargas' testimony
22   concerning the transaction at issue was somewhat inconsistent. First, he testified that
23   disputes involving beneficial interests in *fideicomiso* trusts holding title to real
24   property in the restricted coastal zone of Mexico are more in the nature of *in rem*,
25   rather than *in personam* actions under Mexican law because of the application of the
26   / / /
27   / / /
28

- 15 -

Calvo clause.[6]  However, on cross-examination, he admitted that in an article he authored in March 2007, he opined that he considered the Calvo clause a "legal relic."

56.    Second, Prof. Vargas testified at length on direct examination about the sufficiency of the due diligence conducted by the Diaz Defendants.  In his opinion, once the Diaz Defendants' counsel Mr. Sanchez determined that previous transfers of the Villa Property were regular, that the transferor corporation, H&G, was in good standing; that the notary public certified there were no liens or claims against the Villa Property, and that there was a proper corporate resolution, the transaction could close and would be a legitimate and complete transaction under Mexican law.

57.    On cross examination, Prof. Vargas testified as to what he believed was a higher duty of due diligence in a cross-border transaction.  For example, he stated that some investigation into the nature of the business and the reputation of the selling (or buying) a U.S. corporation should be conducted to avoid involvement in money laundering by drug or arms dealers; that some contact with the U.S. corporation by telephone should be attempted; that some information about the capitalization of the U.S. corporation should be obtained; and, generally, that getting into the "intricacies" of the U.S. corporation was a necessary part of due diligence in a cross-border transaction.  Prof. Vargas stated that in his view, it was the obligation of Mexican counsel to do this investigation or associate U.S. counsel to assist in that investigation.  He opined that failure to do this was negligence in performing due diligence.  Thereafter, the next day, on redirect by the Diaz Defendants' counsel, Prof. Vargas retracted this testimony and his opinion of negligence, characterizing it as excessively academic.

58.    Finally, as to questions posed by the Court, Prof. Vargas stated that Mexican corporations operate in a manner similar to U.S. corporations; that is, they

_____

[6] The Calvo clause is a doctrine of Mexican law which holds that judgments rendered by foreign courts purporting to affect real property in Mexico are unenforceable as against the public interest of Mexico, and contrary to the exclusive sovereignty of Mexico over its realty.

1  operate through the mechanism of corporate resolutions and they require a
2  shareholders' resolution to dispose of substantially all of the property of a Mexican
3  corporation.

4      59.    Eduardo Bustamante ("Mr. Bustamante") testified on behalf of Kismet
5  in rebuttal to Prof. Vargas' opinion of the regularity of the Villa Property transaction
6  and the sufficiency of due diligence.  Mr. Bustamante is an attorney licensed in
7  Mexico since 1979.  He obtained a Masters in Law from a U.S. university and then
8  returned to private practice in Mexico, doing commerical and civil litigation and
9  eventually specializing in cross-border business and real estate transactions.  He and
10 his firm represent Fortune 500 companies.  He has testified in court proceedings at
11 least five times as an expert witness, as well as been employed in that capacity at least
12 ten times.  He is also designated as an official translator for the State Supreme Court
13 of the Northern Baja Peninsula.

14     60.    Mr. Bustamante identified the following items as "red flags" that
15 required additional enquiry by the Diaz Defendants:

16 •   Article SIXTH of the Purchase Agreement conveys not only the *fideicomiso*
17     trust interest but also personalty, including vehicles, but there is no warranty
18     by the seller H&G that the personalty was legally within Mexico. [Ex. 2]
19     Mr. Bustamante stated this is a significant omission because vehicles, for
20     example, have to be properly imported into Mexico, otherwise they are
21     contraband.  A carefully crafted purchase agreement would not only contain
22     warranties of title to the personalty but also require the seller to substantiate his
23     claim of ownership.  Mr. Bustamante says that, in his opinion, such omission
24     indicates the parties were in a rush to close the transaction.

25 •   The disparity between the stated purchase price ($7,508,800 Mex. Pesos or
26     $678,071 USD), versus the actual price for the purchase of $1,500,000 USD,
27     was irregular.  It was his opinion that where there is this sort of disparity, either
28     the seller is misleading the buyer or there is collaboration between them in

- 17 -

1    understating the purchase price so that the transaction has a "discount" by way
2    of incurring less taxes.

3  •    Payment of the consideration to entities other than H&G required additional
4    due diligence by the Diaz Defendants or their counsel because a purchaser has
5    to know where the proceeds are going to avoid violating Mexican laws about
6    money laundering.

7  •    The 2002 H&G Purchase Agreement between Mr. Icenhower and H&G which
8    gave Mr. Icenhower total control over management and sale of the Villa
9    Property, and the right to retain all rentals, should have raised questions about
10    the relationship between Mr. Icenhower and H&G.  [FF ¶ 17]

11    61.    In completing his review of Mr. Sanchez' file, it was Mr. Bustamante's
12  opinion that the due diligence of the Diaz Defendants was lacking.  Because of
13  irregularities he identified in the transfers between the prior holders of interests in the
14  *fideicomiso* trust, he believes, at minimum, Mr. Sanchez should have tried to contact
15  the prior owners of the *fideicomiso* trust interests  *(e.g.,* the Lonie Trust or its
16  beneficiaries, or their counsel) to find out if any residual interest was being asserted.
17  That investigation would have revealed the district court litigation which precipitated
18  Mr. Icenhower's transfer to H&G.    When pressed on cross-examination, Mr.
19  Mr. Bustamante characterized the failure to do this as negligent.

20    62.    Further, Mr. Bustamante disagreed with Prof. Vargas' characterization
21  of the rights in the *fideicomiso* trust as *in rem* rights, stating that they are *in personam*
22  rights.  This point is critical to determining whether the Trustee or his predecessors,
23  the Lonie Trust and the Lonies, could have recorded a "preventative notice" of the
24  pending litigation, providing public notice of a claim against the trust beneficiary.  It
25  was Mr. Bustamante's uncontroverted testimony, based on his experience, that a final,
26  nonappealable judgment would first have had to be obtained before that order could
27  be  domesticated into a foreign judgment in Mexico to lien  *in personam* rights held
28  by a *fideicomiso* trust.    Since the Lonie Trust's judgment was prevented from

- 18 -

1  becoming a final, nonappealable order by Icenhower's bankruptcy, no preventative

2  notice could have been recorded against the trust interest holding the Villa.  Mr.

3  Bustamante's explanation is clear, consistent and persuasive.

4       63.    The Court has weighed the testimony, experience and demeanor of

5  Mr. Sanchez, Prof. Friedman, Prof. Vargas and Mr. Bustamante and, based on the

6  findings made above, finds that the Diaz Defendants exercised insufficient due

7  diligence in determining whether the purchase from H&G was legally sufficient and

8  permitted.

9  **L.    Other Facts that Should have Triggered Further Enquiry.**

10      64.    In addition to the inadequate due diligence found in Factual Findings

11  ¶¶ 57-63 above, the Court finds that Diaz Defendants knew or should have known the

12  following facts prior to the closing of the sale of the Villa Property:

13      65.    Mr. Diaz knew that even though the interest in the Villa Property was

14  titled in H&G, Mr. Icenhower retained total control over the management of the Villa

15  Property  and its sale price, including the right to reduce that price to repay his

16  personal debts. Mr. Diaz asked no questions about how Mr. Icenhower could adjust

17  the Villa Property sales price. Moreover, Mr. Diaz knew that Mr. Icenhower, a person

18  he barely knew,  had approached him for a $100,000 loan just two months before

19  filing bankruptcy without any warning.  Mr. Diaz admits he was concerned and he

20  should have been on heightened enquiry. Had Mr. Diaz conducted *any*  independent

21  investigation into the bankruptcy, he would have discovered the district court action

22  involved the Villa Property and the Trustee was questioning the Debtors' transfer of

23  the Villa Property to H&G.

24      66.    The Diaz Defendants had actual notice of the possibility of litigation by

25  the Trustee (i)  challenging the Debtors' sale of the Villa Property to H&G; and

26  (ii) attempting to tie Debtors with H&G.  Mr. Icenhower is one hundred percent

27  certain he discussed the possibility of the litigation with the Diaz Defendants,

28  including the Trustee's claim that H&G was a "shell."  He is certain these

- 19 -

1  conversations took place "prior to closing" because he used these facts to hurry up
2  Mr. Diaz's decision to purchase the Villa. He wanted Mr. Diaz to understand that if
3  he wanted to purchase the Villa Property, he needed to act quickly.  Mr. Diaz
4  acknowledges the conversation but disputes the timing, claiming it occurred after the
5  close of the transaction.

6        67.    The Court finds that although Mr. Icenhower may be partially mistaken
7  about the scope of that conversation, the conversation about possible litigation
8  avoiding the Debtors' transfer of the Villa Property to H&G did, in fact, take place
9  prior to closing. Mr. Icenhower is a witness who has aligned himself with the Diaz
10 Defendants throughout this litigation. He has no reason to lie about the timing of his
11 disclosure of possible litigation.

12       68.    The Diaz Defendants had in their possession prior to closing the actual
13 Articles of Incorporation of H&G which require a shareholders' resolution to sell
14 substantially all of the property of H&G. They knew that no such resolution had been
15 provided.

16       69.    Consistent with Mr. Icenhower's testimony, Mr. Diaz and Mr. Sanchez
17 testified they were unconcerned about the possibility of litigation against Icenhower
18 in the United States. Mr. Diaz and his counsel had done due diligence in Mexico, and
19 relied upon their finding of no liens filed against the Villa Property

20       70.    Craig Kelley, the purported president of H&G, did not participate in the
21 closing of the sale other than to sign documents handed to him by Icenhower.

22                                    **II.**
23                          **CONCLUSIONS OF LAW**
24
25 **A.    Kismet is Entitled to Judgment on its Claims in the Alter Ego - Avoidance
        Action.**
26    **1.    H&G is Debtors' alter ego.**
27       71.    To prevail on a claim for alter ego, the plaintiff must demonstrate that:
28 (1) the corporation is influenced and governed by the person asserted to be the alter

1   ego; (2) there is such unity of interest and ownership that one is inseparable from the

2   other; and (3) the facts must be such that adherence to the corporate fiction of a

3   separate entity would, under the circumstances, sanction a fraud or promote injustice.

4   *Polaris Indus. Corp. v. Kaplan*, 103 Nev. 598, 601 (1987). The plaintiff in an alter

5   ego action must show the three factors by a preponderance of the evidence. *LFC Mktg.*

6   *Group, Inc. v. Loomis*, 116 Nev. 896, 904 (Nev. 2000).

7       72.    In determining whether the "unity of interest and ownership" prong is

8   satisfied, the Nevada Supreme Court requires a finding of equitable ownership, taking

9   into consideration all factors such as comingling of funds, undercapitalization,

10   unauthorized diversion of funds, treatment of corporate assets as the individual's own,

11   and failure to observe corporate formalities. *See North Arlington Medical Bldg, Inc.*

12   v. *Sanchez Const. Co.*, 86 Nev. 515, 522 n. 8 (1970). Moreover, under Nevada law,

13   it is not necessary for the plaintiff to prove the alter ego's ownership of shares of the

14   corporation in order to prove unity of ownership. *LFC Mktg. Group*, 116 Nev. at 905;

15   *see also Mallard Automotive Group, Ltd. v. LeClair Management Corp.*, 153 F.Supp.

16   2d 1211, 1215 (D. Nev. 2001).

17       73.    In determining whether the facts are such that adherence to the corporate

18   fiction would sanction a fraud or promote injustice, courts have held an alter ego

19   finding is appropriate where an entity has been used as an instrumentality against the

20   rights of creditors: where the defendants "have each engaged in transactions with the

21   actual intent to hinder, delay or defraud creditors .... the liability of the corporate

22   pawns for that scheme will be visited upon the controlling individual."*In re National*

23   *Audit Defense Network*, 367 B.R. 207, 230 (Bankr. D. Nev. 2007). In this respect,

24   "'[i]t is not necessary that the plaintiff prove actual fraud. It is enough if the

25   recognition of the two entities as separate would result in injustice.'" *In re Giampietro*,

26   317 B.R. 841, 849 (Bankr. D. Nev. 2004) (citing *McCleary Cattle Co. v. Sewell*, 73

27   Nev. 279, 282 1957)).

28   / / /

74. Where (as here) the plaintiff seeks to pierce the corporate veil in reverse, it is proper to infer equitable ownership and pierce the corporate veil in reverse, based upon findings of the individual's dominion and control of their corporate alter ego. The Nevada Supreme Court explained:

> [Defendant entity] argues that the district court blurred the second element – unity of ownership – with the first – influence and control. [Defendant entity] underscores the fact that William does not own a single share of [Defendant entity], and thus argues that this element cannot be found. We disagree. Although ownership of corporate shares is a strong factor favoring unity of ownership and interest, the absence of corporate ownership is not automatically a controlling event. Instead, the "circumstances of each case" and the interests of justice should control. *This is especially true when considering the ease with which corporations may be formed and shares issued in names other than the controlling individual.*

*LFC Mktg. Group*, 116 Nev. at 904-5 (citations omitted)(emphasis added); *accord Mallard Automotive*, 153 F.Supp. 2d at 1215-16.

75. In this case, the Court found that Mr. Icenhower had complete control over H&G; that H&G had no separate corporate existence and no business purpose other than serving as a sham holding company for Debtors' assets; and that H&G is the alter ego of Mr. Icenhower. [FF ¶ 14; ¶¶ 54-55]

76. The remaining question is whether the circumstances of this case require the corporate veil to be pierced in reverse to prevent a fraud or injustice. In making this determination, the Court must weigh both the reasonable expectations of Kismet who stands in the shoes of the Trustee's predecessor, the Lonie Trust, in its dealings with Mr. Icenhower, and the reasonable expectations of the Diaz Defendants who claim to have dealt with H&G as a separate corporate entity and to have purchased the Villa Property from H&G in good faith. *See e.g. In re Flamingo 55, Inc.*, 242 Fed. Appx. 456, 457-58 (9th Cir. 2007) (Nevada).

77. In contrast, the Diaz Defendants have asked the Court to ignore the reasonable expectations of the Lonie Trust and to focus, instead, on Kismet's reasonable expectations. They point out that Kismet was never a victim of

- 22 -

1  Mr. Icenhower's fraudulent scheme, having been a stranger to the transaction and the

2  bankruptcy case until 2006. [FF ¶¶ 50-53] Kismet is building a golf resort which

3  surrounds the Villa Property. Kismet's alleged motive is to acquire the Villa Property

4  as a "crown jewel" for its golf resort. The Court made no findings concerning these

5  objectives because they are irrelevant to the alter ego claim. Kismet, stands in the

6  shoes of the Trustee who brought the alter ego claim on behalf of the Lonie Trust and

7  other creditors of the estate. As such, the relevant inquiry is not Kismet's objectives

8  or the timing of its entry into this case. The relevant inquiry is *the reasonable*

9  *expectations of the estate's creditors and others who dealt with the Debtors and H&G*

10 *at the time the Villa Property transaction closed.* If this enquiry reveals that

11 adherence to H&G's corporate fiction would sanction a fraud or promote injustice, the

12 remedies of alter ego and reverse veil piercing are appropriate. Here, the evidence

13 demonstrates the Lonie Trust dealt with the Debtors in good faith, and it had a

14 reasonable expectation that its claim would be paid, or the Villa Property would be

15 reconveyed to the Lonie Trust free of any encumbrances or liens. [FF ¶¶ 1-5]  In

16 contrast, as more fully set forth in Conclusions of Law ("CL") ¶¶ 102-105 below, the

17 evidence demonstrates the Diaz Defendants lacked good  faith.   They had no

18 reasonable expectation they were dealing with H&G as a separate corporate entity, or

19 that they would be purchasing the Villa Property from H&G free of any claims of the

20 Trustee. [FF ¶¶ 54-55; ¶¶ 60-63; ¶¶ 64-70]

21     78.  The Court concludes the equities of this case support the remedies of alter

22 ego and reverse piercing of the corporate veil *nunc pro tunc* to the petition date. The

23 factual reality is that Mr. Icenhower and H&G were one and the same. Mr. Icenhower

24 was the equitable owner of the Villa Property on the petition date, and the Diaz

25 Defendants had ample notice of his equitable ownership before the Villa Property

26 transaction closed.

27     79.  Further, it is appropriate to substantively consolidate H&G with the

28 Debtors' bankruptcy estate. *See In re Bonham*, 229 F.3d 750, 763-64 (9th Cir. 2000).

1  The *Bonham* test requires that the court consider two factors: "(1) whether creditors
2  dealt with the entities as a single economic unit and did not rely on their separate
3  identity in extending credit; or (2) whether the affairs of the debtor are so entangled
4  that consolidation will benefit all creditors." *Id.* at 766. "The primary purpose of
5  substantive consolidation 'is to ensure the equitable treatment of all creditors.'"
6  *Bonham*, 229 F.3d at 764 (quoting *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515
7  (2nd Cir. 1988)). It allows a truly equitable distribution of assets by treating the
8  corporate shell as a single economic unit with the bankruptcy estate. *Id.* at 768. Here,
9  the same facts that support alter ego and reverse veil piercing support substantive
10  consolidation to return the Villa Property (H&G's sole asset) to the Debtors'
11  bankruptcy estate *nunc pro tunc* to the petition date. *See Id.* (finding that substantive
12  consolidation *nunc pro tunc* to the petition date would allow a truly equitable
13  distribution of assets because it would make it possible for the trustee to pursue
14  avoidance actions for the benefit of the creditors of the consolidated bankruptcy
15  estates).

16        **2.      The Villa Property is property of the estate so the transfer to the
         Diaz Defendants is avoidable under 11 U.S.C. § 549 as an
17        unauthorized postpetition transfer.**

18        80.    Under 11 U.S.C. § 541(a), "[t]he commencement of a case under section
19  301, 302, or 303 of this title creates an estate." The estate is comprised of, *inter alia*,
20  "all legal or equitable interests of the debtor in property as of the commencement of
21  the case."

22        81. Section 549(a) allows a trustee to avoid a transfer of property of the estate
23  made after the commencement of the case which is not authorized under the
24  Bankruptcy Code or by the court. *In re Goodwin*, 115 B.R. 674, 676 (Bankr. C.D. Cal.
25  1990). Section 549(c) creates an exception to avoidance to protect innocent
26  purchasers of real property who had no knowledge of the pending bankruptcy case.
27  *In re Tippett*, 338 B.R. 82, 87-88 (9th Cir. BAP 2006).
28  / / /

- 24 -

1    82.    The Court's finding of alter ego and its substantive consolidation of H&G
2  into the Debtors' estate *nunc pro tunc* to the petition date promotes the equitable
3  reality that the Villa Property was property of the estate on the petition date.    The
4  transfer of the Villa Property from the bankruptcy estate to the Diaz Defendants was
5  an unauthorized postpetition transfer of property of the estate avoidable under
6  § 549(a).

7    83.    The Diaz Defendants have no defense to avoidance because they admit
8  knowledge of the Debtors' bankruptcy case prior to the closing of the Villa Property
9  transaction. [FF ¶ 31] Further, as more fully set forth in CL ¶ 103-106   below, the
10  Court finds the Diaz Defendants lacked good faith.

11
12    **3.    Kismet's recovery of the avoided postpetition transfer pursuant to 11 U.S.C. § 550(a)(1) is absolute.**

13    84.    Section 550(a) of the Bankruptcy Code provides that to the extent that a
14  transfer is avoided under §§ 544, § 545, 547, 548, 549 or 724(a), the trustee may
15  recover, for the benefit of the estate, the property transferred, or if the court so orders,
16  the value of such property,   from – (1) the initial transferee of such transfer or the
17  entity for whose benefit such transfer was made; or (2) any immediate or mediate
18  transferee of such initial transferee.   Quite simply put, § 550 identifies the parties
19  liable for repayment of an avoided transfer, and empowers the trustee to recover the
20  property transferred or its value for the benefit of the estate. *In re Brun*, 360 B.R. 669,
21  672 (Bankr. C.D. Cal. 2007).

22    85.    The purpose of § 550(a) is "'to restore the estate to the financial condition
23  it would have enjoyed if the transfer had not occurred.'" *In re Straightline*
24  *Investments, Inc.*, __ F.3d __, 2008 WL 1970560 at *9 (9th Cir. May 8, 2008) (citing
25  *In re Acequia, Inc.*, 34 F.3d 800, 812 (9th Cir. 1994)); *Brun*, 360 B.R. at 674-75. If the
26  value of the property has declined following a fraudulent transfer, returning devalued
27  property itself would not make the estate whole.   In such instances, the courts have
28  awarded a money judgment.   On the other hand, when the property has appreciated,

- 25 -

1  the trustee is entitled to recover the property itself, or the value of the property at the
2  time of judgment. The statute, in prescribing alternatives, is purposefully flexible to
3  accomplish its remedial goal. *Brun* at 674-75; *In re American Way Service Corp.*,
4  229 B.R. 496, 531-32 (Bankr. S.D. Fla. 1999).

5      86.   The Trustee's entitlement to recover an avoided transfer from the initial
6  transferee is absolute under § 550(a)(1). *In re Cohen*, 300 F.3d 1097, 1102 (9th Cir.
7  2002). In contrast, § 550(b) provides an exception to the right of recovery against an
8  "immediate or mediate" transferee of the initial transferee who takes for value, in good
9  faith and without knowledge of the voidability of the transfer avoided, or any
10 immediate or mediate good faith transferee of such transferee.   This good faith
11 defense is only available to subsequent transferees.   *Cohen*, 300 F.3d at 1102; *In re*
12 *Presidential Corp.*, 180 B.R. 233, 236 (9th Cir. BAP 1995).

13     87.   In the present case, as more fully set forth in ¶¶ 80-83 the Diaz
14 Defendants have no defense to the Trustee's § 549 postpetition avoidance claim.
15 Pursuant to § 550(a)(1), they are strictly liable  *as initial transferees* to return the
16 avoided transfer, or its value to the bankruptcy estate.

**B.    Alternatively, Even if the Court Declined to Apply the Remedies of Alter
       Ego and/or Substantive Consolidation, Kismet is Entitled to Judgment on
       its Fraudulent Conveyance Action.**

    **1.    The Debtors' transfer of the Villa Property to H&G is avoidable
       under 11 U.S.C. § 544(a), pursuant to California law.**

21     88.   Pursuant to § 544(b)(1), "the trustee may avoid any transfer of an interest
22 of the debtor in property ... that is voidable under applicable law ...."

23     89.   Under California law, an unsecured creditor may avoid a fraudulent
24 transfer to the extent necessary to satisfy the creditor's claim. *See* Cal. Civ. Code
25 §§ 3439.04 and 3439.07. A "transfer" as defined by California law, "means every
26 mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing
27 of or parting with an asset or an interest in an asset, and includes payment of money,
28 release, lease, and creation of a lien or other encumbrance." Civ. Code § 3439.01(i).

1  An "asset" means unencumbered, non-exempt equity in property of a debtor. Civ.
2  Code § 3439.01(a).

3      90.    A transfer is fraudulent and avoidable under California law if the debtor
4  made the transfer or incurred the obligation as follows: "With actual intent to hinder,
5  delay, or defraud any creditor of the debtor." Civ. Code § 3439.04(a)(1).
6  Alternatively, a transfer is otherwise avoidable as a fraudulent transfer if the debtor
7  made the transfer or incurred the obligation without receiving reasonably equivalent
8  in exchange for the transfer or obligation, and the debtor either: (A) was engaged in,
9  or was about to engage in, a business or a transaction for which the remaining assets
10 were unreasonably small in relation to the business or transaction; or (B) intended to
11 incur, or believed or reasonably should have believed that he or she would incur, debts
12 beyond his or her ability to pay. Civ. Code § 3439.04(a)(2).

13     91.    Further, in establishing a prima facie case for fraudulent transfer, the
14 plaintiff is required to show that the debtor  made the transfer or incurred the
15 obligation within four years of bringing the action, or if later, within one year after the
16 transfer or obligation was or could have reasonably been discovered by the plaintiff.
17 Civ. Code § 3439.09(a).

18     92.    There is a clear distinction between the law governing the avoidability
19 of a fraudulent transfer, and the law governing the trustee's recovery of an avoided
20 transfer. Section 550 separates the concepts of *avoiding* a transfer (*i.e.*, the transfer
21 from the Debtors to H&G), and *recovering* from the initial transferee (H&G) or any
22 immediate or mediate transferees of the initial transferee (the Diaz Defendants). *See*
23 *Acequia, Inc.*, 34 F.3d at 809. "[W]hile California law governs whether and to what
24 extent a transfer of property is voidable, the value of the avoided transfer, and
25 therefore, the recovery is governed by § 550(a), irrespective of any recovery
26 limitations imposed by California law." *Brun*, 360 B.R. at 672.

27     93.    In this case, the Diaz Defendants acknowledge that the applicable transfer
28 to be *avoided* under § 544(b) and pursuant to California law, is the Debtors' transfer

1  of the Villa Property to H&G in 2002. [Suppl. Trial Brief at 3:6-7, Adv. Proc.
2  04-90392 at Doc. #496]    They acknowledge that the claim against the Diaz
3  Defendants is one for *recovery* of the avoided transfer pursuant to § 550(a)(2) as a
4  subsequent transferee of H&G. [*Id.* at page 4:1-4]

5      94.    The fraudulent transfer claim is deemed admitted as to H&G. [FF ¶ 49]
6  The Diaz Defendants dispute the fraudulent transfer claim, but presented no evidence
7  at trial to show the transfer from Debtors to H&G was *not* fraudulent. [PTO in Adv.
8  Proc. 04-90392, Remaining Issues of Law ¶ 1]    In closing argument, the Diaz
9  Defendants conceded the Debtors' transfer to H&G was likely a fraudulent transfer.

10      95.    There is ample evidence to conclude the Debtors' transfer to H&G is
11 avoidable both as a constructively fraudulent, and an actually fraudulent transfer.
12 H&G did not pay any consideration in exchange for the Villa Property, thereby
13 making the transfer constructively fraudulent. [FF ¶ 16]  Additionally, the timing and
14 circumstances surrounding the transfer show Mr. Icenhower intended the transfer to
15 be actually fraudulent. [FF ¶¶ 7-21] Finally, there is no dispute as to the timeliness of
16 the Fraudulent Conveyance Action.  [Suppl. Trial Brief at page 3:9-10, Adv. Proc.
17 04-90392 at Doc. # 496]

18
19      **2.    Recovery of the Villa Property from the Diaz Defendants is permitted pursuant to 11 U.S.C. § 550(a)(2).**

20      96.    As more fully set forth in CL ¶¶ 84-85 above, to the extent a transfer is
21 avoided,  § 550(a) of the Bankruptcy Code permits *recovery* of the avoided transfer
22 or, if the courts so orders, the value of such property, from -- (1) the initial transferee
23 of such transfer or the entity for whose benefit such transfer was made; or (2) any
24 immediate or mediate transferee of such initial transferee. [CL 86] In the present case,
25 the Diaz Defendants have asserted the good faith defense in § 550(b) available to a
26 subsequent transferee of the initial transferee.

27      97.    A subsequent transferee asserting the good faith defense must prove all
28 three elements of that defense: (1) taking a property for value; (2) in good faith; and

- 28 -

1  (3) without knowledge of the voidability of the transfer avoided. *In re Laguna Beach*

2  *Motors, Inc.*, 159 B.R. 562, 565-66 (Bankr. C.D. Cal. 1993)(citing *Bonded Financial*

3  *Svcs., Inc. v. European American Bank*, 838 F.2d 890, 896-97 (7th Cir. 1988). The

4  party asserting this defense bears the burden of proving the validity of the affirmative

5  defense. *Laguna Beach Motors*, 159 B.R. at 566.

6        98.    The Bankruptcy Code does not define the meaning of the phrases "good

7  faith" and "without knowledge of the voidability of the transfer avoided." *Goodwin*,

8  115 B.R. at 676. The courts have generally treated the requirements of "good faith"

9  and "lack of knowledge of voidability" synonymously and have looked to whether a

10 transferee had knowledge of the transferor's unfavorable financial condition, or other

11 circumstances sufficient to lead a reasonable person to investigate the voidability of

12 the transfer, to determine whether the transferee acted in good faith. *In re Smoot*, 265

13 B.R. 128, 141(Bankr. E.D. Va. 1999) (a person is not a good faith transferee under

14 § 550(b)(1) if the person has knowledge of the transferor's unfavorable financial

15 condition at the time of transfer); *Bonded Financial*, 838 F.2d at 897-98 (a recipient

16 of fraudulent transfer lacks good faith if he possessed enough knowledge of the events

17 to induce a reasonable person to investigate); *see also* 5 A. Resnick & H. Sommer,

18 eds., *Collier on Bankruptcy*, ¶ 550.03[2] and [3] at 550-23-25 (15th ed. Rev. 2007)

19 (recognizing the growing body of case law that has applied an objective standard for

20 good faith).

21       99.    The courts within this circuit have adopted the objective standard for

22 good faith enunciated in *Bonded Financial*. *See e.g. In re Richmond Produce Co.,*

23 *Inc.*, 195 B.R. 455, 464 (N.D. Cal. 1996); *Goodwin*, 115 B.R. at 677; *In re Concord*

24 *Senior Housing Foundation*, 94 B.R. 180, 183 (Bankr. C.D. Cal. 1988) (overruled on

25 other grounds).[7]

26 ————————————————

27      [7] *See Rupp v. Markgraf*, 95 F.3d 936, 943 n. 1 (10th Cir. 1996) (recognizing *Concord Senior Housing* is overruled to the extent it supported the proposition that a corporate principal becomes

28 an initial "transferee" by the mere act of causing the debtor to make a fraudulent transfer).

1        100.  Specifically, the district court in *Richmond Produce* rejected the

2  defendant's argument that lack of good faith means "actual knowledge" of the

3  voidabiltiy of the transfer by the transferee. The court explained the standard is one

4  of objective good faith:

> 5        [T]he recipient of a voidable transfer may lack good faith if he
> 6  possessed enough knowledge of the events to induce a reasonable person
> to investigate. No one supposes that "knowledge of voidability" means
> complete understanding of the facts and receipt of a lawyer's opinion that
> 7  such a transfer is voidable; some lesser knowledge will do. Some facts
> strongly suggest the presence of others; a recipient that closes its eyes to
> 8  the remaining facts may not deny knowledge.

9

10  195 B.R. at 464 (quoting *Bonded Financial*, 838 F.2d at 897-98). The bankruptcy

11  court in *Concord Senior Housing* stated:

> 12        [A] transferee acts in good faith if it had no facts before it that would
> cause a reasonable person to investigate whether the transfer would be
> 13  avoidable. Within the context of a section 549 proceeding, I conclude
> that if the subsequent transferee knew, or if a reasonable person would
> 14  suspect, that the initial transfer was an unauthorized one from a
> bankruptcy estate, then the immediate transferee would not have received
> 15  the transfer in good faith.

16  94 B.R. at 183.

17        101.  Likewise, in considering the meaning of the phrase "without knowledge

18  of the voidability of the transfer avoided," the bankruptcy court in *Goodwin*

19  concluded:

> 20        It is my view that the transferee must have knowledge of sufficient facts
> that (i) puts the transferee on notice that the transfer might be avoidable
> 21  or (ii) requires further inquiry into the situation and such inquiry is likely
> to lead to the conclusion that the transfer *might* be avoidable.

22

23  115 B.R. at 677 (emphasis added).

24        102.  Accordingly, the courts within this circuit reject an "actual knowledge"

25  standard for § 550(b). They have consistently applied a standard of objective good

26  faith. This standard examines what the transferee knew or should have known given

27  the events, and whether it would cause a reasonable person to investigate. If such

28  investigation would have likely led to the conclusion the transfer *might* be avoidable,

1  then the transferee lacks good faith and knowledge of the voidability of the transfer
2  is imputed to the transferee.   A transferee cannot turn a blind eye to   factual
3  circumstances that would cause a reasonable person to investigate in order to deny
4  knowledge and claim good faith. *Bonded Financial*, 838 F.2d at 897-98.

5       103.   The Court concludes the Diaz Defendants are liable as subsequent
6  transferees  pursuant to § 550(a)(2) because they have failed to show they received
7  the transfer from H&G in objective good faith.  First, the Court observes this *not* a
8  situation where Mr. Diaz had no reason to question Mr. Icenhower. *Cf. Goodwin*, 115
9  B.R. at 677-78 (transferee had no reason to question any wrongdoing due to past
10  business dealings and family relationship).  To the contrary, Mr. Diaz barely knew
11  Mr. Icenhower, and even he concedes their past dealings (unwittingly lending
12  $100,000 to a bankrupt), would put any reasonable person on heightened enquiry in
13  conducting further business with Mr. Icenhower. [FF ¶¶ 27-32; ¶ 65]

14       104.   Second, Mr. Diaz cannot claim he failed to enquire due to lack of
15  sophistication. He is an educated, experienced businessman who has owned companies
16  and served on an audit committee. [*See* FF ¶ 23]  Any reasonable person of similar
17  sophistication who had made the same bad loan would have investigated
18  circumstances surrounding the Debtors' bankruptcy, and enquired into the reason
19  Mr. Icenhower could cause H&G to lower the Villa Property sales price to repay his
20  personal debt. Had Mr. Diaz conducted any enquiry, he would have discovered the
21  district court litigation involved the Villa Property and the Trustee was questioning
22  the Debtors' transfer of the Villa Property to H&G. [FF ¶ 65]  Additionally, Mr. Diaz
23  would  have  discovered  what  he  likely  already  knew,  that  Mr. Icenhower  had
24  fraudulently transferred the Villa Property to H&G to keep it away from the Lonies.

25       105.   Third, there were many other "red flags" that should have caused
26  Mr. Diaz, and any other reasonable person in his shoes, to investigate the voidability
27  of the transfer to H&G. [*See* FF ¶¶ 60-61]  The Diaz Defendants and their attorney
28  Mr. Sanchez closed their eyes to these "red flags" to avoid actual knowledge.  Their

1  own Mexican law expert (Prof. Vargas) conceded that, given the cross-border nature
2  of this transaction, a heightened level of due diligence was required.  [FF ¶ 57;
3  ¶¶ 61-63] Had any heightened enquiry been made, the Diaz Defendants would have
4  learned what they likely already knew, that H&G was a shell entity controlled by
5  Mr. Icenhower.

6      106.   Finally, the Court finds the Diaz Defendants cannot possibly be good
7  faith transferees because, prior to closing of the Villa Property transaction, Mr. Diaz
8  actually knew the Debtors' transfer of the Villa Property to H&G *might* be voidable
9  by the Trustee.   Mr. Icenhower is one hundred percent certain he disclosed this
10 information to "hurry up" Mr. Diaz's decision to purchase the Villa Property while the
11 title in Mexico remained clear. [FF ¶¶ 66-67]  Mr. Diaz denies knowledge, but other
12 facts suggest this was likely the case. [FF ¶ 60, ¶ 67]  Mr. Diaz proceeded with the
13 Villa Property transaction because he believed the clear title in the Mexican Public
14 Registry would defeat the Trustee. Having made the conscious decision to "hurry up"
15 the transfer to defeat the Trustee, the Diaz Defendants cannot be good faith
16 transferees.

17     107.   Because the Diaz Defendants are not good faith transferees, Kismet is
18 entitled to recover for the benefit of the estate, either the Villa Property or its value at
19 the time of judgment from any combination of the transferees, subject to the limitation
20 of a single satisfaction set forth in § 550(d). [CL ¶¶ 84-85]   The Diaz Defendants
21 cannot complain about the inequities of being ordered to return their cherished
22 vacation home to the estate when the evidence shows  they are renting to the public.
23 [FF ¶ 26]  Moreover, the equities favor an order directing the return of the Villa
24 Property where it appears Mr. Diaz conspired with Mr. Icenhower to use the clear title
25 in  Mexico to defeat the Trustee.    *See Straightline Investments*, 2008 WL at * 9
26 (requiring return of wrongfully transferred property to the estate was proper course of
27 action where defendant was aware of the bankruptcy and conspired with Debtor's
28 president to transfer the property).

- 32 -

1     108.   The Court makes no legal conclusion concerning whether its consolidated

2 judgment in these actions is enforceable in Mexico.   As this Court has previously

3 ruled, it has subject matter jurisdiction over claims to avoid and recover the wrongful

4 transfer of the Debtors' interest in the *fideicomiso* trust, and it has *in personam*

5 jurisdiction over each of the Defendants in these actions to *order them to execute the*

6 *necessary conveyance documents* to return the Villa Property to the estate, subject to

7 enforcement through this Court's contempt powers, even though it indirectly affects

8 title to real property in Mexico. [PTO in Adv. Proc. 06-90369, Doc. # 191, Judicially

9 Noticeable Facts ¶ 5]; *see also Fall v. Eastin*, 215 U.S. 1, 9-12 (1909) (recognizing

10 that a court of equity, having authority to act upon the person, may indirectly act upon

11 real estate in another jurisdiction, and even in a foreign country, through the

12 instrumentality of its authority over the person); A. Ahart, *Cal. Prac. Guide: Enf. J.*

13 *& Debts*, Ch. 6, ¶ 6:1849.9 (The Rutter Group 2008).

14     109.   Any findings of facts which may be considered a conclusion of law shall

15 be deemed a conclusion of law.   Any conclusions of law which may be considered a

16 findings of facts shall be deemed a findings of facts.   A separate judgment is filed

17 concurrently with these findings.

18

19

20 Dated: 2 June 08                                              

21                                 LOUISE DE CARL ADLER, Judge

22

23

24

25

26

27

28

CAD 168
[Revised July 1985]

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF CALIFORNIA

Case No. <u>03-11155-A7</u>
Adv. No. <u>06-90369-A7</u>
Adv. No. <u>04-90392-A7</u>
Case Name:  In Re: JERRY L. ICENHOWER dba Seaview
　　　　　　　Properties, et al.

## CERTIFICATE OF MAILING

　　　　The undersigned, a regularly appointed and qualified clerk in the Office of the United States Bankruptcy Court for the Southern District of California, at San Diego, hereby certifies that a true copy of the attached document, to-wit:

**CONSOLIDATED FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW**

was enclosed in a stamped and sealed envelope and mailed to the following parties at their respective addresses listed below:

Stephen B. Morris, Esq.
Mark C. Hinkley, Esq.
MORRIS AND ASSOCIATES
444 West C Street Suite 300
San Diego CA 92101

Ali Mojdehi Esq.
Janet Gertz, Esq.
BAKER & MC KENZIE LLP
12544 High Bluff Dr. Third Floor
San Diego CA 92130-3051

Jerry L. and Donna L. Icenhower
684 Margarita Avenue
Coronado CA 92118

Howell & Gardner Investors, Inc.
c/o Jerry and Donna Icenhower
684 Margarita Avenue
Coronado CA 92118

Gerald H. Davis, Chapter 7 Trustee
P.O. Box 2850
Palm Springs CA 92263

Office of the United States Trustee
402 West Broadway, Suite 600
San Diego CA 92101

　　　　The envelope(s) containing the above document was deposited in a regular United States mail box in the City of San Diego in said district on <u>June 2, 2008.</u>

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿, Deputy Clerk
Roma London

CAD 168

- 34 -