1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

7

## SOUTHERN DISTRICT OF CALIFORNIA

8

9  ALEJANDRO DIAZ-BARBA, et al.,

10                          Defendants/Appellants,
   vs.

11  KISMET ACQUISITION, LLC,

12

13                          Plaintiff/Appellee.

Case No. 08cv1446 BTM (BLM)
consolidated with 08cv1572 BTM
(BLM)

**ORDER AFFIRMING JUDGMENT
OF BANKRUPTCY COURT**

14      Alejandro Diaz-Barba and Martha Margarita Barba de la Torre have appealed under

15  28 US.C. § 158(a)(1) from a judgment of the United States Bankruptcy Court for the

16  Southern District of California.  For the following reasons, the Court **AFFIRMS** the judgment.

17

18                          **I.  BACKGROUND**

19      This is an appeal from a judgment in two bankruptcy avoidance actions.  The object

20  of those avoidance actions was the sale of a coastal villa in Mexico (the "Villa").  The Villa

21  is at the heart of this dispute, and both Appellants and Appellee claim that they are its lawful

22  owners.

23

24  **A.  The Icenhowers Purchase the Villa**

25      The Villa has been the object of litigation and bought and sold several times in recent

26  history.  In 1995, the D. Donald Lonie, Jr., Family Trust ("Lonie Trust") owned the beneficial

27

28

interest in the Villa.[1]  (Excerpts of Record ("ER") 18–51, June 2, 2008 Consolidated Findings of Fact and Conclusions of Law ("FFCL") ¶ 3.)  The Lonie Trust agreed to sell its interest in the Villa to Jerry and Donna Icenhower (collectively the "Icenhowers" or "Debtors").  (*Id.*)  Mr. Icenhower executed promissory notes in exchange for the Villa, but a dispute arose regarding the notes and the Lonie Trust sued the Icenhowers in the United States District Court for the Southern District of California.[2]  (*Id.*)

The lawsuit sought a determination of the parties' respective rights in the Villa.  (*Id.* at ¶ 4.)  The Lonie Trust prevailed, and in 2003 the district court entered judgment against the Icenhowers.  (*Id.* at ¶ 5.)  The judgment required the Icenhowers to either (1) pay damages of about $1.36 million and re-register a lien on the Villa as security for the damages; or (2) reconvey the Villa to the Lonie Trust, free of any encumbrances.  (*Id.*)

## B.  The Icenhowers Transfer the Villa to a Shell Corporation

But before the district court entered that judgment, the Icenhowers had already transferred the Villa to Howell & Gardner Investors, Inc. ("H&G"), a shell corporation.  (*Id.* at ¶ 16.)  The Icenhowers received virtually nothing in exchange for transferring the Villa to H&G.  (*Id.*)  And under the terms of the sale, Mr. Icenhower retained total control over the Villa.  (*Id.* at ¶ 17.)  Not only did Mr. Icenhower control the Villa, but Mr. Icenhower also controlled H&G; it had no real corporate existence apart from him and had no business purpose other than as a sham company to hold the Icenhowers' assets.  (*Id.* at ¶ 14.)  Thus, when the district court entered judgment against the Icenhowers and ordered them to either pay damages or return the Villa to the Lonie Trust, H&G—and not the Icenhowers—purportedly owned the Villa.

---

[1]  Under Mexican law, a foreign national may not directly hold title to coastal property in Mexico, but may hold the beneficial interest in a *fideicomiso* bank trust formed to hold title to the real property.  Unless stated otherwise, all references to the transfer of the Villa refer to the transfer of the beneficial interest.

[2]  That action is entitled *Lonie v. Icenhower*, 00cv612.

08cv1446 BTM (BLM)

### C. The Icenhowers File for Bankruptcy

Shortly after the district court entered judgment against the Icenhowers, on December 15, 2003 the Icenhowers responded by filing a Chapter 7 bankruptcy petition.  (FFCL ¶ 6.) During the course of the bankruptcy, the Icenhowers (or "Debtors") disclosed that they had transferred the Villa to H&G.  (*Id.* at ¶ 44.)  And in August 2004, the bankruptcy trustee filed a fraudulent conveyance action to avoid the transfer and recover the Villa (the "Fraudulent Transfer Action").  (*Id.* at ¶ 45.)  But by the time the Court entered a preliminary injunction preventing H&G from transferring the Villa, Mr. Icenhower had caused the Villa to be transferred yet again—this time to Appellants Martha Barba Diaz[3] and her son Alejandro Diaz-Barba (collectively the "Diaz Family").  (*Id.* at ¶ 37.)

### D. The Diaz Family Agrees to Purchase the Villa and Conducts Due Diligence

Mr. Icenhower met Mr. Diaz through a mutual friend, and Mr. Diaz understood Mr. Icenhower to be the manager of the Villa.  (*Id.* at ¶ 27.)  Mr. Diaz was interested in purchasing the Villa, and during 2003 and 2004 they negotiated and finally agreed on a purchase price of $1.5 million. (*Id.* at ¶¶ 28–29.)  After agreeing on the price, Mr. Diaz began his due diligence.  (*Id.* at ¶ 29.)

While Mr. Diaz conducted his due diligence, Mr. Icenhower asked him for a $100,000 personal loan to invest in a golf-pro shop.  (*Id.* at ¶ 29.)  Mr. Icenhower made only one payment on the loan before he filed for bankruptcy in December 2003.  (*Id.* at ¶ 29.) Although Mr. Icenhower did not tell Mr. Diaz of the filing, Mr. Diaz received notice of the bankruptcy because Debtors listed the $100,000 loan in their filing.  (*Id.* at ¶ 31.)

Mr. Diaz was shocked and concerned about the bankruptcy, but Mr. Icenhower assured Mr. Diaz that he was forced to file due to an unfair judgment against him.  (*Id.* at ¶ 32.)  Mr. Icenhower further assured Mr. Diaz that he would pay back the $100,000 personal loan through an equivalent reduction in the purchase price of the Villa.  (*Id.*)  Mr. Diaz

---

[3]  Appellants' briefing papers refer to Ms. Barba Diaz as Martha Barba De La Torre. The Court will adhere to the FFCL's reference to Appellant as Martha Barba Diaz or Ms. Barba Diaz.

08cv1446 BTM (BLM)

accepted Mr. Icenhower's explanation and did not believe he needed to separately investigate why, given that H&G purportedly owned the Villa, Mr. Icenhower had authority to lower the sales price of the Villa to repay Mr. Icenhower's personal loan.  (*Id.*)

The Diaz Family hired Eduardo Sanchez, a lawyer licensed only in Mexico, to conduct due diligence on their purchase of H&G's interest in the Villa.  (*Id.* at ¶ 33.)  The scope of Mr. Sanchez's due diligence was the following: (1) he confirmed H&G's corporate existence by obtaining its Articles of Incorporation; (2) he confirmed from the State of Nevada that H&G was in good standing; (3) he obtained a corporate resolution authorizing Craig Kelley, H&G's sole office and director, to sell the Villa; and (4) he reviewed the property records in the property office in Autlan, Mexico and determined that the previous transfers of the Villa were legally correct and that there were no liens or claims against it.  (*Id.* at ¶ 34.)

There were several things, however, that Mr. Sanchez did not review or confirm. Because he viewed the transaction as governed by Mexican law, he did not review any relevant U.S. law.  (*Id.* at ¶ 35.)  Although Mr. Sanchez had H&G's Articles of Incorporation, which required shareholder authorization for a transaction selling substantially all of H&G's assets, he never requested or obtained that authorization.  (*Id.*)  Nor was he concerned that Mr. Icenhower asked the Diaz Family to pay consideration to entities other than H&G for transfer of the Villa.  (*Id.*)  He knew of Mr. Icenhower's personal bankruptcy, but was unconcerned about this too because he viewed the transaction as a purchase from H&G, not Mr. Icenhower.  (*Id.*)  He did not check either the bankruptcy court or call the bankruptcy trustee.  (*Id.*)  Lastly, although Mr. Icenhower had warned Mr. Diaz that the trustee was looking into the Debtors' sale of the Villa to H&G, Mr. Sanchez testified that he was unaware that the transaction was under review.  (*Id.*)

**E.  Mr. Icenhower and the Diaz Family Close the Deal**

Still, Mr. Sanchez and the Diaz Family proceeded with the transaction.  In June 2004, the Diaz Family executed a purchase agreement for the Villa.  (FFCL ¶ 37.)  The actual agreed price was $1.5 million.  (*Id.*)  But the stated consideration in the purchase agreement

was $7,508,800 Mexican pesos, equivalent to $658,071 USD.  (*Id.*)  The Diaz Family, their lawyer, and Mr. Icenhower admitted that the lower price was a ruse to avoid Mexican taxes. (*Id.*)

Mr. Icenhower, Mr. Diaz, Mr. Sanchez, and Mr. Kelley (H&G's sole officer and director) were present at the closing in Chula Vista, California.  (*Id.* at ¶ 38.)  Although Mr. Kelley signed the transaction documents on behalf of H&G, he was only a passive participant and followed Mr. Icenhower's directions.  (*Id.*)  The Diaz Family only paid $25,000 of the purchase price directly to H&G.  (*Id.* at ¶ 39.)  At the closing, Mr. Icenhower directed them to pay the balance to third parties: $675,000 USD to Buckeye International Funding, Inc.; $398,663 USD to Western Financial Assets, Inc.; and $191,567 USD to Icenhower Investments.  (*Id.* at ¶ 39.)  The $675,000 was paid from an account owned by Ms. Barba Diaz, and the other two payments were made from accounts owned by Mr. Diaz.  (SER 416–18.)

Neither Mr. Diaz nor Mr. Sanchez thought it odd that Mr. Icenhower directed them to pay virtually all of the consideration to third parties and not to H&G.  (FFCL ¶ 40.)  In addition, although the Villa constituted all the property H&G owned, there was no shareholder resolution authorizing the sale as required by H&G's Articles of Incorporation.  (*Id.* at ¶ 41.)

**F.  The Bankruptcy Trustee Files Actions to Avoid the Transfers of the Villa**

As mentioned above, the bankruptcy trustee filed the Fraudulent Transfer Action to avoid the transfer from Debtors to H&G in August 2004.  (FFCL ¶ 45.)  Once the trustee learned that H&G had transferred the Villa to the Diaz Family, the trustee added them as defendants in that action.  (*Id.* at ¶ 46.)  Later, in August 2006, the trustee filed an alter ego and avoidance action, seeking a finding that H&G was the Debtors' alter ego and for substantive consolidation of Debtors and H&G *nunc pro tunc* to the petition date, and to recover the postpetition transfer of the Villa (the "Postpetition Transfer Action") (collectively with Fraudulent Transfer Action, "Avoidance and Recovery Actions").  (*Id.* at ¶ 48.)

During the course of the Avoidance and Recovery Actions, Kismet Acquisition, LLC

("Kismet" or "Appellee") intervened and purchased the estate's assets, including those actions.  (*Id.* at ¶ 50–51.)  Kismet replaced the trustee in the actions and is the Appellee here.  (*Id.* at ¶ 52.)

### G.  The Bankruptcy Court's Findings of Fact and Conclusions of Law

After the conclusion of a bench trial in the Avoidance and Recovery Actions, the bankruptcy court issued its findings of fact and conclusions of law.  Its findings of fact were substantially similar to the facts recited above.  Based on these facts, the bankruptcy court made several conclusions of law.

First, based on the claims in the Postpetition Transfer Action, the court held that H&G was Debtors' alter ego.  The Court therefore consolidated H&G's assets with the bankruptcy estate *nunc pro tunc* to the petition date.  The consolidation had the effect of treating the Villa as part of the bankruptcy estate as of the date of filing.

Second, based on the consolidation, the Villa's transfer to the Diaz Family was avoidable under 11 U.S.C. § 549 as an unauthorized postpetition transfer.  The bankruptcy court ruled that the Diaz Family had no defense to the avoidance because they admitted knowledge of Debtors' bankruptcy filing.  As a result of the avoidance, the court could recover the Villa under 11 U.S.C. § 550(a)(1);

Third, the court alternatively held based on the claims in the Fraudulent Transfer Action, that the Villa's transfer to H&G was a fraudulent transfer and therefore avoidable. And the court could recover the Villa from the Diaz Family under 11 U.S.C. § 550(a)(2) because, due to their insufficient due diligence in light of all the red flags, they were not good-faith transferees.

In its Amended Consolidated Judgment ("ACJ"), the bankruptcy court ordered the Diaz Family to undo the avoided transfer and convey the Villa to a *fideicomiso* trust naming Kismet as the sole beneficiary.  Alternatively, Kismet could elect to receive a make-whole monetary judgment.  The Diaz Family eventually satisfied an oral amendment to the judgment after the bankruptcy court entered coercive and remedial sanctions.

1    The Diaz Family appeals the ACJ.

2

3                        **II.  STANDARDS OF REVIEW**

4         The Court has jurisdiction over the appeals under 28 U.S.C. § 158(a).  The Court

5    reviews the bankruptcy court's factual findings for clear error.  *See Harsh Investment Corp.*

6    *v. Bialac (In re Bialac)*, 712 F.2d 426, 429 (9th Cir. 1983).  Conclusions of law are subject to

7    *de novo* review, *id.*, as are most mixed questions of fact and law, *Biggs v. Stovin (In re Luz*

8    *Int'l., Ltd.)*, 219 B.R. 837, 840 (B.A.P. 9th Cir. 1998).

9

10                             **III.  DISCUSSION**

11   **A.  Local-Action Doctrine**

12        Appellants first argue that in avoiding the Villa's transfer from H&G to them, and

13   ordering Appellants to transfer the Villa to Kismet, the bankruptcy court exceeded its

14   jurisdiction.  The bankruptcy court, they argue, purportedly exercised *in rem* jurisdiction over

15   the Villa.  But because the Villa is in Mexico, Appellants contend, it is beyond the *in rem*

16   jurisdiction of the court.  In support of this argument, Appellants invoke the local-action

17   doctrine.

18        The local-action doctrine is a common-law doctrine that prevents federal courts from

19   exercising subject-matter jurisdiction[4] over certain actions involving out-of-state real property.

20   When "the remedies [a party] seeks would act *directly* upon the land itself, jurisdiction is

21   properly exercised in the state where the land is situated."  *See U.S. v. Byrne*, 291 F.3d

22   1056, 1060 (9th Cir. 2002) (emphasis added).  Local actions are essentially actions *in rem*

23   and may only be prosecuted "where the thing on which they are founded is situated."  *Casey*

24   *v. Adams*, 102 U.S. 66, 68 (1880).

25        On the other hand, causes of action that are related to a particular defendant are

26   _____

27        [4] Federal courts disagree over whether the local-action doctrine affects subject-matter
     jurisdiction or merely venue.  14D Charles Alan Wright et al., Federal Practice and Procedure
28   § 3822 (3d ed. 2009).  The Ninth Circuit, however, has treated the issue as affecting subject-
     matter jurisdiction.  *McGowan*, 219 F. at 370.  The Court follows that rule here.

called transitory actions.  Unlike local actions, which must be brought where the *res* at issue is located, transitory actions may be brought in any district where the court has *in personam* jurisdiction over that defendant.  *See Massie v. Watts*, 10 U.S. (6 Cranch) 148, 160 (1810).

Although the line between transitory and local actions is not always clear, what is clear is that actions for fraud are transitory.  *Massie*, 10 U.S. (6 Cranch) at 160 ("[T]his court is of opinion that, in a case of fraud . . . the jurisdiction of a court of chancery is sustainable wherever the person be found, although lands not within the jurisdiction of that court may be affected by the decree."); *Safeway Stores*, 743 F.2d at 506–09; *Neet v. Holmes*k 19 Cal. 2d 605, 611 (1942) (same is true under California law).  Similarly, actions filed by a bankruptcy trustee to avoid a fraudulent transfer under 11 U.S.C. § 548 are also transitory.  *Coffey v. Managed Properties*, 85 F.2d 88, 90 (2d Cir. 1936); *Kalso Systemet, Inc. v. Jacobs*, 474 F. Supp. 666, 668–69 (D.C.N.Y. 1979); *see also Safeway Stores, Inc.*, 743 F.2d at 506–09 (listing cases holding actions to avoid fraudulent transfer are transitory); *Sax v. Sax*, 294 F.2d 133, 136–37 (5th Cir. 1961) (suit to avoid fraudulent conveyance is transitory); *Tcherepnin v. Franz*, 439 F. Supp. 1340, 1345 (D.C. Ill. 1977) ("It is well-settled that in an action to set aside a fraudulent conveyance of land the court has jurisdiction wherever the person can be found, although lands not within the jurisdiction may be affected by the court's decree.").  *But c.f. Mann v. Hanil Bank*, 900 F. Supp. 1077 (E.D. Wis. 1995) (holding non-bankruptcy fraudulent transfer action is local in nature).  The Court holds that actions to avoid a fraudulent conveyance are transitory and may be brought wherever the court has *in personam* jurisdiction over the defendant.

In transitory actions, a court may use its *in personam* jurisdiction over a defendant to indirectly act upon out-of-state real property.  *See, e.g., Fall v. Eastin*, 215 U.S. 1, 8 (1909) ("A court of equity, having authority to act upon the person, may indirectly act upon real estate in another state, through the instrumentality of this authority over the person."); *Sax*, 294 F.2d at 137 (court could declare agreement invalid due to fraud and use coercive sanctions to compel action with respect to out-of-state property).  Using its *in personam* jurisdiction, at least one court in this jurisdiction has transferred interests in Mexican land by

8

ordering defendants to effect the transfer themselves.  *See Brady v. Brown*, 51 F.3d 810, 819

(9th Cir. 1995) (affirming district court's judgment requiring defendants to execute power of

attorney transferring interests in Mexican land into *fideicomiso* trust).

Here, the bankruptcy court had *in personam* jurisdiction over Appellants and therefore

had jurisdiction to hear the Avoidance and Recovery Actions.  Avoidance actions are

transitory, *see, e.g., Coffey*, 85 F.2d at 90, and cases cited *supra*, and transitory actions may

be brought wherever the court has *in personam* jurisdiction over the defendants, *e.g., Watts*,

10 U.S. (6 Cranch) at 160.  Furthermore, once it had avoided the transfers, the bankruptcy

court had the authority to recover the property because it could do so through its *in personam*

power over Appellants.  *See, e.g., Central Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 372

(2006) (After avoiding transfer in bankruptcy, action to recovery property "might itself involve

*in personam* process.")

Alternatively, the bankruptcy court's exercise of jurisdiction was proper under 28

U.S.C. § 1334(b), which gives district courts (and bankruptcy courts under 28 U.S.C. § 157)

original jurisdiction over all civil proceedings arising in or related to bankruptcy cases.[5]

*Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995); 28 U.S.C. §§ 157, 1334(b).  Congress

has explicitly granted bankruptcy courts with subject-matter jurisdiction to hear avoidance

and recovery actions like the ones at issue here.  *See* 28 U.S.C. §§ 157, 1334(b).  Thus,

even if an action to avoid a fraudulent transfer was a local action under federal common law,

the bankruptcy court would still have jurisdiction because Congress's broad grant of

jurisdiction supersedes the common-law doctrine.  *See City of Milwaukee v. Illinois*, 451 U.S.

304, 313 (1981) (federal statutes supersede federal common law).

Appellants cite no case holding that a bankruptcy trustee must bring actions to avoid

the transfer of real property in the state where the real property is located.  Appellant's most

---

[5] As the Court mentions above *supra* n. 4, federal courts disagree over whether the local-action doctrine goes to subject matter jurisdiction or venue.  28 U.S.C. § 1334(b) addresses subject-matter jurisdiction and under that statute the bankruptcy court below had jurisdiction to hear the claims.  Even if the Court assumes the local-action doctrine addresses venue, venue was proper in the bankruptcy court under 28 U.S.C. § 1408(1) because Debtors and Appellants resided in San Diego County.

helpful case held that a district court lacked jurisdiction to hear a fraudulent transfer action regarding property located in Korea. *Mann v. Hanil Bank*, 900 F. Supp. 1077 (E.D. Wis. 1995). This holding is not binding on the Court. But more importantly, the avoidance action in *Mann* did not arise from a bankruptcy case. This is a crucial distinction because Congress has granted bankruptcy courts with broad jurisdiction to hear all civil proceedings related to a bankruptcy, *see* 28 U.S.C. § 1334(b), and this statutory jurisdiction was not present in *Mann*.

Appellants also attempt to distinguish between a bankruptcy court's jurisdiction over avoidance and its jurisdiction over recovery. Appellants are correct that a court's avoidance of a transfer of real property under § 548 is distinct from a court's subsequent recovery of that property under § 550. *Dzikowski v. N. Trust Bank of Fl. (In re Prudential of Florida Leasing, Inc.)*, 478 F.3d 1291, 1301 (11th Cir. 2007); *Suhar v. Burns (In re Burns)*, 322 F.3d 421, 427 (6th Cir. 2003). But in this context the distinction is immaterial. As explained above, the Court may indirectly act upon out-of-jurisdiction real property through its *in personam* power over defendants. Furthermore, Congress explicitly granted bankruptcy courts jurisdiction to hear not only avoidance actions, but also recovery actions. *In re Gandy*, 299 F.3d 489, 496 (5th Cir. 2002); 28 U.S.C. § 1334 (bankruptcy court has jurisdiction over all civil proceedings related to bankruptcy); 28 U.S.C. § 157 (b)(2)(H) (action to recover property is core proceeding). Thus, even assuming the local-action doctrine would otherwise apply to recovery actions, Congress's grant of jurisdiction overrides the purported application of the common-law doctrine. *See City of Milwaukee*, 451 U.S. at 313.

For these reasons, the Court holds that the local-action doctrine did not preclude the bankruptcy court from exercising jurisdiction over, and entering judgment in, the avoidance and recovery actions.

## B. Extraterritorial Application of Avoidance and Recovery Provisions

Federal laws are presumed to be inapplicable to conduct outside the United States unless Congress "clearly expresses a contrary intent." *See Gushi Bros. Co. v. Bank of*

*Guam*, 28 F.3d 1535, 1538–42 (9th Cir. 1994).  This is called the presumption against extraterritoriality.  *Id.* at 1540.  Appellants argue that the bankruptcy court erred in recovering the Villa from them under § 550 because Congress did not intend the avoidance and recovery statutes to apply to extraterritorial transactions.  In order to succeed on this argument, Appellants must establish (1) the transaction at issue occurred outside of the United States and (2) the avoidance and recovery statutes do not apply extraterritorially.

1.  Appellants Have Not Waived the Presumption Against Extraterritoriality

As a threshold matter, Appellee argues that Appellants have waived this argument by submitting to the jurisdiction of the bankruptcy court.  Appellee correctly states that when a party affirmatively invokes the jurisdiction of the bankruptcy court, the presumption against extraterritoriality does not apply to that party.  *In re Simon*, 153 F.3d at 997.  But here Appellants did not voluntarily submit to the jurisdiction of the bankruptcy court.  They were made defendants in an adversary proceeding and moved to dismiss the adversary complaint.  Only after they were made defendants and their motion to dismiss was denied did they voluntarily participate in the bankruptcy proceedings to protect their interests.  Appellants, therefore, have not waived this argument

2.  Did the Transaction At Issue Occur Within the United States?

The presumption against extraterritoriality does not apply to "conduct occurring within, or having effect within, the territory of the United States . . . ."  *Omega S.A. v. Costco Wholesale Corp.*, 541 F.3d 982, 987 (9th Cir. 2008).  But acts inside the United States that are merely preparatory or incidental to the conduct at issue are, by themselves, insufficient to confer federal jurisdiction.  *Gushi Bros. Co. v. Bank of Guam*, 28 F.3d 1535, 1538 (9th Cir. 1994).

The Villa was transferred twice—first from the Icenhowers to H&G and then from H&G to Appellants.  The parties dispute which transfer should be the subject of the extraterritoriality analysis.  There are only two choices: either (1) the transfer from the

08cv1446 BTM (BLM)

Icenhowers to H&G or (2) the transfer from H&G to Appellants.

The parties fail to recognize that the relevant transfer is different depending on the action.  As mentioned above, the trustee filed both a Fraudulent Transfer Action and a Postpetition Transfer Action.  These actions focus on different transfers.  The Postpetition Transfer Action necessarily focuses on the transfer from H&G to Appellants.  This is because under the theory of this action, H&G was the alter ego of Debtors and H&G's asset—the Villa—was consolidated with the Debtors' estate.  When H&G later transferred the Villa to Appellants, it would therefore be treated as a postpetition transfer depleting the assets of the estate.  Therefore, the only transfer at issue in the Postpetition Transfer Action is the one from H&G to Appellants.

With respect to the Fraudulent Transfer Action, the focus is different.  In this action, the trustee sought to avoid the transfer from Debtors to H&G as a fraudulent transfer because H&G paid no consideration for the Villa.  After H&G then transferred the Villa to Appellants, the trustee sought to recover the Villa from them under § 550(a)(2) as immediate transferees of H&G.  Under the Fraudulent Transfer Action, the Court affirms the bankruptcy court's ruling that the relevant transfer was the first transfer from the Icenhowers to H&G. This is because the first transfer is the *only* transfer that the bankruptcy court avoided in its ACJ.

The bankruptcy court entered judgment against Appellants in the Fraudulent Transfer Action based only on 11 U.S.C. § 550(a)(2) and its authority under that section to recover improperly transferred property.  Indeed, in its February 13, 2007 order the bankruptcy court dismissed any avoidance claims aimed directly against the Diaz Family.  (ER 55.)  Thus, the Court looks exclusively to § 550 to determine which transfer is relevant to the extraterritoriality analysis.

With some exceptions, the bankruptcy court's authority under § 550(a) to recover property is coextensive with its authority to avoid fraudulent transfers.  *In re Richmond Produce Co.*, 195 B.R. 455, 463 (N.D. Cal. 1996) ("[O]nce the trustee proves that a transfer is avoidable under section 548, he may seek to recover against any transferee . . . .")  In

other words, when a transfer may be avoided, generally the property may also be recovered. 28 U.S.C. § 550(a) ([T]o the extent that a transfer is avoided . . . the trustee may recover, for the benefit of the estate, the property transferred . . . .")  Thus, although avoidance and recovery are distinct claims, *In re Burns*, 322 F.3d at 427, they are not completely independent because a transfer must be avoided before the property may be recovered.

Because a § 550 claim is dependent on the avoidance of a transfer, and because a court's recovery power is generally coextensive with its avoidance power, the relevant transfer for purposes of determining whether the presumption against extraterritoriality applies is only the transfer that has been avoided.  And in this case, that is the first transfer from the Icenhowers to H&G.

But even when the focus of the extraterritoriality analysis is the transfer from H&G to the Appellants—as in the Postpetition Transfer Action—the presumption against extraterritoriality still will not apply.  This is because both the transfer to H&G and the transfer to Appellants occurred within the United States.

i. *The Transfer from the Icenhowers to H&G Occurred Within the United States*

The bankruptcy court found that the transfer from Debtors to H&G occurred within the territorial jurisdiction of the United States.  (ER 55.)  The Court reviews this finding for clear error.  *In re Bialac*, 712 F.2d at 429.

Debtors are U.S. citizens and residents of San Diego County, California.[6]  H&G was a Nevada corporation and Debtors' alter ego.  The transfer between these parties was executed in the United States, and it had significant effects on the suit initiated by the Lonie Trust and on the bankruptcy proceedings.  Indeed, by transferring the property to H&G, Debtors intended to thwart the Lonie Trust's attempts to recover the property.

Under these circumstances, when the acts central to the avoided transaction occurred within the United States, the parties to the transaction are domestic, and the transfer had

---

[6]  Although the FFCL does not explicitly state that Debtors reside in San Diego County, the Court takes judicial notice of this fact based on the venue of the bankruptcy filing and numerous references to Debtors' residence in the record.

significant, intentional effects within the territory of the United States, the presumption against extraterritoriality does not apply.  *See Hong Kong & Shanghai Banking Corp. v. Simon (In re Simon)*, 153 F.3d 991, 995 (9th Cir. 1998) (holding presumption does not apply when conduct is "intended to, and results in, substantial effects within the United States").

Appellants focus on Debtors' and H&G's purported actions in Mexico to complete the transfer.  Essentially, Appellants argue that because Debtors and H&G went to Mexico to sign documents transferring the Villa to H&G, the transfer occurred in Mexico.  But the execution of that document in Mexico was made in furtherance of the principal agreement to transfer the property.  The object of the avoidance action is not the document signed in Mexico, but the contract signed in the United States.

ii. *The Transfer from H&G to the Diaz Family Also Occurred Within the United States*

For similar reasons, the Villa's transfer from H&G to the Diaz Family also occurred within the United States and the presumption against extraterritoriality is therefore inapplicable.[7]

First, although Ms. Barba Diaz and Mr. Diaz are citizens of Mexico, they are residents of San Diego County.  (FFCL ¶ 22.)  Both Ms. Barba Diaz and Mr. Diaz are officers, directors, or members of numerous limited liability companies and corporations having a principal place of business in San Diego County.  (*Id.* at ¶ 23.)

Second, Mr. Diaz and Mr. Icenhower had several contacts in San Diego related to the Diaz Family's purchase of the Villa.  Mr. Diaz and Mr. Icenhower first met in Pacific Beach in San Diego County.  When Mr. Diaz learned that Mr. Icenhower filed for bankruptcy, they met at Mr. Diaz's home in San Diego to discuss Mr. Diaz's concerns about the bankruptcy. And at the same meeting, they discussed a reduction in the Villa's price.  Importantly, Mr. Diaz and Mr. Kelley (H&G's sole officer) signed the closing documents in Chula Vista, California, which is within this district's territorial jurisdiction .  Furthermore, it is evident from

---

[7]   The bankruptcy court did not make a factual finding regrading this point. Nevertheless, the record amply supports a finding that this transaction also occurred within the United States.

the record that in causing H&G to transfer the Villa, Mr. Icenhower intended to thwart the efforts of the bankruptcy trustee to recover the property.

Under these circumstances, when the parties reside in San Diego, negotiation largely occurred in the United States, the transfer was executed in the United States, and the transfer had the intended effect of stymying the Villa's recovery for the bankruptcy estate, the presumption does not apply. *See In re Simon*, 153 F.3d at 995.

Appellants again focus on the execution of documents in Mexico. But H&G and the Diaz Family executed the principal purchase agreement in San Diego. Any later actions were in furtherance of, and incidental to, the original purchase agreement, which documented the bargained-for exchange. Appellants also argue that because they are Mexican citizens, the transaction did not occur in the United States. But Appellants resided in San Diego County, and they executed the principal purchase agreement there. Furthermore, even though a Mexican bank was the trustee for the interests in the Villa, Mr. Icenhower or H&G exercised control over those property rights. Even when taken together, the transaction's connections to Mexico are insufficient to invoke the presumption in light of the parties' substantial actions in the United States.

3. <u>The Bankruptcy Code Applies Extraterritorially to Protect Property of the Estate</u>

Even if either transaction at issue did occur within Mexico, the bankruptcy court could recover the property under the holding of *In re Simon*, 153 F.3d at 996. The bankruptcy court may exercise jurisdiction over all property of the bankruptcy estate, even if it is located outside the territorial jurisdiction of the United States. *Id.* The provisions of the Bankruptcy Code, as they relate to property in the bankruptcy estate, apply extraterritorially. *Id.* ("[W]e conclude that congress intended extraterritorial application of the Bankruptcy Code as it applies to the property of the estate.")

In this case, the bankruptcy court ruled that H&G, as Debtors' alter ego, would be consolidated *nunc pro tunc* to the petition date. Consequently, the Villa was part of the bankruptcy estate upon filing the petition. The bankruptcy court therefore properly exercised

15

1    its jurisdiction over the Villa in ordering its recovery and transfer to Appellee.  *See id.*

2        Appellants cite cases holding that Congress did not intend the avoidance statutes to

3    apply extraterritorially.  *Maxwell Commc'n Corp. PLC v. Societe General PLC (In re Maxwell*

4    *Commc'n Corp. PLC)*, 186 B.R. 807 (S.D.N.Y. 1995); *Barclay v. Swiss Fin. Corp. (In re*

5    *Midland Euro Exch., Inc.)*, 347 B.R. 708 (Bankr. C.D. Cal. 2006).  But these cases are

6    distinguishable because the property at issue in those cases was not already a part of the

7    bankruptcy estate.  Here, as a result of the bankruptcy court's judgment, the Villa was a part

8    of the bankruptcy estate from the date Debtors filed their petition.  And under the reasoning

9    of *In re Simon*, the bankruptcy court properly exercised jurisdiction over it.

10

11   **C.  The Forum Selection Clause**

12       Appellants next contend that the bankruptcy court erred in refusing to enforce a forum

13   selection clause contained in the five *escrituras.*[8]  The Court reviews the bankruptcy court's

14   refusal to enforce a forum selection clause for an abuse of discretion.  *Fireman's Fund Ins.*

15   *Co. v. M.V. DSR Atl.*, 131 F.3d 1336, 1338 (9th Cir. 1997).

16       As a preliminary matter, the Court questions whether the purported forum selection

17   clauses even apply to this dispute.  The relevant provision in the *escrituras* states

18       JURISDICTION AND COMPETENCE

19       For everything relative to the *Interpretation* and *compliance* of this agreement,

20       the parties expressly submit to the Laws and Tribunals of the City of

21       Guadalajara, Jalisco or Mexico . . . [T]hey also accept to be considered as

22       Mexicans, in regards to the rights derived from this agreement, and that they

23       will not invoke therefore the protection of their Government, in case of

24       breaching this agreement, they would forfeit in favor of Mexico, the rights

25       acquired.  (Emphasis added.)

26

27

28       [8]  *Escrituras* are the Mexican legal documents that transferred interests in the Villa
     from the Icenhowers to H&G, and from H&G to Appellants.

16                                                    08cv1446 BTM (BLM)

1    The avoidance and recovery actions do not interpret or enforce the *escrituras*. Rather,

2    the actions void a transfer of property under United States bankruptcy law.  But even if the

3    provision applied to these actions, the bankruptcy court did not err in declining to enforce it.

4    Generally, international forum-selection clauses are enforceable absent a strong

5    showing that they should be set aside.  *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1,

6    12–15 (1972).  Forum-selection clauses should not be enforced if litigation in the selected

7    forum would be "seriously inconvenient" or if their enforcement would violate a strong public

8    policy of the forum in which the suit is brought.  *Bremen*, 407 U.S. at 12–18.  Public policy

9    strongly favors centralization of core bankruptcy proceedings.  *N. Parent, Inc. v. Cotter & Co.*

10   *(In re N. Parent, Inc.)*, 221 B.R. 609, 621–22 (Bankr. D. Mass. 1998) (see listed cases

11   holding same); *Official Comm. of Unsecured Creditors v. Transpacific Corp. (In re*

12   *Commodore Int'l, Ltd.)*, 242 B.R. 243, 261 (Bankr. S.D.N.Y. 1999), *aff'd on other grounds*,

13   2000 WL 977681 (S.D.N.Y. July 17, 2000) (see listed cases).   And the Avoidance and

14   Recovery Action are core proceedings.  28 U.S.C. § 157(b)(2)(F), (H).

15   Here, the *Bremen* factors weigh against enforcing the forum selection clause because

16   the avoidance recovery actions are core proceedings.   There is a strong public policy

17   favoring consolidating these core proceedings in the bankruptcy court.  *E.g.*, *In re N. Parent*,

18   221 B.R. at 621–22.  Based on this strong public policy alone, the bankruptcy court did not

19   abuse its discretion in declining to enforce the forum selection clause.  Furthermore, forcing

20   Appellee to litigate its claims in Mexico would likely be extremely difficult because the causes

21   of action are based on United States statutory law.[9]

22   Additionally, the forum selection clauses are not binding on Appellee.  This is because

23   Appellee, standing in the shoes of the trustee as plaintiff in the avoidance and recovery

24   //

25   actions, is not in privity with Debtors or Appellants.  *See Corzin v. Fordu (In re Fordu)*, 201

---

[9]  The Court notes that the bankruptcy court did not make specific findings regarding the difficulty of Appellee pursuing its claims in Mexico.  Even absent these findings, the public policy favoring consolidation of core proceedings is sufficient to support the bankruptcy court's decision.

F.3d 693, 705 (6th Cir. 1999) (trustee not in privity with debtor).  Debtors and Appellants are the only parties to these proceedings who signed the *escrituras*; Appellee was never a party to the *escrituras* and therefore is not bound by the documents' forum selection clauses.

For these reasons, the bankruptcy court did not abuse its discretion in declining to enforce the forum selection clause in the *escrituras*.

**D. International Comity**

Appellants also contend that the bankruptcy court erred in declining to exercise jurisdiction over the Avoidance and Recovery Actions based on international comity.  The Court reviews the bankruptcy court's refusal to abstain based on international comity for an abuse of discretion.[10]  *See Sarei v. Rio Tinto, PLC*, 487 F.3d 1193, 1211 (9th Cir. 2007).

1. <u>Comity Requires a True Conflict Between Domestic and Foreign Law</u>

"Under the international comity doctrine, courts sometimes defer to the laws or interests of a foreign country and decline to exercise jurisdiction that is otherwise properly asserted."  *Id.*  "Comity is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other."  *Dependable Highway Express, Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1067 (9th Cir. 2007) (citation omitted).  In order for the doctrine to apply, there must be a true conflict between domestic and foreign law.  *Sarei*, 487 F.3d at 1211.

Here, the Court is unpersuaded that there is a true conflict between United States and Mexican law.  Appellants argue that Mexican and United States law differ in that Mexican law does not permit courts to affect interests in land through their *in personam* jurisdiction.  They also argue that Mexican courts do not recognize foreign judgments concerning Mexican real property.  Lastly, they argue that Mexican courts have exclusive jurisdiction over interests

---

[10]  It appears that although Appellants moved the bankruptcy court to abstain based on comity, the bankruptcy court never ruled on the motion.  It was never formally withdrawn, but at a pre-trial hearing on January 21, 2008, Appellants did not include it in a list of outstanding motions.  Nevertheless, because it was not explicitly withdrawn, the Court considers Appellants' comity argument.

08cv1446 BTM (BLM)

1  in Mexican land.

2  But the judgment at issue here affected Appellants directly and Mexican land only

3  indirectly.  The bankruptcy court only exercised jurisdiction over Appellants through its *in*

4  *personam* power and did not exercise jurisdiction over the Villa itself.  Thus, the judgment

5  does not require recognition by Mexican courts in order to be effective against Appellants.

6  *Compare Remington Rand Corp. v. Bus. Sys. Inc.*, 830 F.2d 1260, 1273 (3d Cir. 1987)

7  (requiring Dutch court to recognize judgment, which directly attached assets in Holland, as

8  a precondition to enforcing judgment) *with Brady v. Brown*, 51 F.3d 810, 817 (9th Cir. 1995)

9  (approving order requiring defendant to transfer Mexican property to *fideicomiso* trust, even

10  without prior approval of Mexican court).  *See also Perry v. O'Donnell*, 749 F.2d 1346, 1351

11  (9th Cir. 1985) ("It is well settled that although a court may have in personam jurisdiction to

12  order one of the parties to convey to the other party a deed to property in another state, it

13  cannot directly affect or determine title to that real property.") (citing, *inter alia*, *Fall*, 215 U.S.

14  at 11).

15  In addition, the portion of the judgment regarding transferring the Villa to Kismet via

16  a *fideicomiso* trust is now moot.  The bankruptcy court later orally amended the ACJ and

17  directed Appellants to transfer the Villa "to Axolotl or other assignee that Kismet may

18  designate . . . for the purpose of effectuating the transfer directed to be effectuated in the

19  Court's judgment of June 2."  (Appellants' RJN, Ex. 7.)  The bankruptcy court's oral

20  modification is not before the Court on this appeal, and therefore the Court declines to

21  address the legality of its original order requiring Appellants to transfer the Villa to Kismet

22  through a *fideicomiso* trust.  The transfer to Axolotl, however, was still accomplished by the

23  creation of a *fideicomiso* trust.[11]  Accordingly, the Court addresses the whether the ACJ

24  properly compelled Appellants to transfer the Villa to such a trust.

25  *Fideicomiso* trusts are explicitly permitted under Mexican law.  *Brady*, 51 F.3d at 819

26  (referencing *fideicomiso* trusts and stating "[s]uch an arrangement, if it can be accomplished,

27

28  _____
   [11]  During a status conference on May 10, 2010, the parties agreed and represented
   to the Court that the transfer to Axolotl still required the creation of a *fideicomiso* trust.

1   does not violate Mexican law."). These trusts are the means by which foreigners can own

2   interests in restricted coastal land, and their creation must be approved by the Mexican

3   government. *Brady*, 51 F.3d at 817. In *Brady v. Brown*, the Ninth Circuit approved a district

4   court's order requiring the defendant to effect the transfer of Mexican property to a

5   *fideicomiso* for the benefit of plaintiffs. *Id.* at 819. The district court retained jurisdiction to

6   consider alternative remedies if the transfer could not be completed. *Id.* For these reasons,

7   the Ninth Circuit found that the district court's order did not violate Mexican law and,

8   therefore, comity abstention did not apply. *Id.*

9        Here, the substance of the bankruptcy court's order was very similar. The bankruptcy

10  court ordered Appellants to "take all actions necessary to execute and deliver any and all

11  documents needed to undo the avoided transfer, and to take all actions necessary to cause

12  the property to be reconveyed to a *fideicomiso* trust naming Plaintiff as the sole beneficiary

13  for the benefit of the bankruptcy estate." The bankruptcy court did not require the Mexican

14  government to approve the transaction, but only required Appellants to make every effort to

15  effect the transfer and creation of the trust. And, like in *Brady v. Brown*, the district court

16  effectively reserved jurisdiction to enter a monetary award if Appellee so chose or, by

17  implication, if Appellants were somehow unable to effect the transfer.

18       The Court agrees with Appellee that the distinction between whether interests in a

19  *fideicomiso* trust are *in rem* or *in personam* rights is largely academic in this context. The

20  important facts are that the bankruptcy court did not order Appellants to do anything illegal,

21  *Brady*, 51 F.3d at 81, and it effectively retained jurisdiction to consider alternative remedies.

22  The ruling in *Brady* virtually forecloses Appellants' argument here and there is no true conflict

23  of law for purposes of comity abstention. *Id.*; *cf. Hartford Fire Ins. Co. v. California*, 509 U.S.

24  764, 799 (1993) (no true conflict where entity subject to regulation in two countries may

25  comply with both sets of regulations).

26  //

27  //

28  //

20

08cv1446 BTM (BLM)

1    2.  <u>The Seven-Factor Comity Abstention Test</u>

2           But even if there was a true conflict, abstention would be inappropriate.  Courts should

3    consider seven factors when deciding whether to abstain.  First, the court should consider

4    the degree of conflict with foreign law or policy.  *Timberlane Lumber Co. v. Bank of America*,

5    749 F.2d 1378, 1384 (9th Cir.), *overruled on other grounds by Hartford Fire Ins. Co. v.*

6    *California*, 509 U.S. 764, 799 (1993).  As explained above, the degree of conflict, if any, is

7    low.

8           Second, the court should consider the nationality or allegiance of the parties and the

9    location of a corporation's principal places of business.  *Id.*  Here, the parties to the

10   Avoidance and Recovery Actions were (1) Appellants, citizens of Mexico, but residents and

11   owners of several businesses in San Diego; (2) Appellee, a United States corporation owned

12   by a German citizen who resides in Mexico; (3) trustee, a United States citizen; and (4)

13   Debtors, who are United States citizens and residents of San Diego.  The Court finds that

14   this factor weighs against abstention, given that each party has substantial ties to the United

15   States.

16          Third, the court should consider the extent to which enforcement by either state can

17   be expected to achieve compliance.  *Id.*  This factor also weighs against abstention, given

18   that the bankruptcy court's judgment was permissible under Mexican law.  *See Brady*, 51

19   F.3d at 819.

20          Fourth, the court should consider the relative significance of effects on the United

21   States as compared with those elsewhere.  *Timberlane*, 749 F.2d at 1384.  The Fourth

22   Circuit addressed this issue in a similar case involving Bahamian real property and held that

23   the United States's "strong interest" in efficiently administrating bankruptcy estates,

24   preventing the estates' depletion, and protecting creditor rights outweighed Bahamas'

25   interest.  *French v. Liebmann (In re French)*, 440 F.3d 145, 153–54 (4th Cir. 2006).  Mexico's

26   interest here, however, is stronger than the interest in *French* because Appellants are

27   Mexican citizens and the Villa is in Mexico.  This factor is therefore neutral.

28          Fifth, the court should consider the extent to which there is explicit purpose to harm

or affect American commerce.  *Timberlane*, 749 F.2d at 1385.  The bankruptcy court found that Debtors set up H&G as a sham corporation to hide their assets.  They therefore intended to harm their creditors and affected American commerce.  Appellants knew, or should have known, of Debtors' bankruptcy and the effect that their purchase of the Villa would have on Debtors' creditors.

Sixth, the court should consider the foreseeability of such effect.  *Id.*  The effects of transferring assets out of the bankruptcy estate was foreseeable and obvious to Debtors and Appellants.

And seventh, the court should consider the location of the alleged conduct in order to assess the appropriateness of the exercise of extraterritorial jurisdiction.  *Id.*  As set forth *supra*, much of the conduct at issue, including the negotiation and consummation of the various transfers, occurred in the United States.  Although the parties executed additional documents in Mexico, they were only in furtherance of the principal agreements signed in the United States.  This factor weighs against abstention.

In sum, all the relevant factors weigh against abstention.  Accordingly, the bankruptcy court did not abuse its discretion in declining to abstain based on international comity.

3.  <u>Requirement That Bankruptcy Court Obtain Recognition of Judgment by Mexico</u>

Lastly, Appellants argue that under the doctrine of comity, the bankruptcy court was required to determine whether its judgment could be enforced under Mexican law and to retain jurisdiction to consider alternative remedies if enforcement under Mexican law was not possible.  Although Appellants cite examples of courts making similar orders, they cite no binding authority requiring such orders.  Nevertheless, even if the bankruptcy court was required to "retain[] jurisdiction to consider alternative remedies if the trust could not be established under Mexican law," *Brady*, 51 F.3d at 819, the bankruptcy court here satisfied that requirement.  In the ACJ, the court stated that it "reserves jurisdiction to issue any and all orders necessary to carry out and enforce this judgment."  This reservation of jurisdiction satisfied the requirement—if indeed such a requirement exists—that the court retain the

1  ability to issue further orders should the judgment be unenforceable in its original form.[12]

2

3  **E.  Mexico As a Required Party Under Rule 19**

4       Appellants next claim that Mexico is a necessary party under Federal Rule of Civil

5  Procedure 19, and that because it cannot be joined, the ACJ should be vacated and the

6  avoidance actions dismissed.  In order for Appellants to succeed on their claim, they must

7  establish under Rule 19 that (1) Mexico is a required party and (2) the action cannot proceed,

8  in equity and good conscience, without it.  *Cachil Dehe Band of Wintun Indians of the Colusa*

9  *Indian Cmty. v. State of California*, 547 F.3d 962, 969 (9th Cir. 2008).

10      Appellants must first establish that Mexico is a required party.  A party might be

11 required under Rule 19 for two alternative reasons: (A) in that party's absence, the court

12 cannot accord complete relief among existing parties; or (B) the party has a legally protected

13 interest in the proceedings.  Fed. R. Civ. P. 19(a)(1); *Cachil*, 547 F.3d at 970.

14      Here, complete relief is possible between the parties.  The avoidance and recovery

15 actions related to transfers and rights in the Villa between Debtors, Appellants, and Appellee.

16 Furthermore, Mexico does not have a legally protected interest in the litigation.  The interest

17 must be more than one of convenience.  *N. Alaska Environmental Ctr. v. Hodel*, 803 F.2d

18 466, 468 (9th Cir. 1986).  Mexico has a generalized interest in compliance with its laws, but

19 the ACJ did not violate Article 27 of Mexico's Constitution, which merely requires that foreign

20 nationals not acquire direct ownership of coastal lands.  Here, the bankruptcy court did not

21 order direct ownership, but only ordered Appellants to take all necessary action to transfer

22 the Villa into a government-sanctioned *fideicomiso* trust.

23      Furthermore, as Appellants state in their brief, "Mexico was neither involved in the

24 allegedly avoidable transaction nor holds the property . . . ."  (Appellants' Br. 20.)  These

25 interests are not strong enough to be legally protected.  Indeed, from a practical perspective

26 it is difficult to imagine how Mexico would assert any rights at all if it were joined in the

27 

28      [12]  This is precisely what the bankruptcy court did in ultimately requiring Appellants to transfer the Villa through a *fideicomiso* trust to Axototl, Kismet's assignee.

1   adversary proceedings.  It has no claim of ownership over the Villa.

2

3   **F. Appellants' Good Faith Defense Is Governed By United States Law**

4       Appellants' argue that the bankruptcy court erred in applying United States law,

5   instead of Mexican law, to Appellants' good faith defenses under 11 U.S.C. §§ 549(c),

6   550(b)(1).[13]  Appellants argue that under Mexican law their due diligence was sufficient and

7   would have provided a defense to the avoidance and recovery actions.

8       Appellants cite primarily *In re Tippett* to support their argument.  542 F.3d 684, 686

9   (9th Cir. 2008).  Appellants argue that *Tippett* stands for the proposition that the "Bankruptcy

10  Code does not preempt the *law of the situs of a property* as it applies to a transfer of title to

11  such property." (Appellants' Br. 38) (emphasis added.)   Therefore, they argue, the

12  Bankruptcy Code does not preempt Mexican law regarding what constitutes a good faith

13  purchaser. But this is an imprecise statement of *Tippet's* holding.  *Tippett* does not require

14  application of the law of the situs of the property in every instance.  In that case, there was

15  no dispute about whether California law applied to the transaction at issue.  *See id.* at

16  689–90.  It merely held that in a case where California fraudulent-transfer law *does* apply,

17  it is not preempted by the Bankruptcy Code.  *See id.* at 690.

18      Here, there are several reasons why Mexican law does not apply to the transactions

19  at issue, even though the situs of the property was Mexico.  The most important reason is

20  that the two sales of the Villa occurred in the United States.  *See supra* § B.   The

21  negotiations took place in the United States.  And the parties to the sales resided in the

22  United States.  Under these circumstances, it was not error for the bankruptcy court to apply

23  United States law to Appellants' good-faith-purchaser defense.

24  _____

25      [13] Appellants state that all the parties, including the bankruptcy court, agreed that the
    transfer to Appellants was governed by Mexican law.  This is incorrect. First, the Appellee's
26  expert only agreed that the transfer of the *fideicomiso* rights was governed by Mexican law.
    This is axiomatic, since *fideicomiso* rights are a creation of Mexican law.  The bankruptcy
27  court later reiterated Appellee's expert's statement and did not state its own opinion. (ER
    1238.)   Moreover, neither Appellee's expert nor the bankruptcy court agreed that the
28  purchase agreement executed in San Diego between H&G and Appellants was governed by
    Mexican law.

1   Appellants do not contest that under United States law Appellants were not good-faith

2   purchasers.

3

4   1.  Good Faith Under Mexican Law

5   Even under Mexican law Appellants are not good-faith purchasers.  The Court does

6   not analyze whether Appellants were good-faith purchasers in a vacuum, and looks to the

7   findings of the bankruptcy court.  Although the Court reviews de novo the bankruptcy court's

8   interpretation of foreign law, *Brady*, 51 F.3d at 816, the Court reviews for clear error the

9   determination that Appellants were not good-faith purchasers under Mexican law,[14] *see*

10  *United States v. McConney*, 728. F.2d 1195, 1203 (9th Cir. 1993) (mixed questions of law

11  and fact which are essentially factual reviewed for clear error); *Hollywood Nat'l Bank v. Int'l*

12  *Bus. Machines Corp.*, 38 Cal. App. 3d 607, 614 (1974) (analyzing facts to determine whether

13  purchaser was bona fide).

14  Appellants cite to the testimony of their Mexican-law expert, Professor Jorge Vargas,

15  to support their contention that Appellants' diligence was adequate under Mexican law.

16  Based on Professor Vargas's testimony, Appellants argue that under Mexican law Appellants

17  were only required to obtain a certificate of no liens from the Mexican Public Registry of

18  Property.

19  The bankruptcy court, however, rejected the opinions of Appellants' Mexican-law

20  expert as contradictory.  For example, Professor Vargas testified that rights in *fideicomiso*

21  trusts are *in rem* rights under Mexican law because of the Calvo clause in the Mexican

22  Constitution.[15]  But on cross examination, he admitted that in 2006 he wrote in an article that

23  the Calvo clause was a legal relic.  More importantly, Professor Vargas admitted on cross

24  examination that the due diligence requirements are heightened in a cross-border transaction

25

26  [14] The Court notes that even if it were to review the bankruptcy court's findings *de novo*, it would reach the same result.

27  [15] The Calvo clause is a doctrine of Mexican law which holds that judgments rendered

28  by foreign courts purporting to affect real property in Mexico are unenforceable as against the public interest of Mexico, and contrary to the exclusive sovereignty of Mexico over its realty.

with a United States corporation.   He admitted, among other things, that (1) some investigation into the nature of the business and the reputation of the corporation should be conducted to avoid involvement in money laundering by drug or arms dealers; (2) some contact with the corporation by telephone should be attempted; (3) some information about the capitalization of the corporation should be obtained; and (4) generally, that getting into the "intricacies" of the corporation was a necessary part of the due diligence in a cross-border transaction.   (ER 892–904.)   He further opined that the Mexican counsel or an associate United States counsel should conduct this heightened diligence, and that failure to do so might be negligence in performing due diligence.   (ER 899.)

The bankruptcy court found Appellee's expert to be more credible and consistent. Appellee's Mexican-law expert testified that Appellants exercised insufficient due diligence under Mexican law, and the bankruptcy court adopted the expert's findings.

According to Appellee's Mexican-law expert, there were several red flags that should have prompted further inquiry by Appellants.   These include (1) the purchase agreement between H&G and Appellants conveyed vehicles on the Villa property, but the agreement did not provide a warranty that the vehicles were legally within Mexico; (2) there was a significant disparity between the actual purchase price ($1,500,000 USD) and the stated price ($678,071 USD); (3) payment of consideration to entities other than H&G required additional diligence to avoid Mexican money-laundering laws; and (4) the previous purchase agreement between Mr. Icenhower and H&G, which gave Mr. Icenhower total control over management and sale of the Villa, should have raised questions about the relationship between Mr. Icenhower and H&G.

Furthermore, because of irregularities in the transfers between previous holders of the *fideicomiso* trust interests, the expert testified that at a minimum Appellants should have contacted the prior owners (e.g., the Lonie Trust, its beneficiaries, or their counsel).   Had Appellants done so, they would likely have learned that the Lonie Trust had obtained a judgment against the Icenhowers and that the Villa might not have free title.

The Court affirms the bankruptcy court's findings and conclusions regarding the due

diligence requirements under Mexican law.  The Court further holds that, for the reasons stated above, the bankruptcy court correctly held that Appellants exercised insufficient due diligence in their cross-border transaction with H&G and Debtors and did not act in good faith.

2.  Appellants' Knowledge of Debtors' Bankruptcy Precludes the Good-Faith Defense

As an alternative, even if Mexican law applies and Appellants were good-faith purchasers under Mexican law, the Court holds that Appellants' knowledge of Debtors' bankruptcy precludes the good-faith defenses under § 549(c) and § 550(b)(1).  Section 549(c) states that a transfer is not avoidable if made by a "good faith purchaser without knowledge of the commencement of the case . . . ."  11 U.S.C. § 549(c).  Section 550(b)(1) similarly states that a transfer is not voidable if made by a transferee that takes "in good faith, and without knowledge of the voidability of the transfer avoided . . . ."  11 U.S.C. § 550(b)(1).  "Knowledge of the voidability" does not require actual knowledge; knowledge of facts to induce a reasonable person to investigate is enough.  *In re Richmond Produce Co., Inc.*, 195 B.R. 455, 464 (N.D. Cal. 1996) (citing *Bonded Fin. Servs., Inc. v. European Amer. Bank*, 838 F.2d 890, 897–98 (7th Cir. 1988).  Appellants do not dispute that they had knowledge of the commencement of the bankruptcy, so they cannot be good-faith purchasers under § 549(c).  Only § 550(b)(1) is at issue.

Appellants argue that because H&G held title to the Villa when Appellants purchased it, knowledge of Debtors' bankruptcy did not give it notice that the transfer might be avoidable.  This argument is unconvincing.

First, Appellants admit knowledge of the bankruptcy case, which would put a reasonable person on notice about the potential voidability of the transfer.  *See In re Richmond Produce*, 195 B.R. at 464.  Second, there were several facts found by the bankruptcy court that put Appellants on notice of the connection between H&G and Debtors, including (1) Mr. Icenhower exercised control over the management and sale of the Villa; (2) Mr. Icenhower was able to reduce the purchase price of the Villa by $100,000 to satisfy a

debt owed personally by Mr. Icenhower; (3) at the closing, Mr. Icenhower exercised control over and directed the H&G's purported officer; (4) Appellants paid part of the consideration for the Villa to Icenhower Investments; (5) Icenhower told Appellants that the trustee was challenging the Villa's transfer from Debtors to H&G; and (6) Appellants knew the trustee was trying to tie Debtors to H&G.

Under these circumstances, Appellants knew or should have known of the connection between Debtors and H&G under § 549(c).  And they knew or should have known of the voidability of the transfer under § 550(b)(1).  *See Hayes v. Palm Seedlings Partners (In re Agric. Research & Tech. Group, Inc.*, 916 F.2d 528, 535–36 (9th Cir. 1990) (applying objective standard of good faith).

For these reasons, the Court affirms the bankruptcy court's ruling that Appellants did not purchase the Villa in good faith under either United States or Mexican law.

## G.  The Case Against Ms. Barba Diaz

Finally, Appellants argue that the bankruptcy court erred in finding Ms. Barba Diaz liable in the avoidance actions.  They contend that Ms. Barba Diaz had a good-faith defense against the avoidance and recovery actions because she had no knowledge of Mr. Icenhower, H&G, or the bankruptcy.  The bankruptcy court's finding that Ms. Barba Diaz lacked good faith is reviewed for clear error.[16]  *See United States v. McConney*, 728. F.2d 1195, 1203 (9th Cir. 1993) (mixed questions of law and fact which are essentially factual reviewed for clear error).

The burden was on Appellants to prove that Ms. Barba Diaz was a good-faith transferee.[17]  *Kendall v. Sorani (In re Richmond Produce Co.)*, 195 B.R. 455, 464 (N.D. Cal.

---

[16]  The Court notes that even if it were to review the bankruptcy court's findings *de novo*, it would reach the same result.

[17]  Appellants are correct that the original purchase agreement was between H&G and Mr. Diaz only—not Ms. Barba Diaz.  But Ms. Barba Diaz wired $675,000 of the purchase money directly to an entity controlled by Mr. Icenhower, and her testimony reveals that she believed she was purchasing the Villa.  More importantly, she later took ownership of the Villa by deed.  Thus, she would still have to prove she was a good faith transferee under 11 U.S.C. § 550(b)(1) or (b)(2).

1    1996).  The record supports the bankruptcy court's conclusion that Ms. Barba Diaz failed to

2    carry her burden for several reasons.

3          First, the bankruptcy court found that Ms. Barba Diaz and Mr. Diaz hired Eduardo

4    Sanchez, a Mexican lawyer, to conduct due diligence and execute the purchase of the Villa.

5    Mr. Sanchez acted as Ms. Barba Diaz's agent during the transaction.  She testified at length

6    about how she trusted him to handle the transaction for her.  Thus, every fact known to Mr.

7    Sanchez can be imputed to Ms. Barba Diaz.  *See, e.g., Garcia v. INS*, 222 F.3d 1208, 1209

8    (9th Cir. 2000) ("[E]ach party is deemed bound by the acts of his lawyer-agent and is

9    considered to have 'notice of all facts, notice of which can be charged upon the attorney.'")

10         Second, Mr. Sanchez knew of the facts underlying the bankruptcy court's finding that

11   the Appellants lacked good faith.  Mr. Sanchez knew of Debtors' bankruptcy.  He knew of the

12   irregularities in H&G's documentation.  He knew there was no shareholder authorization

13   permitting H&G to sell the Villa.  He was aware that Mr. Icenhower requested Appellants pay

14   most of the consideration to third parties other than H&G, including to Icenhower

15   Investments.  The bankruptcy court lists several other red flags in its FFCL.  Ms. Barba Diaz

16   was on notice of all of these facts.  *Garcia*, 222 F.3d at 1209.

17         Third, even without imputation of facts from her lawyer Ms. Barba Diaz had knowledge

18   of the red flags.  Instead of wiring money to H&G, which purportedly owned the Villa, she

19   wired $675,000 to an entity associated with Mr. Icenhower.  More importantly, her son told

20   her that Mr. Icenhower was in bankruptcy.  (ER 1262.)

21         Under these circumstances, the bankruptcy court did not clearly err in finding that Ms.

22   Barba Diaz was not a good-faith transferee.

23   //

24   //

25   //

26   //

27   //

28   //

29

## IV.  CONCLUSION

For the foregoing reasons, the Court **AFFIRMS** the judgment of the bankruptcy court. The clerk shall enter judgment affirming the order and judgment of the bankruptcy court appealed herein.

**IT IS SO ORDERED.**

DATED:  May 20, 2010

Honorable Barry Ted Moskowitz
United States District Judge

30

08cv1446 BTM (BLM)